# 15-1164-cv

## United States Court of Appeals
*for the*
## Second Circuit

FLO & EDDIE, INC., a California Corporation,
individually and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

– v. –

SIRIUS XM RADIO, INC., a Delaware Corporation,

*Defendant-Appellant,*

DOES, 1 THROUGH 10,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX
FOR DEFENDANT-APPELLANT SIRIUS XM RADIO INC.**

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

DANIEL M. PETROCELLI
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
(310) 553-6700

*Attorneys for Defendant-Appellant Sirius XM Radio Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel states as follows:

1. Sirius XM Radio Inc. is a wholly owned subsidiary of Sirius XM Holdings Inc., a publicly held corporation.

2. Liberty Media Corporation possesses an ownership interest of 10 percent or more in Sirius XM Holdings Inc.

Dated: July 29, 2015

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli

Daniel M. Petrocelli
Cassandra L. Seto
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700

Jonathan D. Hacker
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

*Attorneys for Defendant-Appellant Sirius XM Radio Inc.*

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ....... 1

STATEMENT OF JURISDICTION....... 5

STATEMENT OF ISSUES PRESENTED....... 5

STATEMENT OF FACTS ....... 6

STANDARD OF REVIEW ....... 8

SUMMARY OF ARGUMENT ....... 8

ARGUMENT ....... 10

I. THE DISTRICT COURT ERRED IN HOLDING THAT NEW YORK COMMON LAW GIVES THE OWNER OF A PRE-1972 RECORDING A PUBLIC PERFORMANCE RIGHT ....... 10

A. Under New York Common Law, A Recording Owner's Rights In Pre-1972 Recordings Have Never Included The Right To Control All Public Performances Of The Recordings ....... 10

B. Creation Of A New Right To Control Public Performances Would Be A Legislative Act....... 20

C. Internal Reproductions Made to Facilitate Sirius XM's Performances of Pre-1972 Recordings Are Fair Use ....... 33

II. ENFORCING A COMMON LAW PERFORMANCE RIGHT AGAINST INTERSTATE BROADCASTERS LIKE SIRIUS XM WOULD VIOLATE THE COMMERCE CLAUSE....... 36

A. New York Common Law Is Subject To Commerce Clause Scrutiny ....... 37

B. Applying A New York Performance Right To Sirius XM's National Broadcasts Would Violate The Commerce Clause ....... 41

1. *As Applied To Sirius XM, A New York Performance Right Violates The Commerce Clause* Per Se ....... 41

# TABLE OF CONTENTS
# (continued)

**Page**

2. *As Applied To Sirius XM, A New York Performance Right Also Violates The Supreme Court's Balancing Test* ....................45

CONCLUSION ....................49

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) ....................39, 42, 43

*Am. Civ. Liberties Union v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ....................47

*Am. Libraries Ass'n v. Pataki*,
969 F. Supp. 160 (S.D.N.Y. 1997) ....................47

*Atl. Coast Line R.R. Co. v. Mazursky*,
216 U.S. 122 (1910)....................38

*Authors Guild Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ....................36

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996)....................4, 10, 38

*Bonneville Int'l Corp. v. Peters*,
347 F.3d 485 (3d Cir. 2003) ....................26

*Brandon Films, Inc. v. Arjay Enters., Inc.*,
230 N.Y.S.2d 56 (Sup. Ct. 1962)....................32

*Campaign for Fiscal Equity, Inc. v. New York*,
8 N.Y.3d 14 (2006) ....................20

*Capitol Records, Inc. v. Mercury Records Corp.*,
221 F.2d 657 (2d Cir. 1955) ....................13, 15

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
4 N.Y.3d 540 (2005) ....................13, 15, 17

*Capitol Records, LLC v. Escape Media Grp., Inc.*,
Case No. 12-CV-6646 (S.D.N.Y.)....................17, 18

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Capitol Records, LLC v. Harrison Greenwich, LLC*,
Case No. 65224/2012 (N.Y. Sup. Ct.) ....................16, 17

*Cartoon Network LP, LLP v. CSC Holdings, Inc*.,
536 F.3d 121 (2d Cir. 2008) ....................34

*Chamberlain v. Feldman*,
300 N.Y. 135 (1949) ....................3, 9, 20

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) ....................38

*City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*,
877 F.2d 1146 (2d Cir. 1989) ....................29

*Coates v. Mayor of New York*,
7 Cow. 585 (N.Y. Sup. Ct. 1827) ....................18

*D.C. v. Beretta, U.S.A., Corp.*,
872 A.2d 633 (D.C. 2005) ....................40, 46

*Di Santo v. Commonwealth of Pennsylvania*,
273 U.S. 34 (1927) ....................40

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
Case No. 2:13-cv-05693 (C.D. Cal.) ....................6

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
2015 WL 3852692 (S.D. Fla. June 22, 2015) .................... *passim*

*Flood v. Kuhn*,
407 U.S. 258 (1972) ....................42

*French v. Maguire*,
1878 WL 11310 (N.Y. Sup. Ct. 1878) ....................32

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
716 F.3d 302 (2d Cir. 2013) ....................8

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*,
742 F.3d 414 (9th Cir. 2014) ....................................................................44

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)..............................................................................35

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989)......................................................................... *passim*

*Ileto v. Glock Inc.*,
349 F.3d 1191 (9th Cir. 2003) ..................................................................38

*In re N.Y. State Inspection v. Cuomo*,
64 N.Y.2d 233 (1984) .....................................................................20, 21

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*,
729 F.3d 99 (2d Cir. 2013) ......................................................................8

*McCauley v. First Unum Life Ins. Co.*,
551 F.3d 126 (2d Cir. 2008) ...................................................................48

*Metro. Opera Ass'n v Wagner-Nichols Recorder Corp.*,
199 Misc. 786 (N.Y. Sup. Ct. 1950)........................................................14

*Nat'l Fed'n of the Blind v. Target Corp.*,
452 F. Supp. 2d 946 (N.D. Cal. 2006)....................................................44

*NCAA v. Miller*,
10 F.3d 633 (9th Cir. 1993) .............................................................41, 42, 44

*New Eng. Power Co. v. New Hampshire*,
455 U.S. 331 (1982)..............................................................................37

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
92 N.Y.2d 458 (1998) .....................................................................9, 20, 31

*NXIVM Corp. v. Ross Inst.*,
364 F.3d 471 (2d Cir. 2004) ...................................................................35

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Palmer v. De Witt*,
47 N.Y. 532 (1872) ....................................................................31, 32

*Parker v. Brown*,
317 U.S. 341 (1943)....................................................................45

*Partee v. San Diego Chargers Football Co.*,
34 Cal. 3d 378 (1983) ....................................................................47

*Patterson v. Century Prods.*,
93 F.2d 489 (2d Cir. 1937) ....................................................................32

*Pike v. Bruce Church Inc.*,
397 U.S. 137 (1970)....................................................................45, 46, 47

*RCA Mfg. Co. v. Whiteman*,
114 F.2d 86 (2d Cir. 1940) .................................................................... *passim*

*Roy Export Co. v. Columbia Broad. Sys., Inc.*,
672 F.2d 1095 (2d Cir. 1981) ....................................................................32

*S. Pac. Co. v. State of Arizona ex rel. Sullivan*,
325 U.S. 761 (1945)....................................................................39

*S.-Central Timber Dev., Inc. v. Wunnicke*,
467 U.S. 82 (1984)....................................................................37

*Sherlock v. Alling*,
93 U.S. 99 (1876)....................................................................38, 39

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)....................................................................21, 31

*Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*,
256 F. Supp. 2d 28 (D. Mass. 2002)....................................................................41

*Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am.*,
419 F.3d 181 (2d Cir. 2005) ....................................................................48

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Victory v. Baker*,
67 N.Y. 366 (1876) .......... 18

*Waring v. WDAS Broad. Station, Inc.*,
327 Pa. 433 (1937) .......... 11

*West v. Broderick & Bascom Rope Co.*,
197 N.W.2d 202 (Iowa 1972) .......... 40

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992) .......... 37

**STATUTES & REGULATIONS**

17 U.S.C. § 102 .......... 6

17 U.S.C. § 106 .......... 24

17 U.S.C. § 107 .......... 35

17 U.S.C. § 114 .......... 24

17 U.S.C. § 301 .......... *passim*

28 U.S.C. § 1292 .......... 5

28 U.S.C. § 1332 .......... 5

CAL. CIV. CODE § 980 .......... 6

N.C. GEN. STAT. § 66-28 (2015) .......... 44

N.Y. PENAL LAW § 275 (Consol. 2015) .......... 36

S.C. CODE ANN. § 39-3-510 (2015) .......... 44

23 FCC Rcd 12348 (2008) .......... 44

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

47 C.F.R. § 25.144 .....43

**LEGISLATIVE HISTORY**

1971 Sound Recording Act,
Pub. L. No. 92-140, 85 Stat. 391 (1971) .....24

Act of Aug. 24, 1912, ch. 356, 37 Stat. 488 (1912) .....32

Copyright Act of Aug. 18, 1856, ch. 169, 11 Stat. 138 (1856). .....31

120 CONG. REC. 30,405 (1974) .....26

141 CONG. REC. S945-02 (Daily ed. Jan. 13, 1995) .....27

*Copyright Law Revision: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary, Part 3*, 89th Cong. (Comm. Print 1965) .....25

*Copyright Law Revision: Hearings Before the Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary, Part 2*, 90th Cong. (1967) .....25

*Digital Performance Right in Sound Recordings Act of 1995: Hearings Before the Subcomm. on Courts & Intell. Prop. of the H. Comm. on the Judiciary*, 104th Cong. (1995) .....26

H.R. REP. NO. 104-274 (1995) .....27, 28

H.R. REP. NO. 60-2222 (1909) .....22

*Performance Rights in Sound Recordings: Subcomm. on Courts, Civ. Liberties, & the Admin. of Justice of the H. Comm. on the Judiciary*, 95th Cong. (Comm. Print 1978) .....22, 23

*Revision of Copyright Laws: Hearings Before the H. Comm. on Patents*, 74th Cong. (Comm. Print 1936) .....25

S. REP. NO. 104-128 (1995) .....27, 28

# TABLE OF AUTHORITIES (continued)

Page(s)

SUPP. REGISTER'S REP. ON THE GENERAL REV. OF U.S. COPYRIGHT LAW (Comm. Print 1965) ....................23

## OTHER AUTHORITIES

2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT (rev. ed. 2015) ....................31

Barry Cushman, *Formalism and Realism in Commerce Clause Jurisprudence*, 67 U. CHI. L. REV. 1089 (2000) ....................40

Douglas Baird, *Common Law Intellectual Property & the Legacy of Int'l News Serv. v. Assoc. Press*, 50 U. CHI. L. REV. 411 (1983) ....................12

Gary Pulsinelli, *Happy Together? The Uneasy Coexistence of Federal and State Protection for Sound Recordings*, 82 TENN. L.R. 167 (2014) ....................29

Jessica Litman, *The Invention of Common Law Play Right*, 25 BERKELEY TECH. L.J. 1381 (2010) ....................32

Joseph Singer, PROPERTY § 1.1.2 (4th ed. 2014) ....................18

Julie Ross, *[Un]happy Together: Why the Supremacy Clause Preempts State Law Digital Performance Rights in Radio-Like Streaming of Pre-1972 Sound Recordings*, J. COPYRIGHT SOC'Y U.S.A. (forthcoming 2015) ....................26, 29

June Besek & Eva Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, 37 COLUM. J.L. & ARTS 327 (2014) ....................12

Lauren Kilgore, *Guerrilla Radio, Has the Time Come for a Full Performance Right in Sound Recordings?*, 12 VAND. J. ENT. & TECH. L. 549 (2010) ....................12, 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Norman Williams, *The Commerce Clause and the Myth of Dual Federalism*, 54 UCLA L. REV. 1847 (2007)....................39, 40

Ralph Brown, Symposium, *The Semiconductor Chip Protection Act of 1984 and its Lessons: Eligibility for Copyright Protection: A Search for Principled Standards*, 70 MINN. L. REV. 579 (1986)....................12

Richard Posell, *'60s on 6' May Be in Sirius Trouble*, DAILY JOURNAL (Apr. 29, 2015)....................12

Richard Posner, ECONOMIC ANALYSIS OF LAW (7th ed. 2007)....................18

Robert Gorman, *An Overview of the Copyright Act of 1976*, 126 U. PENN. L.R. 856 (1978)....................14

Steven Seidenberg, *Pay to Play: State Copyright Law Now Gives Musicians Performance Rights*, A.B.A.J. (Apr. 2015)....................12

Steven Seidenberg, *US Perspectives: Courts Recognise New Performers' Rights*, INTELL. PROP. WATCH (Nov. 24, 2014)....................12

Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings & State Copyright Law*, TECHNOLOGY & MARKETING BLOG (Oct. 1, 2014)....................11

U.S. COPYRIGHT OFFICE, COPYRIGHT & THE MUSIC MARKETPLACE (2015)....................29

U.S. COPYRIGHT OFFICE, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS (2011)....................12

## PRELIMINARY STATEMENT

Plaintiff Flo & Eddie, Inc. is a corporation that claims to own recordings of songs by a musical group known as The Turtles. Defendant Sirius XM is a satellite radio broadcaster that—like AM/FM radio broadcasters, club DJs, sports arenas, and others for many decades—has publicly performed tens of thousands of recordings, including recordings that plaintiff claims to own. Sirius XM, like others who perform music for the public, has always paid royalties to the owners of *musical compositions*, because the federal Copyright Act grants composers the right to receive compensation for public performances of their songs. But Sirius XM, like others, has never paid royalties to the purported owners of *sound recordings* fixed prior to February 15, 1972 ("pre-1972 recordings"), because no law—federal or state—gives those owners the right to control or demand payment for public performances of their recordings. Since the dawn of the recording industry, pre-1972 recordings have been freely and widely performed without restriction.

Until now. The district court's decision in this case is the first in history to hold that under New York common law, the rights in a pre-1972 recording include an unfettered, unconditional right to control all public performances of that recording—*i.e.*, when and where it is played, by whom, and for how much. In the stroke of a pen, the court's ruling converted thousands of broadcasters, DJs, and

other entities—everyone who plays in public any record made before 1972—into serial infringers, miring the broadcasting industry in chaos and uncertainty.

The court's ruling is incorrect in two basic respects. *First*, and most important, New York common law has never recognized the right created by the court. Before now, the only case to address the existence of a "public performance right" under New York common law, *RCA Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), held that no such right exists. Since *Whiteman*, courts in New York and elsewhere have held that members of the public cannot *copy* and distribute pre-1972 recordings without permission—*i.e.*, "bootleg"—but no court has held that members of the public are prohibited from *playing* pre-1972 recordings whenever and wherever they like.

The complete absence of authority restricting the public performance of pre-1972 recordings is consistent with the federal Copyright Act, which governs rights in *post*-1972 recordings (Congress left rights in pre-1972 recordings to state law). For nearly a century, Congress expressly declined to grant owners of pre- *and* post-1972 recordings any right to control or restrict performances of those recordings, which could harm composers (by reducing performances of their songs and thus their royalties), broadcasters (by increasing costs), and the public (by decreasing access to music). In 1995, Congress enacted the Digital Performance Right in Sound Recordings Act ("DPRA"), which established a *limited* digital performance

right restricted to *post*-1972 recordings. In marked contrast to the district court decision here, which announces a categorical, unlimited right to control all performances of pre-1972 recordings, the DPRA includes key exemptions—such as a carve-out for AM/FM radio—as well as a compulsory licensing scheme to balance the interests of recording owners on the one hand, with the many countervailing interests on the other, including the interests of music composers in having their works widely heard and appreciated, the interests of broadcasters and others in performing post-1972 recordings with minimal restrictions, and the interests of the public in enjoying music in both public and private venues. The district court's ruling thus creates a far broader performance right for pre-1972 recordings than that legislated by Congress for post-1972 recordings—with *none* of the nuanced policy limitations that were built into the DPRA.

New York law is clear that where creating a new right would dramatically alter the common law and profoundly affect the interests of many competing stakeholders, the creation of that right should be a matter of legislative judgment and discretion, not judicial will. *See, e.g.*, *Chamberlain v. Feldman*, 300 N.Y. 135, 139-40 (1949). That rule applies with full force here. The district court itself recognized that its "unprecedented" ruling would "upset … settled expectations," have "significant economic consequences" that could "upend the analog and digital industries," and create huge "administrative difficulties in the imposition and

collection of royalties," which would ultimately increase consumer costs, shut down many broadcasters, and decrease access to pre-1972 recordings. SPA24, 39-40. Those observations confirm that these issues are legislative matters, as a Florida district court recently recognized in rejecting the same claim filed by Flo & Eddie under Florida law. *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 2015 WL 3852692, at *5 (S.D. Fla. June 22, 2015). The role of a federal court sitting in diversity, the court observed, is to *interpret* state law, not to create broad new property rights. *Id.* Only a legislature can address the "difficult regulatory issues" and policy problems inherent in creating a right to control performances of pre-1972 recordings. *Id.* Exactly the same is true under New York law.

*Second*, even if New York common law did give the owners of pre-1972 recordings the right to control public performances of those recordings, the U.S. Constitution's Commerce Clause would prohibit the state from enforcing that right against interstate broadcasters like Sirius XM, which is *required* by the FCC to broadcast on a nationwide basis *without* tailoring its satellite broadcasts by state. The district court held otherwise on the ground that New York common law is not a "regulation" subject to Commerce Clause scrutiny, which is obviously incorrect—state common law is just as much a "regulation" as any other form of state law. *See BMW of N. Am. v. Gore*, 517 U.S. 559, 572 n.17 (1996).

For these reasons, which are elaborated in this brief, the judgment below should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this matter pursuant to 28 U.S.C. § 1332. This Court has appellate jurisdiction over the district court's November 14, 2014 summary judgment order and December 12, 2014 reconsideration order pursuant to 28 U.S.C. § 1292(b). The district court certified those orders for interlocutory appeal under § 1292(b) on February 10, 2015. SPA53. This Court granted Sirius XM's timely petition to appeal in an order dated April 15, 2015.

## STATEMENT OF ISSUES PRESENTED

1. Whether, as a matter of New York common law, the owner of a pre-1972 recording has an unfettered, unconditional right to control all public performances of that recording.

2. Whether purely internal reproductions of pre-1972 recordings made to facilitate public performances—which cannot be downloaded, streamed or otherwise accessed by the public—are protected by the doctrine of fair use.

3. Whether a New York common law right to control public performances of pre-1972 recordings would violate the U.S. Constitution's Commerce Clause as applied to interstate broadcasters that, like Sirius XM, are required to have nationally uniform broadcasts.

## STATEMENT OF FACTS

Plaintiff claims to own certain pre-1972 recordings of songs by The Turtles.[1] As with all sound recordings since the inception of the music and broadcast industries, these Turtles recordings have been freely played on the radio without any need for consent or demand for compensation. A1011-18 ¶¶ 46-49, 69; A64-65; A84-85; A99. In 2013, plaintiff filed lawsuits in California, New York, and Florida claiming, for the first time, that it has an absolute right to block and control all performances of its recordings.[2] In this action, plaintiff alleged that Sirius XM violated New York common law by performing pre-1972 recordings owned by plaintiff and making internal, incidental reproductions (*e.g.*, library, buffer, and cache copies) to facilitate those performances. A24-25 ¶¶ 19, 24.

[1] This lawsuit concerns sound recordings—*i.e.*, the medium on which a particular performance of a song is fixed—rather than musical compositions—*i.e.*, the notes and lyrics written by a song's composer. Sound recordings fixed prior to February 15, 1972 are governed by state law. 17 U.S.C. § 301(c). Musical compositions are protected by the federal Copyright Act. 17 U.S.C. § 102(a)(2).

[2] In the California case, the district court held that California Civil Code Section 980(a) provides a performance right to owners of pre-1972 recordings, and granted plaintiff's motion for summary judgment on liability. A1608. The court also granted plaintiff's motion for class certification, but stayed all further proceedings to allow Sirius XM to pursue an interlocutory appeal of the certification order, which remains pending in the Ninth Circuit. Case No. 2:13-cv-05693, Dkt. 225, 237 (C.D. Cal.).

In the Florida case, the district court held that Florida common law does *not* provide a performance right, and granted Sirius XM's motion for summary judgment. 2015 WL 3852692, at *5. Plaintiff has filed a notice of appeal.

Sirius XM moved for summary judgment on two grounds. First, Sirius XM contended that its broadcasts are lawful and any incidental reproductions are fair use because New York common law does not give owners of pre-1972 recordings the right to control public performances of those recordings. Second, even if New York did recognize such a right, enforcing it against Sirius XM's nationally uniform broadcasts would violate the Commerce Clause. On November 14, 2014, the district court denied Sirius XM's motion. SPA1.

As to the first issue, the district court concluded that there was "[n]o New York case [that] so much as suggested" there was not a performance right in pre-1972 recordings, and interpreted this "judicial silence" to mean there *was* such a right. SPA15-25. The court held that if Sirius XM's performances were unlawful, so, too, were internal reproductions made to facilitate those performances. SPA26-28. As to the second issue, the court concluded that New York's common law was not a "regulation" to which the Commerce Clause applied and consequently declined to undertake a Commerce Clause analysis. SPA34-39.

Sirius XM moved for reconsideration based in part on this Court's decision in *Whiteman*, which had not been addressed in the summary judgment briefing, and requested in the alternative that the district court certify its summary judgment order for interlocutory appeal. The court denied Sirius XM's motion for reconsideration on December 12, 2014, SPA41, and subsequently certified its

November 14, 2014 and December 12, 2014 orders for interlocutory appeal and stayed the proceedings below, SPA53.

Sirius XM filed a petition for interlocutory appeal on February 20, 2015, which this Court granted on April 15, 2015. 15-497 ECF No. 1; A1665. This appeal timely followed.

## STANDARD OF REVIEW

This Court reviews de novo the district court's denial of Sirius XM's motion for summary judgment, *see Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 320 (2d Cir. 2013), and Sirius XM's motion for reconsideration, *see Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 103 (2d Cir. 2013).

## SUMMARY OF ARGUMENT

The district court's ruling is incorrect for two fundamental reasons. *First*, New York common law has *never* granted owners of pre-1972 recordings an absolute, unfettered right to control all public performances. *Whiteman* is the only case to address the existence of such a right, and it squarely held that there was none. Courts in New York and elsewhere have recognized only limited rights in pre-1972 recordings to prevent the unauthorized reproduction and distribution of bootleg copies.

New York law is clear that where, as here, creating a new right would significantly expand the common law and affect the interests of many competing stakeholders, the creation of that right should be a matter of legislative balancing rather than judicial will. *See Chamberlain*, 300 N.Y. at 139-40; *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 467-68 (1998). The district court's violation of this settled principle creates widespread policy, economic, and administrative problems, as the court itself acknowledged.

In crafting the 1995 DPRA, Congress was able to avoid these problems by designing a legislative scheme that would protect the interests of all stakeholders. Congress did not establish an absolute, unlimited right to control all public performances of post-1972 recordings. Instead, Congress created a narrow, digital performance right in post-1972 recordings that included important limitations—including a carve-out for AM/FM radio—and a compulsory licensing scheme to ensure that digital and satellite broadcasters like Sirius XM can obtain a statutory license to perform a post-1972 recording at a reasonable royalty rate. There has been, and could be, no judicial counterpart to this deliberative legislative process.

*Second*, even if New York common law did grant owners of pre-1972 recordings a public performance right, it would violate the Commerce Clause to enforce that right against interstate broadcasters like Sirius XM, which is required by the FCC to have nationally uniform satellite broadcasts and cannot tailor its

broadcasts by state. The district court held otherwise on the ground that New York common law is not a "regulation" subject to Commerce Clause scrutiny. This was error. State common law is just as much a "regulation" as any other form of state law. *See BMW*, 517 U.S. at 572 n.17. If the court had engaged in a Commerce Clause analysis, it would have been compelled to find a violation.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN HOLDING THAT NEW YORK COMMON LAW GIVES THE OWNER OF A PRE-1972 RECORDING A PUBLIC PERFORMANCE RIGHT

#### A. Under New York Common Law, A Recording Owner's Rights In Pre-1972 Recordings Have Never Included The Right To Control All Public Performances Of The Recordings

As the district court recognized, there is *no* case holding that under New York common law, a pre-1972 recording owner's rights include the right to control public performances of that recording by those who have lawfully obtained a copy. SPA17-20. *Whiteman* is the only case to squarely consider whether such a right exists, and *Whiteman* held—per Judge Learned Hand—that none does. That holding remains good law and is dispositive here, although a separate and distinct aspect of *Whiteman* was rejected in a later decision of this Court.

In *Whiteman*, a record company and orchestra leader brought copyright infringement and unfair competition claims under New York common law against a radio network that broadcast their records. Those claims raised the question for this Court whether the performer and/or the record company "had any musical

property at common-law in the records" that was infringed when the radio network played the records on air. 114 F.2d at 87.

To answer this question, Judge Hand surveyed the common law across the United States and found that only one case—*Waring v. WDAS Broad. Station, Inc.*, 327 Pa. 433 (1937)—had ever recognized any right to control the performance of a sound recording (in the limited form of barring the unauthorized broadcast of records sold with a label prohibiting public performance). Judge Hand's opinion for the Court rejected the reasoning in *Waring* and held that the radio performance of recordings did not infringe any protected property interest, because common law rights in a recording "consist[] *only* in the power to prevent others from *reproducing* the copyrighted work." *Id.* at 88 (emphasis added). By simply playing the records on air, the radio network "never invaded any such right"—indeed, they "never *copied* [Whiteman's] performances at all," but "merely used those copies which he and the [record company] made and distributed." *Id.* (emphasis added). The radio network thus could not be held liable under New York common law for broadcasting the records.

Commentators have recognized for decades that *Whiteman* established a longstanding, nationwide "consensus that state law does not provide a public performance right for sound recordings." Prof. Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings & State Copyright Law*, TECHNOLOGY & MARKETING

BLOG (Oct. 1, 2014), http://blog.ericgoldman.org; *see* Steven Seidenberg, *US Perspectives: Courts Recognise New Performers' Rights*, INTELL. PROP. WATCH (Nov. 24, 2014), http://www.ip-watch.org ("As a result [of *Whiteman*], it has been settled since 1940 that there is no performance right in a sound recording."); Lauren Kilgore, *Guerrilla Radio: Has the Time Come for a Full Performance Right in Sound Recordings?*, 12 VAND. J. ENT. & TECH. L. 549, 559-60 (2010) (*Whiteman* "helped put radio on solid legal ground to play records without compensating performers for the next seventy years"); Ralph Brown, Symposium, *The Semiconductor Chip Protection Act of 1984 and its Lessons: Eligibility for Copyright Protection: A Search for Principled Standards*, 70 MINN. L. REV. 579, 585-86 (1986) (*Whiteman* "turned the tide against judges creating" a "common law performers' right").[3]

---

[3] *See also* Douglas Baird, *Common Law Intellectual Property & the Legacy of Int'l News Serv. v. Assoc. Press*, 50 U. CHI. L. REV. 411, 419 n.35 (1983) (the "law did not (and in fact still does not) give a performer the right to control radio broadcasts of his performances"); U.S. COPYRIGHT OFFICE, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS 44-45 (2011) (citing *Whiteman* and explaining that, although states *could* interpret common law as providing a performance right, "state law does not appear to recognize a performance right in sound recordings"); June Besek & Eva Subotnik, *Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recordings*, 37 COLUM. J.L. & ARTS 327, 338 (2014) ("states do not appear to recognize a right of public performance in pre-1972 sound recordings"); Steven Seidenberg, *Pay to Play: State Copyright Law Now Gives Musicians Performance Rights*, A.B.A.J. (Apr. 2015) (state law "did not provide performers or record labels with public performance rights … according to the seminal case of [*Whiteman*]"); Richard Posell, *'60s on 6' May Be in Sirius Trouble*, DAILY

Breaking decisively from the longstanding consensus, the district court dismissed *Whiteman* as, in effect, a short-lived aberration, overruled in the following decade by *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955)—"no longer good law" since that decision, and further interred by *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540 (2005). SPA43, 46. The district court badly misread *Mercury Records* and *Naxos*, neither of which had anything to do with the issue here and the relevant issue in *Whiteman*—*i.e.*, the right to control public performances of sound recordings. *Mercury Records* and *Naxos* instead were piracy cases involving the *unauthorized reproduction and distribution of bootleg copies*. In *Mercury Records*, the court held that a record company with an exclusive license to produce, copy, and sell recordings could enforce that license against a competing record company. 221 F.2d at 661-63. The *Naxos* court simply enforced the same rule, holding that Capitol Records, which owned U.S. rights to 1930s recordings, could prevent a competing record company from copying and distributing recordings in the U.S. 4 N.Y.3d at 544, 565. Nor were those decisions alone on the issue—as early as 1950, a New York court held that a party who made and sold unauthorized recordings of live opera broadcasts committed unlawful "piratical conduct," without ever suggesting that its holding

---

JOURNAL (Apr. 29, 2015) (district court's ruling "challenges the common understanding of state copyrights since at least 1940").

was in any way in tension with *Whiteman*'s well-known rule. *See Metro. Opera Ass'n v Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 796 (N.Y. Sup. Ct. 1950).

Indeed, *Metropolitan Opera*, *Mercury Records*, and *Naxos* are all entirely consistent with the relevant holding and analysis in *Whiteman*, which expressly observed that the "only" common law right in sound recordings is "the power to prevent others from reproducing" them. 114 F.2d at 88. That right to control the *reproduction* of sound recordings was the same right recognized and enforced in *Mercury Records* and *Naxos*. Nowhere did those decisions even suggest that New York law *also* recognizes a right to control the *performance* of sound recordings lawfully obtained.

*Mercury Records* and *Naxos* did address and reject dictum in *Whiteman* that is irrelevant to this case. Historically, and until it was overhauled in 1976, the federal Copyright Act governed copyrights in published works, and state common law governed copyrights in unpublished works. *See* Robert Gorman, *An Overview of the Copyright Act of 1976*, 126 U. PENN. L.R. 856, 857 (1978). In *Whiteman*, Judge Hand considered whether the sale of a record constituted a "publication" that extinguished its common law copyright under federal preemption principles, and opined that after a record's sale, "anyone may copy it who chances to hear it, and

may use it as he pleases." 114 F.2d at 89.[4] *Mercury Records* held that this statement about *copying* recordings and selling the copies "is not the law of the State of New York," because the "public sale" of a record "does not constitute a dedication of the right to *copy and sell* the record[]." 221 F.2d at 663 (emphasis added); *see Naxos*, 4 N.Y.3d at 553-55. The rejection by *Mercury Records* and *Naxos* of *Whiteman*'s dictum has no relevance either to *Whiteman*'s central holding or to this case, both of which are about the *performance* of recordings lawfully obtained, not *copying and selling* them without permission. As commentators have consistently recognized—including *after Mercury Records* and *Naxos*—*Whiteman* remains good law on the public performance issue.[5]

The district court also misread *Whiteman* to suggest that New York law *does* grant pre-1972 recording owners a right to control public performances, because otherwise there would have been no reason for the Court to consider whether that right was forfeited by public sale of the recording. But *Whiteman*'s dictum about public sale was plainly independent from its holding that there is no performance right to begin with. The decision first holds that copyright "consists *only* in the

---

[4] Judge Hand later acknowledged this statement was dictum, since copying was not at issue in *Whiteman*—only public performance via radio broadcast was. *Mercury Records*, 221 F.2d at 664.

[5] *See* Kilgore, *supra*, at 572, 559-60 (*Mercury Records* overruled *Whiteman* only on a different issue); *see also supra* note 3 (citing commentators recognizing authority of *Whiteman* after *Mercury Records* and *Naxos*).

power to prevent others from *reproducing* the copyrighted work"—not performing it. 114 F.2d at 88 (emphasis added). The decision then later and separately asserts that even the right against unauthorized copying was lost upon public sale: "If 'the common-law property' in the rendition be gone, then anyone may *copy* it who chances to hear it, and may use it as he pleases." *Id.* at 89 (emphasis added). The later rejection of this dictum casts no doubt on the vitality of the antecedent point that a recording owner's rights are limited rights to prevent unauthorized copying and distribution.

Finally, plaintiff below asserted two additional arguments that the district court rightly declined to accept. *First*, plaintiff cited two trial court decisions that supposedly recognize a performance right in pre-1972 recordings, but neither is controlling or persuasive. In *Capitol Records, LLC v. Harrison Greenwich, LLC*, plaintiff sued a New York restaurant for common law copyright infringement because the restaurant's website played a 1970 song that plaintiff owned. The court granted partial summary judgment for plaintiff, holding that "uploading music onto a company's website without a license is copyright infringement." 984 N.Y.S.2d 274, 276 n.2 (N.Y. Sup. Ct. 2014). While the unauthorized reproduction sufficed to establish an unexceptionable case of infringement, the court subsequently granted plaintiff's unopposed motion to "clarify" that the restaurant "committed both an 'unauthorized reproduction and public performance'" of the

song. Case No. 652249/2012, Dkt. 86 at 1. The district court here correctly disregarded the *Harrison* court's unnecessary, unsupported, and conclusory dictum concerning "public performance," because it did not "explain its ruling and cite[d] no prior case law recognizing any public performance right in sound recordings." SPA16 n.2.

Plaintiff below also cited *Capitol Records, LLC v. Escape Media Group, Inc.*, Case No. 12-CV-6646 (S.D.N.Y.), again to no avail. The defendant in that case did not even address—much less dispute—the existence of a performance right for pre-1972 recordings in its summary judgment briefing. A magistrate judge assigned to the case wrongly assumed, relying on *Naxos*, that there was such a right because the "elements" for a copyright infringement claim under federal law for post-1972 recordings "mirror" those under state common law for pre-1972 recordings. *Id.*, Dkt. 90 at 51 (A1399). But *Naxos* merely held that the test for infringement of a recording owner's *reproduction* right is the same under federal and New York law—*i.e.*, "(1) the existence of a valid copyright; and (2) unauthorized reproduction." 4 N.Y.3d at 563. *Naxos* did not even suggest, much less hold, that the *scope of rights* in post-1972 recordings under the Copyright Act

are the same as the scope of rights in pre-1972 recordings under state common law. The district court below declined to rely on the magistrate judge's ruling.[6]

*Second*, plaintiff invoked general principles of property law recited in a hoary precedent, *Victory v. Baker*, 67 N.Y. 366 (1876), to assert that ownership of a pre-1972 recording is absolute and all-encompassing, and therefore necessarily includes the right to control all public performances of that recording by those who lawfully obtain it. Dkt. 56 at 11. But of course *Victory* itself says nothing about *what* specific rights are encompassed by "ownership" of a pre-1972 recording.

Indeed, *Victory* confirms that "ownership" of "property" is *not* all-encompassing: property ownership "cannot be an absolute right," *Victory* observes, because it is always limited by the interests of other stakeholders. 67 N.Y. at 368; *see also* Joseph Singer, PROPERTY § 1.1.2 (4th ed. 2014) (rights of property owner are limited by "the legitimate interests of others"); Dkt. 81 at 1-3. For example, the owner of a land parcel has no inherent right to build a skyscraper or drill into the ground. *See Coates v. Mayor of New York*, 7 Cow. 585, 604-05 (N.Y. Sup. Ct. 1827) (right to build structure on land may be restricted to protect public welfare); Richard Posner, ECONOMIC ANALYSIS OF LAW §§ 3.2, 3.8, 3.9 (7th ed. 2007) (right to build structures, extract oil from subsurface reservoirs, and use

[6] The *Escape Media* district court subsequently accepted the magistrate's ruling, with no additional analysis other than a cite to the district court's intervening summary judgment ruling in this case. 2015 WL 1402049, at *4 (S.D.N.Y. Mar. 25, 2015).

water in riparian streams may be limited to protect other stakeholders). Likewise, the mere fact that one claims "ownership" of a pre-1972 recording does not itself define the particular rights attendant to that ownership claim, especially whether the right includes the right to control use and performance of the recording lawfully obtained by someone else.

Even taken on its own terms, plaintiff's categorical "property ownership" theory makes no sense. Because the theory does not (and cannot) define and distinguish among the specific rights that come with ownership, it necessarily would allow the owner of a pre-1972 recording to prohibit a consumer who lawfully purchased a recording from playing it at a private party, listening to it in the car with the windows down, or re-selling it to a used record store.[7] Obviously no precedent or sound policy supports that result. For that reason, the *Flo & Eddie* Florida court correctly rejected plaintiff's argument, emphasizing that general principles of property law do not provide an "unqualified property right" that allow

[7] Plaintiff might suggest, to make its argument more palatable, that the sale of a physical recording conveys an implicit license to listen to the recording *in private*. Putting aside that plaintiff has never articulated how a principled line between public and private performances could be drawn, this argument would come as a complete surprise to club DJs who have been spinning records for the pleasure of millions for many decades. Nothing in the history of the industry or in any legal precedent suggests any "*private* performance" limitation on the expected uses of recordings sold for the public's enjoyment, in the myriad ways that people have enjoyed music not just for decades, but for millennia.

plaintiff to "control everything related to the performance of sound recordings." 2015 WL 3852692, at *5.

### B. Creation Of A New Right To Control Public Performances Would Be A Legislative Act

The district court explicitly acknowledged that *no* New York case has ever recognized that ownership of a pre-1972 recording includes the right to control all public performances of that recording. SPA17-20. The district court's ruling thus represents a dramatic alteration of existing common law rights. The common law, however, is supposed to evolve incrementally to avoid "encroachment on the legislative branch." *Norcon*, 92 N.Y.2d at 467-68. In particular, "the manner by which the State addresses complex societal ... issues is a subject left to the discretion of the political branches of government." *Campaign for Fiscal Equity, Inc. v. New York*, 8 N.Y.3d 14, 28 (2006). Accordingly, where, as here, the creation of a new right would alter complex economic and legal relationships involving many stakeholders—including parties not before the Court such as composers, performing artists, and consumers—the decisions whether and how to establish the new right "must be the doing of the Legislature." *Chamberlain*, 300 N.Y. at 139-40; *accord In re N.Y. State Inspection v. Cuomo*, 64 N.Y.2d 233, 240 (1984) (where "policy matters have demonstrably and textually been committed to a coordinate, political branch of government, any consideration of such matters by a [different] branch or body" would "constitute an *ultra vires* act.").

There is no doubting the widespread policy, economic, and administrative consequences of the new right minted by the district court. Indeed, Congress faced—and explicitly acknowledged—exactly the same consequences when it was considering whether and how to create such a performance right by statute, after almost a full *century* of debate on the issue. Congress's response was limited, nuanced, and carefully crafted to balance the interests of all stakeholders—demonstrating exactly why the creation of new rights concerning the performance of sound recordings lawfully obtained is and must be a matter of legislative discretion rather than judicial will. *See id.*; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984) (noting "[t]he judiciary's reluctance to expand the protections afforded by copyright without explicit legislative guidance …. Sound policy, as well as history, supports our consistent deference to Congress," which "has the constitutional authority and institutional ability to accommodate fully the varied permutations of competing interests"), *superseded on other grounds by statute*, 17 U.S.C. § 1201, *as recognized in Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1172 (9th Cir. 2012).

Sound recordings are unique among creative works in that they involve competing stakeholders, including composers (who have a copyright in the underlying musical composition), performing artists, recording owners (in most cases, the record company), broadcasters, and the public—the ultimate consumers

of music. Those competing interests have been the subject of legislative deliberation for some 110 years, as new technologies and other developments changed the landscape in which music is composed, produced, and delivered to the listening public.

From the time sound recordings were invented in the late 1800s until 1971, Congress declined to recognize any rights in sound recordings at all. Recognizing that such rights would singularly benefit recording owners at the expense of music composers, broadcasters, and consumers, Congress expressly rejected proposals by the recording industry to extend copyright protection to sound recordings in 1909, 1925, 1926, 1930, 1932, 1936, 1937, 1939, 1940, 1942, 1943, 1945, 1947, and 1951. *See* H.R. REP. NO. 60-2222, at 9 (1909); *Performance Rights in Sound Recordings: Subcomm. on Courts, Civ. Liberties, & the Admin. of Justice of the H. Comm. on the Judiciary*, 95th Cong., 29-37 (Comm. Print 1978) ("1978 Report").

In the 1930s and 1940s, as the popularity of radio grew, the recording industry began to recognize the enormous promotional benefits of radio airplay. All stakeholders benefitted from the unrestricted public performance of sound recordings, which increased record sales, music royalties, and advertising revenue, popularized performing artists, and gave the public widespread access to music. By the 1950s, the recording industry ceased its efforts to exert unilateral control

over the performance of sound recordings through federal copyright protection. *See* 1978 Report at 35-36.

The advent of new duplication technology in the 1950s and 1960s, however, created a new problem: pirates became able to copy sound recordings and sell these "bootleg" copies. The problem did not solely affect the recording industry—all stakeholders suffered from record piracy, which does not generate any record sales, music royalties, or advertising revenue, and creates quality control issues that hurt all legitimate stakeholders. The recording industry responded by proposing to Congress various solutions to the problem of record piracy, but those proposals were repeatedly rejected because they not only proposed prohibitions against piracy itself—*i.e.*, unauthorized copying and sale—but rights to control public performances of recordings lawfully obtained. *See id.* at 42-50. While there was widespread support for protection against unauthorized copying, the proposed right to control public performances was "explosively controversial," because it would grant a windfall to recording owners at the expense of composers and performing artists (since any restrictions on performances would decrease the number of times their songs are played and the consequent publishing royalties and publicity they receive) as well as broadcasters and music consumers (who would face increased costs and decreased access to recordings). SUPP. REGISTER'S REP. ON THE GENERAL REV. OF U.S. COPYRIGHT LAW 38 (Comm. Print 1965) (A185).

Congress was finally able to solve the problem in the 1970s by focusing solely on piracy, *without* creating additional rights in the performance of non-pirated recordings. In the 1971 Sound Recording Act, Congress addressed record piracy by creating a prospective, limited anti-copying right in post-1972 recordings that protected against unauthorized *reproduction and distribution* only. Pub. L. No. 92-140, 85 Stat. 391 (1971) (A248) (noting purpose "to provide for the creation of a limited copyright in sound recordings for the purpose of protecting against unauthorized duplication and piracy of sound recording[s]"). No performance right was established. Congress revisited the issue in the 1976 Copyright Act, which defined the complete "bundle of rights" that could attach to a copyrighted work and reaffirmed the limited anti-*copying* right for post-1972 recordings, making explicit that the right did not include the right to control public performances. 17 U.S.C. §§ 106, 114.[8]

The written history of Congress's consideration of whether and how to create rights in the public performance of sound recordings makes perfectly clear that, as all parties understood, state law did not *already* provide such a

[8] The district court stated that "if public performance rights were not part of the normal bundle of rights in a copyright, Congress would not have needed to carve out an exception specifically for sound recordings." SPA21. But the legislative history is clear that there was no performance right. Congress included the carve-out to distinguish sound recordings from other copyrighted works, which enjoy the complete "bundle of rights" provided by 17 U.S.C. § 106, including a specific public performance right.

performance right. As various stakeholders observed, the *whole point* of the decades-long legislative effort was to create a right the common law did not recognize. As a record executive stated to Congress in 1936, the "law up to date has not granted" protection against radio stations' "indiscriminate use of phonograph records." *Revision of Copyright Laws: Hearings Before the H. Comm. on Patents*, 74th Cong. 622 (Comm. Print 1936) (A144). Three decades later, the Register of Copyrights observed that a proposed bill "denying [record companies] rights of public performance ... reflects—accurately, I think—the present state of thinking on this subject in the United States." *Copyright Law Revision: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary, Part 3*, 89th Cong. 1863 (Comm. Print 1965) (A202). Two years later, Capitol Records bemoaned the lack of common-law protection for the rights it wanted to claim: "The record company receives nothing from the widespread performance-for-profit of its products …. There is no clearly established legal remedy available to stop this unauthorized use." *Copyright Law Revision: Hearings Before the Subcomm. on Patents, Trademarks & Copyrights of the Sen. Comm. on the Judiciary, Part 2*, 90th Cong. 496, 502 (1967) (A1634, 1640). And when Congress rejected the record companies' complaints and declined to create a performance right in the 1976 Copyright Act, Congress confirmed that the statute "merely states what has been the law and the widely accepted fact for many years—namely, there is no

compensable property right in sound recordings and no … performance royalty for broadcasters because they play records for profit." 120 CONG. REC. 30,405 (1974).

The recording industry, predictably, did not give up, but continued its efforts in the 1980s and 1990s to establish by legislation what it *concededly* did not have at common law. *See Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 488 (3d Cir. 2003) (after 1971 Sound Recording Act, "[t]he recording industry had repeatedly sought ... additional copyright protection in the form of a performance copyright"). "Under existing law," the RIAA advised Congress in 1995, "record companies ... have no rights to authorize or be compensated for the public performance of the sound recording." *Digital Performance Right in Sound Recordings Act of 1995: Hearings Before the Subcomm. on Courts & Intell. Prop. of the H. Comm. on the Judiciary*, 104th Cong. 31 (1995) (A313); *see also* Julie Ross, *[Un]happy Together: Why the Supremacy Clause Preempts State Law Digital Performance Rights in Radio-Like Streaming of Pre-1972 Sound Recordings*, J. COPYRIGHT SOC'Y U.S.A. 18 (forthcoming 2015), *available at* http://scholarship.law.georgetown.edu/facpub/1478/ (legislative history of DPRA confirms "the assumption by Congress, the Copyright Office, and all interested parties … that the [DPRA] created a new, narrowly-defined performance right that simply had not existed for sound recordings under either federal or state law").

Congress took a new approach to the issue in 1995, when it enacted the DPRA. That statute, for the first time, created a limited digital performance right for *post*-1972 recordings. The DPRA was enacted after dozens of witnesses testified about the competing policy considerations, after committees produced multiple reports detailing their findings, and after Congress revised the proposed legislation to address each issue. *See* H.R. REP. NO. 104-274 (1995) (A299-311); S. REP. NO. 104-128 (1995). On the one hand, Congress wanted to protect recording owners, who claimed that the advent of new digital technologies cut into their profits. *See* S. REP. NO. 104-128, at 15 (1995); H.R. REP. NO. 104-274, at 13-14 (1995) (A306-07). On the other hand, Congress sought to protect broadcasters and maintain their symbiotic relationship with the recording industry. *See* S. REP. NO. 104-128, at 15 (intent to avoid "imposing new and unreasonable burdens on ... broadcasters, which often promote, and appear to pose no threat to, the distribution of sound recordings"); *id.* (intent to avoid making it "economically infeasible for some transmitters to continue certain current uses of sound recordings"); 141 CONG. REC. S945-02, at 948 (Daily ed. Jan. 13, 1995) (A356) (DPRA's sponsor rejecting unlimited performance right because the "long-established business practices within the music and broadcasting industries represent a highly complex system of interlocking relationships … and should not be lightly upset").

The DPRA thus includes an exemption for AM/FM radio and a complex compulsory licensing scheme, which ensures that digital and satellite broadcasters like Sirius XM can obtain a statutory license to perform a post-1972 recording at a reasonable royalty rate. S. REP. NO. 104-128, at 15-16. The DPRA also includes a requirement that the recording owner share one-half of the compulsory license fees with performing artists, instead of pocketing the money for itself. H.R. REP. NO. 104-274, at 14-15, 24 (A307-08, 17).

There has been no judicial counterpart to this carefully reticulated legislative process—nor could there have been. As the district court acknowledged, the common-law performance right it created is far "broader than the right legislated by Congress." SPA24. The newly-minted right encompasses AM/FM radio and contains none of the other exemptions of the DPRA. The right obviously does not include a compulsory licensing scheme—no court could impose that kind of regulatory solution—thus leaving all broadcasters and others seeking to perform pre-1972 recordings at the mercy of recording owners, who can demand exorbitant royalty rates or refuse to license their recordings altogether.

The right created by the district court leaves many questions unanswered as well. For example, how will a broadcaster identify the recording owner with whom a license must be negotiated? Who will resolve ownership disputes? What happens if the parties are unable to agree on a royalty rate? Even if they are, how

will royalties be distributed? Must a recording owner share the royalties with the performing artists? As the district court conceded, these and other "administrative difficulties … would ultimately increase the costs consumers pay to hear broadcasts, and possibly make broadcasts of pre-1972 recordings altogether unavailable." *Id.*; *cf.* Ross, *supra* ("the state law performance rights recognized in the *Flo & Eddie* cases come into direct conflict with the compulsory statutory licensing provisions of [the DPRA]"); Gary Pulsinelli, *Happy Together? The Uneasy Coexistence of Federal and State Protection for Sound Recordings*, 82 TENN. L.R. 167, 214 (2014) (DPRA's "statutory licensing scheme ... serve[s] 'important public purposes'" and state performance right would "interfere with this public purpose").[9]

As a federal court sitting in diversity, the district court's role was to interpret New York law and predict how the New York Court of Appeals would rule on the performance-right issue. *See City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146, 1153 (2d Cir. 1989). Its role was *not* to create a controversial new

[9] The Copyright Office recently issued a report discussing this case, noting the policy problems that result from creating a common-law performance right, and advocating for federal regulation, which can offer "uniform protection … as well as appropriate exceptions and limitations for the benefit of users." U.S. COPYRIGHT OFFICE, COPYRIGHT & THE MUSIC MARKETPLACE 53-55, 85-87 (2015); *see also* A607 (comments of SoundExchange, the organization that administers royalties under the DPRA, to Copyright Office: *Flo & Eddie* rulings "will not lead to a sensible regime for licensing," "do not provide the simplicity and efficiency that Congress contemplated when enacting the statutory licenses," and are "not the regime that Congress had in mind when it created the [DPRA] in 1995").

performance right in pre-1972 recordings that has never existed at common law, that is far broader than that legislated by Congress for post-1972 recordings, and that creates major economic and administrative difficulties. That distinctively legislative function is not one for which the judicial branch is well suited.

For these very reasons, the *Flo & Eddie* Florida court declined to recognize a performance right in pre-1972 recordings. The Florida action is identical to this one, except that it involves Florida rather than New York law. There is no Florida case holding that ownership of pre-1972 recordings includes the right to control the performance of recordings lawfully obtained. 2015 WL 3852692, at *4. The Florida court acknowledged that if it were "to recognize and create this broad right in Florida, the music industry—including performers, copyright owners, and broadcasters—would be faced with many unanswered questions and difficult regulatory issues including: (1) who sets and administers the licensing rates; (2) who owns a sound recording when the owner or artist is dead or the record company is out of business; and (3) what, if any, are the exceptions to the public performance right." *Id.* at *5. A legislative body "is in the best position to address these issues" and determine "whether copyright protection for pre-1972 recordings *should* include the exclusive right to public performance." *Id.* (emphasis added). A court, by contrast, can say only what the law *is*, and Florida law clearly had not recognized such a right. *Id.* at *4-*5. The same is true in New York.

The district court below downplayed the significance of its ruling by analogizing to New York cases that recognized performance rights in plays and motion pictures. SPA17-19. But those cases only recognized performance rights where—unlike here—Congress itself had already recognized a corollary performance right under federal law. The Copyright Act traditionally provided only for a right of reproduction—literally, a "copy right." *See* 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.02 (rev. ed. 2015); *Palmer v. De Witt*, 47 N.Y. 532, 542 (1872). Over time, the Copyright Act has been amended to expand the scope of copyright protection—and in certain specific contexts, to create a public performance right. It was not until Congress created performance rights in plays and motion pictures under federal law that New York courts recognized equivalent rights under the common law—which is consistent with the principle that the common law should evolve incrementally to avoid "encroach[ing] on the legislative branch." *Norcon*, 92 N.Y.2d at 467-68; *see also Sony*, 464 U.S. at 430-31.

In 1856, Congress amended the Copyright Act to grant the owner of a "dramatic composition" the "sole right to … perform, or represent" it. Copyright Act of Aug. 18, 1856, ch. 169, 11 Stat. 138 (1856). It was only after Congress created this statutory performance right in published plays that New York courts filled the gap by recognizing an equivalent right at common law in unpublished

plays. *See French v. Maguire*, 1878 WL 11310, at *5 (N.Y. Sup. Ct. 1878); Jessica Litman, *The Invention of Common Law Play Right*, 25 BERKELEY TECH. L.J. 1381, 1386, 1403-04 (2010) (surveying case law and finding "no trace of a common law play right before 1856"); *accord Palmer*, 47 N.Y. at 542-43 (England similarly rejected common-law performance right in plays until corollary statutory right was created).

In 1912, Congress first extended copyright protection to motion pictures. Act of Aug. 24, 1912, ch. 356, 37 Stat. 488. This Court later clarified that the Copyright Act includes a performance right in motion pictures. *Patterson v. Century Prods.*, 93 F.2d 489, 493-94 (2d Cir. 1937). New York courts subsequently recognized a common-law performance right in unpublished motion pictures and clips. *See Brandon Films, Inc. v. Arjay Enters., Inc.*, 230 N.Y.S.2d 56, 58 (Sup. Ct. 1962); *Roy Export Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1104 (2d Cir. 1981); *see also* SPA19-20 (noting that it was only after Congress granted protection to choreographic works that courts developed law in this area).

In contrast, Congress has *never* created a right to control the public performance of pre-1972 recordings. To the contrary, it repeatedly declined to create any performance right in pre-1972 recordings, and eventually created a very *limited* right for post-1972 recordings. Congress's statutory guidance is thus very

much the *opposite* of the guidance provided in the context of plays and motion pictures: the legislative judgment is that the law should not be changed to recognize a performance right in pre-1972 recordings. The district court's decision creating such a right impermissibly overrides that legislative judgment.

### C. Internal Reproductions Made to Facilitate Sirius XM's Performances of Pre-1972 Recordings Are Fair Use

The district court's ruling that plaintiff has a performance right under New York law led to another error: its ruling that internal reproductions made by Sirius XM in New York to facilitate performances of plaintiff's pre-1972 recordings were likewise infringing. That corollary reproduction ruling also must be reversed.

Gone are the days when a broadcaster can simply queue up a physical record or CD and broadcast it live. A987 ¶ 17; A1003 ¶ 24. Sirius XM, like other broadcasters, maintains its music in a library of digital files created from CDs it lawfully acquired. A988-99 ¶¶ 21-22; A1003-04 ¶¶ 25, 27. Sirius XM's library, which includes some pre-1972 recordings plaintiff claims to own, is stored on a primary and backup server in New York. A987 ¶ 18. Library copies are purely internal—they cannot be accessed by the public. A986-88 ¶¶ 14, 20; A1009 ¶ 40. In order to broadcast these library copies, Sirius XM makes various temporary copies, retained briefly in what are commonly referred to as "buffers" or "caches," that assist in the transmission process and then are discarded. These buffer and cache copies include temporary server copies created for broadcast, short

fragments of Sirius XM's broadcast stream that ensure an uninterrupted delivery, "tips and tails" copies (the endings and beginnings of songs used to make voiceover announcements by DJs), and copies stored on computers that allow users of Sirius XM's Internet radio service to listen to a program from the beginning even if the user logs into the service in the middle of the program. A987-92 ¶¶ 17, 30; A1007-08 ¶¶ 36-39. These temporary copies, many of which are just a few milliseconds long, are not permanent and are never accessible to the public. A991-94 ¶¶ 30, 31, 35; A1009 ¶ 40.

The district court correctly recognized that these temporary copies do not constitute infringement. *See* SPA26. In order to be an actionable "copy," a work "must be embodied in a medium ... 'for a period of more than transitory duration." *Cartoon Network LP, LLP v. CSC Holdings, Inc.*, 536 F.3d 121, 127 (2d Cir. 2008). Sirius XM's buffer and cache copies do not meet this standard.

The district court also acknowledged that, if there is no performance right under New York law, then Sirius XM's library copies would almost certainly constitute lawful fair use. SPA55; SPA27, 31-33. Thus, reversal of the district court's ruling on plaintiff's performance claims also requires reversal of its ruling on plaintiff's reproduction claims. But even if this Court does not reverse the performance-right ruling, it still must reverse the reproduction ruling, because

Sirius XM's library copies are fair use regardless of whether there is a performance right under New York law.

Fair use is "a privilege in others … to use the copyrighted material in a reasonable manner without [the owner's] consent." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549 (1985). Courts applying the fair use doctrine under New York law look to the fair use factors articulated in the federal Copyright Act for guidance. *See* SPA28; 17 U.S.C. § 107. The fourth factor, which considers the effect on the market for the copyrighted work, is "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566. The relevant inquiry is "whether the secondary use usurps the market of the original work." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004).

Here, Sirius XM's library copies—which cannot be downloaded, streamed, or otherwise accessed by the public—have *no* effect on the market for plaintiff's recordings, let alone a usurping effect. If the district court's performance-right ruling is upheld, this would create a new market for public performances of plaintiff's pre-1972 recordings, allowing plaintiff to license those recordings to broadcasters and others wishing to perform them. Sirius XM's library copies would not impact that market; plaintiff could still license its recordings in the same way and for the same price. Indeed, plaintiff's principals have testified that they can identify *no* market harm from Sirius XM's broadcast of their recordings—let

alone internal copies made to facilitate those broadcasts. A1020-22 ¶¶ 79-82; A68-69, 86, 98.

The district court improperly conflated Sirius XM's *performances* of plaintiff's recordings—which it believed could cause market harm by "satisfy[ing] public demand to hear those recordings," SPA29-32—with Sirius XM's *reproductions*, which have no impact on the market whatsoever. These internal reproductions constitute fair use as a matter of law. *See Authors Guild Inc. v. HathiTrust*, 755 F.3d 87, 98-99 (2d Cir. 2014) (making complete copies of copyrighted books on servers at four different locations, as well as disaster back-up copies, constitutes fair use because copies were "necessary to facilitate the services [defendant] provides to the public and to mitigate against the risk of disaster or data loss"); *cf.* N.Y. PENAL LAW § 275 (Consol. 2015) (criminal anti-piracy statute expressly exempting radio broadcasters from liability for reproductions made in aid of radio broadcasts).

## II. ENFORCING A COMMON LAW PERFORMANCE RIGHT AGAINST INTERSTATE BROADCASTERS LIKE SIRIUS XM WOULD VIOLATE THE COMMERCE CLAUSE

Even assuming that New York common law *does* give the owner of a pre-1972 recording a public performance right, the district court's ruling must nonetheless be reversed, because applying such a right to Sirius XM—which is

required by the FCC to have nationally uniform satellite radio broadcasts—would violate the Commerce Clause of the U.S. Constitution.

### A. New York Common Law Is Subject To Commerce Clause Scrutiny

The first question is whether state common-law regulation of rights in pre-1972 recordings is even subject to Commerce Clause scrutiny. Plaintiff below argued that the Commerce Clause was categorically inapplicable because Section 301(c) of the Copyright Act exempts rights in pre-1972 recordings from the Commerce Clause, and because common-law regulation is not actually regulation for Commerce Clause purposes. The district court correctly rejected the first argument,[10] but incorrectly accepted the second.

---

[10] States cannot regulate interstate commerce unless Congress *expressly authorizes* them to do so in a way that is "unambiguous" and "unmistakably clear." *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992); *S.-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984).

Section 301(c) provides that, "[w]ith respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title." 17 U.S.C. § 301(c). Section 301(c) is a classic example of a "savings clause" that saves state laws from express preemption by federal law. *See New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982). There is no question that Section 301(c) authorizes states to make laws concerning pre-1972 recordings and protects such laws from express preemption by the federal Copyright Act. But Section 301(c) does *not* authorize states to burden interstate commerce: it provides only that state laws will "not be annulled or limited *by this title*"—*i.e.*, by the Copyright Act itself. The district court thus correctly recognized that "§ 301(c) does not 'unambiguous[ly],' or 'unmistakab[ly],' permit state interference with interstate commerce," because "§ 301(c) is framed as a limitation on preemption, not a relaxation of Commerce Clause limitations." SPA37; *see also New Eng. Power*, 455 U.S. at 341 (holding

The district court's holding that a state's property law is not a "state-imposed regulation" subject to Commerce Clause analysis, SPA39, directly contradicts case law establishing that positive-law "regulation is not necessary for asserting a dormant Commerce Clause claim." *Ileto v. Glock Inc.*, 349 F.3d 1191, 1217 (9th Cir. 2003). As the Supreme Court has observed, "[s]tate power may be exercised as much by a jury's [or judge's] application of a state rule of law in a civil lawsuit as by a statute." *BMW*, 517 U.S. at 572 n.17. After all, "regulation can be as effectively exerted through an award of damages as through some form of preventive relief," because the "obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992).

The district court erroneously considered common-law regulation exempt from Commerce Clause scrutiny because the court relied on an outmoded test articulated in *Sherlock v. Alling*, 93 U.S. 99 (1876), for evaluating state laws under the Commerce Clause.[11] *Sherlock* held that when a state law declares a general principle of liability that is not expressly directed at interstate commerce, but rather merely relates to the rights, duties, and liabilities of citizens and thus only

---

that similar language in Federal Power Act was savings clause and "in no sense an affirmative grant of power to the states to burden interstate commerce").

[11] The district court also cited *Atlantic Coast Line Railroad Company v. Mazursky*, 216 U.S. 122 (1910), which relied on *Sherlock*'s outmoded test. *Id.* at 132-33.

*indirectly* affects commerce, the state law is not subject to Commerce Clause scrutiny. *Id.* at 102-05. That so-called "direct-indirect" test, however, was abandoned by the Supreme Court, which has made clear that state law is subject to Commerce Clause scrutiny even where it has only "indirect" or incidental effects on commerce. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332 (1989); *S. Pac. Co. v. State of Arizona ex rel. Sullivan*, 325 U.S. 761, 768-70 (1945).[12]

A state law that only indirectly affects commerce violates the Commerce Clause *per se* if it has the practical effect of regulating commerce occurring outside that state's borders. *See Healy*, 491 U.S. at 332; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103-04 (2d Cir. 2003). Even if the state law is not invalid *per se*, it is subject to a balancing test that considers whether the state interest is outweighed by the national interest involved. *S. Pac.*, 325 U.S. at 768-69; *see also* Norman Williams, *The Commerce Clause and the Myth of Dual Federalism*, 54 UCLA L. REV. 1847, 1902 (2007) (noting that Supreme Court replaced *Sherlock*'s direct-

[12] *Sherlock* is not only anachronistic, but also distinguishable. In that case, a shipping company sought to evade liability for a boat accident in Indiana by claiming that it was an actor in interstate commerce. The Court held that an entity is not automatically immunized from liability for injuries it causes in a particular state simply because it happens to be engaged in interstate commerce. 93 U.S. at 100-01. Unlike in *Sherlock*, recognizing a New York performance right in pre-1972 recordings would not "indirectly and remotely affect" commerce. *Id.* at 104. Because the FCC prohibits state-specific broadcasting, *see infra* at 43-44, Sirius XM could not engage in interstate commerce *at all* without complying with this law. This is tantamount to imposing a state-specific "license fee" on interstate commerce, which *Sherlock* recognizes would be improper. *Id.* at 102.

indirect test with balancing test in *Southern Pacific*); Barry Cushman, *Formalism and Realism in Commerce Clause Jurisprudence*, 67 U. CHI. L. REV. 1089, 1148 (2000) (noting that balancing test "would supply the standard mode of analyzing nondiscriminatory state and local regulations for the remainder of the century").[13]

In the other cases cited by the district court, the courts *did* conduct a Commerce Clause analysis and found no violations based on the particular facts of those cases—simply underscoring the court's error in refusing to even conduct a Commerce Clause analysis here. *D.C. v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 657-58 (D.C. 2005) (validity of state gun law "depends on whether it imposes a burden on interstate commerce that is clearly excessive in relation to the putative local benefits"). Indeed, two of the cases directly refute the district court's erroneous conclusion that state common law does not constitute regulation subject to Commerce Clause scrutiny. As those cases correctly observe, "if a court-made rule imposes an unreasonable burden on commerce among the states, presumably it would be as vulnerable to attack as a corresponding statute," *West v. Broderick & Bascom Rope Co.*, 197 N.W.2d 202, 214 (Iowa 1972), and thus a court must scrutinize state laws under the Commerce Clause "regardless of whether the state law in question emerges from common law or directly from a state regulation,"

---

[13] Differentiating between direct and indirect burdens on commerce is unhelpful because it "uses labels to describe a result rather than any trustworthy formula by which it is reached." *Di Santo v. Commonwealth of Pennsylvania*, 273 U.S. 34, 44 (1927) (Stone, J., dissenting); *see also* Williams, *supra*, at 1899-1902.

*Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 45-47 (D. Mass. 2002).

**B. Applying A New York Performance Right To Sirius XM's National Broadcasts Would Violate The Commerce Clause**

Had the district court conducted a Commerce Clause analysis, it would have been compelled to find a violation. As noted above, there are two separate, independent tests for whether application of a state law violates the Commerce Clause: a *per se* test and a balancing test. Applying a New York performance right to Sirius XM would violate the Commerce Clause under either test.

1. *As Applied To Sirius XM, A New York Performance Right Violates The Commerce Clause* Per Se

A state law *per se* violates the Commerce Clause where it: (1) "directly regulates interstate commerce," (2) "discriminates against interstate commerce," or (3) "favors in-state economic interests over out-of-state interests." *NCAA v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993). Sirius XM does not contend that a New York performance right would be discriminatory or protectionist, as applied to Sirius XM, but it would "directly regulate[] interstate commerce." *Id.*

A state law that is otherwise valid can *per se* violate the Commerce Clause when *applied* in a way that affects interstate commerce. The intent of the law is irrelevant. The "critical" question is whether, as applied, the law has the "practical effect" of "control[ling] conduct beyond the boundaries of the State." *Id.* at 639;

*see Healy*, 491 U.S. at 332 ("[A] state law that has the 'practical effect' of regulating commerce occurring wholly outside the State's borders is invalid.").

Courts have held that a state law has the practical effect of regulating interstate commerce when it is applied to an entity engaged in conduct that has no geographic boundaries or is nationally uniform. For example, in *American Booksellers*, 342 F.3d at 103-04, this Court considered whether a Vermont statute that prohibited the distribution of material "harmful to minors" applied to plaintiffs' sexual education website, which could be accessed by minors in and outside of Vermont. Although the statute was not explicitly directed at interstate commerce, this Court held that it nonetheless violated the Commerce Clause *per se* as applied to plaintiffs' "boundary-less … internet speech," because its practical effect was to regulate activities occurring outside of Vermont. *Id.*; *see id.* at 103 ("Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities.").

And in *NCAA*, the Ninth Circuit considered whether a Nevada statute that established due process requirements for NCAA athletes applied to the NCAA, which adheres to nationally uniform rules. 10 F.3d at 638-40. The court held that applying the Nevada law to the NCAA would effectively require it to comply with Nevada law nationwide, which would violate the Commerce Clause *per se*. *Id.*; *see Flood v. Kuhn*, 407 U.S. 258, 284-85 (1972) (violation of Commerce Clause to

apply state's antitrust statute to national baseball league, because "uniformity [was required] in any regulation of baseball and its reserve system").

Here, the Commerce Clause violation is even more clear than in *American Booksellers* and *NCAA*, as Sirius XM's broadcasts have no "geographic boundaries" *and* are required by federal law to be "nationally uniform." Sirius XM broadcasts to millions of people across the country through satellite radio and internet streaming—which are by their very nature "boundary-less," *Am. Booksellers*, 342 F.3d at 103—and the car radios, mobile devices, and computers that subscribers use to access those broadcasts (most often while driving) are routinely transported across state lines. A900 ¶ 3; A981-84 ¶¶ 4-6, 11. Because Sirius XM's transmissions are one-way, it cannot control, or even track, where those broadcasts are received. A983-84 ¶ 11; A997-98 ¶¶ 7-8.

Moreover, the FCC requires Sirius XM's broadcasts to be nationally uniform. FCC regulations, which were enacted to protect local AM/FM radio broadcasters, provide that satellite radio broadcasts must be "restricted to the simultaneous retransmission of the complete programming" and "may not be used to distribute any information not also transmitted to all subscribers' receivers." 47 C.F.R. § 25.144(e)(4) (2014); *see id.* § 25.144(a)(3)(i) (requiring that applications for satellite radio service "[d]emonstrate that [the] system will, at a minimum, service the 48 contiguous states"); A983-84 ¶ 11. Sirius XM's FCC license also

"prohibits" Sirius XM from using terrestrial repeaters, which facilitate satellite radio broadcasts, to "distribute localized content that is distinct from that provided to subscribers nationwide via satellite." 23 FCC Rcd 12348 ¶ 155 (2008); A983-84 ¶ 11.[14]

The Commerce Clause prohibits the legislature or courts of one state from projecting its policies onto activity occurring in another state—much less throughout the entire country. *See Healy*, 491 U.S. at 337; *NCAA*, 10 F.3d at 638-40. Yet states outside of New York have expressly rejected a performance right in pre-1972 recordings. As already discussed, the *Flo & Eddie* Florida court recently held that Florida law does not provide a performance right in pre-1972 recordings, 2015 WL 3852692, at *5, and North Carolina and South Carolina have enacted legislation "abolish[ing] any common-law rights" in sound recordings, N.C. GEN. STAT. § 66-28 (2015); S.C. CODE ANN. § 39-3-510 (2015). Those policy choices would be overridden by New York law, because the FCC's uniformity requirement would effectively compel Sirius XM to respect the new New York performance

[14] Because Sirius XM is legally prohibited from state-specific broadcasting, this is not a case where Sirius XM can tailor its business activities to comply with New York law and thus avoid any extra-territorial effects. *Cf. Greater L.A. Agency on Deafness, Inc. v. CNN, Inc.*, 742 F.3d 414, 432-34 (9th Cir. 2014) ("CNN could enable a captioning option for California visitors to its site, leave the remainder unchanged, and thereby avoid the potential for extraterritorial application of the [state law]"); *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 961 (N.D. Cal. 2006) ("The commerce clause is not necessarily implicated since Target could choose to make a California-specific website.").

right in all broadcasts in all jurisdictions nationwide. The Commerce Clause precludes that result.

2. *As Applied To Sirius XM, A New York Performance Right Also Violates The Supreme Court's Balancing Test*

The Supreme Court has held that when a state law "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142 (1970). Applying a New York performance right to Sirius XM would fail this balancing test, because: (1) there is no New York-specific interest at stake, (2) the effects on interstate commerce are not "incidental," and (3) any New York-specific interest would be far outweighed by the burden on interstate commerce.

Plaintiff has yet to identify *any* New York-specific interest. This is not a case in which New York has a unique interest in ensuring the "safety, health and well-being of local communities, … which, because of its local character and the practical difficulties involved, may never be adequately dealt with by Congress." *Parker v. Brown*, 317 U.S. 341, 262 (1943). To the contrary, Congress already regulates rights in post-1972 recordings—and is far better situated than either New York, or a federal district court, to regulate rights in pre-1972 recordings. This case has nothing at all to do with the safety, health, and well-being of New

Yorkers. The performance right recognized by the district court does not just protect New York recording owners—it applies to recording owners in every state and country in the world. And this right does not just restrict New York broadcasters—it applies to every broadcaster and other entity that performs a pre-1972 recording, so long as that performance is received by a car radio, computer, or mobile device located in New York. A981-84 ¶¶ 4-5, 11; A997-98 ¶ 7. New York has no unique interest at stake. *Cf. Pike*, 397 U.S. at 143 (recognizing Arizona's interest in protecting reputation of local fruit growers); *Beretta*, 872 A.2d at 657 (D.C. gun law "addresses a pressing concern for public safety").

Even if some local benefit would accrue to New York, the burden on interstate commerce is not "incidental" and far outweighs any interest New York might have. The burden on Sirius XM and other broadcasters imposed by the district court's ruling is staggering. At a minimum, it would require all broadcasters whose performances of pre-1972 recordings are received in New York to identify the owner (or owners) of that recording, locate those owners, and attempt to negotiate a reasonable license agreement—without the benefit of a registration system or compulsory licensing scheme. *See* A1012-17 ¶¶ 51-53, 57-60, 63. As the district court recognized, this would have "significant economic consequences" and "could upend the analog and digital broadcasting industries." SPA39-40. It would shut down many broadcasters, or force them to stop

performing pre-1972 recordings, thereby depriving listeners nationwide of access to that music. A983-84 ¶ 11. *Compare Pike*, 397 U.S. at 145 (requiring fruit company to build $200,000 packaging plant in Arizona unreasonably burdened interstate commerce).

Moreover, courts applying the *Pike* balancing test have held that entities requiring nationally uniform governance, like Sirius XM, are unreasonably burdened by the application of state laws. *See Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997) ("The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states that the actor never intended to reach."); *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999) (citing *Pataki*) ("The Internet, like ... rail and highway traffic ..., requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations."); *Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378, 384-85 (1983) (violation of Commerce Clause to apply California's antitrust statute to NFL, which follows "a nationally uniform set of rules").

As discussed above, Sirius XM adheres to a nationally uniform set of rules, and is prohibited by the FCC from tailoring its satellite radio broadcasts to New York or any other state. Moreover, it is not possible to tailor broadcasts by state using Sirius XM's current technology, A983-84 ¶ 11; A998 ¶ 8, and designing and

implementing new technology would be extremely costly and burdensome, as it would require new satellites and millions of new receivers. The burden of requiring Sirius XM to change its national broadcasts to comply with New York law—particularly when other states do not recognize a performance right, *see supra* at 44—far outweighs any benefit to New York.

* * *

This Court should find that applying a New York performance right in pre-1972 recordings to Sirius XM would violate the Commerce Clause *per se* and under the Supreme Court's balancing test. Because Sirius XM is entitled to summary judgment as a matter of law, this Court can and should reverse the district court's summary judgment ruling and order it to enter summary judgment in favor of Sirius XM. *See McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 137 (2d Cir. 2008) (no need to remand for further proceedings when appellant entitled to judgment as matter of law based on evidence in record); *Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of Am.*, 419 F.3d 181, 195 (2d Cir. 2005) (reversing and remanding for entry of order granting summary judgment in appellant's favor where appellant entitled to summary judgment as matter of law). At a minimum, this Court should remand so the district court can conduct the Commerce Clause analysis in the first instance.

## CONCLUSION

For the foregoing reasons, the judgment should be reversed.

Dated: July 29, 2015

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli

Daniel M. Petrocelli
Cassandra L. Seto
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700

Jonathan D. Hacker
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

*Attorneys for Defendant-Appellant Sirius XM Radio Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,803 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: July 29, 2015

O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli

Daniel M. Petrocelli
Cassandra L. Seto
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700

Jonathan D. Hacker
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

*Attorneys for Defendant-Appellant Sirius XM Radio Inc.*

# Special Appendix

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**


| | **Page** |
|---|---|
| Memorandum Decision and Order Denying Defendant's Motion for Summary Judgment, dated November 14, 2014 | SPA-1 |
| Memorandum Decision and Order Denying Defendant's Motion for Reconsideration, dated December 12, 2014 | SPA-41 |
| Decision and Order Certifying Interlocutory Appeal, dated February 10, 2015 | SPA-53 |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/14/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

FLO & EDDIE, INC.,

Plaintiff,

-against-

SIRIUS XM RADIO, INC., and DOES 1-10,

Defendants.

---------------------------------------------------------x

No. 13 Civ. 5784 (CM)

**MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

Plaintiff Flo & Eddie, Inc. ("Flo and Eddie") brings this putative class action suit against Defendant Sirius XM Radio, Inc. ("Sirius"). The complaint alleges that Sirius committed common law copyright infringement and engaged in unfair competition by publicly performing sound recordings owned by Flo and Eddie, and by reproducing those recordings in aid of its performances. Before the Court is Docket #46, Sirius's motion for summary judgment. For the reasons stated below, the motion is **DENIED**.

Furthermore, it appears to the Court that there are no disputed issues of material fact as to liability. Sirius is therefore **ORDERED** to show cause by December 5, 2014, why summary judgment should not be entered in favor of Flo and Eddie as to liability only. *See* FED. R. CIV. P. 56(f)(1).

## BACKGROUND

### I. Factual Background

#### A. The Parties

Flo and Eddie is a California corporation, wholly owned by its principals, Mark Volman ("Volman") and Howard Kaylan ("Kaylan"). (Sirius 56.1 Statement ¶¶ 1-2; Volman Decl. ¶ 1.) Volman and Kaylan are two of the original members of The Turtles ("the Turtles"), a 1960s rock group whose hits included "Happy Together" and a cover of Bob Dylan's "It Ain't Me Babe." (Sirius 56.1 Statement ¶ 16; Flo and Eddie 56.1 Statement ¶¶ 2-3.)

Master recordings of the Turtles' performances – all of which were made prior to February 15, 1972 – were originally held by White Whale Records. (Sirius 56.1 Statement ¶¶ 1, 17; Flo and Eddie 56.1 Statement ¶¶ 3, 5; Volman Decl. ¶ 2.) White Whale transferred those recordings to the Turtles' members as part of a legal settlement. (Sirius 56.1 Statement ¶ 18; Flo and Eddie 56.1 Statement ¶ 5.) Volman and Kaylan purchased the remaining Turtles' members' interests in the recordings, and ultimately transferred all ownership interests in the recordings to Flo and Eddie. (Sirius 56.1 Statement ¶¶ 19-20; Flo and Eddie 56.1 Statement ¶¶ 6-7.)

Sirius is a Delaware corporation engaged in the satellite radio business. (Sirius 56.1 Statement ¶ 3.) Sirius provides digital audio content to its subscribers, who pay a periodic fee. (Geller Decl., Ex. 6.) Subscribers can receive audio content in several ways. Many subscribers – a majority according to Sirius – use special digital radios installed in their vehicles. (Sirius 56.1 Statement ¶ 5; Smith Decl. ¶ 4.) Other subscribers stream the same programming over the internet to a computer or mobile device. (Sirius 56.1 Statement ¶ 6; Flo and Eddie 56.1 Statement ¶ 14; Smith Decl. ¶ 6; *see* Smith 2/11/14 Dep. Tr. at 194:22-25.) Some users receive Sirius's music programming through Dish Network set-top boxes. (Sirius 56.1 Statement ¶ 6; Flo and Eddie 56.1 Statement ¶ 3; Smith Decl. ¶ 6; Smith 2/11/14 Dep. Tr. at 224:22-226:5.) Businesses can also

receive music broadcasts to play in their retail establishments through Sirius's "Business Establishment Service." (Sirius 56.1 Statement ¶ 6; Smith Decl. ¶ 6.)

Sirius offers a diverse set of programming including talk radio, live sports coverage, and music. (Sirius 56.1 Statement ¶ 4.) Music programming is featured on dozens of Sirius channels. (Geller Decl., Ex. 7.) Many of those channels – for example "60s on 6" or "70s on 7" – broadcast pre-1972 sound recordings. (Flo and Eddie 56.1 Statement ¶ 13.) Some of those channels have broadcast Turtles sound recordings. (*See, e.g.*, Sirius 56.1 Statement ¶¶ 21-22; Smith Decl. ¶¶ 12-13.) Both Sirius subscribers and users those who receive Sirius content through Dish Network set-top boxes can listen to programming that features pre-1972 sound recordings. (Smith 2/11/14 Dep. Tr. at 226:6-18.)

Sirius acknowledges that it "perform[s]" sound recordings, including pre-1972 sound recordings, by broadcasting them over its satellite radio network and streaming them over the internet. (Smith 3/12/14 Dep. Tr. at 96:21-97:15.) The pre-1972 sound recordings Sirius has performed include Turtles recordings. (Smith 3/12/14 Dep. Tr. at 104:8-105:9.) Sirius does not currently know how many pre-1972 recordings it has performed, or how many times it has performed Turtles recordings. (Smith 3/12/14 Dep. Tr. at 97:16-25, 105:11-22.)

**B. Sirius's Operations**

To understand Flo and Eddie's claims, one has to understand a bit about the technical aspects of Sirius's operations. Sirius stores its permanent digital music library on three databases, named "Prophet," "Dalet 5.1," and "Dalet Plus." (Sirius 56.1 Statement ¶¶ 24-26; Smith Decl. ¶ 17; Smith 2/11/14 Dep. Tr. at 154:2-8.) The Prophet database is located in New York City, and the two Dalet databases are located in Washington, D.C. (Sirius 56.1 Statement ¶¶ 25-26; Smith Decl. ¶¶ 18-19.) Sirius maintains onsite backup copies of each database, as well as offsite disaster recovery copies of the Prophet database in New Jersey, and of the Dalet databases in Georgia.

(Sirius 56.1 Statement ¶¶ 25-26; Flo and Eddie 56.1 Statement ¶ 18; Smith Decl. ¶¶ 18-19; Smith 2/11/14 Dep. Tr. at 154:11-155:23, 156:15-157:7.)

The content of the three databases overlaps imperfectly. (Smith 2/11/14 Dep. Tr. at 156:7-14.) Some recordings may be stored on all three databases. Other recordings might be stored only on Prophet, while others may be stored only on the Dalet databases. (Smith 2/11/14 Dep. Tr. at 75:12-76:13.) Each database stores copies of pre-1972 recordings. (Smith 2/11/14 Dep. Tr. at 159:24-160:9; Smith 3/12/14 Dep. Tr. at 38:6-40:6.) At least 18,000 such copies are stored on the Prophet database, and at least 24,000 are stored on each of the Dalet databases. (Flo and Eddie 56.1 Statement ¶ 17; Smith 3/12/14 Dep. Tr. at 40:8-42:15, 43:15-44:19; *see* Smith 3/12/14 Dep. Tr. at 61:19-62:11.) The Prophet database in New York contains 14 Turtles recordings, while the Dalet databases in Washington, D.C., contain 71 such recordings. (Sirius 56.1 Statement ¶¶ 29-30; *see* Flo and Eddie 56.1 Statement ¶ 16; Smith Decl. ¶¶ 23-24.) The backup and disaster recovery databases, like the Dalet and Prophet databases also contain pre-1972 recordings. (Smith 2/11/14 Dep. Tr. at 73:9-24.)

In addition to its three main databases, Sirius stores subsets of its music library on smaller databases at off-site locations. (Sirius 56.1 Statement ¶ 33; Flo and Eddie 56.1 Statement ¶ 18; Smith Decl. ¶ 27.) Specifically, Sirius maintains recordings from the Prophet database on smaller databases in Nashville, Orlando, and Boston. (Smith 2/11/14 Dep. Tr. at 158:17-21, 159:6-9.) Recordings from the Dalet databases reside on databases in Cleveland, Austin, and Los Angeles. (Sirius 56.1 Statement ¶ 33; Smith 2/11/14 Dep. Tr. at 158:22-159:5.) These smaller databases are used to produce on-location shows tailored to a particular musical style or on-air talent. (Smith 2/11/14 Dep. Tr. at 158:17-159:9, 163:4-21.) Some of these databases contain pre-1972 recordings, and the Cleveland database contains at least one Turtles recording. (Sirius 56.1 Statement ¶ 33;

Smith 2/11/14 Dep. Tr. at 160:9-161:25, 162:25-163:3, 164:12-23; Smith 3/12/14 Dep. Tr. at 51:11-54:4.)

Sirius has also copied some recordings to a database that it transferred to Omnifone, a UK-based firm that operates the My SXM service, described below. (Sirius 56.1 Statement ¶ 35; Flo and Eddie 56.1 Statement ¶ 29; Smith 2/11/14 Dep. Tr. at 33:25-34:16, 165:4-11; Smith 3/12/14 Dep. Tr. at 107:15-21.) Although the parties agree that Omnifone continues to possess those copies, Sirius claims that Omnifone can use them only for a very limited purpose: to provide the customized My SXM service. (Sirius 56.1 Statement ¶ 35; Smith 2/11/14 Dep. Tr. at 35:9-25.) The database transferred to Omnifone contains pre-1972 recordings, including Turtles recordings. (Sirius 56.1 Statement ¶ 35; Smith Decl. ¶¶ 27, 29; Smith 2/11/14 Dep. Tr. at 165:7-15; Smith 3/12/14 Dep. Tr. at 54:22-55:14.)

Several hours before Sirius plays a sound recording on one of its programs, it creates an additional copy of the recording on its "play-out server." (Sirius 56.1 Statement ¶ 37; Flo and Eddie 56.1 Statement ¶ 20; Smith Decl. ¶ 31; Smith 2/11/14 Dep. Tr. at 19:5-16.) Content is broadcast directly from the play-out server; the copy ensures a smooth broadcast even if there is a network disruption. (Sirius 56.1 Statement ¶ 37; Smith Decl. ¶ 31; *see* Smith 2/11/14 Dep. Tr. at 114:15-116:16.) The copy on the play-out server is deleted once a recording is broadcast. (Sirius 56.1 Statement ¶ 37; Smith Decl. ¶ 31.) Each time a recording is performed, a new copy is created on the play-out server. (Smith 2/11/14 Dep. Tr. at 117:9-11; Smith 3/12/14 Dep. Tr. at 89:2-7.) Because Sirius has performed pre-1972 recordings, including Turtles recordings, it has necessarily copied those recordings to its play-out server – many times, in fact. (Smith 3/12/14 Dep. Tr. at 88:2-20, 91:5-16.) But Sirius does not know how many copies of those recordings have been made on its play out server (Smith 3/12/14 Dep. Tr. at 89:8-91:4.)

To deliver content through its streaming service, Sirius employs a third party, Akami. (Smith 2/11/14 Dep. Tr. at 176:5-11; Smith 3/12/14 Dep. Tr. at 108:3-21.) Sirius sends a signal of its programming to Akami; Akami in turn makes several temporary copies of the recordings that Sirius sends it in order to facilitate its content distribution operation. (Smith 2/11/14 Dep. Tr. at 177:21-178:11.) Pre-1972 recordings are included in the programming that Sirius broadcasts and Akami copies. (Smith 3/12/14 Dep. Tr. at 46:17-20.)

Sirius makes additional complete of recordings it has broadcast for its "Start Now" service.[1] (*See* Sirius 56.1 Statement ¶ 39; Flo and Eddie 56.1 Statement ¶¶ 15, 22, 29; Geller Decl., Ex. 5; Smith Decl. ¶ 33.) Start Now is a time-shifting feature. It allows users to start from the beginning (up to five hours earlier) a program that Sirius is currently broadcasting. (Sirius 56.1 Statement ¶ 39; Smith Decl. ¶ 33; Smith Decl. ¶ 33.) To provide this service, Sirius keeps a running cache of its broadcasts. (Sirius 56.1 Statement ¶ 39; Smith Decl. ¶ 33.) The cache is continually updating to store the most recent five hours – earlier data is overwritten on a first-in-first-out basis. (Sirius 56.1 Statement ¶ 39; Smith Decl. ¶ 33.) Sirius acknowledges that copies of pre-1972 recordings have been cached for the Start Now feature. (Smith 2/11/14 Dep. Tr. at 214:9-12.)

Separately from the Start Now feature, Sirius also authorizes Quick Play, a third party, to maintain a five hour cache of Sirius programming. (Smith 2/11/14 Dep. Tr. at 179:5-17, 193:16-19.) Quick Play's role, performed in conjunction with Akami, is to deliver Sirius content to mobile devices. (Smith 2/11/14 Dep. Tr. at 179:23-180:4.) As with the Start Now cache, Quick Play has included pre-1972 recordings in its five-hour cache. (Smith 2/11/14 Dep. Tr. at 214:9-19.)

[1] Flo and Eddie describes the five-hour time-shifting as Sirius's "On Demand" feature. Although the parties are not entirely clear, it appears that "On Demand" and "Start Now" are separate features. The allegedly unauthorized copy made for time-shifting purposes is properly referred to as "Start Now." (*See* Geller Decl., Ex. 8; Smith Decl. ¶ 33.)

In aid of broadcasting, Sirius also makes partial copies of some recordings, known as "tips-and-tails" copies. (Sirius 56.1 Statement ¶ 36; Flo and Edie 56.1 Statement ¶ 19; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 18:4-25.) These copies contain the final few seconds of one recording and the first few seconds of the recording set to play after it. (Sirius 56.1 Statement ¶ 36; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 52:20-53:25.) Hosts of Sirius programs use the tips-and-tails copies to properly time voice-overs in which they will, for example, announce the titles of the recording that just played and the one about to play. (Sirius 56.1 Statement ¶ 36; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 18:4-25.) A host will pre-record voice-overs against the background of the tips-and-tails recording to ensure that a voice-over does not bleed over too far into the body of a recording. After the voice-over is recorded, the tips-and-tails copy is deleted. (Sirius 56.1 Statement ¶ 36; Smith Decl. ¶ 30; Smith 2/11/14 Dep. Tr. at 55:5-56:10.) (There appears to be one exception. The smaller regional "Margaritaville" database retains permanent copies of tips-and-tails recordings. (Smith 2/11/14 Dep. Tr. at 83:2-84:6.)) Partial copies of pre-1972 recordings, including Turtles recordings, have been made for tips-and-tails purposes. (Smith 2/11/14 Dep. Tr. at 56:11-18; Smith 3/12/14 Dep. Tr. at 80:11-81:4, 82:14-20, 84:8-21.) But Sirius does not know exactly how many such copies have been made. (Smith 3/12/14 Dep. Tr. at 81:6-82:13.)

The most contentious factual dispute between the parties concerns buffering, which Flo and Eddie describes as "progressive downloading." (Flo and Eddie 56.1 Statement ¶¶ 30-31; Smith 2/11/14 Dep. Tr. at 203:18-204:10.) Buffering, in general, refers to storing a small segment of audio or video content in computer memory to ensure smooth playback. Sirius's content is buffered at several points. Sirius buffers for four seconds at the "earth station," where content is uplinked to a satellite. (Sirius 56.1 Statement ¶ 38; Smith Decl. ¶ 32; Smith 2/11/14 Dep. Tr. at 119:12-

120:2.) The four second buffer allows Sirius to send two separate signals to its satellites. A user's radio can then substitute one transmission for another if a connection is momentarily blocked, so that playback will not be interrupted. (Sirius 56.1 Statement ¶ 38; Smith Decl. ¶ 32.) The satellites then send back the two signals, where they are received by a "terrestrial repeater." (Sirius 56.1 Statement ¶ 38; Smith Decl. ¶ 32; Smith 2/11/14 Dep. Tr. at 93:12-15.) The terrestrial repeaters buffer the first signal received until they receive the second signal, generally on the order of a few milliseconds later. (Smith 2/11/14 Dep. Tr. at 93:16-94:3, 135:18-136:25.) Finally, Sirius digital radios store signals they receive in memory, creating a four-second buffer at the point where subscribers listen to content. (Smith 2/11/14 Dep. Tr. at 96:3-97:7, 111:15-112:10; *see* Smith 2/11/14 Dep. Tr. at 137:14-18 (noting that there are two distinct four-second buffers).)

Some individual radio receivers create a buffer of up to 30 minutes on a channel to which a subscriber is listening. (Sirius 56.1 Statement ¶ 44; Smith Decl. ¶ 35.) That buffer allows users to "replay" a few minutes of a show they miss. (Sirius 56.1 Statement ¶ 44; Smith Decl. ¶ 35.) The replay buffer is overwritten on a rolling first-in, first-out basis and is erased if a user changes the channel or turns off the radio. (Sirius 56.1 Statement ¶ 44; Smith Decl. ¶ 35.) Finally, mobile phones or other internet-connected devices also create a buffer when they stream Sirius's content. (Sirius 56.1 Statement ¶ 43; Smith Decl. ¶ 34.) Because buffers are created any time Sirius broadcasts a recording, Sirius has of course created buffers of pre-1972 recordings. (Smith 2/11/14 Dep. Tr. at 138:7-13.)

Flo and Eddie emphasizes that every second of a buffered recording will, at some point, be cached in the buffer, even if no complete copy is ever created. Sirius stresses that buffers are constantly adding new data and removing old data. At any one time, a buffer contains at most a few seconds of content, which may include portions of more than one recording.

The long and short of this is – Sirius makes multiple copies, temporary, permanent, whole or partial, during its broadcast process; and it performs the copies it makes. Furthermore, as to pre-1972 sound recordings, it does so without obtaining licenses or paying royalties. Sirius has not obtained a license to copy most of the pre-1972 recordings stored in its various databases. (Frear 3/12/14 Dep. Tr. at 77:20-79:25.) Nor has Sirius obtained licenses to perform most of those recordings over the internet, (Frear 3/12/14 Dep. Tr. at 80:2-21), or to authorize third parties Omnifone or Akami to stream its programming. (Frear 3/12/14 Dep. Tr. at 90:11-91:5.) Sirius has not paid royalties to copy or perform most of its pre-1972 recordings. (Frear 3/12/14 Dep. Tr. at 69:10-16.)

For all the copying it does do, it's worth noting what Sirius does not do. Sirius does not currently allow users to download and store complete copies of any recordings. (Sirius 56.1 Statement ¶¶ 24, 40, 41, 43; Smith Decl. ¶ 14.) In this way, Sirius differs from file-sharing services such as Napster and Limewire. (Sirius 56.1 Statement ¶ 41; Smith Decl. ¶ 14.)

Nor does Sirius allow users to listen to a particular recording whenever they choose to do so. In this way, Sirius differs from some internet radio services like Spotify. (Sirius 56.1 Statement ¶ 41; Smith Decl. ¶ 14.) Users can customize the programming they receive to a limited extent using the "My SXM" feature. (Sirius 56.1 Statement ¶ 35; Flo and Eddie 56.1 Statement ¶ 15; Geller Decl., Ex. 8; Smith Decl. ¶ 28.) For example, a user could choose to emphasize folk music and deemphasize rock music on a 70s channel. But that user could not choose to listen only to Bob Dylan, much less a particular Bob Dylan recording, while excluding anything by Led Zeppelin. (*See* Sirius 56.1 Statement ¶ 41; Smith Decl. ¶¶ 14, 28.)

## II. Procedural Background

Flo and Eddie filed its initial complaint on August 16, 2013. (Docket #1.) In response to a motion to dismiss filed by Sirius, Flo and Eddie filed an amended complaint on November 13, 2013. (Docket #32.)

Flo and Eddie has filed companion suits in California and Florida. (*See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-23182 (S.D. Fla.); *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-05693 (C.D. Cal.)). In each case, Flo and Eddie has asserted state-law claims under the law of the state in which the suit was filed. The district court in the California suit granted Flo and Eddie's motion for summary judgment as to liability. The district court in the Florida suit has not yet issued a decision on a pending motion by Flo and Eddie for summary judgment as to liability.

To understand why Flo and Eddie seeks relief under state law, one has to know a bit about federal copyright law. Since 1831, federal law has protected copyrights in musical compositions. *See* 17 U.S.C. § 102(a)(2); Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436. "The creator of a musical composition has long had a right of exclusive public performance of that musical piece." *Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 487 (3d Cir. 2003). Thus, when radio stations publicly perform – that is, broadcast – copyrighted musical compositions, they pay royalties to the holder of the copyright in the song – generally the composer or his heirs – for the privilege of doing so. *Woods v. Bourne Co.*, 60 F.3d 978, 983-84 (2d Cir. 1995). Those royalties are typically collected and distributed by professional clearinghouses, such as the American Society of Composers, Authors and Publishers ("ASCAP"). *Id.*; *see Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 4-5 (1979) (describing ASCAP).

A copyright in a musical composition is *not* same as a copyright in a sound recording of a performance of that composition. And this lawsuit not about musical compositions. (Pl. Opp.

Mem. at 10 n.6.) As far as the Court is aware, Sirius pays royalties to the holder of the copyright for the right to perform the Turtles' musical compositions.

This suit is about copyright in sound recordings, which is a different animal. A sound recording is a medium in or on which a particular performance of a musical composition (song) is fixed for posterity and for playback. *See* 17 U.S.C. § 101. In essence, a copyright in a sound recording is a copyright in the performance – not in the work being performed.

Congress only made sound recordings eligible for federal statutory copyright protection in 1971. *See* Sound Recordings Act, Pub. L. No. 92-140, 85 Stat. 391 (1971). Furthermore, that protection was limited in two important ways.

First, Congress did not originally provide sound recording copyright holders with an exclusive right to publicly perform their works. *Bonneville Int'l Corp.*, 347 F.3d at 487. Thus, the owners of copyrights in sound recordings, unlike copyright holders in musical compositions were not entitled to compensation under federal law when radio stations broadcast their recordings between 1972 and 1995. *Id.* In 1995, Congress added a limited public performance right for sound recordings, giving holders of sound recording copyrights the "exclusive right[] . . . to perform the copyrighted work publicly by means of a digital audio transmission." 17 U.S.C. § 106. Federal copyright law still provides no exclusive right to public performance of sound recordings by any other means. *See Arista Records, LLC v. Launch Media, Inc.*, 578 F.3d 148, 153-54 (2d Cir. 2009).

The second important limitation of the 1971 Act was that it operated prospectively. Recordings "fixed" (recorded) prior to February 15, 1972 were not, and still are not, eligible for federal copyright protection. *See* 17 U.S.C. § 301(c). The Turtles recordings were all fixed before February 15, 1972. Therefore, none is eligible for federal copyright protection.

Instead of adopting a federal copyright scheme for pre-1972 sound recordings, Congress left the issue to the states. For works protected by federal law, Congress broadly preempted any "equivalent right in any such work under the common law or statutes of any State." *Id.* § 301(a). For sound recordings fixed before February 15, 1972, however, Congress expressly did "not . . . annul[] or limit[]" "any rights or remedies under the common law or statutes of any State." *Id.* § 301(c).

Flo and Eddie argues that New York provides pre-1972 sound recording owners with rights and remedies under its common law. Flo and Eddie further argues that New York's common law copyright protection, which extends to pre-1972 sound recordings, prohibits both reproducing and publicly performing those recordings. It also argues the law of unfair competition provides similar protection.

Sirius has moved for summary judgment. (Docket #46.) It argues that: (1) New York common law copyrights in pre-1972 sound recordings do not afford an exclusive right of public performance; (2) the copies Sirius made of Turtles recordings are protected by fair use; (3) sustaining Flo and Eddie's claims would violate the Dormant Commerce Clause; and (4) Flo and Eddie's entire action is barred by the doctrine of laches.

## DISCUSSION

### I. Standard

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see* FED. R. CIV. P. 56(a), (c). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. "Summary judgment is designed . . . to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

## II. Sirius Cannot Invoke the Defense of Laches

Sirius argues that Flo and Eddie's entire suit is barred by the defense of laches. But it is not.

"The defense of laches is unavailable in [an] action at law commenced within the period of limitations." *Cadlerock, L.L.C. v. Renner*, 898 N.Y.S.2d 127, 128 (App. Div. 2010); *see Onanuga v. Pfizer, Inc.*, 369 F. Supp. 2d 491, 499 (S.D.N.Y. 2005); *Coit v. Campbell*, 82 N.Y. 509, 512-13 (1880). Flo and Eddie has brought an action at law for damages. Flo and Eddie's unfair competition claim – grounded in misappropriation – is subject to a three-year statute of limitations. *Sporn v. MCA Records, Inc.*, 451 N.Y.S.2d 750, 751 (App. Div. 1982) *aff'd*, 58 N.Y.2d

482 (1983). The claim for common law copyright infringement is also an action at law, *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); *Bercovici v. Chaplin*, 7 F.R.D. 61, 62 (S.D.N.Y. 1946), subject to a six year statute of limitations. *Capitol Records, LLC v. Harrison Greenwich, LLC*, 986 N.Y.S.2d 837, 838 (Sup. Ct. 2014). Flo and Eddie seeks damages on both claims, and Sirius does not argue that they are brought outside the applicable statutes of limitations. Thus, those claims are not barred by laches.

Nor does laches bar Flo and Eddie's prayer for an injunction. That request "for an equitable remedy" is made "in aid of or to enforce a legal right." *Bohemian Brethren Presbyterian Church v. Greek Archdiocesan Cathedral of Holy Trinity*, 405 N.Y.S.2d 926, 929 (Sup. Ct. 1978) *aff'd*, 416 N.Y.S.2d 751 (App. Div. 1979) (citing *Galway v. Metro. Elevated Ry. Co.*, 128 N.Y. 132 (1891)). In that situation, the defense of laches is similarly unavailable. The statute of limitation controls both the legal action for damages and the equitable remedy. *Id.*; *see Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890, 2005 WL 2582177, at *8 & n.87 (S.D.N.Y. Oct. 11, 2005).

## III. Flo and Eddie Holds the Valid Common Law Copyright in the Turtles' Sound Recordings

As explained above, federal law provides copyright protection for sound recordings fixed on or after February 15, 1972. *See* 17 U.S.C. §§ 102(a)(7), 301(c). As to those sound recordings, Congress broadly preempted equivalent state-law protections. *Id.* § 301(a). Federal law does not, however, provide copyright protection for sound recordings fixed before February 15, 1972. Furthermore, Congress expressly declined to preempt whatever common law copyright protection was provided to those recordings by state law until February 15, 2067. *Id.* § 301(c).

New York has elected to "fill th[e] void" Congress left, by continuing to enforce its preexisting body of copyright common law for pre-1972 sound recordings. *Capitol Records, Inc.*

*v. Naxos of Am., Inc.* (*Naxos*), 4 N.Y.3d 540, 559-60, 565 (2005); *see Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 662-63 (2d Cir. 1955); *Firma Melodiya v. ZYX Music GmbH*, 882 F. Supp. 1306, 1316 (S.D.N.Y. 1995). Under that law, artists can acquire a common law copyright in "any original material product of intellectual labor" *A.J. Sandy, Inc. v. Junior City, Inc.*, 234 N.Y.S.2d 508, 510 (App. Div. 1962) – including sound recordings – by expending "time, effort, money, and great skill" in its creation. 104 N.Y. JUR. 2D TRADE REGULATION § 262; *see RCA Mfg. Co. v. Whiteman*, 114 F.2d 86, 88 (2d Cir. 1940). The term "any original material product of intellectual labor" includes sound recordings. *See, e.g.*, *Capitol Records, Inc. v. Greatest Records, Inc.*, 252 N.Y.S.2d 553, 554-55 (Sup. Ct. 1964); *Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 492-93 (Sup. Ct. 1950) *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951).

The Turtles originally acquired a common law copyright in their sound recordings by expending time, effort, money and skill to create them. That copyright was then transferred to White Whale, and eventually to Flo and Eddie, which now owns the sound recordings. Sirius does not contest Flo and Eddie's claim to possess a common law copyright in the Turtles recordings (though it insinuates that some of the underlying ownership transfers are undocumented). Rather, Sirius contends that Flo and Eddie's rights as holder of the copyright in the sound recordings does not give them the exclusive right to publicly perform those works.

## IV. Flo and Eddie's Common Law Copyright Provides Exclusive Rights to Reproduce and Publicly Perform Turtles Recordings

Flo and Eddie alleges that Sirius has infringed its common law copyright by (1) reproducing (making copies of) the master recordings, and (2) performing those recordings (or the illicit copies of them) publicly.

New York unquestionably provides holders of common law copyrights in sound recordings with an exclusive right to reproduce those recordings. *See Capitol Records*, 221 F.2d at 663; *Naxos*, 4 N.Y.3d at 559-60, 563-64. Sirius does not challenge that proposition, although it argues that its reproductions of Turtles sound recordings constitute fair use. That issue will be discussed below.

Whether New York provides holders of common law copyrights in sound recordings with an exclusive right to publicly perform those recordings presents a much thornier question – one of first impression, and one that has profound economic consequences for the recording industry and both the analog and digital broadcast industries. My first task is to predict how I believe the New York Court of Appeals would rule on this question, which no appellate court in New York has yet confronted. *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F. 2d 1146, 1153 (2d Cir. 1989).[2]

I conclude that the New York Court of Appeals would recognize the exclusive right to public performance of a sound recording as one of the rights appurtenant to common law copyright in such a recording.

"In general, the rights under common law copyright . . . are at least co-extensive with the rights commanded under the Copyright Act." 2 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT § 8[C][2] (Matthew Bender, Rev. Ed.). But when New York first recognized common law copyrights in sound recordings – over 50 years ago – Congress had not yet authorized any federal copyright protection for sound recordings. *Naxos*, 4 N.Y.3d at 560.

---

[2] One very recent decision of the New York State Supreme Court appears to recognize just the sort of public performance right that Sirius says does not exist. *See Capitol Records, LLC v. Harrison Greenwich, LLC*, 984 N.Y.S.2d 274, 275-76 (Sup. Ct. 2014); Decision and Order, *Capitol Records, LLC v. Harrison Greenwich, LLC*, No. 652249/2012 (N.Y. Sup. Ct. May 13, 2014). But that Decision and Order does not explain its ruling and cites no prior case law recognizing any public performance right in sound recordings, so I can take no guidance from it.

Thus, the protections New York common law offers to holders of copyrights in sound recordings cannot be determined by reference to comparable federal protection. Instead, I must look to the background principles and history of New York copyright common law. *See id.* at 546 ("[W]hen examining copyright law, a page of history is worth a volume of logic." (internal citations and quotation marks omitted)).

The common law typically "protects against unauthorized reproduction of copies or phonorecords, unauthorized distribution by publishing or vending, *and unauthorized performances.*" 2 NIMMER ON COPYRIGHT § 8[C][2] (internal citations omitted) (emphasis added); *see Letter Edged in Black Press, Inc. v. Pub. Bldg. Comm'n of Chicago*, 320 F. Supp. 1303, 1308 (N.D. Ill. 1970); *cf. Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F. 3d 73, 81 (2d Cir. 2014) (describing the bundle). New York courts have long afforded public performance rights to holders of common law copyrights in works such as plays, *Palmer v. De Witt*, 47 N.Y. 532, 535-36, 540-41 (1872); *Roberts v. Petrova*, 213 N.Y.S. 434, 434-37 (Sup. Ct. 1925); *French v. Maguire*, 55 How. Pr. 471, 472-73, 479-80, 1878 WL 11310 (N.Y. Sup. Ct. 1878) and films, *Brandon Films, Inc. v. Arjay Enter., Inc.*, 230 N.Y.S.2d 56, 57-58 (Sup. Ct. 1962). The Second Circuit concluded over three decades ago that New York would recognize a public performance right in compilations of film clips. *Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1097-99, 1101-04 (2d Cir. 1982) (applying New York law).

Nonetheless, Sirius advances a number of arguments for why New York common law copyright in sound recordings does not include any public performance right.

Sirius principally argues that no such right exists because New York case law contains no discussion of public performance rights in sound recordings. But the exact same argument could have been made (and undoubtedly was made, and rejected) in *Naxos* – a case decided only in 2005,

more than a century after sound recordings were invented. The very fact that *Naxos* was decided in favor of the common law copyright holder, after more than a century of judicial silence, means that this court can infer nothing – certainly not that the common law copyright in sound recordings does not encompass all of the rights traditionally accorded to copyright holders in other works, including the right of public performance – from the fact that this is the first case to raise the issue.

Of course, the conspicuous lack of any jurisprudential history confirms that not paying royalties for public performances of sound recordings was an accepted fact of life in the broadcasting industry for the last century. So does certain testimony cited by Sirius from record industry executives, artists and others, who argued vociferously before Congress that it was unfair for them to operate in an environment in which they were paid nothing when their sound recordings were publicly performed. *See, e.g.*, *Digital Performance Rights: Hearing Before the House Judiciary Committee Subcommittee on Courts and Intellectual Property on H.R. 1506*, 104th Cong. (1995) (statement of Edward O. Fritts, President & CEO, Nat'l Ass'n of Broadcasters), 1995 WL 371107; H. Comm. On Patents, 74th Cong., Hearings on Revision of Copyright Laws 622 (Comm. Print. 1936) (statement of H.A. Huebner, representing Brunswick Record Corp. and Columbia Phonograph Co.); *see also* Sirius Summary Judgment Mem. at 9-12. That they were paid no royalties was a matter of statutory exemption under federal law; that they demanded no royalties under the common law when their product as ineligible for federal copyright protection is, in many ways, inexplicable.

But acquiescence by participants in the recording industry in a status quo where recording artists and producers were not paid royalties while songwriters were does not show that they lacked an enforceable right under the common law – only that they failed to act on it. The United States Copyright Office, in its most recent commentary on this subject, concluded, "While, as a factual

matter, a state may not have affirmatively acknowledged a public performance right in pre-1972 recordings as of the Office's 2011 report, the language in the report should not be read to suggest that a state could not properly interpret its law to recognize such a right." *Music Licensing Study: Second Request for Comments*, 79 Fed. Reg. 42,833-01, 42,834 n.3 (July 23, 2014).

The United States Supreme Court admonished recently against reading too much into a lack of precedent for a point:, stating (in another context), "It should be unsurprising that such a significant matter has been for so long judicially unresolved." *D.C. v. Heller*, 554 U.S. 570, 625 (2008). The Supreme Court, for example, failed to grapple with many fundamental constitutional questions for the first 150 years of the Constitution's existence. *Id.* at 625-26. I thus do not read too much into the fact that New York courts have never squarely addressed a particular feature of state copyright law in the context of sound recordings.

In fact, there is precedent for this kind of judicial silence in the copyright arena. Prior to 1976, choreography was deemed ineligible for any sort of copyright protection, under federal or common law. Courts declined to offer copyright protection to dance on the theory that choreographic works did not "tell" a story, and thus could not be considered copyright-eligible "dramas." *See, e.g.*, *Seltzer v. Sunbrock*, 22 F. Supp. 621, 628-29 (S.D. Cal. 1938); *Fuller v. Bemis*, 50 F. 926, 929 (S.D.N.Y. 1892). That changed with the 1976 amendments to the Copyright Act, which explicitly recognized "choreographic works" as copyright-eligible. *See* Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541, 2544-45. Since then, an entire body of law has evolved concerning dance copyright – not all at once, or all as soon as the 1976 Act became effective, but over the ensuing decades.

So it is not surprising that sound recordings, like choreographic works, received little attention from courts before they became eligible for statutory copyright. It is likely that the issue

was just not on anyone's radar screen until Congress granted a public performance right in more recent sound recordings.

An arguably stronger argument can be made that years of judicial silence implies exactly the opposite of what Sirius contends – not that common law copyright in sound recordings carries no right of public performance, but rather that common law copyright in sound recordings comes with the entire bundle of rights that holders of copyright in other works enjoy. No New York case recognizing a common law copyright in sound recordings has so much as suggested that right was in some way circumscribed, or that the bundle of rights appurtenant to that copyright was less than the bundle of rights accorded to plays and musical compositions. The expansive nature of New York's common law protection for artistic works that do not enjoy federal statutory copyright protection was announced over fifty years ago, in *Metropolitan Opera Association v. Wagner-Nichols Recorder Corp.*, supra – a case protecting property rights in sound recordings. There, the court said, "The law has . . . protected the creative element in intellectual productions—that is, the form or sequence of expression, the new combination of colors, sounds or words presented by the production . . . against appropriation by others." *Metro. Opera*, 101 N.Y.S.2d at 493.

Modern federal law supports the notion that an express carve-out is required in order to circumscribe the bundle of rights appurtenant to copyright. When Congress amended the Copyright Act in 1971 to protect copyrights in sound recordings, it announced quite explicitly that sound recordings would not carry any right to public performance. The relevant section of Title 17 limits copyright in sound recordings to the rights, "To reproduce and distribute to the public by sale or other transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording." Sound Recordings Act, Pub. L. No. 92-140, 85 Stat. 391, 391 (1971). The 1971 Act further provided that "the exclusive right of the owner of a copyright in a

sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form," and that "this right does not extend to . . . reproductions made by transmitting organizations exclusively for their own use." *Id.*

This express carve-out for public performance strongly suggest that, absent such an explicit limitations, holder of sound recording copyrights would have enjoyed the entire bundle of rights traditionally granted to copyright holders – including the right to public performance, which has been part of the bundle of rights enjoyed by holders of federal copyrights in performable works since 1897 or earlier. Put otherwise, if public performance rights were not part of the normal bundle of rights in a copyright, Congress would not have needed to carve out an exception specifically for sound recordings. *See Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 375 n.12 (2006) (same principle in the context of bankruptcy law).[3]

[3] The history of Congressional grants of public performance rights is convoluted. The 1831 Act, which first granted copyright protection to authors of musical compositions, did not provide a public performance right. *See* Act of Feb. 3, 1831, ch. 16, § 1, 4 Stat. 436. When Congress added copyright protection for "dramatic composition[s]" in 1856, it expressly included a "sole right to . . . perform, or represent" the composition, without providing any comparable right for copyrights in other works. Act of Aug. 18, 1856, ch. 169, 11 Stat. 138, 139. That state of affairs continued through the general copyright law revisions of 1870 in which Congress expressly provided a "public[] perform[ance]" right for dramatic compositions but not for musical compositions. Act of July 8, 1870, ch. 230, § 86, 16 Stat. 198, 212. Finally, in 1897, Congress added a public performance right specifically for musical compositions. Act of Jan. 6, 1897, ch. 4, 29 Stat. 481, 481-82. When Congress revised the copyright law in 1909, it continued to provide the holders of copyrights in dramatic compositions and musical compositions with the exclusive right to "perform [their works] publicly." Act of Mar. 3, 1909, ch. 320, § 1, 35 Stat. 1075, 1075. Other types of works, however, did not enjoy that same privilege.

By the time Congress enacted copyright protection for sound recordings, public performance rights were firmly entrenched for musical compositions and dramatic compositions: the two kinds of works to which public performance rights could sensibly be provided. It was thus an accepted part of the background law that public performance rights would, absent a deliberate effort to exclude them, extend to sound recordings. That principle applies with even more force to common law copyright, which generally includes fewer limitations on exclusive rights than does federal statutory law. *See* Shyamkrishna Balganesh, *The Pragmatic Incrementalism of Common Law Intellectual Property*, 63 VAND. L. REV. 1543, 1563 (2010).

Sirius also raises several policy arguments against public performance rights in pre-1972 sound recordings.[4]

Sirius claims that affording public performance rights would not serve the underlying purposes of copyright law because pre-1972 recordings already exist and further rights cannot create incentives for the creation of new pre-1972 recordings.

But the same criticism could be leveled against the New York Courts of Appeals' decision in *Naxos*. There, in answer to a certified question from the Second Circuit, the New York Court of Appeals held that, "New York provides common-law copyright protection to sound recordings not covered by the federal Copyright Act, regardless of the public domain status in the country of origin." *Naxos*, 4 N.Y.3d at 563. The plaintiffs in *Naxos* owned several sound recordings made in the 1930s, which had fallen into the public domain in the United Kingdom where they were originally copyrighted. Allowing the *Naxos* plaintiffs to assert their common law right of reproduction could not possibly have created any incentive to produce new sound recordings – especially since all newly created sound recordings enjoy exclusive copyright protection under federal law. Yet the New York Court of Appeals held that those plaintiffs could proceed on their common law copyright infringement claims. From that holding, I conclude that New York does not protect common law copyrights only when that protection creates incentives for new similar works.

---

[4] Sirius frames these arguments with the general principle that federal courts should apply state common law as it currently stands – not as they think it should be. That is a correct statement of the role of federal courts. But I am not applying the law as I think it "should" be, but as I "predict how the New York Court of Appeals would resolve the . . . question." *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005). Unlike the Second Circuit, I do not have the option to certify even profoundly uncertain issues of state law to the Court of Appeals.

New York is hardly unique in this regard. Each time that Congress is asked to extend the term of copyright protections (a request not infrequently made), someone observes that allowing the children and grandchildren of creative people long dead to collect royalties does nothing to encourage creativity, and so cuts against both the traditional argument in favor of copyright and undermines the historic belief that, at some point, a Government-created monopoly on intellectual property should yield to an expanded public use. Congress has rejected that perfectly sensible argument time and time again. I see no reason to conclude that either statutory or common law copyright any longer focuses on fostering future creativity, as opposed to rewarding past creativity.

Sirius also claims that recognizing public performance rights in pre-1972 sound recordings would unjustly punish good faith investors who provided capital for Sirius.

Investors always assume the risk that whatever economic model they are working off will turn out not to be correct, so investor expectations are rarely "settled" enough to provide a justification for declining to apply the correct legal rule.

However, I question whether the investors would be truly surprised if Sirius were to have to pay royalties in order to perform pre-1972 sound recordings. Sirius, which broadcasts exclusively in non-analog form, must pay royalties under federal law in order to broadcast post-1972 sound recordings. All Flo and Eddie seeks here is the right to receive royalties under state law for the digital broadcasting of its pre-1972 recordings – hardly a shocking development in the world of digital broadcasting.

Indeed, as a matter of public policy there would seem to be good reason to harmonize New York's common law of copyright with its federal statutory counterpart, *see* 2 NIMMER ON COPYRIGHT § 8[C][2], and recognizing public performance rights in pre-1972 sound recordings would conform the two.

In 1995, Congress added a limited right for sound recording copyright holders to publicly perform their works "by means of a digital audio transmission." 17 U.S.C. § 106. In creating that limited right, Congress carefully balanced the interests of all affected parties. As Senator Hatch explained, the bill establishing a public performance right was "forward looking. It largely leaves in place mature businesses that have grown up under the old copyright regime [i.e., analog broadcasting]. It seeks to ensure that creators of sound recordings will have the rights they have been denied until now as the digital age dawns." 141 Cong. Rec. 22,775, 22,779 (1995). By establishing a "new digital performance right [that] applies to digital audio transmission . . . [but] not [] to traditional broadcasts and most other free transmissions" Congress "attempted to balance the competing interests of the various copyright owners as well as users." *Id*; *see* H.R. Rep. No. 104-274, at 13-15 (1995); S. Rep. No. 104-128, at 13-17 (1995); *see generally* Kimberly L. Craft, *The Webcasting Music Revolution Is Ready to Begin, As Soon As We Figure Out the Copyright Law: The Story of the Music Industry at War with Itself*, 24 HASTINGS COMM. & ENT. L.J. 1, 9-13 (2001) (discussing the legislative history of the 1995 Act).

Sirius would of course respond that any public performance right that the New York Court of Appeals might recognize would be broader than the right legislated by Congress, encompassing analog broadcasting, the "mature" (some would say dying) industry that Congress exempted from the payment of royalties for public performance. And Sirius quite rightly notes that the right Congress has created for post-1972 works is part of a carefully crafted scheme that operates nationwide, whereas common law copyrights are the province of the several states – raising the specter of administrative difficulties in the imposition and collection of royalties, which would ultimately increase the costs consumers pay to hear broadcasts, and possibly make broadcasts of pre-1972 recordings altogether unavailable.

Sirius may well be correct that a legislative solution would be best. But the common law, while a creature of the courts, exists to protect the property rights of the citizenry. And courts are hardly powerless to craft the sort of exceptions and limitations Congress has created, or to create a mechanism for administering royalties. Sirius forgets that it was this court, not Congress, that, back in 1950 fashioned a consent decree that set up what became the most successful mandatory licensing and royalty scheme in the world – a system still administered by a judge of this court, which functions as a rate court for the major licensing houses like ASCAP and BMI. *See United States v. Am. Soc'y of Composers, Authors and Publishers*, No. CIV.A. 42-245, 1950 WL 42273 (S.D.N.Y. Mar. 14, 1950), *amended* (July 17, 1950); *see also United States v. Broad. Music, Inc.*, No. 64 CIV. 3787, 1994 WL 901652, (S.D.N.Y. Nov. 18, 1994) (modifying 1966 BMI consent decree). New York courts are capable of fashioning appropriate relief – and even of recognizing only such public performance rights in pre-1972 sound recordings as conform to rights statutorily conferred on holders of statutory copyright in post-1972 recordings.

In short, general principles of common law copyright dictate that public performance rights in pre-1972 sound recordings do exist. New York has always protected public performance rights in works other than sound recordings that enjoy the protection of common law copyright. Sirius suggests no reason why New York – a state traditionally protective of performers and performance rights – would treat sound recordings differently.

## V. Sirius Infringed Flo and Eddie's Common Law Copyright and Engaged in Unfair Competition

### A. Common-Law Copyright Infringement

#### 1. Sirius Reproduced Flo and Eddie's Copyrighted Recordings Without Authorization

"A copyright infringement cause of action in New York consists of two elements: (1) the existence of a valid copyright; and (2) unauthorized reproduction of the work protected by the copyright." *Naxos*, 4 N.Y.3d at 563.

As explained above, Flo and Eddie holds a valid copyright in the Turtles recordings. The record clearly shows that Sirius reproduced those recordings without authorization. In particular, Sirius reproduced Turtles recordings for its three main databases and associated backups, as well as for the smaller on-site databases, including the database it transferred to Omnifone. Sirius also made several temporary but complete copies of Turtles recordings: on its play-out server each time a Turtles song was performed, in each of the five-hour caches, and in the half-hour buffer available on some in-vehicle satellite radios.

To be sure, some of the alleged copies may not qualify as infringing reproductions. Buffering, for example, does not constitute infringement under federal law. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 127-30 (2d Cir. 2008). The tips-and-tails partial copies may be too fragmentary or ephemeral to constitute infringement. But Sirius does not seriously dispute that many of the copies it made of Turtles recordings – in particular the permanent copies – amount to reproductions as a matter of law.

In reproducing Turtles recordings, Sirius acted without authorization. As noted above, Sirius has not obtained licenses for using pre-1972 recordings, either to store those recordings in its databases or to broadcast them. Nor has Sirius obtained licenses or paid royalties for transferring those recordings to third parties.

Sirius argues instead that it is not liable for infringement because it did not *distribute* the Turtles recordings. Sirius supports that argument with language from *Naxos*, "Copyright infringement is distinguishable from unfair competition, which in addition to unauthorized copying and distribution requires competition in the marketplace or similar actions designed for commercial benefit." 4 N.Y.3d at 563. This language, according to Sirius, establishes that "distribution" of a copyrighted work is an element of common law copyright infringement. A distribution requirement would be consistent with Sirius's assertion that New York does not provide any exclusive right to publicly perform sound recordings.

But as I explained above, New York law does provide copyright holders with just that exclusive performance right for sound recordings. To the extent that distribution is an element of common law copyright infringement, publicly performing sound recordings is an act of distribution. Otherwise, Sirius cannot explain how New York courts could have recognized infringement claims alleging that defendants publicly performed copyrighted works without authorization. *See, e.g.*, *Brandon Films*, 230 N.Y.S.2d at 57-58; *French*, 55 How. Pr. at 472-73, 479-80, 1878 WL 11310.

In addition to *Naxos*, Sirius cites *Hemingway's Estate v. Random House, Inc.*, 279 N.Y.S.2d 51 (Sup. Ct.) *aff'd sub nom.* 285 N.Y.S.2d 568 (App. Div. 1967) *aff'd sub nom.* 23 N.Y.2d 341 (1968), in which the New York Supreme Court held that a publisher did not infringe the plaintiff's copyright by including gallery proofs in a few copies of a book before the book was finally published. *Id.* at 54-56. But public performance rights were not at issue in *Hemingway's Estate*, and the Supreme Court never suggested in its opinion that public performance could not be a form of distribution. Rather, on the facts of the case, that court found that, "No use of any kind was made of the original galley proofs." *Id.* at 55.

One might argue that Flo and Eddie divested itself of its copyright in the Turtles sound recordings by "publishing" those recordings. *See Jewelers' Mercantile Agency v. Jewelers' Weekly Pub. Co.*, 155 N.Y. 241, 247 (1898). Publication is a term of art in the common law of copyright and it does not encompass every dissemination of a copyrighted work, even if the work reaches thousands of people. *Jewelers' Mercantile Agency*, 155 N.Y. at 247-48; *Hemingway's Estate*, 279 N.Y.S.2d at 55.

But there is a good reason why Sirius did not make this argument. In the context of sound recordings, "it has been the law in [New York] for over 50 years that, in the absence of federal statutory protection, the public sale of a sound recording otherwise unprotected by statutory copyright does not constitute a publication sufficient to divest the owner of common-law copyright protection." *Naxos*, 4 N.Y.3d at 560; *see also Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483, 493-95 (Sup. Ct. 1950) *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951). Public sale is exactly what Flo and Eddie have done with the Turtles sound recordings. Under *Naxos*, that does not constitute publication. Flo and Eddie therefore retains its common law copyright in those recordings.

**2. Sirius's Creation of Multiple Complete Copies of Flo and Eddie's Sound Recordings Cannot Be Considered Not Fair Use**

Although the case law is sparse, it appears that New York recognizes fair use as a defense to copyright infringement. *See Fendler v. Morosco*, 253 N.Y. 281, 291 (1930); *EMI Records Ltd. v. Premise Media Corp., L.P.*, 2008 N.Y. Misc. LEXIS 7485, at *9-11 (N.Y. Sup. Ct. Aug. 8, 2008); *Hemingway's Estate*, 279 N.Y.S.2d at 57. New York courts have not, however, articulated the scope of New York's fair use doctrine. I will assume, as do the parties, that New York's fair use defense operates similarly to the federal defense, which is codified in 17 U.S.C. § 107. *See EMI Records*, 2008 N.Y. Misc. LEXIS 7485, at *16-18.

Under federal law, courts "determin[e] whether the use made of a work in any particular case is a fair use" by considering, among other factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

On all four factors, Sirius's creation of the unauthorized copies fails to qualify as "fair use."

In considering the first factor – the "purpose and character of the use," courts must ask "whether the new work merely supersedes the objects of the original creation or instead adds something new, with a further purpose or different character . . . , in other words, whether and to what extent the new work is transformative. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal citations, quotation marks, and alterations omitted); *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).

Sirius is a for-profit entity using Flo and Eddie's recordings for commercial purposes. Moreover, Sirius's use is not transformative. Sirius does not add anything new or change the Turtles recordings by copying and performing them. Publicly performing a recording adds no "new expression, meaning, or message," to the recording. *Campbell*, 510 U.S. at 579. Sirius lets subscribers hear Turtles recordings through a different medium, but that does not make its use "transformative." insofar as the recording is concerned – however "transformative" satellite radio may be in the context of broadcasting.

The cases cited by Sirius do establish that a use may be transformative even when it requires completely copying a copyrighted work. But the uses in those cases are far different than what Sirius does. Courts, for example, have upheld as fair use copying images that then appear as "thumbnail" results in response to an internet search. *See, e.g.*, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-19 (9th Cir. 2003). But a thumbnail is a lower-quality image that does not serve the

purpose of the original – to view and appreciate. *Id.* Courts have also upheld search engines' copying original books so that users can search the books and find out where certain phrases appear. *Authors Guild, Inc. v. Google Inc.*, 954 F. Supp. 2d 282, 291 (S.D.N.Y. 2013). That too is a different use from the original book, which is meant to be read, not searched by keyword. *Id.* What one wants to do with a sound recording is to hear it, and that can be done just by listening to Sirius.

The second fair use factor "calls for recognition that some works are closer to the core of intended copyright protection than others." *Campbell*, 510 U.S. at 586. In particular, "creative expression for public dissemination falls within the core of the copyright's protective purposes." *Campbell*, 510 U.S. at 586; *see Authors Guild, Inc.*, 755 F.3d at 96. Even Sirius recognizes that the Turtles works are "creative." Sirius claims that the second factor does not favor Flo and Eddie because the Turtles' sound recordings have been widely disseminated for decades. This is a non-sequitur; widespread distribution does nothing to alter the creative character of a copyrighted work. The cases Sirius cites does not hold to the contrary.

The third fair use factor requires courts to consider "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107. "The third factor asks whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor." *Authors Guild, Inc.*, 755 F.3d at 96. Further, "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87. Sirius has copied and performed several Turtles recordings in their entirety. As explained above, Sirius's use is non-transformative and commercial. It has, in the words of the Second Circuit, no "valid purpose[] asserted under the

first factor." *Authors Guild, Inc.*, 755 F.3d at 96. Thus, the third factor does not favor even minimal copying by Sirius.

Sirius leans heavily on the fourth fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. The Second Circuit has explained that "the relevant market effect with which we are concerned is the market for plaintiffs' expression, and thus it is the effect of defendants' use of that expression on plaintiffs' market that matters." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 482 (2d Cir. 2004) (internal quotation marks and citation omitted). As a matter of "common sense[] when a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Campbell*, 510 U.S. at 591. (internal citations, quotation marks, and alterations omitted).

Sirius makes non-transformative use of Flo and Eddie's recordings and does so for commercial gain. It is, therefore, "common sense[]," *id.*, that Flo and Eddie would suffer market harm when Sirius takes its property and exploits it, unchanged and for a profit. That exploitation "supersedes the objects of the original." *Id.*

Sirius responds to this common-sense conclusion with two points: (1) Flo and Eddie points to no actual evidence or lost sales or licensing fees caused by Sirius's operations; and (2) there is no existing market for licensing pre-1972 sound recordings for public performance. Those responses are unpersuasive.

First, discovery on damages has not yet been conducted. The evidence might ultimately show that Flo and Eddie has lost fewer sales than one might expect as a result of Sirius' unauthorized copying and public performances of their recordings. But it is beyond cavil that Flo and Eddie has hereto been unable to obtain *any* money from the broadcasting of their sound recordings; if its common law copyright had been recognized, plaintiff could and undoubtedly would have charged Sirius something to broadcast them.

Second, Flo and Eddie describes the fourth fair use factor too narrowly. The fourth factor allows courts to consider not only presently existing markets, but also "potential" or "reasonable, [] likely to be developed markets." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014) (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir.1994)). A market for licensing post-1972 sound recordings already exists. It has to, by law. *See* 17 U.S.C. §§ 112, 114. It is not difficult to conceive that a similar market for pre-1972 recordings would develop if owners of those recordings asserted their rights.

The fourth factor also requires courts to consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590. Widespread public performance of sound recordings – that is, the conduct in which Sirius is engaged – could easily satisfy public demand to hear those recordings. That, again as a matter of common sense, could result in a substantial impact on Flo and Eddie's ability to sell and license Turtles recordings. If a subscriber can easily hear recordings performed by Sirius, why buy a record or download the recording from iTunes? If a potential licensee wants to perform Turtles recordings, why pay to do so, when Sirius performs them for free?

**3. Sirius Engaged in Unfair Competition**

Unfair competition is an "adaptable and capacious" tort that "has been broadly described as encompassing 'any form of commercial immorality.'" *Roy Exp. Co. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (quoting *Metro. Opera Ass'n*, 101 N.Y.S.2d at 492). More precisely, New York courts "have long recognized two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476-77 (2007). Palming off – "that is, the sale of the goods of one manufacturer as those of another," *id.* – is not at issue in this litigation. "An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." *Roy Exp. Co.*, 672 F.2d at 1105; *see ITC Ltd.*, 9 N.Y.3d at 477-79.

Flo and Eddie's claim involves misappropriation. In particular, it argues that Sirius has taken and used the Turtles recordings – its property – to compete against it. Sirius does not truly dispute that it has "tak[en] and use[d]" Flo and Eddie's recordings. Instead Sirius raises two objections to Flo and Eddie's unfair competition claim.

First, Sirius claims that under *Naxos*, unfair competition requires "distribution" of property. *See* 4 N.Y.3d at 563. That is a strained reading of *Naxos*, which described a particular unfair competition claim grounded in physically pirating and selling records. No other opinion of which I am aware has described "distribution" as a requirement of the otherwise highly flexible and adaptable unfair competition tort. In any event, as I explained above, public performance is a form of distribution.

Second, Sirius argues that Flo and Eddie has not suffered any competitive injury. It is now well established that "the existence of actual competition between the parties is no longer a prerequisite" to sustaining an unfair competition claim. *Metro. Opera Ass'n*, 101 N.Y.S.2d at 491-92 (citing cases); *see ITC Ltd.*, 9 N.Y.3d at 478. Some "competitive injury," however, is still

required. *Yantha v. Omni Childhood Ctr., Inc.*, No. 13-CV-1948, 2013 WL 5327516, at *7 (E.D.N.Y. Sept. 20, 2013). A plaintiff must therefore show, "a direct financial loss, lost dealings, or lost profits resulting from the anticompetitive acts at issue or, at the very least, that defendant diverted plaintiff's customers and business to defendant." *Id.* (internal citations, quotation marks, and alterations omitted).

Flo and Eddie has satisfied the competitive injury requirement. As I explained when discussing fair use, it is a matter of economic common sense that Sirius harms Flo and Eddie's sales and potential licensing fees (even if the latter market is not yet extant) by publicly performing Turtles sound recordings. Evidence of the extent of that loss has not yet been presented because discovery has not yet been conducted on damages.

**VI. Flo and Eddie's Assertion of its Common Law Copyright Is Not Barred by the Dormant Commerce Clause**

Finally, Sirius argues that Flo and Eddie's claims are barred by the Dormant Commerce Clause. Sirius is wrong.

The Constitution grants to Congress "Power . . . To regulate Commerce . . . among the several States . . . ." U.S. CONST. art. I, § 8. Although the Commerce Clause is written as an affirmative grant of power to Congress, the Supreme Court has held that it includes a negative or "dormant" implication that states may not interfere with interstate commerce. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 326 n.1 (1989).

States may run afoul of the Dormant Commerce Clause's implied limits on their power in several ways: by discriminating against out-of-state goods, *see, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 454-57 (1992), by imposing generally applicable regulations that have the effect of excessively burdening interstate commerce, *see, e.g.*, *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142-46 (1970), or by directly regulating commerce in other states, *see, e.g.*, *Healy*, 491 U.S. at

335-40. Sirius argues that the last prohibition – directly regulating commerce in other states – applies here.

Flo and Eddie argues that the Court need not reach the constitutional question because Congress has authorized New York to regulate pre-1972 sound recordings.

It is hornbook law that "Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid." *Maine v. Taylor*, 477 U.S. 131, 138 (1986). "But because of the important role the Commerce Clause plays in protecting the free flow of interstate trade, th[e Supreme] Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.'" *Id.* at 138-39 (quoting *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984)); *see Wyoming v. Oklahoma*, 502 U.S. at 458 (requiring an "unambiguous" congressional directive).

Flo and Eddie claims to find unambiguous Congressional authorization for New York's common law copyright scheme to be exempted from the implied limitations of the Commerce Clause in 17 U.S.C. § 301(c), which reads in full:

> With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067. The preemptive provisions of subsection (a) shall apply to any such rights and remedies pertaining to any cause of action arising from undertakings commenced on and after February 15, 2067. Notwithstanding the provisions of section 303, no sound recording fixed before February 15, 1972, shall be subject to copyright under this title before, on, or after February 15, 2067.

In one of the two companion cases between Flo and Eddie and Sirius, my colleague in the District Court for the Central District of California found that § 301(c) unambiguously authorizes Flo and Eddie's companion California-law action. In a footnote, it dismissed with almost no discussion a Dormant Commerce Clause challenge similar to the one Sirius raises here, stating that "Because Congress specifically authorized protection of pre–1972 sound recording rights by the

states in 17 U.S.C. § 301(c), the California statute protecting those rights is not subject to the Commerce Clause." *Flo & Eddie Inc. v. Sirius XM Radio Inc.*, No. CV 13-5693, 2014 WL 4725382, at *9 n.1 (C.D. Cal. Sept. 22, 2014).

However, I do not find the California Court's analysis persuasive, as it does not explain why the cited statute qualifies as a Commerce Clause exemption. And Flo and Eddie cites no legislative history or case law indicating that Congress intended to eliminate Dormant Commerce Clause scrutiny for state common law copyright. Instead, Flo and Eddie emphasizes the word "any," which it argues is an indication that Congress intended to permit "all" state statutes regulating copyright.

I do not read the cited section as Flo and Eddie does. I note that § 301(c) is contained in the section of the federal copyright law that addresses the law's preemptive scope. Thus, the language cited by Flo and Eddie could plausibly be interpreted, not to allow states to impose otherwise unconstitutional burdens on interstate commerce, but only to limit the scope of federal copyright law – by excluding, for a period of time, otherwise preempted state laws from the preemptive reach of 17 U.S.C. § 301(a). Under this interpretation, although § 301(c) broadly reaches "any" state right or remedy, it shields state regulation only from statutory preemption, not from Commerce Clause scrutiny.

The Supreme Court has construed an analogous statute in this very manner when analyzing a Dormant Commerce Clause challenge. In *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982), the Court decided whether Section 201 of the Federal Power Act was "an affirmative grant of power to the states to burden interstate commerce." *Id.* at 341. Subsection 201(b) provided that no provisions of the subchapter of which it was a part – including the sweeping preemption provisions of § 201(a) – "shall . . . deprive a State or State commission of its lawful authority now

exercised over the exportation of hydroelectric energy which is transmitted across a State line." *Id.* (quoting 16 U.S.C. § 824(b)).

The Court held that § 201(b) did "[n]othing . . . to alter the limits of state power otherwise imposed by the Commerce Clause," but "simply save[d] from pre-emption under Part II of the Federal Power Act such state authority as was otherwise lawful." *Id.* (internal citations and quotation marks omitted). So it is with 17 U.S.C. § 301(c). Like the statute at issue in *New England Power*, § 301(c) is framed as a limitation on preemption, not a relaxation of Commerce Clause limitations. That interpretation is even more persuasive here because, unlike in the statute analyzed in *New England Power*, § 301(c) makes no explicit reference to any sort of interstate commerce.

Even if the matter is not free from doubt, at the very least it is reasonable to interpret § 301(c) as a provision about federal statutory preemption, and not as an authorization for states to interfere with interstate commerce. That being so, § 301(c) does not "unambiguous[ly]," *Wyoming v. Oklahoma*, 502 U.S. at 458, or "unmistakably," *S.-Cent. Timber*, 467 U.S. at 91, permit state interference with interstate commerce in connection with pre-1972 sound recordings.

Therefore, and applying the reasoning of *New England Power*, I decline to adopt Flo and Eddie's interpretation of § 301(c).

However, Sirius's Dormant Commerce Clause challenge fails for a different reason: New York does not "regulate" anything by recognizing common law copyright. The issue is nothing more than a red herring.

The Clause itself "withholds from the states[, ]the power to regulate Commerce among the several States." *SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 510 (2d Cir. 1995) (original alterations omitted). Thus, "the strictures of the dormant Commerce Clause are not activated unless a state action may be characterized as a 'regulation.'" *Id*; *United Haulers Ass'n, Inc. v. Oneida-*

*Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 254 (2d Cir. 2001) *aff'd*, 550 U.S. 330 (2007); *Metro. Washington Chapter v. D.C.*, No. CV 12-853, --- F. Supp. 2d ----, 2014 WL 3400569, at *16 (D.D.C. July 14, 2014).

Typically, courts have applied that principle in the context of the market participant exception, holding that states do not "regulate" commerce by actively participating in commercial markets. *See, e.g.*, *SSC Corp.*, 66 F.3d at 510.

But it is not only market participation that falls outside Dormant Commerce Clause scrutiny. In *Sherlock v. Alling*, 93 U.S. (3 Otto) 99 (1876), the Supreme Court considered whether an Indiana statute establishing liability for wrongful death, "if applied to cases of marine torts, would constitute a new burden upon commerce." *Id.* at 101-02 The Court affirmed the general principle that "States cannot by legislation place burdens upon commerce with foreign nations or among the several States." *Id.* at 102. But it noted that in every case where it had found a Dormant Commerce Clause violation, "the legislation adjudged invalid imposed a tax upon some instrument or subject of commerce, or exacted a license fee from parties engaged in commercial pursuits, or created an impediment to the free navigation of some public waters, or prescribed conditions in accordance with which commerce in particular articles or between particular places was required to be conducted." *Id.* By contrast, the Indiana statute at issue "only declare[d] a general principle respecting the liability of all persons within the jurisdiction of the State for torts." *Id.* at 103.

The Court explained that "General legislation . . . prescribing the liabilities or duties of citizens of a State . . . is not open to any valid objection because it may affect persons engaged in foreign or inter-State commerce." *Id.* Otherwise, "Objection might with equal propriety be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to the contracts or estates

of persons engaged in such commerce." *Id.* Since *Sherlock* was decided, courts have rejected Dormant Commerce Clause challenges for the reasons it cites. *See, e.g.*, *Atl. Coast Line R. Co. v. Mazursky*, 216 U.S. 122, 132-34 (1910) (challenge to a law attaching liability to common carriers who failed to settle loss claims within forty days); *Stone ex rel. Estate of Stone v. Frontier Airlines, Inc.*, 256 F. Supp. 2d 28, 46 (D. Mass. 2002) (challenge to tort action attaching liability to airline's failure to carry a defibrillator); *D.C. v. Beretta, U.S.A.*, Corp., 872 A.2d 633, 656-57 (D.C. 2005) (challenge to statute attaching strict liability to actions by firearms manufacturers); *West v. Broderick & Bascom Rope Co.*, 197 N.W.2d 202, 214-15 (Iowa 1972) (challenge to negligence action asserting failure-to-warn liability) (collecting cases).

What Sirius objects to is a "general principle respecting the liability of all persons within the jurisdiction of" New York. *Sherlock*, 93 U.S. (3 Otto) at 103. In particular, Sirius objects to property law principles that establish liability for infringing another party's copyright. But that property law principle is not a state-imposed regulation – even when applied to public performances by a national broadcaster. Sirius has not cited, and the Court has not found any cases holding that a state's general property law and associated liability principles could, in and of themselves, violate the Dormant Commerce Clause.

Holding Sirius liable might affect interstate commerce – just as a finding of liability did in *Sherlock*. *Id.* at 103. But concluding that Sirius is liable under New York property law principles would not amount to a "regulation" of interstate commerce by New York. It would, therefore, not give rise to a Dormant Commerce Clause claim.

Sirius is correct that this holding is unprecedented (aside from the companion California case, which reached the same result), and will have significant economic consequences. Radio broadcasters – terrestrial and satellite – have adapted to an environment in which they do not pay

royalties for broadcasting pre-1972 sound recordings. Flo and Eddie's suit threatens to upset those settled expectations. Other broadcasters, including those who publicly perform media other than sound recordings, will undoubtedly be sued in follow-on actions, exposing them to significant liability. And if different states adopt varying regulatory schemes for pre-1972 sound recordings, or if holders of common law copyrights insist on licensing performance rights on a state-by-state basis (admittedly, an unlikely result, since such behavior could well cause broadcaster to lose interest in playing their recordings) it could upend the analog and digital broadcasting industries.

But in the end, all this case presents me with is a suit between private parties seeking to vindicate private property rights – not a challenge to state regulation. That lawsuit can and will be resolved on its merits. The broader policy problems are not for me to consider. They are the province of Congress, the New York Legislature, and perhaps the New York Court of Appeals.

## CONCLUSION

For the foregoing reasons, Sirius's motion for summary judgment is **DENIED**. The Clerk of the Court is directed to remove Docket # 46 from the Court's list of pending motions. Sirius is **ORDERED** to advise the Court by Friday, December 5 of any remaining disputes of material fact that would require a trial. Otherwise, the Court will enter summary judgment in favor of Flo and Eddie as to liability and proceed to an inquest on damages.

Dated: November 14, 2014

U.S.D.J.

BY ECF TO ALL COUNSEL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/12/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

x

FLO & EDDIE, INC.

Plaintiff,

-against-

SIRIUS XM RADIO, INC., and DOES 1-10,

Defendants.

x

No. 13 Civ. 5784 (CM)

**MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION**

McMahon, J.:

Defendant Sirius XM Radio, Inc. ("Sirius") has moved for reconsideration of the Court's November 14, 2014 Memorandum Decision and Order Denying Defendant's Motion for Summary Judgment ("the Order"), Docket #88, and in the alternative, for the Court to certify the Order for interlocutory appeal. For the reasons stated below, Sirius's motion for reconsideration is **DENIED.**

Decision on the alternative motion for certification of an interlocutory appeal pursuant to 28 U.S.C. §1292(b) is deferred pending resolution of the outstanding order to show cause why a summary judgment as to liability should not be awarded to Plaintiff.

The reader is presumed to be familiar with the facts of this case and with the Court's prior decision.

**DISCUSSION**

**I. Standard**

To prevail on a motion for reconsideration, the movant must demonstrate "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *See Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir.

1983). The decision to grant or deny the motion for reconsideration is within the sound discretion of the district court, especially when there has been no appellate review of the prior decision. *Mina Invest. Holdings, Ltd. v. Lefkowitz*, 184 F.R.D. 245, 250 (S.D.N.Y. 1999).

The Court's review "is narrow and applies only to already-considered issues; new arguments and issues are not to be considered." *See Morales v. Quintiles Transnat'l Corp.*, 25 F. Supp. 2d 369, 372 (S.D.N.Y. 1998). A motion for reconsideration "is not a substitute for appeal and may be granted only where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision." *See id.* (internal citations and quotation marks omitted).

## II. Sirius's Motion for Reconsideration is Denied

### A. *Whiteman* Does Not Alter The Court's Analysis of New York Common Law

Sirius (represented by newly-retained counsel) predicates its motion on the Court's admitted failure to consider in its decision a case not briefed, either by it or by Flo & Eddie, on the original motion: *RCA Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940). Sirius's new lawyers from O'Melveny & Myers assert that *Whiteman* is the very case that this Court stated did not exist: a case squarely holding that New York does not recognize any right of public performance in sound recordings that are protected by common law copyright. Obviously *Whiteman* is a very old case, and does not represent any "intervening change of controlling law," so the argument must be that the Court's failure to apply *Whiteman* constitutes "clear error."

The only clear error in this case is O'Melveny's. Sirius's former counsel had two perfectly good reasons not to argue the lack of any public performance right on the basis of Whiteman: (1) *Whiteman* does not hold that New York does not recognize a public performance right as part of the common law copyright in sound recordings; and (2) its actual holding – which is that the sale

of sound recordings to the public constituted "publication," which divested a creation of any common law copyright whatsoever – is no longer good law, and has not been for 60 years.

Paul Whiteman was a legendary orchestra conductor; in 1924, at Aeolian Hall, he famously conducted the first performance of George Gershwin's *Rhapsody in Blue*. Whiteman and his orchestra made a number of sound recordings on the RCA label, which were sold to the consuming public. The recordings bore a legend "Not Licensed for Radio Broadcast," or something similar. Nonetheless, W.B.O. Broadcasting went to a record store, purchased copies of the records and broadcast them over the radio. RCA Manufacturing sued to prevent W.B.O. from broadcasting certain sound recordings owned by RCA, under theories of common law copyright and unfair competition. *Id.* at 87.

The Second Circuit, in an opinion written by Judge Learned Hand, described the question raised by the case as whether RCA "*had any musical property at common-law* in the records which radio broadcasting invaded." *Id.* at 87. (emphasis added). The Court of Appeals held that RCA did not have any common law rights, of any sort, because the sale of the recordings to the public constituted "publication" of the recordings, which divested them of common law copyright protection altogether. Since sound recordings were ineligible for federal statutory copyright protection prior to 1972 (that is why we have this lawsuit), the effect of Judge Hand's ruling was to deny any sort of copyright protection to the creators of sound recording performances that were sold in the commercial marketplace.

Sirius argues that *Whiteman* rejected RCA's claims because New York law did not afford public performance rights to holders of common law copyrights in sound recordings.

I disagree. So does every other court and authority that has considered the issue.

The exact *holding* of *Whiteman* was this: "[W]e think that the 'common-law property' in these performances ended with the sale of the records and that the restriction [the words on the record jacket] did not save it." *Id.* All of the reasoning in *Whiteman* addressed that issue – whether RCA had "published" its sound recordings by selling them to the public, thereby losing all of its common law rights under then-applicable law. The Second Circuit did not decide what those rights might have been, let alone specifically address whether those lost rights included an exclusive right to publicly perform the sound recordings. One looks in vain in *Whiteman* for the statement, "New York's common law copyright protection for sound recordings does not encompass any sort of public performance right" – or words to that effect.

Sirius points to two sentences from *Whiteman* that it views as declaring public performance rights to be unavailable for holders of common law copyrights in sound recordings.

> Copyright in any form, whether statutory or at common-law, is a monopoly; it consists only in the power to prevent others from reproducing the copyrighted work. W.B.O. Broadcasting Corporation has never invaded any such right of Whiteman; they have never copied his performances at all; they have merely used those copies which he and the RCA Manufacturing Company, Inc.; made and distributed. *Whiteman*, 114 F.2d at 88.

Sirius argues that Judge Hand – a famously precise and articulate writer – was actually saying in these sentences that New York common law copyright in sound recordings does not come with a public performance right attached.

Even read out of context, it would be a stretch to conclude that Sirius's strained interpretation of Hand's decision is correct. But read in the context of the *Whiteman* decision as a whole (including the holding that this Court quotes above), it is perfectly clear that these sentences simply restate, in a different way, what the case actually held: once RCA offered copies of the recordings for sale (i.e., "published" them), any common law copyright was lost and the purchaser could "use[]" the copies that it purchased in any way it chose – including by playing them over the

radio. The reason W.B.O. "merely used" the sound recordings and "never invaded" RCA's rights, was because those rights (whatever they were) had vanished when RCA sold copies of the sound recordings.

Judge Hand's reasoning also gives the lie to Sirius' contorted reading of his decision. He observed, for example, that if a composer published a musical composition by printing copies of sheet music and selling them to the public,[1] he would have no right to limit how the purchaser used those copies of the music. Similarly, Judge Hand described how selling a book was an act of publication that destroyed common law copyrights. Judge Hand understood that both musical compositions and books were eligible for statutory copyright, whereas sound recordings were not. Nonetheless, he saw "no reason why the same acts that unconditionally dedicate the common-law copyright in works copyrightable under the act, should not do the same in the case of works not copyrightable" under federal law. *Id.*

Nothing in the justification offered for his decision so much as suggested that the Circuit was pronouncing that the bundle of rights appurtenant to common law copyright in sound recordings did not include a public performance right. Indeed, had Whiteman been predicated on the absence of a public performance right in sound recordings, the entire discussion of whether RCA's common law rights were divested by publication would have been superfluous; RCA could not possibly have "lost" via publication a right that never existed in the first place! That the Second Circuit felt the need to reach the publication issue actually suggests that it assumed the existence of a public performance right in the context of common law copyright.

---

[1] For this analogy to work, the copies sold would have lacked the familiar © legend; publication with the © divested common law copyright but preserved federal copyright (indeed, laid claim to federal statutory copyright) under the 1909 Copyright Act, which was in effect at the time Hand wrote *Whiteman*. That law was superseded in 1976.

Judge Hand also rejected RCA's suggestion that W.B.O.'s broadcasting of its recordings constituted unfair competition, again on the ground that the loss of rights associated with publication ended any unfairness. As he put it, if RCA "cannot bring themselves within the law of common-law copyright, there is nothing to justify *a priori* any continuance of their control over the activities of the public to which they have seen fit to dedicate the larger part of their contribution" through the theory of unfair competition. *Id.* at 90.

I am hardly the only jurist or scholar who reads *Whiteman* in this way. All the courts and secondary sources we have located interpret *Whiteman* as a case about publication, not about whether public performance is part of the bundle of rights conferred by common law copyright. *See, e.g.*, *Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir. 1955) (*Whiteman* "stated that the common law property in the performances of musical artists which had been recorded ended with the sale of the records and that thereafter anyone might copy them and use them as he pleased."); *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 554 (2005) (*Whiteman* "concluded that the sale of a record to the public is a general publication that ends common-law copyright protection."); Sidney A. Diamond, *Sound Recordings and Phonorecords: History and Current* Law, 1979 U. ILL. L. F. 337, 347 ("*Whiteman* stands for the principle that the sale of a record divests the production company or the performing artists of their rights, if any, to control its use."); Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings*, 43 GEO. WASH. L. REV. 152, 155 (1974) ("Judge Learned Hand . . . ruled that any common law property of the record producer in the recorded performances ended with the record's sale, thereby making the restrictive legend on the label legally ineffective.").

Even if *Whiteman* stood for the proposition that Sirius asserts – and it does not – Sirius's motion for reconsideration fails for a second reason: *Whiteman* has been overruled, so it stands for nothing at all.

The Second Circuit in *Whiteman* was doing exactly what I am doing in this case: predicting how the New York courts, which are the ultimate authority on New York common law, would rule on an unsettled question of New York common law.[2] After *Whiteman*, New York courts spoke to the question, and they did not reach the same conclusion as Judge Hand. *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 101 N.Y.S.2d 483 (Sup. Ct. 1950) aff'd, 107 N.Y.S.2d 795 (App. Div. 1951). Recognizing this development, the Second Circuit concluded, in 1955, that: "the quoted statement from the RCA case is *not the law of the State of New York*." *Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 663 (2d Cir. 1955) (citing *Whiteman*, 114 F.2d at 88-89) (emphasis added). The "quoted statement" to which reference is made spans *Whiteman*'s entire discussion of the effect of publication on the existence of a copyright. So while Sirius tries to avoid the impact of *Whiteman's* reversal by arguing that the Second Circuit overruled only a single statement about unlimited copying of published works from the earlier opinion, that is plainly not the case. It overturned Judge Hand's ruling that the sale of sound recordings constituted publication – as this Court recognized in the Order, when it said "it has been the law in New York for over 50 years that . . . the public sale of a sound recording . . . does not constitute a publication sufficient to divest the owner of common-law copyright protection." Order at 28 (internal citations, quotation marks, and alterations omitted)

[2] The certification of questions to the New York Court of Appeals was almost unheard of in 1940, and that was true even when this Court was engaged in the practice of law; but it is now quite routinely done to settle issues like the one raised by this case. I rather expect that this case will be certified to the New York Court of Appeals once it goes up on appeal.

In short, *Whiteman* affords no basis to reconsider my earlier Order; if anything, it reinforces the decision reached by this Court.[3]

**B. The Court Properly Rejected Sirius's Dormant Commerce Clause Challenge**

Sirius also attempts to reargue its Dormant Commerce Clause challenge. Its arguments are entirely without merit.

Sirius does not dispute that the reach of the Dormant Commerce Clause is only to state actions properly characterized as "regulations." *See* Order at 37-38. Instead of explaining how liability for common law copyright infringement constitutes a regulation, Sirius dodges and misconstrues the issues.

I did not hold, and I do not hold now, that New York common law copyright is exempt from Dormant Commerce Clause scrutiny because it is neutral and generally applicable. Nor did I hold that the Commerce Clause does not apply because New York law establishes Sirius's liability in some form. Rather, I said that the New York common law copyright – specifically a judicial decision protecting Flo and Eddie's common law copyright – is not a "regulation" subject to Commerce Clause scrutiny.

Sirius argues that state common law and state law as interpreted by courts can violate the Dormant Commerce Clause. Sirius also argues that state regulation may run afoul of the Dormant Commerce Clause entirely because of the "practical effects" on interstate commerce. That is all true, but irrelevant. The question is whether the law at issue – common law copyright – constitutes "regulation." In the one case Sirius does cite applying the Commerce Clause to a judicial finding

---

[3] Sirius does add some new spin on its arguments, claiming that public performance rights for sound recordings are unique in that they affect multiple competing stakeholders. Recordings are not really unique – musical composition copyrights raise the same issues. More importantly, those stakeholders all have an incentive to negotiate over the use of copyrighted material. Sirius's result ensures Flo and Eddie can never receive compensation of any sort for public performance of its sound recordings.

of liability, the law involved as a California statute requiring pre-approval for marketing cosmetic products. *See Allergan, Inc. v. Athena Cosmetics, Inc.*, 738 F.3d 1350, 1353 (Fed. Cir. 2013). The cases holding that a law may violate the Dormant Commerce Clause because of its "practical effects" on interstate commerce each involved state liquor-pricing schemes. *See Healy v. Beer Inst.*, 491 U.S. 332 (1989); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986). All of those state laws – pharmaceutical approval and liquor pricing laws – are classic instances of states exercising their regulatory power, and are very different from this case, where the issue is protection of property rights.

Protecting Flo and Eddie from the theft of its property is not "regulation"; a simple example illustrates the point. Suppose, instead of stealing Flo and Eddie's property rights in the sound recordings, someone stole its company car, which was then used to operate an interstate taxi service. The Dormant Commerce Clause obviously would not bar Flo and Eddie from maintaining an action at common law for conversion of the car. And that would be true even though the action, and the return of the car and the end of the taxi service, would affect interstate commerce. State laws barring theft do not violate the Dormant Commerce Clause.

Sirius also argues that the Court failed to address the balancing test *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). But that test, like the *per se* tests used in other cases, applies only to regulations. Thus, there was no need to discuss it in the Order separate and apart from the *per se* tests. All fail, and for the same reason.

Finally, Sirius that the Communications Act, 47 U.S.C. §§ 307 *et seq*. preempts any state from recognizing a public performance right in sound recordings because recognizing such a right would interfere with the ability of the FCC to regulate radio broadcasting. This is an entirely new argument, which could have been raised in support of the original motion but was not. It is not

properly raised on a motion for reconsideration; it is also inappropriately mentioned only in a footnote.

But this argument is yet another example of how Sirius' new counsel are deliberately missing the point. Nothing in this Court's Order "restricts content" of radio broadcasts. Congress expressly provided that common law copyright would subsist in pre-1972 sound recordings. *See* 17 U.S.C. § 301(c). The federal government thus recognizes the existence of common law copyright in older sound recordings. Flo and Eddie holds the common law copyright in the Turtles' pre-1972 sound recordings. Common law copyright, as Judge Hand reminds us in the very portion of his *Whiteman* decision on which Sirius relies, confers a legally recognized monopoly on the holder. That legally recognized monopoly gives Flo and Eddie – not the State of New York – the right to decide who, if anyone, is allowed to broadcast, or make any copies that are necessary to do so.

Sirius does nothing but raise red herrings. This case is not about the content of radio broadcasts; it is about whether Sirius has to pay for the privilege of copying and broadcasting pre-1972 sound recordings – just as it pays royalties through ASCAP and BMI to the composers of the music contained on all the recordings it broadcasts, and just as it pays statutory copyright holders for the privilege of playing post-1972 sound recordings. The Dormant Commerce Clause does not stand in the way of a purely private party's availing himself of his legal rights in order to protect his property. This Court harbors no doubt whatsoever that Flo and Eddie will be perfectly delighted to let Sirius play – for pay.

**III. Sirius's Motion to Certify an Interlocutory Appeal is Deferred**

A district judge may certify an order for interlocutory appeal if (1) "such order involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion", and (3) "an immediate appeal from the order may materially advance the ultimate termination of

the litigation." 28 U.S.C. § 1292(a); *see Childers v. N.Y. & Presbyterian Hosp.*, No. 13 CIV. 5414, --- F. Supp. 2d ----, 2014 WL 2815676, at *21 (S.D.N.Y. June 23, 2014).

"A controlling question of law exists if: (1) reversal of the district court's opinion could result in dismissal of the action, (2) reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or (3) the certified issue has precedential value for a large number of cases." *In re Lloyd's Am. Trust Fund Litig.*, No. 96 CIV. 1262, 1997 WL 458739, at *4 (S.D.N.Y. Aug. 12, 1997); *see Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990).

In considering a request for certification, the district court must carefully assess whether each of the three conditions for certifications is met. *See German v. Fed. Home Loan Mortg. Corp.*, 896 F.Supp. 1385, 1398 (S.D.N.Y.1995); *see also Gottesman v. General Motors Corp.*, 268 F.2d 194, 196 (2d Cir.1959) (certification is to be "strictly limited to the precise conditions stated in the law"). The determination of whether § 1292(b) certification is appropriate under the above standards is in the discretion of the trial court. *See Ferraro v. Sec. of U.S. Dept. of Health and Human Servs.*, 780 F.Supp. 978, 979 (E.D.N.Y.1992);

Sirius raises excellent arguments in favor of certification. However, I am going to defer ruling on this motion until I first address the outstanding order to show cause why summary judgment of liability should not be entered in favor of Flo and Eddie. The case for interlocutory certification is much stronger if the issue of liability is settled.

**CONCLUSION**

For the foregoing reasons, Sirius's motion for reconsideration is **DENIED** and decision on the motion for Section 1292(b) certification is **DEFERRED**.

Dated: December 12, 2014

U.S.D.J.

BY ECF TO ALL COUNSEL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/10/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FLO & EDDIE, INC., *individually and on behalf of all others similarly situated*,

Plaintiff,

-against-

SIRIUS XM RADIO INC., and DOES 1 through 10,

Defendants.

No. 13 Civ. 5784 (CM)

**DECISION AND ORDER CERTIFYING INTERLOCUTORY APPEAL**

McMahon, J.:

Plaintiff Flo & Eddie, Inc. ("Flo and Eddie") brings this action under New York law for common law copyright infringement and unfair competition against Sirius XM Radio Inc. ("Sirius"). On November 14, 2014, the Court denied Sirius's motion for summary judgment dismissing the case and ruled that plaintiffs – the owners of the common law copyrights in certain sound recordings made prior to February 1972 – had the right to exclusively publicly perform and reproduce those recordings. (Docket #88). On December 12, 2014, the Court denied Sirius's motion for reconsideration (Docket #108).

In the alternative, Sirius asked this Court to certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). That motion is **GRANTED**. Dockets #88 and Docket #108 are certified for interlocutory appeal because they present the following legal question:

Under New York law, do the holders of common law copyrights in pre-1972 sound recordings have, as part of the bundle of rights attendant to their copyright, the right to exclusive public performance of those sound recordings?[1]

## DISCUSSION

### I. Standard for Certifying an Order for Interlocutory Appeal

A district judge may certify an order for interlocutory appeal if (1) "such order involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b); *see Childers v. N.Y. & Presbyterian Hosp.*, No. 13 CIV. 5414, --- F. Supp. 2d ----, 2014 WL 2815676, at *21 (S.D.N.Y. June 23, 2014).

"A controlling question of law exists if: (1) reversal of the district court's opinion could result in dismissal of the action, (2) reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action, or (3) the certified issue has precedential value for a large number of cases." *In re Lloyd's Am. Trust Fund Litig.*, No. 96 CIV. 1262, 1997 WL 458739, at *4 (S.D.N.Y. Aug. 12, 1997); *see Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990).

In considering a request for certification, the district court must carefully assess whether all three § 1292(b) requirements are satisfied. *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 529 (S.D.N.Y. 2014); *see also Gottesman v. General Motors Corp.*, 268 F.2d 194, 196 (2d Cir. 1959) (certification is to be "strictly limited to the precise conditions stated in the law"). The trial court is vested with discretion whether to certify an interlocutory appeal based

---

[1] As per my letter endorsement of January 28, 2015, I decline to certify a subsequent decision addressing whether Flo and Eddie were entitled to an immediate entry of judgment on the issue of liability. (*See* Docket #114).

on the above criteria. *See Ferraro v. Sec. of U.S. Dept. of Health and Human Servs.*, 780 F. Supp. 978, 979 (E.D.N.Y. 1992).

## II. The Requirements for Certifying an Interlocutory Appeal are Met

Here, the requirements for certification are all met as to the question identified on the first and second page of this decision.

First, there is indeed a critically important controlling question of law in this case: whether the holders of common law copyrights in pre-1972 sound recordings have, as part of the bundle of rights appurtenant to their copyright, the right to exclusive public performance. If the Court's holding that they do have such a right is incorrect, then significant portions of this lawsuit – including the public performance copyright infringement and unfair competition claims – will have to be dismissed. Furthermore, reversal of this Court's ruling might well require reconsideration of the Court's fair use analysis in the context of Plaintiff's claim for copyright infringement on the basis of unauthorized copying – a right plaintiffs plainly enjoy, *see Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 563-64 (2005) – since it is at least arguable that the making of temporary copies in order to facilitate the public performance of such sound recordings qualifies as "fair use." That would dispose of the entire case.

This issue also qualifies as a "controlling question of law" because it will have "precedential value for a large number of cases." *Lloyd's Am. Trust Fund Litig.*, 1997 WL 458739, at *4. I previously noted that, "Other broadcasters, including those who publicly perform media and other sound recordings, will undoubtedly be sued in follow-on actions." Summary Judgment Decision at 40. Receiving authoritative guidance from the Second Circuit (and, I rather imagine, from the New York Court of Appeals) will help resolve those actions quickly and consistently.

The second criterion for certifying an interlocutory appeal is also satisfied because "there is substantial ground for difference of opinion" concerning the Summary Judgment Decision. 28 U.S.C. § 1292(b).

Flo and Eddie correctly observes that substantial ground does not exist for differences of opinion merely because an issue is one of first impression about which little case law exists. But here there is far more than a previously unaddressed question of law. There is in fact a difficult legal question about which reasonable minds can differ. *See Klinghoffer*, 921 F.2d at 25.

The Court held that under New York law the right to publicly perform sound recordings is part of the bundle of rights associated with common law copyrights in those recordings. That conclusion was reached primarily upon consideration of New York's treatment of common law copyrights in other types of works. But while this Court believes it reached the correct result, I appreciate that another judge might feel differently. In this regard, I note particularly that federal statutory copyrights in sound recordings did not come with an associated right to exclusive public performance until Congress passed a law in 1995, which provided a limited "exclusive right[] . . . to perform [copyrighted sound recordings] publicly by means of a digital audio transmission." 17 U.S.C. § 106; *see* Digital Performance Right in Sound Recordings Act of 1995, Pub. L. 104-39, 109 Stat. 336. Between 1971, when Congress first granted statutory copyright protection to sound recordings, and 1995, Congress did not include public performance rights among the specifically enumerated rights granted to holders of copyrights in sound recordings. Of course, the very fact that Congress felt compelled to carve out a statutory exception for public performance rights, by excluding them from the bundle of rights associated with copyrights in sound recordings, suggests that such rights would otherwise have existed, and so exist at common law. *See* Summary Judgment Decision at 20-21 & n.3. However, the complicated history of public performance rights

and copyright in the discrete medium of sound recordings makes the answer to this question less than straightforward, and warrants a close look by a controlling court.

Turning to the third factor, "an immediate appeal from [the Summary Judgment Decision] may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). If I am wrong about public performance rights for holders of copyrights in pre-1972 sound recordings then this lawsuit will end, either immediately or in short order, after this Court revisits whether Sirius's limited copying of pre-1972 recordings qualifies as fair use.

If, however, this Court's ruling is affirmed, then Sirius and the holders of copyrights in pre-1972 sound recordings will turn their attention to the thorny but ultimately soluble issue of how to license and compensate public performances of those recordings. That negotiation, which would also advance the termination of this litigation, will never proceed until there is a definitive ruling on this question of first impression.

Following other district courts in this Circuit, I have identified a particular controlling question of law which I am certifying to the Second Circuit. *See, e.g.*, *Transp. Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.*, 358 F. Supp. 2d 347, 352 (S.D.N.Y. 2005); *Maestri v. Westlake Excavating Co.*, 894 F. Supp. 573, 577 (N.D.N.Y. 1995); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 664 F. Supp. 91, 95 (S.D.N.Y. 1987) *rev'd on other grounds*, 859 F.2d 242 (2d Cir. 1988); *see also J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 115 (2d Cir. 2004) ("The district court certified only the subject matter jurisdiction issue for interlocutory appeal and denied the School District's motion insofar as it sought certification of the district court's ruling on the sufficiency of plaintiffs' Section 504 and Section 1983 claims."). I recognize, however, that "Though it is helpful for a district court to frame the controlling questions of law that the order involves, . . . the statutory procedure specifies appeal of the order, rather than certification of the

questions . . . ." *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1157 (2d Cir. 1986); *see also Isra Fruit Ltd. v. Agrexco Agr. Exp. Co.*, 804 F.2d 24, 25 (2d Cir. 1986) ("[S]ection 1292(b) authorizes certification of orders . . . not certification of questions. Of course, in certifying an order for interlocutory review it is helpful if the district judge frames the controlling question(s) that the judge believes is presented by the order being certified.") (internal citations omitted). As a result, although I am certifying only a "portion" of an order for interlocutory appeal, I recognize that the Second Circuit's Circuit's review is "not necessarily limited to the certified issue;" the Court of Appeals has "the discretion to consider any aspect of the order from which the appeal is taken." *J.S.*, 386 F.3d at 115. This includes a second question of law that Sirius asked this Court to certify: assuming this Court answered the certified question correctly, does the Dormant Commerce Clause prohibit the State of New York from enforcing a property right that it recognizes at common law? That question, too, qualifies as "controlling," and its resolution could materially advance the resolution of this lawsuit. However, I do not believe that there is substantial ground for a difference of opinion on that issue, so I would not certify the case if that were the only question raised, and I do not base my decision to certify an interlocutory appeal on the presence of this question in the case.

## III. Further Proceedings in The Action Are Stayed Pending Interlocutory Appeal

"The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441-42 (2d Cir. 1964) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)). "A district court's authority to stay a pending action is an aspect of its broad and inherent power over its own process, to prevent abuses, oppressions and injustice, so as not to produce hardship, and to do substantial justice. In issuing a stay, a court must weigh competing interests and maintain an even

balance." *Soler v. G & U, Inc.*, 86 F.R.D. 524, 526 (S.D.N.Y. 1980) (internal citations, quotation marks, and alterations omitted).

Here, the competing interests favor granting a stay.

As explained above, judicial economy strongly favors staying the proceedings pending resolution of the legal question at the core of this action. Whether or not the Court's judgment on appeal is affirmed, granting a stay now, rather than proceeding with cumbersome class-wide discovery, a motion for certification, and ultimately a decision on damages, is very likely to save time and money for the litigants – whether by resolving the case outright or by providing a basis on which the parties can negotiate licenses for the public performance of pre-1972 sound recordings.

It is true that Sirius would not suffer irreparable harm if a stay is denied. Its injury – if it is in fact injured by the failure to grant a stay – would be in the form of monetary costs. However, granting a stay would not impose substantial hardship on Flo and Eddie. Flo and Eddie has tolerated public performances of sound recordings in which it holds common law copyrights, by both digital and terrestrial broadcasters, for decades. If Flo and Eddie prevails on appeal, it can obtain damages for all Sirius's acts of infringement dating from three years before its complaint was filed. It loses not a dime's worth of potential damages by holding up until the legal issue is resolved.

With the balance of hardships thus favoring neither side, the public interest in judicial economy rules the day. The Court will stay this action.

**CONCLUSION**

For the foregoing reasons, Sirius's motion to certify the Summary Judgment Decision and the Decision on Reconsideration for interlocutory appeal is **GRANTED**, and this action is **STAYED** pending a decision by the Second Circuit.

Dated: February 10, 2015

U.S.D.J.

BY ECF TO ALL COUNSEL