# 15-1164-cv

## United States Court of Appeals

*for the*

## Second Circuit

FLO & EDDIE, INC., a California Corporation,
individually and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

– v. –

SIRIUS XM RADIO, INC., a Delaware Corporation,

*Defendant-Appellant,*

DOES, 1 THROUGH 10,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF *AMICI CURIAE* OF COPYRIGHT AND INTELLECTUAL
PROPERTY LAW PROFESSORS IN SUPPORT OF DEFENDANT-
APPELLANT SIRIUS XM RADIO INC.**

EUGENE VOLOKH
UCLA SCHOOL OF LAW
385 Charles E. Young Drive East
Los Angeles, CA 90095
(310) 206-3926

*Attorney for Amici Curiae Copyright and Intellectual Property Law Professors*

# TABLE OF CONTENTS

Table of Contents ........................................................................ i

Table of Authorities ................................................................... ii

Interest of *Amici Curiae* ......................................................... 1

Summary of Argument ............................................................... 1

Argument ..................................................................................... 3

I.    Statutory Background ............................................................ 3

II.   For 75 Years, It Has Been Considered Settled Law That There Is

      No Common-Law Public Performance Right for Sound Recordings. ............ 5

III.  Proponents Have Repeatedly Denied The Existence of Public

      Performance Rights When Seeking Relief From Congress. ....................... 13

Conclusion ................................................................................. 19

Certificate of Compliance ........................................................ 20

Appendix: List of *Amici Curiae* ............................................ 21

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*American Vitagraph, Inc. v. Levy*, 659 F.2d 1023 (9th Cir. 1981) ..........................4

*Brown v. Tabb*, 714 F.2d 1088 (11th Cir. 1983) .......................................4

*Caliga v. Inter Ocean Newspaper Co.*, 215 U.S. 182 (1909) ..................................4

*Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657
    (2d Cir. 1955) .........................................................8, 9, 10

*Capitol Records, Inc. v. Naxos of America, Inc.*, 797 N.Y.S.2d 352 (2005) ....10, 11

*Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc.*, 73 F.2d 276 (2d Cir. 1934) ....3

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d 325
    (S.D.N.Y. 2014)........................................................11

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 114 U.S.P.Q.2d (BNA) 1997
    (S.D. Fla. June 22, 2015) ..............................................6

*Holmes v. Hurst*, 80 F. 514 (2d Cir. 1897), *aff'd*, 174 U.S. 82 (1899) ...................4

*Louis DeJonge & Co. v. Breuker & Kessler Co.*, 235 U.S. 33 (1914) ....................4

*Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Co.*, 101 NY.S.2d 483
    (Sup. Ct. 1950), *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951) .................7, 8, 9

*Mifflin v. Dutton*, 190 U.S. 265 (1903).....................................................4

*RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), *cert. denied*,
    311 U.S. 712 (1940)........................................................ *passim*

*National Comics Publication v. Fawcett Publications*, 191 F.2d 594
    (2d Cir. 1951) ...........................................................3

*Rosette v. Rainbo Record Mfg. Corp.*, 354 F. Supp. 1183 (S.D.N.Y. 1973), *aff'd*, 546 F.2d 461 (2d Cir. 1976)................................................................5

*Waring v. WDAS Broadcasting System*, 194 A. 631 (Pa. 1937)............................6

*White-Smith Music Publishing Co. v. Apollo Co.*, 209 U.S. 1 (1908) .....................5

Statutes

17 U.S.C. § 101 ......................................................................................................5

17 U.S.C. § 114(a) ...............................................................................................14

17 U.S.C. § 303(b) ..................................................................................................5

Copyright Act of 1909, Pub. L. 60-349, ch. 320, § 9, 35 Stat. 1077 .......................3

Copyright Act of 1909, Pub. L. 60-349, ch. 320, § 18, 35 Stat. 1079 .....................3

N.C. Gen. Stat. Ann. § 66-28 .................................................................................6

S.C. Code § 39-3-510..............................................................................................6

Sound Recording Amendments Act of 1971, Pub. L. No. 92-140, § 1, 85 Stat. 391 ......................................................................................................14

Legislative Materials

Copyright Law Revision, Hearings Before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., pursuant to S. Res. 37 on S. 597, Part 2 (1967)...................16

Copyright Law Revision, Hearings Before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., pursuant to S. Res. 37 on S. 597, Part 3 (1967)...................16

Economic Conditions In the Performing Arts, Hearings Before the Select Subcommittee on Education of the House Committee on Education and Labor, 87th Cong., 1st and 2d Sess. (1962) ..........................................15

H.R. Rep. 92-487, at 3 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1566 ..................14

Performance Rights in Sound Recordings, Hearings Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 95th Cong., 2d Sess. (1978) ..............................16, 17

Regulations

47 C.F.R. § 25.144(a)(3)(1) (2014) .......................................................11

47 C.F.R. § 25.144(e)(4) (2014).........................................................11

Rules

Fed. R. App. P. 29(c)(5) ........................................................................1

Other Authorities

Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings: How to Alter the Copyright System Without Improving It*, 43 Geo. Wash. L. Rev. 152, 155 (1974) ......................................7, 10, 12, 13

Steven J. D'Onofrio, *In Support of Performance Rights in Sound Recordings*, 29 UCLA L. Rev. 168 (1978) ....................................................................13

Benjamin Kaplan, *Performer's Right and Copyright: The* Capitol Records *Case*, 69 Harv. L. Rev. 409, 435-36 (1956).................................................10

Linda A. Newmark, *Performance Rights in Sound Recordings: An Analysis of the Constitutional, Economic, and Ethical Issues*, 38 Copyr. L. Symp. (ASCAP) 141 (1992) ...............................................................................13

Kevin Parks, MUSIC AND COPYRIGHT IN AMERICA: TOWARD THE CELESTIAL JUKEBOX (ABA 2012) ........................................................................ 5-6, 7

Report of the Register of Copyrights, *Copyright and the Music Marketplace* (Feb. 2015) ...................................................................................15

Report of the Register of Copyrights, *Copyright Implications of Digital Audio Transmission Services* (Oct. 1991) ...................................... 15, 17, 18

Report of the Register of Copyrights, *Federal Copyright Protection for Pre-1972 Sound Recordings* (Dec. 2011) ............................................12, 15

Report of the Register of Copyrights, *Performance Rights in Sound Recordings* (June 1978) ...................................................................14, 17

Barbara A. Ringer, Copyright Law Revision Study No. 26, *The Unauthorized Duplication of Sound Recordings* (1957) ......................................................6

## INTEREST OF *AMICI CURIAE*

*Amici curiae*, whose names and institutional affiliations are listed in the Appendix, are all professors who teach and write about copyright law or about intellectual property law in general. *Amici* do not have any financial interest in the outcome of this litigation. The only interest that *amici* have in this litigation is a respect for the historical development of copyright law, and a commitment to the orderly development of copyright law in the future. *Amici* do not necessarily agree on the merits of a public performance right for sound recordings, but *amici* agree that 1) historically there has not been any public performance right in sound recordings under state law, and 2) the issue should be addressed on a nationwide basis, by Congress, prospectively, rather than on a piecemeal basis through state-by-state litigation.[1]

## SUMMARY OF ARGUMENT

From the early days of radio, performers and record companies have sought to establish a public performance right for sound recordings. In 1940, this Court ruled that no such right existed or could be enforced in New York. Ever since

---

[1] Pursuant to Fed. R. App. P. 29(c)(5), *amici* certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of the brief; and no person other than amici contributed money intended to fund the preparation or submission of the brief.

1

then, broadcasters have freely played sound recordings without any obligation to pay royalties to the performers or record companies. During the past seven decades, proponents have repeatedly asked Congress to enact a public performance right for sound recordings. Each time, proponents contended that they did *not* have an existing public performance right in sound recordings, under either state or federal law. With one limited exception, Congress has repeatedly refused to enact a public performance right for sound recordings. Plaintiffs' frustration with Congressional inaction has resulted in this attempt to convince this Court to recognize a public performance right in sound recordings for the first time, under New York law. Such a ruling would improperly extend New York law beyond the borders of New York, as Internet and satellite broadcasters who operate on a nationwide basis are unable to tailor their broadcasts to fit only within the borders of New York. If public performance rights for sound recordings are to be recognized, it should be left to Congress to do so on a nationwide basis, as recommended by the Register of Copyrights, rather than through litigation on a state-by-state basis.

# **ARGUMENT**

## I.    Statutory Background

Under the 1909 Copyright Act, an eligible work acquired federal copyright protection when it was published with proper copyright notice.  Copyright Act of 1909, Pub. L. 60-349, ch. 320, § 9, 35 Stat. 1077.[2]  (Proper copyright notice consisted of 1) the word "Copyright" or the abbreviation "Copr.," or in some cases the symbol ©; 2) the year of first publication; and 3) the name of the copyright owner.  Copyright Act of 1909, Pub. L. 60-349, ch. 320, § 18, 35 Stat. 1079.[3])  If a work was published without proper notice, it immediately and irrevocably entered the public domain, meaning that it could be copied (and publicly performed) without restriction. *National Comics Publications, Inc. v. Fawcett Publications, Inc.*, 191 F.2d 594, 598 (2d Cir. 1951) (per L. Hand, J.) ("It is of course true that the publication of a copyrightable 'work' puts that 'work' into the public domain except so far as it may be protected by [federal statutory] copyright. That has been unquestioned law since 1774."); *Fleischer Studios, Inc. v. Ralph A. Freundlich, Inc.*, 73 F.2d 276, 277 (2d Cir. 1934) ("Publication with notice of copyright is the

---

[2]    When the Copyright Act was codified in Title 17 in 1947, this section was renumbered as section 10.  Therefore cases decided after 1947 concerning this section refer to it as section 10, rather than as section 9.

[3]    When the Copyright Act was codified in Title 17 in 1947, this section was renumbered as section 19.

essence of compliance with the statute, and publication without such notice amounts to a dedication to the public sufficient to defeat all subsequent efforts at copyright protection.").[4]

Before a work was published, it could be protected by state law, which typically provided a common-law right to prevent reproduction of the work. Once the work was published, however, state-law protection was forfeited, and unless the plaintiff took steps to secure a federal statutory copyright, the work entered the public domain. *See Caliga v. Inter Ocean Newspaper Co.*, 215 U.S. 182, 188 (1909) ("At common law, the exclusive right to copy existed in the author until he permitted a general publication. Thus, when a book was published in print, the owner's common-law right was lost.").

A work was "published" when copies of the work were distributed or offered to the general public. *Brown v. Tabb*, 714 F.2d 1088, 1091 (11th Cir. 1983); *American Vitagraph, Inc. v. Levy*, 659 F.2d 1023, 1027 (9th Cir. 1981).[5] In 1908, the U.S. Supreme Court held that a federally copyrighted musical work was not infringed by the sale of piano rolls, perforated sheets of paper that caused a

---

[4]     This principle was carried forward from previous copyright acts. *See Mifflin v. Dutton*, 190 U.S. 265, 265 (1903); *Louis DeJonge & Co. v. Breuker & Kessler Co.*, 235 U.S. 33, 35-37 (1914).

[5]     Again, this case law carried forward the definition that applied under pre-1909 Act case law. *See Holmes v. Hurst*, 80 F. 514 (2d Cir. 1897), *aff'd*, 174 U.S. 82, 88 (1899).

player piano to perform the melody. *White-Smith Music Publishing Co. v. Apollo Co.*, 209 U.S. 1 (1908). In so holding, the Court defined a "copy" of a musical work as "a written or printed record of it in intelligible notation." *Id.* at 17. Accordingly, both the courts and Congress posit that under the 1909 Act, the distribution of "phonorecords" containing sound recordings of musical works did *not* constitute a publication of the musical works contained on those recordings. 17 U.S.C. § 303(b); *Rosette v. Rainbo Record Mfg. Corp.*, 354 F. Supp. 1183, 1188-92 (S.D.N.Y. 1973), *aff'd*, 546 F.2d 461 (2d Cir. 1976). Unlike a musical work, however, a sound recording can *only* be perceived through hearing, rather than by sight. Consequently, there is no persuasive reason why the same definition of publication (a definition limited to the public distribution of "copies") should be applied to sound recordings. Indeed, under the 1976 Copyright Act, the legal definition of publication specifically includes the public distribution of "phonorecords" as well as "copies." 17 U.S.C. § 101 (definition of "published").

II.   <u>For 75 Years, It Has Been Considered Settled Law That There Is No Common-Law Public Performance Right for Sound Recordings.</u>

Since the dawn of radio broadcasting, performers and record companies have sought to establish a right to exclude others from publicly performing their sound recordings. *See generally* Kevin Parks, MUSIC AND COPYRIGHT IN AMERICA:

5

TOWARD THE CELESTIAL JUKEBOX 101-137 (ABA 2012). Early answers to the question were split, with Pennsylvania recognizing a common-law right of public performance, *see Waring v. WDAS Broadcasting System*, 194 A. 631 (Pa. 1937), and three states (North Carolina, South Carolina, and Florida) enacting statutes prohibiting recognition of such a right. *See* Barbara A. Ringer, Copyright Law Revision Study No. 26, *The Unauthorized Duplication of Sound Recordings* 8-9 & n.79 (1957).[6] In 1940, this Court (per Judge Learned Hand) decided *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), *cert. denied*, 311 U.S. 712 (1940), which questioned the existence of a common-law right of public performance, and held that even assuming such a right existed, any such right was divested when the sound recordings were first sold to the public, nowithstanding the restrictive legend on some of the records "Not Licensed for Radio Broadcast." 114 F.2d at 88.[7]

---

[6]     Two of those statutes are still in effect. *See* N.C. Gen. Stat. Ann. § 66-28; S.C. Code § 39-3-510. Although Florida repealed its statute effective July 1, 1977, a federal district court in Florida recently refused to recognize a public performance right in sound recordings under Florida common law. Flo & Eddie, Inc. v. Sirius XM Radio, Inc., 114 U.S.P.Q.2d (BNA) 1997 (S.D. Fla. June 22, 2015).

[7]     "[T]he monopoly of the right to reproduce the compositions of any author— his 'common-law property' in them— was not limited to words; . . . and for the purposes of this case we shall assume that it covers the performances of an orchestra conductor. . . . [If so, w]e think that the 'common-law property' in these performances ended with the sale of the records and that the restriction did not save it; and that if it did, the records themselves could not be clogged with a servitude." *Id.* at 88.

Although *Whiteman* was technically decided as a matter of New York law, "when the Supreme Court refused to hear the case on December 16, 1940, it became official: Judge Hand's opinion was [accepted as] the last word on the legality of broadcasting sound recordings." Parks, at 121. *See also* Robert L. Bard & Lewis S. Kurlantzick, *A Public Performance Right in Recordings: How to Alter the Copyright System Without Improving It*, 43 Geo. Wash. L. Rev. 152, 155 (1974) ("The last reported case involving purported common law performing rights was *R.C.A. Mfg Co. v. Whiteman*."). Instead, "performers refocused their efforts from the courts to Congress. No fewer than six bills were introduced between 1942 and 1951; they were designed to bring recordings under the copyright statute." Parks, at 123. All such efforts failed. Indeed, by the 1950s, the economics of the music industry were such that record companies paid broadcasters to play their recordings, rather than vice versa, in order to promote the sales of records. *Id.* at 137; Bard & Kurlantzick, 43 Geo. Wash. L. Rev. at 155.

Plaintiffs contend that *Whiteman* was overturned by subsequent New York case law, especially *Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Co.*, 101 NY.S.2d 483 (Sup. Ct. 1950), *aff'd*, 107 N.Y.S.2d 795 (App. Div. 1951). In that case, the Met had sold the exclusive right to make phonograph records of its performances to CBS and had sold the exclusive right to broadcast its live performances to ABC. The defendant recorded broadcast performances off the air

and sold records made from those recordings.  The N.Y. Supreme Court granted an

injunction, which was affirmed by the Appellate Division, on the ground that

broadcasting live performances was not a "publication" of those performances, and

therefore the common-law right in such performances was preserved.  101

N.Y.S.2d at 498-99.  This is entirely consistent with *Whiteman*, in which this Court

specifically stated:

> [I]f a conductor played over the radio, and if his performance was not
> an abandonment of his rights, it would be unlawful without his
> consent to record it as it was received from a receiving set and to use
> the record.  Arguendo, we shall also assume that such a performance
> would not be an abandonment, just as performance of a play, or the
> delivery of a lecture is not; that is, that it does not 'publish' the work
> and dedicate it to the public.

*Whiteman*, 114 F.2d at 88.  *Metropolitan Opera* involved only the right to create,

reproduce and sell phonograph records of broadcast performances; it did *not*

involve the right to publicly perform recordings which had been lawfully made and

sold to the general public.

   *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir.

1955), is also distinguishable from *Whiteman* and from this case.  That case

involved competing claims to the exclusive right to reproduce and distribute in the

United States certain recordings made by Telefunken in Germany during the Nazi

regime.  This Court held that: 1) the sound recordings could not themselves receive

a federal statutory copyright under the 1909 Copyright Act, *id.* at 659-62; 2) as

between the two parties, Capitol Records held the contractual right to reproduce and sell the recordings in the United States, even if Mercury retained a contractual right to reproduce and sell the recordings in Czechoslovakia, *id.* at 662-63; and 3) the sale of phonograph records to the public did not divest Capitol of its common-law right to exclude others from reproducing and selling copies of those recordings, *id.* at 663.[8] Specifically, this Court characterized *Whiteman* as holding in part that "the common-law property in the performances of musical artists which had been recorded ended with the sale of the records and that thereafter anyone might *copy* them and use them as he pleased," *Id.* at 663 (emphasis added), and it stated that "the quoted statement from the *RCA* case is not the law of the State of New York." *Id.*  It reasoned that under the *Metropolitan Opera* case, "where the originator, or the assignee of the originator, of records of performances by musical artists puts those records on public sale, his act does not constitute a dedication of *the right to copy and sell the records*." *Id.* at 663 (emphasis added).[9]  As the emphasized language indicates, *Capitol Records v. Mercury Records* involved only "the right to copy and sell" recordings that had been lawfully made.  It said nothing

---

[8]     Judge Hand agreed with the first two holdings but dissented on the third, on the ground that federal law, rather than state law, should determine whether a work had been "published."  221 F.2d at 665-67 (L. Hand, J., dissenting).

[9]     Judge Hand expressly agreed that if New York law controlled the issue in question, then the *Metropolitan Opera* case should be followed.  221 F.2d at 665-66 (L. Hand, J. dissenting).

about whether the common-law property right in such recordings included a public

performance right. *RCA v. Whiteman* itself had distinguished the right to

reproduce and sell from the right of public performance:

> Copyright . . . consists only in the power to prevent others from
> reproducing the copyrighted work. [Defendant] has never invaded
> any such right of Whiteman; they have never copied his performances
> at all; they have merely used those copies which he and [RCA] made
> and distributed.

114 F.2d at 88. *See also* Benjamin Kaplan, *Performer's Right and Copyright: The*

*Capitol Records Case*, 69 Harv. L. Rev. 409, 435-36 (1956) (distinguishing a

"right to prevent unlicensed broadcast" from "physical duplication of records" and

concluding "[t]he *RCA* case may be right in result without necessarily calling for

the denial of relief in *Capitol Records*"); Bard & Kurlantzick, 43 Geo. Wash. L.

Rev. at 154 (same). If, as plaintiffs contend, the *Capitol Records* case overturned

*RCA v. Whiteman* in its entirety, such that they had an enforceable common-law

public performance right in sound recordings in New York, why did recording

companies publicly complain for six decades afterward that they did *not* have a

public performance right in their recordings? Their silence in asserting such a

right, and their vehement public protests about the unfairness of not having such a

right, ought to be conclusive on the question of whether such a right existed.

Similarly, *Capitol Records, Inc. v. Naxos of America, Inc.*, 797 N.Y.S.2d

352 (2005), only involved Capitol's right to prevent Naxos from *reproducing and*

*selling* recordings that had been released to the public.  The issue was whether the New York common-law right expired at the same time as the statutory right in England, the country where the recordings were made.  The New York Court of Appeals held that the common-law right did *not* follow the "rule of the shorter term," but instead persisted until preempted by federal law on February 15, 2067. *Id.* at 366-67.  *Capitol Records v. Naxos* said nothing about whether the state common-law right in sound recordings did or did not include a right of public performance.

As the district court in this case acknowledged, "the conspicuous lack of any jurisprudential history confirms that not paying royalties for public performances of sound recordings was an accepted fact of life in the broadcasting industry for the last century."  *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d 325, 340 (S.D.N.Y. 2014).  Imposing an obligation to pay such royalties now, retroactively, on a state-by-state basis, would be incredibly disruptive to the broadcast industry, and would improperly extend New York law outside of the borders of New York State.  Sirius XM and other satellite and Internet broadcasters operate on a nationwide basis; they are unable to tailor their signal so that it reaches only clients who live outside of New York State.[10]  *See Whiteman*, 114 F.2d at 89-90 (refusing

---

[10]    Indeed, Sirius XM is *required* by FCC regulations to transmit the same programming to all of its subscribers in the 48 contiguous states.  47 C.F.R. § 25.144(a)(3)(1), § 25.144(e)(4) (2014).

11

to issue an injunction based on Pennsylvania law, because broadcast signals could not be confined to Pennsylvania); Bard & Kurlantzick, 43 Geo. Wash. L. Rev. at 157 ("since radio and television broadcasters are the predominant public performers of recorded music[,] the disruption of interstate commerce attributable to state recognition of a record public performance right would be considerably more severe than that to be expected from state anti-piracy legislation."). Moreover, there is nothing in the district court's ruling that limits its holding to digital audio transmission. Every television network, and every local television station whose signal can be received in New York State, would be obligated to pay royalties to sound recording copyright owners as well, for the first time in the history of television. If such a drastic change in the *status quo* is to occur, it should be done prospectively, on a nationwide basis, by Congress, as the Register of Copyrights has recommended. Report of the Register of Copyrights, *Federal Copyright Protection for Pre-1972 Sound Recordings* (Dec. 2011). Plaintiffs' frustration with Congressional inaction is not a sufficient reason to recognize public performance rights under New York common law retroactively, eight decades after broadcasting was invented.

III.    Proponents Have Repeatedly Denied The Existence of Public Performance
        Rights When Seeking Relief From Congress.

"The fact that sound recordings constitute the only class of copyrightable
subject matter that is denied a performance right is not merely the result of
Congressional oversight.  Numerous legislative attempts to amend the Copyright
Act to include performance rights in sound recordings have failed after receiving
tremendous opposition from lobbying groups supported mainly by the broacasting
industry."  Linda A. Newmark, *Performance Rights in Sound Recordings: An
Analysis of the Constitutional, Economic, and Ethical Issues*, 38 Copyr. L. Symp.
(ASCAP) 141, 142 (1992).  At least twelve bills were rejected between 1936 and
1951, and another twelve were rejected between 1967 and 1981.  *Id.* at 142-43 n.9
(listing bills).  While many commentators supported enactment of such a right, and
many opposed it, the one thing that all commentators agreed on was that *there was
no existing public performance right in sound recordings* under either state or
federal law.  *See, e.g.*, *id.* at 142; Steven J. D'Onofrio, *In Support of Performance
Rights in Sound Recordings*, 29 UCLA L. Rev. 168, 168 (1978); Bard &
Kurlantzick, 43 Geo. Wash. L. Rev. at 154-56.  If such a right was thought to exist
under state law, why were so many people wasting so much effort lobbying for and
against a public performance right under federal law?

13

In 1971, as a condition of getting federal copyright protection against unauthorized duplication and sale of recordings made on or after February 15, 1972, record companies grudgingly accepted the fact that such federal protection would likewise *not* include any public performance right. *See* Sound Recording Amendments Act of 1971, Pub. L. No. 92-140, § 1, 85 Stat. 391. Congress expressly had considered enacting a public performance right for sound recordings; a previous version of the bill "encompass[ed] a performance right so that record companies and performing artists would be compensated when their records were performed for commercial purposes," but the public performance right was deliberately removed from the final legislation. H.R. Rep. 92-487, at 3 (1971), *reprinted in* 1971 U.S.C.C.A.N. 1566, 1568. This restriction was later codified in Section 114(a) of the 1976 Copyright Act: "The exclusive rights of the owner of copyright in a sound recording . . . do not include any right of performance under section 106(4)." 17 U.S.C. § 114(a). Had record companies believed at the time that they had a right of public performance under state law, it is highly doubtful that they would have accepted a federal law that divested them of any such rights for sound recordings made on or after February 15, 1972.

Since 1971, the Register of Copyrights has consistently advocated that Congress enact a public performance right for sound recordings. *See* Report of the Register of Copyrights, *Performance Rights in Sound Recordings* 3-7 (June 1978);

Report of the Register of Copyrights, *Copyright Implications of Digital Audio Transmission Services* 156-57 (Oct. 1991); Report of the Register of Copyrights, *Copyright and the Music Marketplace*, 135-39 (Feb. 2015). The Register has also recommended that Congress bring pre-1972 sound recordings within the federal copyright system. Report of the Register of Copyrights, *Federal Copyright Protection for Pre-1972 Sound Recordings* (Dec. 2011). Summarizing the legal situation in 2011, the Register concluded: "In general, state law does not appear to recognize a performance right in sound recordings." *Id.* at 44; *see also id.* at 45 ("Until 1995 there was no public performance right in sound recordings under federal law, and it does not appear that, in practice, pre-1972 sound recordings had such protection.").

Each time the issue arose, record industry executives testified that they did not have any existing right to collect royalties for unauthorized public performances. For example, in 1961, Herman Kenin, President of the American Federation of Musicians, testified: "It is a shocking crime that people like Mr. Leopold Stokowski or Leonard Bernstein, or Louis Armstrong, or whoever the artist may be, are denied the right to receive additional fees, when money is made with his product." Economic Conditions In the Performing Arts, Hearings Before the Select Subcommittee on Education of the House Committee on Education and Labor, 87th Cong., 1st and 2d Sess., at 17 (1962). In 1967, Alan W. Livingston,

President of Capitol Records, testified: "It must shock one's conscience that the playing of the delayed performance of a phonograph recording artist, however, results in no compensation to the person who made that phonograph record." Copyright Law Revision, Hearings Before the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., pursuant to S. Res. 37 on S. 597, Part 2, at 498 (1967).[11] Jazz pianist Stan Kenton, in his role as Chairman of the National Committee for the Recording Arts, testified that unlike composers and publishers, a recording artist "receives nothing for the commercial playing of his record[,] even though the user may be reaping great profits with it." *Id.* at 542. Erich Leinsdorf, conductor of the Boston Symphony Orchestra, testified: "According to the present laws only the composer and the publisher of a musical work gets a financial benefit when the recorded work is played on the radio or on the television. The artists who recorded the work get nothing." *Id.*, Part 3, at 820.

In 1978, Barbara A. Ringer, Register of Copyrights, testified: "Broadcasters and other commercial users of recordings have performed them without permission or payment for generations." Performance Rights in Sound Recordings, Hearings

---

[11] This occurred 12 years after the *Capitol Records v. Mercury Records* case supposedly overturned the ruling in *RCA v. Whiteman*. If that was the correct interpretation of *Capitol Records*, then Capitol was *already* entitled under state law to demand compensation for the playing of its sound recordings, and the testimony of Mr. Livingston, Capitol's president, would have been meaningless.

16

Before the Subcommittee on Courts, Civil Liberties, and the Administration of

Justice of the House Committee on the Judiciary, 95th Cong., 2d Sess., at 116

(1978). Victor W. Fuentealba, President of the American Federation of Musicians,

asked: "Why, alone, are radio stations and others who use our music without our

consent, exempt from paying for the product on which they base their business?"

*Id.* at 11. The Recording Industry Association of America submitted a statement:

"Under existing law, broadcasters pay the composer and publisher of the song that

is played over the air in a sound recording. But the performers and record

company whose artistry and skill brought that composition to life in a recorded

performance . . . are paid nothing." Report of the Register of Copyrights,

*Performance Rights in Sound Recordings* 726 (June 1978).

In 1991, the RIAA reaffirmed that "[c]urrently, [broadcasters] do not pay

anything for the creative efforts of the musicians, artists and recording companies

that produce records." Report of the Register of Copyrights, *Copyright*

*Implications of Digital Audio Transmission Services*, Appendix at 15 (Oct. 1991).

"[T]he performance royalty stream that results from the airplay and other public

exposure of a hit song benefits only the composer and the music publisher; not the

performing artist, not the musicians, not the record company." *Id.* at 17.[12] The

---

[12] That the RIAA was referring to pre-1972 sound recordings as well as more recent ones is demonstrated by the example that it chose to illustrate the issue: Bing Crosby's classic 1942 recording of "White Christmas." *Id.* at 17.

AFL-CIO, American Federation of Musicians, and American Federation of Television and Radio Artists (AFTRA) stated: "We have long been concerned about the exploitation of sound recordings by broadcasters and others without compensation to those responsible for creating the recordings. No other kind of copyrighted work lacks a performance right." *Id.* at 72.

Plaintiffs would have this Court believe that each of these people testified with their fingers crossed behind their backs, silently thinking: "When I testified that recording artists and record companies did not receive any money from public performances of sound recordings, I only meant that no such right existed under federal law. Such as right exists, and has always existed, under state law. We simply chose voluntarily for decades not to rely on those state-law rights to which we were legally entitled." The notion is highly implausible. For 75 years, performers and record companies alike accepted *Whiteman* as the law and testified in Congress that they lacked a public performance right in sound recordings. With one limited exception, Congress has resisted all invitations to enact a public performance right in sound recordings. It is only dissatisfaction with Congress' judgment that has led sound recording copyright owners to try once again to get this Court to recognize a public performance right under state law.

## **CONCLUSION**

Plaintiffs invite this Court to overturn 75 years of settled precedent and a settled understanding of the law in the music industry by inventing a new common-law right of public performance in sound recordings. This Court should decline this invitation.

Respectfully submitted,

Dated August 4, 2015                    By:  /s/ Eugene Volokh_____

Eugene Volokh
UCLA School of Law
385 Charles E. Young Drive East
Los Angeles, CA  90095
(310) 206-3926
volokh@law.ucla.edu

Counsel of Record for Proposed
*Amici Curiae* Copyright and
Intellectual Property Law Professors

19

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and Fed. R. App. P 32(a)(7)(b)(i) because this brief contains  4,751 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has  been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

# APPENDIX:  LIST OF *AMICI CURIAE*

Howard B. Abrams
Professor of Law
University of Detroit Mercy School of Law

Brandon Butler
Practitioner in Residence
Glushko-Samuelson Law Clinic
American University Washington College of Law

Michael A. Carrier
Distinguished Professor of Law
Rutgers School of Law

Michael W. Carroll
Professor of Law and Director
Program on Information Justice and Intellectual Property
American University Washington College of Law

Ralph D. Clifford
Professor of Law
University of Massachusetts School of Law

Brian L. Frye
Assistant Professor of Law
University of Kentucky College of Law

William Gallagher
Professor of Law and Co-Director
IP Law Center
Golden Gate University School of Law

Eric Goldman
Professor of Law and Co-Director
High Tech Law Institute
Santa Clara University School of Law

James Grimmelmann
Professor of Law
Francis King Carey School of Law
University of Maryland

Yvette Joy Liebesman
Associate Professor of Law
Saint Louis University School of Law

Brian J. Love
Assistant Professor of Law and Co-Director
High Tech Law Institute
Santa Clara University School of Law

Tyler T. Ochoa
Professor of Law
High Tech Law Institute
Santa Clara University School of Law

David S. Olson
Associate Professor of Law
Boston College Law School

David G. Post
Professor of Law (ret.)
Temple University Beasley School of Law

Michael Risch
Professor of Law
Villanova University School of Law

Matthew Sag
Professor of Law
Loyola University of Chicago School of Law

Rebecca Tushnet
Professor of Law
Georgetown University Law Center

David S. Welkowitz
Professor of Law
Whittier Law School