# 15-1164-cv

## United States Court of Appeals

*for the*

## Second Circuit

FLO & EDDIE, INC., a California Corporation,
individually and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

- v. -

SIRIUS XM RADIO, INC., a Delaware Corporation,

*Defendant-Appellant,*

DOES 1 THROUGH 10,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**OPPOSITION BRIEF
OF PLAINTIFF-APPELLEE FLO & EDDIE, INC.**

HENRY GRADSTEIN
MARYANN R. MARZANO
HARVEY GELLER
GRADSTEIN & MARZANO, P.C.
6310 San Vicente Blvd, Suite 510
Los Angeles, California 90048
(323) 776-3100

EVAN S. COHEN
1180 Beverly Drive, Suite 510
Los Angeles, California 90035
(310) 556-9800

*Attorneys for Plaintiff-Appellee Flo & Eddie, Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant Flo & Eddie, Inc. ("F&E") hereby states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated:  September 28, 2015

Respectfully submitted,

By:   /s/ Harvey W. Geller

GRADSTEIN & MARZANO, P.C.
Henry Gradstein
Maryann R. Marzano
Harvey Geller
6310 San Vicente Blvd., Suite 510
Los Angeles, California 90048
Telephone:  (323) 776-3100

Attorneys for Plaintiff-Appellant
FLO & EDDIE, INC.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS ........................................................................6

1.    The Parties ....................................................................................6

      A.    F&E (The Turtles) .............................................................6

      B.    SiriusXM ..........................................................................7

2.    The Litigations ...............................................................................8

SUMMARY OF ARGUMENT ...............................................................12

ARGUMENT ..........................................................................................14

I.    THE DISTRICT COURT CORRECTLY CONCLUDED
THERE IS A PUBLIC PERFORMANCE RIGHT IN
PRE-1972 RECORDINGS ...................................................................14

      A.    New York Law Governs This Case ....................................14

      B.    Ownership Of The Artistic Performance In A
Recording Includes The Right To Exclude All Others
From Using That Performance ...........................................18

      C.    SiriusXM's Reliance On *Whiteman* Is Misplaced .............24

      D.    SiriusXM Is Liable For Its Unlicensed Public
Performance Of Pre-1972 Recordings ...............................27

II.    SIRIUSXM'S REPRODUCTIONS ARE NOT FAIR USE .........32

      A.    Purpose And Character ......................................................35

      B.    Nature Of Copyrighted Work ............................................36

      C.    Amount Of Work Used ......................................................37

D.     Effect On Potential Market ................................................38

III.    PROTECTION OF PRE-1972 RECORDINGS DOES NOT
VIOLATE THE COMMERCE CLAUSE....................................................39

     A.     New York's Protection of Pre-1972 Recordings
Does Not "Regulate" Interstate Commerce ......................................41

     B.     SiriusXM's Commerce Clause Argument Can Also
Be Rejected On the Ground That Congress Has
Authorized The States To Protect Pre-1972 Recordings ...................46

     C.     Under Either The Per Se Or Balancing Test,
A Public Performance Right Does Not
Violate The Commerce Clause ........................................................50

         1.     Per Se ........................................................................50

         2.     Balancing Test.............................................................53

CONCLUSION ......................................................................................58

# TABLE OF AUTHORITIES

## Cases

*A&M Records, Inc. v. Heilman*,
    75 Cal. App. 3d 554 (1977) ................................................................ 18, 46

*ACLU v. Johnson*,
    194 F.3d 1149 (10th Cir. 1999)...........................................................56

*Agee v. Paramount Communs.*,
    59 F.3d 317 (2d Cir. 1995) .................................................................33

*Am. Geophysical Union v. Texaco Inc.*,
    60 F.3d 913 (2d Cir. 1994) ............................................................ 36, 38

*Am. Libraries Ass'n v. Pataki*,
    969 F. Supp. 160 (S.D.N.Y. 1997) ................................................. 56, 57

*AP v. Meltwater U.S. Holdings, Inc.*,
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) ...............................................36

*Arrow Air, Inc.* v. *Port Auth. Of New York and New Jersey*,
    602 F. Supp. 314 (S.D.N.Y. 1985) ....................................................50

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014) .................................................................37

*Beyond Sys. v. Keynetics, Inc.*,
    422 F. Supp. 2d 523 (D. Md. 2006) ...................................................57

*BMW of N. Am. v. Gore*,
    517 U.S. 559 (1996)...........................................................................43

*Bonneville Int'l Corp. v. Peters*,
    153 F. Supp. 2d 763 (E.D. Pa. 2001)...................................................7

*Bowers v. NCAA, Inc.*,
    151 F. Supp. 2d 526 (D. N.J. 2001)...................................................49

*Brown & Williamson Tobacco Corp. v. Pataki*,
    320 F.3d 200 (2d Cir. 2003) ........................................................................53

*C & A Carbone v. Town of Clarkstown*,
    511 U.S. 383 (1994) ........................................................................56

*Campaign for Fiscal Equity, Inc. v. State of N.Y.*,
    8 N.Y.3d 14 (2006) ........................................................................23

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ........................................................35-36, 38-39

*Capitol Records LLC v. Harrison Greenwich LLC*,
    No. 65224 (N.Y. Sup. Ct. May 13, 2014) ........................................21

*Capitol Records, Inc. v. Erickson*,
    2 Cal. App. 3d 526 (1969) ........................................................18

*Capitol Records, Inc. v. Mercury Records Corp.*,
    221 F.2d 657 (2d Cir. 1955) ........................................................ passim

*Capitol Records, Inc. v. MP3tunes, LLC*,
    821 F. Supp. 2d 627 (S.D.N.Y. 2011) ........................................28

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
    4 N.Y.3d 540 (2005) ........................................................ passim

*Capitol Records, LLC v. Escape Media Group, Inc.*,
    2015 U.S. Dist. LEXIS 38007 (S.D.N.Y. Mar. 25, 2015) ........................21

*Capitol Records, LLC v. Harrison Greenwich, LLC*,
    984 N.Y.S.2d 274 (2014) ........................................................21

*Capitol Records, LLC v. ReDigi Inc.*,
    934 F. Supp. 2d 640 (S.D.N.Y. 2013) ........................................30

*Capitol Records, LLC v. SiriusXM*,
    Case No. BC520981, 2014 WL 7387972 (L.A. Super. Ct.) ........................10, 40

*Capitol Records, LLC v. VideoEgg, Inc.*,
    611 F. Supp. 2d 349 (S.D.N.Y. 2009) ............................................54

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008) ......................................................34

*CBS, Inc. v. Garrod*,
    622 F. Supp. 532 (M.D. Fla. 1985) .............................................18

*Chamberlain v. Feldman*,
    300 N.Y. 135 (1949).................................................................23

*Cipollone v. Liggett Group.*,
    505 U.S. 504 (1992).................................................................43

*Country Rd. Music, Inc., v. MP3.com*,
    279 F. Supp. 2d 325 (S.D.N.Y 2003) ..........................................35

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987)...................................................................56

*Dickman v. Comm'r*,
    465 U.S. 330 (1984).................................................................18

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).................................................................21

*EMI Records Limited v. Premise Media Corp. L.P.*,
    2008 N.Y. Misc. LEXIS 7485 (N.Y. Sup. Ct. Aug. 8, 2008) .......................34

*Estate of Hemingway v. Random House, Inc.*,
    279 N.Y.S.2d 51 (Sup. Ct. 1967)................................................34

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
    762 F.3d 829 (9th Cir. 2014) .....................................................46

*Exxon Corp. v. Governor of Md.*,
    437 U.S. 117 (1978)................................................... 5, 40, 50, 56

*Fendler v. Morosco*,
    253 N.Y. 281 (1930) ................................................................................34

*Ferguson v. FriendFinders, Inc.*,
    94 Cal. App. 4th 1255 (2002) ............................................................ 46, 51

*Fisher v. Star Co.*,
    231 N.Y 414 (1921) ................................................................................28

*Flo & Eddie Inc. v. SiriusXM Radio Inc.*,
    2014 U.S. Dist. LEXIS 139053 (C.D. Cal. Sept. 22, 2014) .................. 10, 40

*Flo & Eddie, Inc. v. Pandora Media, Inc.*,
    2015 U.S. Dist. LEXIS 70551 (C.D. Cal. Feb. 23, 2015) ............................10

*Flo & Eddie, Inc. v. SiriusXM Radio, Inc.*,
    2014 U.S. Dist. LEXIS 174907 (S.D.N.Y. Dec. 12, 2014) .................. 11, 26

*Flo & Eddie, Inc. v. SiriusXM Radio, Inc.*, 2015 U.S. Dist. LEXIS 80535,
    (S.D. Fla. June 22, 2015) ..........................................................................40

*Flo & Eddie, Inc. v. SiriusXM Radio, Inc.*,
    62 F. Supp. 3d 325 (S.D.N.Y. 2014) .................................................. 10, 38

*Flo & Eddie, Inc. v. SiriusXM Radio, Inc.*,
    Case No. 13-CV-23182 (S.D. Fla.) .............................................................8

*Flo & Eddie, Inc. v. SiriusXM Radio*, Inc.,
    Case No. 13-CV-05693 (C.D. Cal.) ............................................................8

*Flood v. Kuhn*,
    407 U.S. 258 (1972) .......................................................................... 51, 56

*Ford Motor Co. v. Texas Dep't of Transp.*,
    106 F. Supp. 2d 905 (W.D. Tex. 2000) ......................................................57

*Gaylord v. United States*,
    595 F.3d 1364 (Fed. Cir. 2010) ................................................................36

*GMC v. Tracy,*
    519 U.S. 278 (1997)......................................................................43

*Goldstein v. California,*
    412 U.S. 546 (1973).............................................................. passim

*Head v. N.M. Bd. of Examiners in Optometry,*
    374 U.S. 424 (1963)......................................................................42

*Healy v. Beer Inst.,*
    491 U.S. 324 (1989)......................................................................44

*Hughes v. Oklahoma,*
    441 U.S. 322 (1979)......................................................................54

*Huron Portland Cement Co. v. Detroit,*
    362 U.S. 440 (1960)......................................................................43

*Ileto v. Glock Inc.,*
    349 F.3d 1191 (9th Cir. 2003) .....................................................43

*In re Colonial Realty Co.,*
    980 F.2d 125 (2d Cir. 1992) ........................................................17

*Infinity Broadcast Corp. v. Kirkwood,*
    150 F.3d 104 (2d Cir. 1998) ........................................................36

*International News Service v. Associated Press*, 2
    48 U.S. 215 (1918)......................................................................28

*Jensen v. Gen. Elec. Co.,*
    82 N.Y.2d 77 (1993)............................................................... 3, 23

*L.P. Acquisition Co. v. Tyson,*
    772 F.2d 201 (6th Cir. 1985) .......................................................49

*Leadsinger, Inc. v. BMG Music Publ'g,*
    512 F.3d 522 (9th Cir. 2008) .......................................................39

*Metro. Opera Ass'n v. Wagner-Nichols Recorder* Corp.,
    199 Misc. 786 (Sup. Ct. 1950)............................................................. passim

*Minn. v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981)....................................................................................55

*Monge v. Maya Magazines, Inc.*,
    688 F.3d 1164 (9th Cir. 2012) ...................................................................37

*Morton v. Mancari*,
    417 U.S. 535 (1974)....................................................................................17

*Nat'l Collegiate Athletic Ass'n v. Miller*,
    10 F.3d 633 (9th Cir. 1993) .......................................................................51

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001).......................................................................53

*Nat'l Fed'n of the Blind v. Target Corp.*,
    452 F. Supp. 2d 946 (N.D. Cal. 2006)................................................. 50, 57

*Ne. Bancorp v. Bd. of Governors of Fed. Reserve Sys.*,
    472 U.S. 159 (1985).............................................................................. 40, 46

*New Energy Co. v. Limbach*,
    486 U.S. 269 (1988)................................................................................ 5, 39

*New England Power Co. v. New Hampshire*,
    455 U.S. 331 (1982)....................................................................................47

*Palmer v. De Witt*,
    47 N.Y. 532 (1872).............................................................................. 19, 20

*Parker v. Brown*,
    317 U.S. 341 (1943)....................................................................................54

*Partee v. San Diego Chargers Football Co.*,
    34 Cal. 3d 378 (1983).................................................................................56

*People ex rel State Bar Resources Bd. v. Wilmhurst,*
    68 Cal. App. 4th 1332 (1999) ....................................................................49

*People ex rel. Brown v. PuriTec,*
    153 Cal. App. 4th 1524 (2007) ..................................................................57

*People ex rel. Freeman v. Hulburt,*
    46 N.Y. 110 (1871)....................................................................................18

*People ex rel. Short v. Warden of City Prison,*
    130 N.Y.S. 698 (1911)...............................................................................19

*People v. Dixson,*
    798 N.Y.S.2d 659 (2005)...........................................................................19

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970)..............................................................................53-56

*Posadas v. Nat'l City Bank,*
    296 U.S. 497 (1936)...................................................................................17

*RCA Mfg. Co. v. Whiteman,*
    114 F.2d 86 (2nd Cir. 1940) ............................................................. passim

*Riley v. Nat'l Fed'n of Blind,*
    487 U.S. 781 (1988)...................................................................................51

*Roy Exp. Co. Establishment v. Columbia Broad. Sys., Inc.,*
    672 F.2d 1095 (2d Cir. 1982) ....................................................................28

*S. Pac. Co. v. Arizona,*
    325 U.S. 761 (1945)...................................................................................45

*Sea Air Shuttle v. Virgin Islands Port Authority,*
    800 F. Supp. 293 (D.V.I. 1992) .................................................................48

*Shamrock Farms v. Veneman,*
    146 F.3d 1177 (9th Cir. 1998) ...................................................................53

*Sherlock v. Alling*,
93 U.S. (3 Otto) 99 (1876)................................................................ passim

*Sony Corp. v. Universal City Studios*,
464 U.S. 417 (1984)........................................................................39

*Soto* v. *Tu Phuoc Nguyen*,
634 F. Supp. 2d 1096 (E.D. Cal. 2009) ................................... 48-49

*SoundExchange, Inc. v. Librarian of Cong.*,
571 F.3d 1220 (D.C. Cir. 2009)......................................................7

*State v. Heckel*,
143 Wash. 2d 824 (2001) ..............................................................57

*Thales Avionics, Inc. v. Matsushita Avionics Sys. Corp*,
2004 U.S. Dist. LEXIS 32433 (C.D. Cal. Aug. 6, 2004) .............................56

*Tiffany (NJ) Inc. v. eBay, Inc.*,
600 F.3d 93 (2d Cir. 2010) .............................................................17

*Town of Southold v. Town of E. Hampton*,
477 F.3d 38 (2d Cir. 2007)..............................................................55

*TufAmerica, Inc. v. WB Music Corp.*,
67 F. Supp. 3d 590 (S.D.N.Y. 2014) ................................................1

*UMG Recordings v. MP3.com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000) ........................................ 35-37

*UMG Recordings, Inc. v. Escape Media Group., Inc.*,
964 N.Y.S.2d 106 (2013)................................................................15

*United States v. Gonzales*,
520 U.S. 1 (1997)............................................................................15

*United States v. Ivezaj*,
568 F.3d 88 (2d Cir. 2009) .............................................................19

*United States v. Santiago*,
   826 F.2d 499 (7th Cir. 1987) ........................................................24

*United States v. Stewart*,
   20 F.3d 911 (8th Cir. 1994) ..........................................................24

*Victory v. Baker*,
   67 N.Y. 366 (1876).......................................................................19

*Waring v. WDAS Broadcasting Station, Inc.*,
   327 Pa. 433 (1937)........................................................................25

*Wausau Ins. Co. v. Argonaut Ins. Co*.,
   678 F. Supp. 1080 (S.D.N.Y. 1988) ............................................33

*White v. Mass. Council of Const. Employers, Inc.*,
   460 U.S. 204 (1983)............................................................. 6, 40, 46

*Williams v. Port Chester*,
   72 A.D. 505 (App. Div. 1902)................................................ 22, 23

*Wynehamer v. People*,
   13 N.Y. 378 (1856) ......................................................................18

*Zimmerman v. Wolff*,
   622 F. Supp. 2d 240 (E.D. Pa. 2008)...........................................49

## Statutes

17 U.S.C. §101 .....................................................................................34

17 U.S.C. §106 .....................................................................................12

17 U.S.C. §107 ........................................................................... 13, 33-35

17 U.S.C. §112(e) .................................................................................38

17 U.S.C. §114 .....................................................................................16

17 U.S.C. §115 ...................................................................................16

17 U.S.C. §301(c) ........................................................................ passim

Cal. Civ. Code § 980(a) ....................................................................10

NY CLS Art & Cult. Affr. §33.09 ......................................................46

NY CLS Civ. R. §50 ...........................................................................46

NY CLS Civ. R. §51 ...........................................................................46

## **Other Authorities**

2 Melville B. Nimmer and David Nimmer,
    Nimmer on Copyright §8[C][2] (Matthew Bender, Rev. Ed.) .....................31

5 W.F. Patry, *Patry On Copyright*, §18:55 (2010 ed.) ............................................48

*Application for Special Temporary Authority*,
    16 FCC Rcd 16773 (F.C.C. 2001) ..................................................52

*Applications for Consent to the Transfer of Control of Licenses*,
    23 FCC Rcd 12348 (F.C.C. 2008) ..................................................52

*Black's Law Dictionary* (9th ed.) ........................................................47

Library of Congress: Copyright Office, Music Licensing Study:
    Second Request for Comments,
    79 Fed. Reg. 141 (July 23, 2014) ..................................................27

*Notice of Proposed Rulemaking*,
    22 FCC Rcd 22123 (F.C.C. 2007) ..................................................52

Pub. L. No. 105-298, 112 Stat. 2827 (1998) ........................................17

SiriusXM Holdings Inc., Current Report (Form 8-K) (June 26, 2015),
    http://investor.siriusxm.com/secfiling.cfm?filingID=930413-15-2915 ........55

## **Regulations**

37 C.F.R. 382.2 ...................................................................................38

## PRELIMINARY STATEMENT

From the Victrola to iTunes, sound recordings fixed prior to February 15, 1972 ("pre-1972 recordings") are the historical backbone of the music industry.[1] Those recordings include the iconic hits of The Turtles, all of which are owned by Flo & Eddie, Inc. ("F&E"). Pre-1972 recordings also comprise a significant amount of the music that Sirius XM Radio, Inc. ("SiriusXM") broadcasts (*i.e.,* publicly performs) on a daily basis to 28 million subscribers through its satellite and Internet radio systems. However, despite using pre-1972 recordings to build its massive business, SiriusXM adopted a corporate policy pursuant to which it refused to obtain licenses or pay any royalties to exploit those recordings.

SiriusXM instituted this policy based on its conclusion that pre-1972 recordings are not protected by ***federal*** copyright law. Indeed, they are not. But what SiriusXM ignored is that federal law is irrelevant, as states were given free rein by Congress to protect pre-1972 recordings until 2067. *See* 17 U.S.C. §301(c) ("With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067"); *see also Goldstein v. California*, 412 U.S. 546 (1973). And New York has long provided this protection. *See e.g.*

---

[1] Pre-1972 recordings are to be distinguished from the musical compositions they embody. *TufAmerica, Inc. v. WB Music Corp.*, 67 F. Supp. 3d 590, 591 n.1 (S.D.N.Y. 2014). Musical compositions are not at issue in this litigation.

*Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540 (2005); *Metro. Opera Ass'n v. Wagner-Nichols Recorder* Corp., 199 Misc. 786 (Sup. Ct. 1950). What New York has protected, and what it continues to protect, are the recorded artistic performances embodied in pre-1972 recordings – in other words, ***the sounds that SiriusXM sells to its subscribers***.

Based on New York's strong protection of property rights, F&E filed this action alleging, on behalf of itself and a class of owners of pre-1972 recordings, claims for common law copyright infringement and unfair competition. After a brief discovery period, SiriusXM sought summary judgment, arguing that: (1) public performance is not one of the protectable rights inherent in the ownership of pre-1972 recordings, (2) its reproductions of pre-1972 recordings were "fair use," and (3) even if it was liable, because it is a national company, the dormant Commerce Clause prevents New York from enforcing within its own borders its non-discriminatory laws that prohibit theft.

The District Court correctly found against SiriusXM on each issue, starting with its holding that, under New York law, pre-1972 recordings *do* have, as part of the bundle of rights attendant to their copyright, an exclusive public performance right. Indeed, New York common law protects the entire bundle of rights inherent in such recordings, and does so regardless of the nature of the unauthorized use or the method of infringement. This is, of course, the only logical result since the

2

appropriation is the same whether SiriusXM is selling a pirated CD containing the artistic performance embodied in a pre-1972 recording or is selling an unlicensed audio transmission of the same performance.

SiriusXM's insistence that the public performance right can only exist if specifically granted by the New York legislature demonstrates a profound misunderstanding of the common law. Rights exist at common law whether or not they have been granted by the legislature, and they exist until the legislature expresses an unequivocal intent to abolish them. *Jensen v. Gen. Elec. Co.*, 82 N.Y.2d 77, 94 (1993). The common law's protection of all such rights does not require extrajudicial action. Perhaps the best proof of this is that the New York legislature has never granted a reproduction right for use in civil litigation, yet no one disputes this right exists under the common law. In fact, the reproduction right – which comes from the same bundle as all other rights in pre-1972 recordings – has been an unquestioned part of New York's jurisprudence for decades.

Rather than focusing on New York law, SiriusXM and its amici have instead constructed one irrelevant argument after another based on *federal* copyright cases, the history of the public performance right in *post*-1972 recordings under *federal* law, and Congressional legislative history and testimony regarding the *federal* Copyright Act. This sleight of hand should be seen for what it is: an improper attempt to substitute federal law for New York law, create confusion where none

exists, and violate the express prohibition in §301(c) against using federal copyright law to limit or annul New York law.

SiriusXM's reliance on the wrong law does not end there. After losing summary judgment, SiriusXM hired new counsel who claimed in a motion for reconsideration that everyone had overlooked *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2nd Cir. 1940), the supposed seminal case under New York law establishing that pre-1972 recordings lack a performance right. There were two problems with this: *Whiteman* was expressly overruled by *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955) and even during its limited life did not stand for the proposition that there was no performance right in recordings. SiriusXM's baffling reliance on *Whiteman* was so egregious that the District Court referred to it as "clear error." Undaunted, SiriusXM and several of its amici perpetuate that clear error by making *Whiteman* a focus of their briefs.

SiriusXM's infringing conduct extends beyond public performance to reproductions as well. SiriusXM does not dispute that it reproduced thousands of pre-1972 recordings in their entirety many times over. Instead, SiriusXM contends that if exclusive ownership does *not* include the performance right, then it is "fair use" for it to appropriate other rights that *do* fall within exclusive ownership. According to SiriusXM, the absence of one right makes all other rights free for the taking. However, *Naxos* already held that copying an entire recording is *not* fair

use.  SiriusXM ignores this holding in favor of a series of federal cases applying the four part test of 17 U.S.C. §107, which it seeks to use to improperly limit New York law in contravention of §301(c).  Yet even under §107, SiriusXM still loses, as all of §107's factors tip decidedly in F&E's favor.

Because it cannot prevail under New York law with respect to either the public performance or reproduction right, SiriusXM tries one last gambit:  it argues that, because of the dormant Commerce Clause, New York is powerless to protect pre-1972 recordings from piracy occurring within its own borders.  The thrust of SiriusXM's argument is ***not*** that New York's protection of pre-1972 recordings is discriminatory or inimical to national commerce, but that New York's protection is inimical to *SiriusXM's* commerce, which is irrelevant.  Indeed, the limited purpose of the dormant Commerce Clause is to protect against regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors, *New Energy Co. v. Limbach*, 486 U.S. 269, 273 (1988), not to protect SiriusXM's "particular structure or methods of operation in a retail market." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978).

But even if SiriusXM's operations *were* a relevant part of this Court's calculus, the dormant Commerce Clause still would not apply.  As the District Court held, a public performance right "is not a state-imposed regulation – even when applied to public performances by a national broadcaster."  **(SPA:39)** (citing

5

*Sherlock v. Alling*, 93 U.S. (3 Otto) 99 (1876))  As the District Court correctly noted, "[s]tate laws barring theft do not violate the dormant Commerce Clause." **(SPA:49)**  The District Court could have come to the same conclusion by relying on §301(c), which codified Congress's intent not only to exempt states from federal preemption, but also to grant them unlimited power to impose "rights and remedies under the common law or statutes" in order to protect pre-1972 recordings until 2067, just as New York has done.  That grant of power moots any Commerce Clause analysis because "[w]here state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce."  *White v. Mass. Council of Const. Employers, Inc.*, 460 U.S. 204, 213 (1983).

## STATEMENT OF FACTS

### 1.   The Parties.

#### A.  F&E (The Turtles).

The Turtles are one of the great American rock bands, having had a string of chart topping hits in the 1960s, including the iconic recording "Happy Together." **(A-1026 ¶¶2-3; A-1067 ¶¶2, 4)**  Since 1971, The Turtles' recordings have been owned by F&E, a corporation controlled by two of The Turtles' founding members – Howard Kaylan and Mark Volman.  For over 40 years, F&E has exploited these recordings by licensing the rights to: (a) make and sell records, (b) use the

6

recordings in movies, TV shows, and commercials, and (c) exploit the recordings digitally, including through the iTunes and Amazon storefronts. In addition, Kaylan and Volman continue to promote The Turtles' music, including as the main act on the annual "Happy Together Tour." **(A-1026-28 ¶¶4-7; A-1067-68 ¶¶5-9)**

## B.    SiriusXM.

SiriusXM is the largest radio broadcaster in the United States, providing music on a subscription fee basis to over 28 million customers through satellite and Internet radio systems. In exchange for a monthly fee, its subscribers gain access to SiriusXM's broadcasts of commercial-free music, including many channels devoted solely to pre-1972 recordings. **(A-1074 ¶6; A-1101-18; A-1068-69, ¶¶10-14)** SiriusXM broadcasts and streams these recordings to partners who operate content delivery networks **(A-1075 ¶¶9-10; A-1228-44; A-1070 ¶23)**, to its own subscribers **(A-38-44 ¶¶6, 38; A-1076. ¶18; A-1245-53; A-1070 ¶23)**, and (3) to users of the Dish Network **(A-1076 ¶19; A-1254-59; A-1070 ¶23)**, as well as by authorizing third parties to broadcast and stream recordings to SiriusXM's end users. **(A-1076 ¶20; A-1260-66; A-1070 ¶23)**.[2]

SiriusXM also copied thousands of pre-1972 recordings to create three vast music libraries and databases **(A-1075 ¶7; A-1119-21; A-1069 ¶16)**, which it then

---

[2] The broadcast of a song constitutes a public performance. *SoundExchange, Inc. v. Librarian of Cong.*, 571 F.3d 1220, 1222 (D.C. Cir. 2009) (radio); *Bonneville Int'l Corp. v. Peters*, 153 F. Supp. 2d 763, 766 n.3 (E.D. Pa. 2001) (Internet).

copied even further to create back-up libraries and databases, **(A-1075 ¶11; A-1145-56; A-1069 ¶18)**, as well as give them to third parties. **(A-1075 ¶12; A-1157-74; A-1069 ¶18)** SiriusXM's copying included the creation of "tips and tails," **(A-1075 ¶13; A-1175-88; A-1069 ¶19)**, copies on its "play out" servers **(Dkt.80-7:1-13)**[3] and buffer copies. **(A-1075 ¶15; A-1190-220; A-1070 ¶21)** Finally, SiriusXM authorized creation of a five hour cache of its broadcasts for on-demand delivery to mobile devices. **(A-1075 ¶16; A-1221-27; A-1070 ¶22)**

### 2. **The Litigations**.

On September 3, 2013, F&E filed this action alleging, on behalf of itself and a class of owners of pre-1972 recordings, claims for common law copyright infringement and unfair competition. **(Dkt.1)** F&E filed a First Amended Complaint on November 13, 2013 alleging the same causes of action. **(A-17-35)** Because pre-1972 recordings are governed on a state-by-state basis, F&E filed two additional federal class actions: one in California on August 1, 2013, *Flo & Eddie, Inc. v. SiriusXM Radio*, Inc., Case No. 13-CV-05693 (C.D. Cal.) (the "California Action") and one in Florida on September 3, 2013, *Flo & Eddie, Inc. v. SiriusXM Radio, Inc.*, Case No. 13-CV-23182 (S.D. Fla.) (the "Florida Action").

On May 30, 2014, SiriusXM filed the motion for summary judgment that is the subject of this appeal. **(Dkt.54)** In its motion, SiriusXM contended that: (1)

---

[3] "Dkt." refers to the docket-entry number assigned by the District Court.

public performance is not one of the protectable rights inherent in the ownership of pre-1972 recordings, (2) its reproductions of pre-1972 recordings were "fair use," and (3) because it is a national company, the dormant Commerce Clause prevents New York from enforcing its property laws within its own borders.

SiriusXM supported its motion with a lengthy discussion of the history of the performance right in sound recordings under the *federal* Copyright Act, including Congressional legislative history and testimony, as well as reports and studies provided to Congress by the United States Copyright Office. **(Dkt.54:8-12, 21-23)** F&E opposed the motion by detailing the New York law that SiriusXM ignored, including that the broad ownership rights in the artistic performances embodied in pre-1972 recordings necessarily include the right to exclude SiriusXM from using or exploiting that performance *in any manner whatsoever* without a license. **(Dkt.56:9-19)** As F&E explained, New York common law protects *all* rights inherent in recordings – not just some of them – including the public performance right *and* the reproduction right. F&E also objected to all of the federal "evidence" and arguments that SiriusXM was improperly inviting the District Court to rely on.

While the District Court's decision was pending, the same arguments that SiriusXM is making in this case were decisively rejected in the California Action on both statutory and common law grounds. *Flo & Eddie Inc. v. SiriusXM Radio*

*Inc.*, 2014 U.S. Dist. LEXIS 139053, *22 (C.D. Cal. Sept. 22, 2014).[4] Not only did the District Court in the California Action rule against SiriusXM on the existence of a public performance right for pre-1972 recordings, it also rejected the argument that protection of pre-1972 recordings violated the dormant Commerce Clause, as "Congress specifically authorized protection of pre-1972 sound recording rights by the states in 17 U.S.C. §301(c)." *Id*. at *23 n.1. These findings were thereafter fully adopted by a California state court in *Capitol Records, LLC v. SiriusXM*, Case No. BC520981, 2014 WL 7387972 (L.A. Super. Ct.). **(A-1614-25)**

On November 14, 2014, the District Court denied SiriusXM's motion for summary judgment, finding against SiriusXM on every issue. *Flo & Eddie, Inc. v. SiriusXM Radio, Inc.,* 62 F. Supp. 3d 325 (S.D.N.Y. 2014). Specifically, the District Court found that the public performance right is one of the protectable rights inherent in the ownership of pre-1972 recordings, that SiriusXM's reproductions were not "fair use," and that the dormant Commerce Clause is irrelevant (albeit for a different reason than in the California Action). Here, the

---

[4] SiriusXM's suggestion that the ruling in the California Action was based solely on Cal. Civ. Code § 980(a) is misleading. **(Opening Brief ["Br."]:6 n.2)** It was also based on common law, as was made clear in *Flo & Eddie, Inc. v. Pandora Media, Inc.*, 2015 U.S. Dist. LEXIS 70551, *25-26, (C.D. Cal. Feb. 23, 2015).

District Court held that a public performance right is not a state-imposed regulation *within the meaning the Constitution* (the test under *Sherlock* and its progeny).[5]

Shortly after the District Court's summary judgment ruling, SiriusXM changed counsel and filed a motion for reconsideration, claiming that prior counsel had overlooked *Whiteman*, the so-called definitive case on performance rights in recordings. Prior counsel had overlooked nothing. As the District Court noted in denying SiriusXM's motion, *Whiteman* never stood for the proposition that there was no performance right in sound recordings, and it was explicitly overruled in *Mercury Records* 60 years ago because it got New York's law wrong. *Flo & Eddie, Inc. v. SiriusXM Radio, Inc.*, 2014 U.S. Dist. LEXIS 174907, *4 (S.D.N.Y. Dec. 12, 2014).

Thereafter, with the permission of the District Court, SiriusXM filed an unopposed petition for interlocutory appeal, which was granted on April 15, 2015. SiriusXM filed its opening brief on July 29, 2015. Seven amicus curiae then moved to file briefs in support of SiriusXM: Electronic Frontier Foundation ("EFF"), Public Knowledge ("PK"), National Association of Broadcasters ("NAB"), New York State Broadcasters Association ("NYSBA"), Pandora Media, Inc. ("Pandora"), Howard Abrams' group of professors ("Various Professors I");

---

[5] The District Court's mistaken belief that §301(c) did not bar SiriusXM's dormant Commerce Clause argument is addressed in Section III(b).

and Gary Pulsinelli's group of professors (Various Professors II").  F&E opposed

four of these motions.  **(Cir.Dkt.75)**[6]

## SUMMARY OF ARGUMENT

Congress has unequivocally ceded to the states exclusive authority for

protecting pre-1972 recordings, not to be annulled or limited in any respect by

federal copyright law until 2067.  *See* 17 U.S.C. §301(c); *Goldstein, supra*.  New

York provides that protection through its broad property laws, which expressly

protect the recorded artistic performances embodied in pre-1972 recordings (*i.e.*,

the sounds) without regard to the form of infringement chosen by the defendant.

Indeed, ownership of pre-1972 recordings necessarily carries with it the right to

prevent *all* unauthorized uses – and this is true until such time as the New York

legislature unbundles and withdraws certain rights from protection that are

otherwise inherent in that ownership.

Rather than confronting the expansive nature of property ownership under

New York common law, which would include a public performance right,

SiriusXM attempts to substitute the much narrower list of enumerated rights

provided under §106 of the federal Copyright Act.  This runs headlong into the

prohibitions of §301(c), misapprehends key differences between common and

---

[6] "Cir.Dkt." refers to the docket-entry number assigned by the Second Circuit.

federal law, and cannot be squared with New York's long history of treating the performance right the same as all other rights in pre-1972 recordings.

SiriusXM cannot get around these shortcomings by citing to *Whiteman*, which not only requires the Court to disregard New York's own jurisprudence protecting pre-1972 recordings, but subsequent *federal* jurisprudence expressly overruling *Whiteman*. While SiriusXM struggles mightily to resurrect *Whiteman*, it can find no actual case law agreeing with its tortured analysis. Ironically, the only fair reading of *Whiteman* is that it recognized a performance right, then limited it by a doctrine (divestive publication) that both New York (*Metro. Opera*) and the Second Circuit (*Mercury Records*) subsequently overturned, leaving the performance right (per Judge Hand's own dissent) without *any* limitations. Under this straightforward precedent, SiriusXM's liability is obvious.

So too is SiriusXM's liability for violation of the reproduction right by repeatedly making complete copies of the various pre-1972 recordings it publicly performs. SiriusXM defends this activity solely on the basis of "fair use" under §107 of the federal Copyright Act, once again violating §301(c) as well as ignoring that New York law *rules out* fair use as a defense to copying an entire pre-1972 recording. *Naxos, supra.* Moreover, even application of the §107 fair use factors would resolve entirely in F&E's favor, since directly analogous case law reveals

that SiriusXM's use is non-transformative, commercial, competitive, and appropriates the very heart of the protected works.

Finally, SiriusXM attempts to use its national business structure (which is entitled to no deference under Supreme Court jurisprudence) and an agreement with the FCC (which it misleadingly represents as federal law) to claim that the dormant Commerce Clause neuters New York's ability to protect property from theft within its own borders. However, New York's protection of property is not a "regulation" susceptible to Commerce Clause scrutiny, and even if it were, §301(c) would render it entirely permissible. Moreover, because it regulates in a non-discriminatory, even-handed fashion with concrete benefits to New York, any attempt to "balance" the protection would resolve decisively in F&E's favor.

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY CONCLUDED THERE IS A PUBLIC PERFORMANCE RIGHT IN PRE-1972 RECORDINGS.

#### A. New York Law Governs This Case.

Unlike recordings made after February 15, 1972, recordings made prior to that date are protected by state law (rather than federal law). While always the case, this was first codified by Congress in the Sound Recording Amendment of 1971, which granted federal copyright protection to post-1972 recordings. In so doing, Congress made clear that with respect to pre-1972 recordings, "any rights or remedies under the common law or statutes of any state shall not be annulled or

14

limited by this title until February 15, 2067." 17 U.S.C. §301(c). Congress's use of the phrase "any rights or remedies" shows the breadth of §301(c), as "any" rights means "all" rights. *United States v. Gonzales*, 520 U.S. 1, 5 (1997).

By enacting §301(c), Congress unequivocally ceded to the states full and complete jurisdiction and power with respect to pre-1972 recordings, as confirmed by the Supreme Court in *Goldstein*. However, SiriusXM continues to ignore the express language of §301(c), imploring this Court to determine New York law based on the legislative process and decisions Congress made with respect to ***post***-1972 recordings **(Br.:21-33)** – exactly what New York's highest court recognizes Congress *prohibited* by §301(c). *See UMG Recordings, Inc. v. Escape Media Group., Inc.*, 964 N.Y.S.2d 106, 111-12 (2013). Thus, the lengthy discussion by SiriusXM and its amici of the history of the protection of ***post***-1972 recordings under the federal Copyright Act is of no consequence or relevance. The same is true with their discussion of the history of the performance right in ***post***-1972 recordings, Congressional legislative history and testimony, and reports and studies provided to Congress by the Copyright Office.[7] Relying on federal law or the federal legislative process to determine New York law is like looking at the color

---

[7] Proposed amici's focus on federal law and Congressional legislative history and testimony is remarkable both in its volume and in its irrelevance. **(EFF:3-4, 6-15; PK:2-15, 19-24; NAB:11-14; NYSBA:4-6, 9-15; Pandora:2-3, 5-10, 13-20; Various Professors I:3-5, 7, 13-18; and Various Professors II:1-36)**

red in order to define the color blue. In granting the states the sole and express power to independently protect pre-1972 recordings, Congress did not say "do as we do," but rather "do as you want to do until 2067."[8]

Despite the clarity of §301(c), two amici (PK and Various Professors II) claim that federal law *still* requires preemption because traditional state law property rights purportedly conflict with the federal licensing scheme created by the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA"). Of course, that is an impossibility given that the DPRA covers only ***post***-1972 recordings (*see generally* 17 U.S.C. §§114-15) and New York's common law covers only ***pre***-1972 recordings. The two sets of laws are mutually exclusive as to their subject matter and thus incapable of being in conflict. However, in order to tunnel under the impenetrable wall erected by Congress in §301(c), Various Professors II suggest that when Congress enacted the DPRA, it silently occupied the field with regard to public performance of ***all*** sound recordings, thereby

---

[8] In light of §301(c), it is not clear why SiriusXM and its amici argue that the issue of a public performance right in pre-1972 recordings is best resolved by Congress when Congress itself does not share that view. **(Br.:45; Various Professors I:12; EFF:6; Various Professors II:14)**.

16

preempting state law under the Supremacy Clause.[9]  In other words, that by enacting the DPRA, Congress impliedly repealed §301(c).

This argument cannot be reconciled with the cardinal rule of statutory construction that Congress is presumed not to override statutory provisions by implication, *Morton v. Mancari*, 417 U.S. 535, 549 (1974), and any intent to repeal "must be clear and manifest."  *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936).  The failure of Congress in the DPRA to even mention pre-1972 recordings or an intent to depart from §301(c)'s bifurcated treatment of recordings speaks volumes since it is "presumed that Congress 'legislates with knowledge of former related statutes,' and will expressly designate the provisions whose application it wishes to suspend, rather than leave that consequence to the uncertainties of implication compounded by the vagaries of judicial construction."  *In re Colonial Realty Co.*, 980 F.2d 125, 132-33 (2d Cir. 1992) (citations omitted).

That Congress never intended to have the DPRA act as an implied repeal of §301(c) was further reinforced in 1998 when Congress passed the Sonny Bono Copyright Term Extension Act pursuant to which it amended §301(c) to extend state law protection of pre-1972 recordings from 2047 to 2067.  Pub. L. No. 105-298, 112 Stat. 2827 (1998).  Thus, three years ***after*** passage of the DPRA,

---

[9] Because the argument made by Various Professors II regarding the Supremacy Clause has never been made by SiriusXM, it should be disregarded.  *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 105 n.9 (2d Cir. 2010).

17

Congress amended §301(c) not to narrow its scope by making it subject to the

DPRA, but to do just the opposite and extend the states' exclusive jurisdiction.

**B.** **Ownership Of The Artistic Performance In A Recording Includes The Right To Exclude All Others From Using That Performance**.

The correct starting point for analyzing New York law is with the

recognition that the artistic performances embodied in pre-1972 recordings (*i.e.,*

the sounds) are themselves a form of property entitled to the full protection of New

York law. *Naxos*, 4 N.Y.3d at 562-63; *Metro. Opera*, 199 Misc. at 802.[10]  As these

courts correctly found, those property rights act to exclude others from "profit[ing]

from the labor, skill, expenditure, name and reputation of others." *Metro. Opera* at

796.  Indeed, excluding others from unauthorized use of property is the *sine qua*

*non* of ownership. *Dickman v. Comm'r*, 465 U.S. 330, 336 (1984) ("Without this

right [of exclusion] all other elements would be of little value…")

New York's common law protection of property is not new or open to

dispute. *See e.g. People ex rel. Freeman v. Hulburt*, 46 N.Y. 110, 113 (1871)

(noting that common-law protects every owner of property in the absolute and

unqualified control of it); *Wynehamer v. People*, 13 N.Y. 378, 387 (1856) ("there

are some absolute private rights…and among these the constitution places the right

---

[10] Other states have reached the same conclusion.  *See e.g. Capitol Records, Inc. v. Erickson*, 2 Cal. App. 3d 526, 538 (1969); *A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 564 (1977); *CBS, Inc. v. Garrod*, 622 F. Supp. 532, 535-536 (M.D. Fla. 1985).

of property."); *Victory v. Baker*, 67 N.Y. 366, 368 (1876) (ownership of personal property "carries with it to the owner the right to enjoy, use and manage it in any way he pleases, subject only to restrictions imposed by law or by the duty which he owes to third persons")[11]; *Palmer v. De Witt*, 47 N.Y. 532, 539 (1872) ("The right to literary property is as sacred as that to any other species of property."). Modern jurisprudence is in accord. *People v. Dixson*, 798 N.Y.S.2d 659, 364 (2005) ("[T]he definition of property was 'intended to embrace every species of valuable right and interest, and whatever tends in any degree, no matter how small, to deprive one of that right, or interest, deprives him of his property'") (citing *People ex rel. Short v. Warden of City Prison*, 130 N.Y.S. 698 (1911)); *United States v. Ivezaj*, 568 F.3d 88, 92-93 (2d Cir. 2009) (holding that New York recognizes broad ownership rights in intangible property). SiriusXM's only response to the foregoing is to say that it "makes no sense" because "property ownership...does not (and cannot) define and distinguish among the specific rights that come with ownership..." **(Br.:9)** It does not need to distinguish among the various rights since common law ownership includes ***all*** rights.

---

[11] SiriusXM derides *Victory* as "hoary precedent," but then claims it actually supports its position that ownership of property is "limited by the interests of other stakeholders." **(Br.:18)** *Victory* says nothing about "stakeholders" and, even if it did, SiriusXM is not one, as it readily admits it had no licenses to engage in its conduct. **(A-1073 ¶¶21, 23; A-1267-79; A-1283-88; A-1070 ¶24)**

Because common law ownership of pre-1972 recordings uses as its starting point that all rights are inherent in ownership, it is necessarily much broader than the list of enumerated rights in §106 of the Copyright Act, which by their exclusive (rather than inclusive) statutory structure are intended to act only as a limited grant of rights.[12] The important distinction between ownership of all rights under the common law and a statutory grant of limited rights, such as under the Copyright Act, is purposely being confused by SiriusXM and its amici. However, when viewed from the proper perspective, the issue is not whether New York has explicitly *granted* a performance right, but rather whether it has explicitly *excluded* a performance right from the bundle of rights inherent in common law ownership of pre-1972 recordings – and the answer to that question is resoundingly "no."

Neither the New York legislature nor any New York court has ever unbundled the rights inherent in the ownership of pre-1972 recordings and treated those various rights differently. In fact, in addition to the District Court, every New York court that has considered the issue has treated the performance right *the same* as all other rights in pre-1972 recordings. *See Metro. Opera*, 199 Misc. at

---

[12] It is because the *federal* copyright act is a limited grant of rights that the court in *Palmer* stated that the reproduction and performance rights "are entirely distinct, and the one may exist without the other." 47 N.Y. at 542. Contrary to the argument made by the NAB, the *Palmer* court was not expressing a view on the scope of performance rights under New York common law. **(NAB:16)** Indeed, the court readily recognized that the issue of the performance right was not even before it. *Id*. at 542.

788 ¶4, *aff'd* 107 N.Y.S.2d 795 (App. Div. 1951) ("The right of the opera company to its name, the exclusive right to the productions created by it, ***the right to license its performances in radio broadcasting and recordings upon terms***, and the rights of the record company and the broadcasting company to exclusive recording and broadcasting of the operas for which they have paid are rights which should be recognized and protected by the court.") (emphasis added); *Capitol Records LLC v. Harrison Greenwich LLC*, No. 65224 (N.Y. Sup. Ct. May 13, 2014) (clarifying that a prior grant of summary judgment applied as to unauthorized public performance); *Capitol Records, LLC v. Harrison Greenwich, LLC*, 984 N.Y.S.2d 274 (2014); *Capitol Records, LLC v. Escape Media Group, Inc.*, 2015 U.S. Dist. LEXIS 38007, *7-11 (S.D.N.Y. Mar. 25, 2015) (finding common law copyright infringement by public performance of pre-1972 recordings); **(Dkt.49-32)**.

But even if no New York court ever had occasion to specifically rule on the existence of the public performance right, it would still exist as a general principle of property law. A contrary rule would have the perverse result of precluding the protection of property rights in every case of first impression. Moreover, as the District Court correctly noted **(SPA:19)**, the Supreme Court has long cautioned against drawing inferences from a lack of judicial precedent. *See District of Columbia v. Heller*, 554 U.S. 570, 625-26 (2008) (noting long gaps of judicial silence before Bill of Rights applied to the states or laws were found to violate

21

the First Amendment's guarantee of freedom of speech or the Establishment Clause).

SiriusXM's demand for more explicit judicial precedent relating to the public performance right is nothing more than a misguided attempt to avoid the obvious conclusion derived from available case law; namely, that the right and ability to exclude others from using pre-1972 recordings applies to ***all*** unauthorized uses as a natural incident of property ownership. Equally misguided is SiriusXM's insistence that protection cannot exist unless there is an affirmative grant of a public performance right by the legislature. SiriusXM is joined in this fantastical view of the common law by virtually all of its amici. **(PK:24-25; EFF:14-15; NYSBA:25; NAB:21; Pandora:2, 8-13, Various Professors I:12; Various Professors II:22-31)** However, rights exist at common law whether or not the legislature acts, and they provide "a remedy for all legal wrongs" against persons or property. *Williams v. Port Chester*, 72 A.D. 505, 522-23 (App. Div. 1902).

Perhaps the best proof that the legislature does not have to act in order for a public performance right to exist is that the New York legislature has never granted the reproduction right for use in civil litigation, yet New York courts readily accept that this right exists, as does SiriusXM. In fact, the reproduction right – which comes from the same bundle as all other rights in pre-1972 recordings – has been

an unquestioned part of New York's jurisprudence for decades. *Naxos*, *supra*; *Metro. Opera*, *supra*.

It is not F&E's rights that require a legislative act, it is SiriusXM's desire to negate those rights that does. Indeed, F&E's common law rights exist until the New York legislature expresses an unequivocal intent to abolish them. *Jensen*, 82 N.Y.2d at 94; *Williams*, 72 A.D. at 522-23. It is for this reason that SiriusXM resorts to misleadingly citing *Chamberlain v. Feldman*, 300 N.Y. 135, 139-40 (1949) for the proposition that "the creation of [a] right should be a matter of legislative judgment..." **(Br.:3)** What *Chamberlain* actually said is that a "change in public policy must be the doing of the Legislature." Here, the District Court did not change any public policy, nor did it create a right; it merely enforced an existing right at common law. This distinction is lost on SiriusXM.

Equally unavailing is SiriusXM's reliance on *Campaign for Fiscal Equity, Inc. v. State of N.Y.*, 8 N.Y.3d 14, 28 (2006) for the proposition that "complex societal issues" should be left to the legislature. The court made that statement in the context of reviewing an act of the Legislature and the Executive branch, not for the purpose that SiriusXM advocates (namely, abstaining from enforcing the common law until the legislature formally acts). It is entirely inapposite here.

## C.    SiriusXM's Reliance On *Whiteman* Is Misplaced.

The lynchpin of SiriusXM's appeal is *Whiteman*, which is remarkable given that *Whiteman* was overruled by this very Court 60 years ago, a fact even acknowledged by the author of that opinion.[13]  Nevertheless, SiriusXM and several of its amici boldy assert that *Whiteman* not only continues to be good law in New York, but for the last 75 years has actually been the law of ***the entire United States***.  Indeed, according to SiriusXM, *Whiteman* "established a longstanding, nationwide 'consensus that state law does not provide a public performance right for sound recordings.'"  **(Br.:11-12)**  SiriusXM does not cite a single case agreeing with this characterization, because there are none.  Instead, SiriusXM cites secondary sources authored by a law professor, a blogger, a reporter, and a law student.  While this menagerie could provide the opening line to a joke about a group of people walking into a bar, it cannot breathe life into *Whiteman*.

An understanding of the facts and holding of *Whiteman* explains why it is not the least bit helpful to SiriusXM.  In *Whiteman*, the only issue addressed was whether after the sale of a recording, the owner could enforce a restrictive legend on the recording's packaging that stated it was "[n]ot Licensed For Radio

---

[13] "Reliance on an overruled case manifests either incompetence, carelessness or an attempt to mislead the court, any one of which falls far short of acceptable professional conduct."  *United States v. Santiago*, 826 F.2d 499, 502 n.1 (7th Cir. 1987)); *see also United States v. Stewart*, 20 F.3d 911, 917-18 (8th Cir. 1994).

Broadcast." *Whiteman*, 114 F.2d at 87. In addressing this limited issue, Judge Learned Hand assumed that the public sale of a record constituted a "general publication" under New York law, ending all common law copyright protection. *Id*. at 88-89. Therefore, Judge Hand reasoned, if all "common law property" rights "ended with the sale of the records," its owner could not control performances through the use of a restrictive legend on the recording. *Id*. It was on that basis alone that the *Whiteman* court declined to enjoin the public performance of the recordings at issue.[14]

   *Whiteman* did not stand for the proposition that there was no performance right in sound recordings. It merely addressed whether a restrictive legend on a recording could be enforced after publication of that recording. And as to this issue, in 1950 (10 years after *Whiteman*), the New York Supreme Court expressed a very different view of its own law, holding that the sale of a record to the public was ***not*** a general publication and did ***not*** end common law copyright protection. *Metro. Opera*, 199 Misc. at 798-99. The holding in *Metro. Opera* was the exact opposite of what Judge Hand had assumed the law to be in *Whiteman*. As such, when the Second Circuit had an opportunity to revisit the issue in *Mercury Records*, it conceded that its holding in *Whiteman* was wrong. *Mercury Records,*

---

[14] At the time that *Whiteman* was decided, the Pennsylvania Supreme Court had reached the opposite conclusion in *Waring v. WDAS Broadcasting Station, Inc.*, 327 Pa. 433 (1937) and found in favor of the artist and enjoined the unlicensed broadcast of the recordings. *Waring,* unlike *Whiteman,* is still good law.

221 F.2d at 663. SiriusXM tries to distort the holding in *Mercury Records* by claiming that it only overruled that portion of *Whiteman* that dealt with copying, and nothing else. **(Br.:10, 14)** That argument certainly cannot be true since copying was not at issue in *Whiteman*, nor is that even what the court said.

SiriusXM's cramped reading of *Mercury Records* is not even supported by Judge Hand, whose dissent recognizes that if sale of a record is not a publication (per *Metro. Opera*), its owner would possess a "perpetual monopoly" and that this monopoly would be "***unlimited both in time and in user***." *Id*. at 667 (emphasis added). Unlike SiriusXM, Judge Hand clearly understood that after *Metro. Opera*, an author's common law copyright in a recording under New York law was unlimited. And, unlike SiriusXM, Judge Hand also understood that he was bound by New York law and could not "deal with the situation as [h]e should like..." *Id*.

Ironically, contrary to SiriusXM's argument that *Whiteman* made a broad pronouncement regarding the supposed non-existence of a performance right, the case actually establishes just the opposite. Indeed, the *Whiteman* court clearly recognized the existence of such a right; otherwise, it would never have had to reach the publication issue, which was the genesis of its entire decision.

Try as it might, *Whiteman* is of no use to SiriusXM. Not only was its holding never as broad as the "strained interpretation" SiriusXM advocates, *Flo & Eddie, Inc*., 2014 U.S. Dist. LEXIS 174907 at *7, but it actually recognized the

26

existence of a public performance right in pre-1972 recordings, fully enforceable in the absence of the "general publication" that *Mercury Records* overrode. *Whiteman*'s history cannot be changed by the secondary sources upon which SiriusXM relies **(Br.:11-12, n.3)**, nor can the authors of those publications undo actual court rulings. The same holds true for statements by the Copyright Office, which exists to interpret and enforce the Copyright Act, not to determine or set New York state law.[15]

### D.   SiriusXM Is Liable For Its Unlicensed Public Performance Of Pre-1972 Recordings.

SiriusXM admitted that it publicly performed pre-1972 recordings and authorized third parties to do the same, all without licenses. These admissions establish its liability for common law copyright infringement. *Naxos, supra*. Moreover, because SiriusXM competed with F&E and acted with a commercial

---

[15] Even if statements by the Copyright Office were relevant, when properly quoted (which SiriusXM did not do), they would support the District Court's summary judgment ruling. Indeed, on July 23, 2014, the Copyright Office stated that:

> "[O]thers have misread the Office's observation in its [2011] report on pre-1972 sound recordings that "in general, state law does not appear to recognize a performance right in sound recordings" as an official statement that no such protection is (or should be) available under state law. This…is a misinterpretation. While, as a factual matter, a state may not have affirmatively acknowledged a public performance right in pre-1972 as of the Office's 2011 report, the language in the report should not be read to suggest that a state could not properly interpret its law to recognize such a right."

*See* Library of Congress: Copyright Office, Music Licensing Study: Second Request for Comments, 79 Fed. Reg. 141, at 42, 834 n. 3 (July 23, 2014).

benefit, SiriusXM is also liable for unfair competition. *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 650 (S.D.N.Y. 2011).[16]

It is hardly a controversial proposition under common law copyright infringement or unfair competition that liability should attach to the conduct of those who attempt to profit off the property of others. *International News Service v. Associated Press*, 248 U.S. 215, 239-40 (1918). As the Supreme Court stated:

> [D]efendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has not sown….

*Id*.

Because the logic of *International News* was unassailable, New York courts hardwired that decision into state common law. *Fisher v. Star Co.*, 231 N.Y 414, 428-29 (1921); *Metro. Opera*, 101 N.Y.S.2d at 490-93; *Naxos*, 4 N.Y.3d at 562, 564 n.11. Rather than admitting that the common law is both broad in scope and purposely flexible in the protections afforded to pre-1972 recordings, SiriusXM argues for a narrow construction of New York law bounded by the precise conduct

---

[16] Unfair competition is "a broad and flexible doctrine...encompassing any form of commercial immorality or simply as endeavoring to reap where (one) has not sown; it is taking the skill, expenditures and labors of a competitor, misappropriating for the commercial advantage of one person...a benefit or property right belonging to another." *Roy Exp. Co. Establishment v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982).

at issue in *Naxos*. **(Br.:13, 15)** But *Naxos* is not nearly that limited, nor does it

make sense that it would be since "[t]here is no complete list of the activities which

constitute unfair competition." *Metro. Opera*, 199 Misc. at 792.

In *Naxos*, the issue presented was whether Naxos' reproduction of foreign

recordings made in the 1930's constituted common law copyright infringement and

unfair competition under New York law. Naxos prevailed in the District Court by

claiming the works were in the public domain in their country of origin. On

appeal, and after certification of three questions to the New York Court of Appeals,

Naxos was found to be liable. Because the specific reproduction allegations in

*Naxos* drove the finding of liability, it can hardly be concluded that the court was

defining the scope of New York law in connection with cases (and issues) that

were not before it. In fact, the *Naxos* court said just the opposite:

> In the absence of the protective legislation, Congress intended
> that the owner of rights to a sound recording should rely on the
> 'broad and flexible' power of the common law to protect those
> property rights after public dissemination of the work. As
> *Metropolitan Opera* so aptly observed more than five decades
> ago, the common law 'has allowed the courts to keep pace with
> constantly changing technological and economic aspects so as
> to reach just and realistic results.' (citation omitted)

*Naxos*, 4 N.Y.3d at 555.

Additionally, *Naxos'* discussion of common law copyright infringement was

in the context of answering the Second Circuit's question as to whether "malicious

intent or bad faith" is a necessary element of such a claim. *Id*. at 563. There is

29

nothing in the opinion that suggests the answer to that question was intended to address forms of infringement not even before the court. Indeed, the *Naxos* court makes no mention of the distribution right being a form of common law copyright infringement, yet, liability for the unlawful distribution of sound recordings is routinely found under New York law. *See e.g. Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 658 n.8 (S.D.N.Y. 2013)

Ultimately, as the District Court correctly recognized here, the method of infringement chosen by SiriusXM is irrelevant. What matters is that SiriusXM's public performances were done without the consent of the owners of those recordings, in total derogation of their rights, and in direct competition with them.

The District Court found additional support for SiriusXM's liability in the fact that "New York courts have long afforded public performance rights to holders of common law copyrights in works such as plays, [citations] and films, [citation]." **(SPA:17-19)** SiriusXM challenges the applicability of those cases by arguing that they "only recognized performance rights where – unlike here – Congress itself had already recognized a corollary performance right under federal law." **(Br.:31)** Of course, SiriusXM's implication that New York's common law is constrained to follow federal copyright law runs afoul of the bifurcated construct created by Congress in §301(c). Ironically, however, even accepting SiriusXM's premise, a "corollary performance right" *does* now exist under the DPRA, as

30

SiriusXM itself admits. **(Br.:27)** Thus, SiriusXM's argument actually *concedes* that it would be proper for the District Court to recognize, as it did, a common law performance right for pre-1972 recordings, since "rights under common law copyright...are at least co-extensive with the rights commanded under the Copyright Act." **(SPA:16)** (quoting 2 Melville B. Nimmer and David Nimmer, Nimmer on Copyright §8[C][2] (Matthew Bender, Rev. Ed.))

Perhaps recognizing that the DPRA actually undermines its argument, SiriusXM attempts to use it to suggest that the "carefully reticulated" digital performance right fashioned by Congress demands a similar legislative process in New York. **(Br.:27-29)** That is simply another way of saying extrajudicial action is a prerequisite to the existence of rights under the common law in New York, and it is not. Because there is no federal common law, Congress was required to engage in a legislative process in order to create a public performance right for recordings; New York, however, is not similarly constrained. Thus, the policy arguments that SiriusXM and its amici make regarding their supposed inconvenience in having to license the recordings they exploit are entirely irrelevant, and justifiably so. Convenience is not a policy argument. Moreover, the negotiation of licenses is an entirely ordinary occurrence that relies, as it should, on the free market (willing sellers and willing buyers) to set the rates and

the terms of the licenses, which is exactly what already happens every time a movie or TV studio obtains a license to use a pre-1972 recording.[17]

## II.  **SIRIUSXM'S REPRODUCTIONS ARE NOT FAIR USE.**

SiriusXM admits that it not only reproduced thousands of pre-1972 recordings to populate numerous different libraries and databases for itself and third parties, but that it also makes additional copies each time it broadcasts or streams a recording.  Because SiriusXM also admits that the ownership of a pre-1972 recording includes an exclusive reproduction right and that every copy it made of a pre-1972 recording was unauthorized, SiriusXM's liability is firmly established under New York law.  *Naxos*, *supra*.

In order to escape its admissions, SiriusXM contends that in the absence of a public performance right, it is "fair use" for it to take all other rights as it desires. That pernicious argument finds no support in the law.  To the contrary, the New York Court of Appeals has already ruled that the copying of entire sound recordings is *not* fair use:

> In the related area of the federal "fair use" doctrine, it is a general rule that the reproduction of an entire copyrighted work

---

[17] The other policy arguments proffered by SiriusXM's amici are also irrelevant, including that granting a performance right would be generally disruptive **(Various Professors I:31-34; Various Professors II:11-12; Pandora:4-7, 11-12, 20-30; NYSBA:3, 20-29; EFF:4-6, 15-21; NAB:21-26)**, or that industry practice is historically at odds with a performance right **(Various Professors I:11, 13-18; PK:26; Pandora:3, 14-18; NAB:4-9; NYSBA:16-20)**.

> constitutes infringement. (citations omitted) ***We see no justification for adopting a different rule of state law.***

*Naxos*, 4 N.Y.3d at 564 (emphasis added).

The holding in *Naxos* is dispositive of SiriusXM's fair use defense and cannot be subverted merely because SiriusXM refers to certain of its copies as "internal" or "incidental." Those descriptors are not exceptions to the holding in *Naxos*, nor are they even accurate. Indeed, SiriusXM's copies were *not* all internal, as SiriusXM admittedly gave copies to third parties. Similarly, there is nothing "incidental" about the copies that SiriusXM makes. Incidental means "'occurring or liable to occur in fortuitous or subordinate conjunction with something else of which it forms no essential part; casual.' [Citation] … 'subordinate, nonessential, or attendant in position or significance: as…occurring merely by chance or without intention or calculation: occurring as a minor concomitant.' [Citation]." *Wausau Ins. Co. v. Argonaut Ins. Co.*, 678 F. Supp. 1080, 1084 (S.D.N.Y. 1988). Intentionally copying thousands of recordings in order to perform them is the opposite of "by chance," "without intention or calculation," and "nonessential."[18]

Instead of focusing on New York law, SiriusXM invites this Court to adopt 17 U.S.C. §107 as a limitation on New York law. In yet another attempt to burrow

---

[18] In *Agee v. Paramount Communs.*, 59 F.3d 317, 322-24 (2d Cir. 1995), the same "incidental" argument was rejected regarding federal copyright infringement.

33

under §301(c)'s prohibition against doing this, SiriusXM suggests that New York courts have independently accepted the fair use limitations of §107, citing (by way of the District Court's opinion) to *Fendler v. Morosco*, 253 N.Y. 281 (1930); *EMI Records Limited v. Premise Media Corp. L.P.*, 2008 N.Y. Misc. LEXIS 7485 (N.Y. Sup. Ct. Aug. 8, 2008); and *Estate of Hemingway v. Random House, Inc.*, 279 N.Y.S.2d 51 (Sup. Ct. 1967). However, none of those cases support SiriusXM's argument or otherwise contravene the holding in *Naxos*. Indeed, the court in *Fendler* specifically declined to reach the fair use issue (*Fendler*, 253 N.Y. at 291-92), *Premise Media* acknowledged that fair use is unavailable as a defense when "an entire copyrighted work" is reproduced (*Premise Media*, 2008 N.Y. Misc. LEXIS 7485 at *10, 12), and *Hemingway* only involved "minor use of fragments of another's work" (*Hemingway*, 279 N.Y.S.2d at 57). In no way do these cases support the argument that it is fair use under New York law to engage in the type and magnitude of copying that SiriusXM did.[19]

Significantly, even if the court was permitted to rely on §107, SiriusXM's defense would still fail. *See UMG Recordings v. MP3.com, Inc.*, 92 F. Supp. 2d

---

[19] SiriusXM also cites *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) for the proposition that buffer copies are automatically fair use. The holding in *Cartoon Network* was based entirely on the definitions of "copy" and "fixed" set forth in 17 U.S.C. §101, which require copies to be sufficiently permanent "for a period of more than transitory duration," *Id.* at 127. Those definitions do not exist under New York law, nor does the requirement that the copy must exist for a certain period of time in order to be considered a copy.

349 (S.D.N.Y. 2000). In *MP3.com*, the defendant had created an online service called "My.MP3.com" permitting its subscribers to store and listen to recordings. Although MP3.com had performance licenses, it did not have authorization to create the server copies necessary to facilitate those performances. MP3.com argued in both *UMG Recordings*, as well as in the follow-on case *Country Rd. Music, Inc., v. MP3.com*, 279 F. Supp. 2d 325 (S.D.N.Y 2003), that its copying was "fair use" in order to facilitate lawful performances. Applying the four factors identified in §107 resulted in a very different conclusion.

### A.    **Purpose And Character**.

With respect to "the purpose and character of the use," *MP3.com* analyzed whether the new use was a transformative "space shift" (as MP3.com contended) or "essentially repeats the old [use]" without "infusing it with new meaning, new understanding, or the like." 92 F. Supp. 2d at 351 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). The court concluded that MP3.com's so-called transformative use was "simply another way of saying that the unauthorized copies are being retransmitted in another medium," adding no "'new aesthetics, new insights and understandings' to the original music recordings it copies." *Id*.

Like MP3.com, SiriusXM's use of pre-1972 recordings serves the same purpose as the recordings were intended to serve, conveying no "new expression, meaning, or message." *Gaylord v. United Sta*tes, 595 F.3d 1364, 1372-73 (Fed.

35

Cir. 2010). Indeed, SiriusXM's use conveys ***the exact same expression, meaning, and message***. That is infringement, not transformativeness. *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108-09 (2d Cir. 1998); *see also AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 551-57 (S.D.N.Y. 2013).

In addition to being non-transformative, SiriusXM's use of pre-1972 recordings is clearly commercial. SiriusXM is a for-profit enterprise, using the reproductions it makes in order to sell performances of those recordings. SiriusXM tries to minimize the commercial nature of its use by characterizing its copying as "internal" – an argument routinely rejected by courts. *See e.g. Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) (holding that even though copying journal articles by in-house researchers was not "commercial exploitation," the court "need not ignore the for-profit nature" or "indirect economic advantage" that Texaco obtained because of the use).

**B.** **Nature Of Copyrighted Work**.

There can be little dispute that musical recordings are at the core of intended copyright protection (*Campbell*, 510 U.S. at 586), and as the court noted in *UMG Recordings*, are "far removed from the more factual or descriptive work more amenable to 'fair use'." *UMG Recordings*, 92 F. Supp. 2d at 351-52.

C.     **Amount Of Work Used**.

SiriusXM acknowledges copying thousands of pre-1972 recordings in their

entirety over and over again to facilitate unlicensed performances.  While

SiriusXM claims it *had* to do so because "gone are the days when a broadcaster

can simply queue up a physical record or CD and broadcast it live" **(Br.:33)**, its

argument is belied by its own testimony.

> **Q**. Can SiriusXM broadcast a recording through its satellite
>         service by playing a CD?
>
> **A**. Yes.  **(A-1077 ¶27; A-1323-1326; A-1071 ¶25)**

But even if SiriusXM's argument was factually correct, it would still go

nowhere.  When the "heart" of a work is taken, it necessarily weighs against a

finding of fair use.  *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1178-79 (9th

Cir. 2012); *see also UMG Recordings*, 92 F. Supp. 2d at 352.  SiriusXM took more

than the *heart* of each work, it took the *entirety* of each work.  SiriusXM claims

that the Second Circuit sanctioned all such copying as fair use in *Authors Guild,*

*Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014).  However, *Authors Guild* does not

create any such bright line rule, nor could it given the fact-intensive vagaries

associated with any fair use analysis.  In *Authors Guild,* fair use was found because

there was both transformative use and the additional copies made were necessary

in order to balance the load of user web traffic to avoid overburdening a single site.

*Authors Guild,* 755 F.3d at 98-99.  That is not the case with SiriusXM's copies.

37

**D.**    **Effect On Potential Market**.

SiriusXM focuses almost its entire fair use argument on this single factor, claiming that because its library copies "cannot be downloaded, streamed, or otherwise accessed by the public," they do not have an adverse effect on the market for pre-1972 recordings.  However, that is not the correct test.  The Supreme Court has held that evaluating the market effect of activities claimed to be "fair use" does not simply focus on the defendant's particular use, but whether "unrestricted and widespread" similar uses by *others* would adversely impact the market.  *Campbell*, 510 U.S. at 590.  SiriusXM purposely tries to confuse the issue by claiming its reproductions have no effect on the market for licensing public performances.  **(Br.:35-36)**  Yet SiriusXM's own arguments point towards an economic advantage obtained by broadcasters who exploit both rights, which indicates that there are potential markets for *licensing* both rights.  *Am. Geophysical*, 60 F.3d at 930 ("traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's 'effect upon the potential market for or value of the copyrighted work.'").  Indeed, both markets exist in the context of *post*-1972 recordings, including a market for library copies.  *See* 17 U.S.C. §112(e); 37 C.F.R. 382.2.  In light of *Naxos*, there is no reason that both markets should not exist for pre-1972 recordings as well.  *Accord Flo & Eddie, Inc*., 62 F. Supp. 3d at 348.

38

Moreover, even if a potential market did not exist, market harm is still presumed "when a commercial use amounts to mere duplication of the entirety of an original." *Campbell*, 510 U.S. at 591. SiriusXM offers nothing to defeat this presumption, and so it controls here. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 531-32 (9th Cir. 2008) (holding that when "the intended use is for commercial gain," the likelihood of market harm "may be presumed" (citing *Sony Corp. v. Universal City Studios,* 464 U.S. 417, 451 (1984))).

## III.  PROTECTION OF PRE-1972 RECORDINGS DOES NOT VIOLATE THE COMMERCE CLAUSE.

While the legal underpinnings of the dormant Commerce Clause are frequently questioned, even its strongest supporters are not brazen enough to suggest that it can be used to cripple a state's non-discrminatory ability to protect against the theft of property occurring within its own borders. Yet according to SiriusXM, the dormant Commerce Clause prevents New York (indeed, every state) from doing just that simply because SiriusXM has chosen to operate a nationwide business under terms it voluntarily agreed to. SiriusXM's view of the dormant Commerce Clause ignores that the limited purpose of that clause is to protect against discriminatory regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors, *New Energy Co.*, 486 U.S. at 273, not to protect its "particular structure or methods of operation in a retail market,"

39

*Exxon*, 437 U.S. at 127. The nationwide structure that SiriusXM has chosen does not define New York's ability to protect pre-1972 recordings.

But this Court does not even need not delve into the legal contours of the dormant Commerce Clause in order to affirm the District Court, as there are two separate reasons why SiriusXM cannot even make a threshold showing that the clause applies. ***First***, as the District Court correctly found, common law protection of pre-1972 recordings is not a regulation within the meaning of the Constitution and is thus not even subject to the dormant Commerce Clause. *Sherlock*, 93 U.S. at 103. The dormant Commerce Clause was never intended to prevent states from using general police powers to protect the property rights of its citizens. ***Second***, as three other courts have already found[20] (but which the District Court incorrectly analyzed in this case), because Congress authorized state protection of pre-1972 recordings in §301(c), that protection is "invulnerable to constitutional attack under the Commerce Clause," *Ne. Bancorp v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985), even if the conduct in question can be argued to interfere with interstate commerce. *White*, 460 U.S. at 213.

---

[20] *Flo & Eddie Inc.*, 2014 U.S. Dist. LEXIS 139053 at *23 n.1; *Capitol Records*, 2014 WL 7387972 at *5 **(A-1625)**; *Flo & Eddie, Inc. v. SiriusXM Radio, Inc.*, 2015 U.S. Dist. LEXIS 80535, *16 (S.D. Fla. June 22, 2015).

**A.**    <u>New York's Protection Of Pre-1972 Recordings Does Not "Regulate" Interstate Commerce</u>.

In concluding that SiriusXM's dormant Commerce Clause argument is "nothing more than a red herring," the District Court recognized that New York's protection of the exclusive ownership rights in pre-1972 recordings does not "regulate" commerce and thus does not even implicate the dormant Commerce Clause. Indeed, since 1876, it has been the position of the Supreme Court that for the dormant Commerce Clause to be relevant, there first must be regulation ***within the meaning of the Constituion***. *Sherlock*, 93 U.S. at 103. And protection of the public performance right "is not a state-imposed regulation – even when applied to public performances by a national broadcaster." **(SPA:39)**

In *Sherlock*, two ships were navigating the Ohio River between Ohio and Kentucky when they collided opposite the State of Indiana. The collision killed an Indiana citizen and led to a wrongful death action in Indiana based on Indiana state law. The defendant ship owner claimed that it could not be sued under Indiana law because it was engaged in interstate commerce under the laws of the United States, which it argued were the exclusive province of Congress and did not subject it to liability. The Supreme Court rejected this expansive view of the Commerce Clause, as it would abolish the police power of the states, holding:

> General legislation of this kind, prescribing the liabilities or
> duties of citizens of a State, without distinction as to pursuit or
> calling, is not open to any valid objection because it may affect

41

persons engaged in foreign or inter-State commerce. Objection might with equal propriety be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to the contracts or estates of persons engaged in such commerce. In conferring upon Congress the regulation of commerce, it was never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.

*Sherlock*, 93 U.S. at 103.

While SiriusXM derides *Sherlock* as "outmoded" and "anachronistic," the Supreme Court does not share that view, routinely citing the case with approval for the exact same proposition the District Court cited it for, ***including with respect to radio stations broadcasting in multiple states***. Indeed, in *Head v. N.M. Bd. of Examiners in Optometry*, 374 U.S. 424, 428 (1963), the Supreme Court dismissed a dormant Commerce Clause challenge to a New Mexico statute prohibiting advertisements that quoted prices or terms for the sale of eyeglasses, despite the fact that the statute burdened the interstate broadcasting of a radio station in New Mexico. In doing so, the Supreme Court cited *Sherlock* with approval and held that "'[s]tate regulation, based on the police power, which does not discriminate against interstate commerce or operate to disrupt its required uniformity, may constitutionally stand.' [Citation.]" *Id*. at 429; *see also Huron Portland Cement*

42

*Co. v. Detroit*, 362 U.S. 440, 444 (1960) (upholding state air pollution laws under *Sherlock*); *GMC v. Tracy*, 519 U.S. 278, 306-07 (1997) (upholding state tax on natural gas sales under *Sherlock*).

Unable to get out from under *Sherlock* and its progeny, SiriusXM turns to attacking the District Court's conclusion that New York's protection of property rights is not a "regulation." SiriusXM makes this argument by impermissibly defining "regulation" in the abstract, at odds with the Supreme Court's requirement in *Sherlock* that only regulations "within the meaning of the Constitution" implicate the dormant Commerce Clause – and police powers are not among those types of regulations. It is for this reason that SiriusXM's reliance on *Ileto v. Glock Inc.*, 349 F.3d 1191 (9th Cir. 2003) is entirely misplaced, as that court never discussed the standard in *Sherlock* and, in fact, *rejected* the dormant Commerce Clause challenge because of the "state's interest in protecting the health and safety of its residents." *Id.* at 1217. Similarly, in *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996), the court did not discuss *Sherlock*, nor was there a reason to, since the issue presented was whether a state could impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct ***in other states***. *Id.* at 572. SiriusXM's last case, *Cipollone v. Liggett Group.*, 505 U.S. 504 (1992), does not even involve the Commerce Clause. Ultimately, SiriusXM's attempt to define what constitutes a regulation without regard to *Sherlock*'s standard

43

completely misses the point and ignores that the protection of property against theft is a police power, not a regulation within the meaning of the Constitution.

SiriusXM's next claim regarding *Sherlock* – that the Supreme Court actually overruled it *sub silentio* by abandoning what SiriusXM characterizes as its "direct-indirect" test – fares no better. That test was neither abandoned nor even the focus of *Sherlock*, which explains why SiriusXM supports its "tacit overrule" argument with nothing more than two law review articles (which are not the law) and two inapplicable cases. The first of those two cases – *Healy v. Beer Inst.*, 491 U.S. 324 (1989) – is offered for the proposition that "a state law that only indirectly affects commerce violates the Commerce Clause *per se* if it has the practical effect of regulating commerce outside the state's borders." **(Br.:39)** *Healy* involved a Connecticut statute that tied the prices out-of-state shippers of beer could charge in Connecticut to the prices they charged in neighboring states (including by forcing shippers to pledge not to change their out-of-state prices), thereby regulating the prices charged in those neighboring states. *Healy*, 491 U.S. at 337-39. SiriusXM conveniently omits that the *Healy* court, in striking down the challenged Connecticut statute, was referring to Connecticut's explicit attempt to regulate conduct "occurring wholly outside that State's borders," *Id*. at 332, 337, which has nothing to do with the conduct in *Sherlock* or in this case.

44

A similar result was reached in SiriusXM's second case – *S. Pac. Co. v. Arizona*, 325 U.S. 761 (1945) – when Arizona's attempt to regulate the length of trains was rejected because it controlled conduct in other states on an issue where "uniformity of regulation" was of national concern. *Id.* at 770. Uniformity of regulation was not an issue in *Sherlock*, nor is it an issue in the context of pre-1972 recordings, since Congress explicitly gave each state the power under §301(c) to protect pre-1972 recordings as they saw fit. That is the opposite of requiring uniformity, a fact noted by the Supreme Court in *Goldstein* when it rejected the argument that the dormant Commerce Clause prevented a state from conferring property rights with respect to pre-1972 recoridngs that may be greater or different than those in other states. *Goldstein*, 412 U.S. at 560 ("No conflict will necessarily arise from a lack of uniform state regulation, nor will the interest of one State be significantly prejudiced by the actions of another.")

SiriusXM has not cited any case that sustained a dormant Commerce Clause challenge based upon a violation of a state-specific property right where the state did not explicitly attempt to regulate conduct outside its own borders. If this Court were to accept SiriusXM's radical view that *its* national operations automatically convert all state property protections into dormant Commerce Clause violations, it would effectively destroy New York's ability to confer intangible property rights within its own borders. Such a ruling would not only affect common law

45

copyrights, but would also require that NY CLS Civ. R. §§50 and 51 (unauthorized publication of name or likeness) and NY CLS Art & Cult. Affr. §33.09 (infringement of trademark) be declared unconstitutional. It is precisely because states are permitted to confer these property rights that dormant Commerce Clause challenges of the type proffered by SiriusXM are routinely defeated. *See Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 837 (9th Cir. 2014) (Washington state law that recognized post-mortem right of publicity not recognized in other states does not impermissibly burden interstate commerce); *Heilman*, 75 Cal. App. 3d at 567-68 (no violation of Commerce Clause where common law was intended to restrain only activities in, or aimed at, California); *Ferguson v. FriendFinders, Inc.*, 94 Cal. App. 4th 1255, 1264 (2002) (state regulation of internet advertisements does not violate Commerce Clause).

**B.** **SiriusXM's Commerce Clause Argument Can Also Be Rejected On The Ground That Congress Has Authorized The States To Protect Pre-1972 Recordings.**

As F&E argued in its opposition to SiriusXM's motion for summary judgment, "[w]hen Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause." *Ne. Bancorp*, 472 U.S. at 174; s*ee also Mass. Council of Const. Employers, Inc.*, 460 U.S. at 213 ("[w]here state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with

46

interstate commerce."). Here, §301(c) provides that express authorization. The District Court erred in concluding otherwise. **(SPA:34-35)**

Section 301(c) codified Congress's intent not only to exempt states from federal preemption, but also to affirmatively and expressly provide the states with the unlimited power to impose "rights and remedies under the common law or statutes" in order to protect pre-1972 recordings. That is consistent with the Supreme Court's holding in *Goldstein* that California can regulate pre-1972 recordings without violating the Copyright Clause or the Commerce Clause.

The California Action found §301(c) to be controlling. Here, the District Court wrongly constrained §301(c) by failing to recognize that it affirmatively ceded power to the states. This analytical misstep caused the District Court to compare §301(c) to the savings clause (§201(b) of the Federal Power Act) discussed in *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982).

However, Section 301(c) is *not* a savings clause, which is "used in a repealing act to preserve rights and claims that would otherwise be lost." *Black's Law Dictionary* at 1461 (9th ed.). That is what the statute in *New England Power* did, providing that the Federal Power Act "shall not…deprive a State or State commission of its ***lawful authority now exercised*** over the exportation of hydroelectric energy which is transmitted across a State line" (emphasis added). *New England Power*, 455 U.S. at 341. By its own terms, it "did no more than

47

leave standing whatever valid state laws existed." *Id*.  That is completely different than the ***prospective*** broad and unlimited grant of power to the states under §301(c) that exists "until February 15, 2067."  Section 301(c) did not repeal anything and it did not provide that states only had that power "now exercised" by them; it was an affirmative grant of power.  As explained in one of the leading copyright treatises:

> General preemption is directed toward material that is…protected under the [Copyright] Act.  The purpose of preemption for this material is to prevent state laws from conflicting with federal law.  ***By contrast***, Section 301(c) is directed toward material (pre-1972 sound recordings) which Congress has expressly told the states that they may protect....States are thus free to extend to pre-1972 sound recordings the full panoply of rights granted to original works of authorship by the Federal Copyright ***and beyond*** (***for example, a performance right for analog and digital***).
> (emphasis added)

5 W.F. Patry, *Patry On Copyright*, §18:55 at 18-198 (2010 ed.)

Courts routinely rely on authorization granted in statutes like §301(c) to reject dormant Commerce Clause arguments.  For example, in *Sea Air Shuttle v. Virgin Islands Port Authority*, 800 F. Supp. 293, 304 (D.V.I. 1992), the Court held Virgin Island's regulations governing the lease of seaplane ramps did not violate the dormant Commerce Clause because the Federal Aviation Act provided that "nothing in [it] shall be construed to limit the authority of any State...to exercise its proprietary powers and rights."  Similarly, in *Soto* v. *Tu Phuoc Nguyen*, 634 F. Supp. 2d 1096 (E.D. Cal. 2009), §30103(e) of the National Traffic and Motor

Vehicle Safety Act (*i.e.,* "[c]ompliance with a motor vehicle standard under this

chapter does not exempt a person from liability at common law") was held to

indicate "an express delegation of power to the states," and thus the Commerce

Clause did not prevent state actions based on common law liability not found in

federal law. *Id*. at 1107. *See also Zimmerman v. Wolff*, 622 F. Supp. 2d 240, 245

(E.D. Pa. 2008) (rejecting dormant Commerce Clause challenge to Pennsylvania

Dog Law because Federal Animal Welfare Act authorized states to promulgate

standards regarding domestic animals); *Bowers v. NCAA, Inc.*, 151 F. Supp. 2d

526, 538-39 (D. N.J. 2001) (rejecting dormant Commerce Clause challenge

because Americans with Disabilities Act provided "[n]othing in this chapter shall

be construed to invalidate or limit the remedies, rights, and procedures of

any…law of any State...that provides greater or equal protection for the rights of

individuals with disabilities than are afforded by this chapter"); *L.P. Acquisition*

*Co. v. Tyson*, 772 F.2d 201, 205 (6th Cir. 1985) (rejecting dormant Commerce

Clause challenge to state securities statute "because the state is regulating in an

area reserved to the states by federal securities legislation"); *People ex rel State*

*Bar Resources Bd. v. Wilmhurst*, 68 Cal. App. 4th 1332, 1345 (1999) (rejecting

dormant Commerce Clause challenge because "pre-emption waiver" in the Federal

Clean Air Act "demonstrates an intent by Congress to grant California the broadest

possible discretion" in restricting emissions from new motor vehicles).

49

**C.** **Under Either The Per Se Or Balancing Test, A Public Performance Right Does Not Violate The Commerce Clause.**

**1.** **Per Se.**

SiriusXM massively overreaches to claim that New York's wholly in-state protection of pre-1972 recordings is a *per se* violation of the Commerce Clause by "directly regulat[ing] interstate commerce." **(Br.:41)** SiriusXM does not argue that New York's protection is discriminatory or inimical to national commerce, only that it is inimical to SiriusXM's commerce as a nationwide broadcaster. Thus, according to SiriusXM, because it has no "geographic boundaries," all states must stand down from enforcing property and theft laws. SiriusXM is wrong.

Indeed, SiriusXM's structure and method of operation ***are not entitled to any deference whatsoever***. *Exxon*, 437 U.S. at 127-28 (1978) ("We cannot, however, accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market…[T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."); *see also Arrow Air, Inc.* v. *Port Auth. Of New York and New Jersey*, 602 F. Supp. 314, 321 (S.D.N.Y. 1985) ("If a regulation is otherwise valid under the Commerce Clause, it is not rendered invalid simply because an operator has to change its market structure."); *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 961 (N.D. Cal. 2006) ("Defendant's argument – that if this court applies the Unruh Act and the Disabled Persons Acts to Target.com, the

practical effect will be to force it to modify its website for all customers nationwide – is not sustainable."); *Ferguson*, 94 Cal. App. 4th at 1264 (rejecting claim that because of the "very nature of the internet" state law prohibiting unsolicited e-mail advertisements violated the Commerce Clause).

SiriusXM nevertheless argues that *Flood v. Kuhn*, 407 U.S. 258 (1972) requires states to suspend their law whenever national organizations are involved. *Flood* dealt with the special issue of applying state antitrust laws to regulate professional sports leagues. SiriusXM is not a national sports league and this is not an antitrust case. For the same reason, *Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993) is inapplicable. The Nevada statute in that case regulated the conduct of national athletic associations wholly outside Nevada's borders.

Because the law is devastating to SiriusXM on this issue, it makes the highly misleading argument that *its* broadcasts "are required by federal law to be 'nationally uniform.'" **(Br.:43)** In fact, there is no such federal law, nor could there be, as it would violate the First Amendment. *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 800-01 (1988). SiriusXM is actually referring to the voluntary agreements it made with the FCC during regulatory negotiations in order to overcome the objections of local broadcasters, who feared SiriusXM would use its terrestrial repeaters and its 2008 merger with XM Radio to encroach upon their

51

markets for local news, information, and advertising. *See Applications for Consent to the Transfer of Control of Licenses*, 23 FCC Rcd 12348, ¶¶ 73, 154-55 (F.C.C. 2008) ("SiriusXM Merger Order"); *see also Application for Special Temporary Authority*, 16 FCC Rcd 16773, ¶¶ 4, 10-11 (F.C.C. 2001); *Notice of Proposed Rulemaking*, 22 FCC Rcd 22123, ¶¶ 55-57 (F.C.C. 2007).

To address the concerns that it would employ this type of predatory conduct, SiriusXM consented to regulations intended to prevent it from engaging in local competitive programming and advertising, which "would cause terrestrial broadcasters to lose advertising revenue" and "ultimately result in the reduction of their production and airing of local programming..." *See* SiriusXM Merger Order at ¶¶ 73, 154-55. SiriusXM's voluntary concessions to the FCC in order to expand its business have no bearing on its obligation to delete infringing programming, nor does it shield conduct that violates the property rights of owners of pre-1972 recordings. And it most assuredly does not nullify New York's property laws. SiriusXM cannot use the dormant Commerce Clause to repurpose an agreement that is intended to protect against one form of predatory conduct in order to engage in a new form of predatory conduct; namely, eviscerating the ability of all 50 states to prevent the theft of property.

## 2. __Balancing Test.__

SiriusXM's final argument comes in the form of the *"Pike* test," which provides that a non-discriminatory law "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970). The District Court rejected application of this test, recognizing that "[p]rotecting Flo and Eddie from the theft of its property is not 'regulation'," and "the balancing test" of *Pike* "applies only to regulations." **(SPA:49)** Moreover, because Congress authorized state protection of pre-1972 recordings, there *is* nothing to balance under *Pike*. *Shamrock Farms v. Veneman*, 146 F.3d 1177, 1179-80 (9th Cir. 1998).

But even if *Pike* were relevant, it would still be of no value to SiriusXM. As a threshold matter, in order to invoke *Pike*, SiriusXM was required to show that New York's protection of pre-1972 recordings imposes a "burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001); *see Brown & Williamson Tobacco Corp. v. Pataki,* 320 F.3d 200, 209 (2d Cir. 2003) ("Under *Sorrell*, a burden that seems incommensurate to the statute's gains survives *Pike* as long as it affects intrastate and interstate interests similarly – the similar effect on interstate and intrastate interests assuaging the concern that the statute is designed to favor local interests."). SiriusXM can never make this

53

showing, as it conceded in its brief that both interstate and intrastate broadcasters are affected by the same burden of having to license the pre-1972 recordings they choose to exploit in New York. **(Br.:46)**

SiriusXM also fails to even establish the *Pike* factors, which is entirely its burden, *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979), and instead merely claims that "(1) there is no New York-specific interest at stake, (2) the effects on interstate commerce are not 'incidental,' and (3) any New York-specific interest would be far outweighed by the burden on interstate commerce" without ever supporting these assertions. **(Br.:45)** Indeed, when SiriusXM contends that F&E "has yet to identify *any* New York-specific interest" **(*Id.*)**, not only does it have the burden backwards, but it also wrong as a matter of law, as New York has a "substantial interest" in protecting the intellectual property rights of copyright holders, *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349, 365 (S.D.N.Y. 2009), in protecting pre-1972 recordings from piracy, *Naxos*, 4 N.Y.3d at 555, and in "maximizing the financial return" to one of its industries, recorded music. *Pike*, 397 U.S. at 143; *Parker v. Brown*, 317 U.S. 341, 363–65 (1943).

Equally unavailing is SiriusXM's argument that the "significant economic consequences" for broadcasters if a public performance right is upheld renders its burden more than "incidental" under *Pike*. **(Br.:46-47)** SiriusXM ignores that "the 'incidental' burdens to which *Pike* refers 'are the burdens on interstate commerce

54

that exceed the burdens on intrastate commerce.' [Citation]." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 50 (2d Cir. 2007). SiriusXM's nonsensical claim that the burden of having to negotiate licenses "without the benefit of a registration system or compulsory license agreement" "far outweighs any interest New York might have" **(Br.:46)** is belied by two facts: (1) the film and television industries have had no trouble licensing pre-1972 recordings for decades; and (2) SiriusXM recently engaged in the exact same process when it settled the pre-1972 recording claims of a group of record companies for $210 million and in the process obtained the right to publicly perform those recordings through 2017.[21] In any event, because the performance right recognized by the District Court in this case applies evenhandedly, without regard to whether a broadcaster supplies the intrastate or interstate market, *see Minn. v. Clover Leaf Creamery Co*., 449 U.S. 456, 471-72 (1981), and is an exercise of New York's traditional, congressionally-recognized power over pre-1972 sound recordings, it cannot be said that the intended effect of protecting pre-1972 recordings is "clearly excessive" in relation to New York's substantial interest in doing so when the only burden caused is that broadcasters must licenses those recordings *like every other industry*.

SiriusXM also cannot satisfy *Pike* with economic doomsaying or decrying a speculative loss of access to pre-1972 recordings, as the dormant Commerce

---

[21] *See* SiriusXM Holdings Inc., Current Report (Form 8-K) at Item 8.01 (June 26, 2015), http://investor.siriusxm.com/secfiling.cfm?filingID=930413-15-2915.

Clause does not incorporate any specific economic theory, and rights that may

harm consumers under one economic view are not necessarily unconstitutional as a

result. *See Exxon*, 437 U.S. at 127-28 (noting that "the [Commerce] Clause

protects the interstate market, not particular interstate firms, from prohibitive or

burdensome regulations. It may be true that the consuming public will be injured

by [a probable effect of a regulation], but again that argument relates to the wisdom

of the [law], not to its burden on commerce."); *accord C & A Carbone v. Town of

Clarkstown*, 511 U.S. 383, 425 (1994) (Souter, J., concurring); *CTS Corp. v.

Dynamics Corp. of Am.*, 481 U.S. 69, 95-96 (1987) (Scalia, J., concurring).

Finally, SiriusXM uses *Pike* as one last opportunity to appeal to the national

structure of its business. **(Br.:47)** (citing *Am. Libraries Ass'n v. Pataki*, 969 F.

Supp. 160 (S.D.N.Y. 1997) and *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir.

1999)).[22] In *Pataki*, the court invalidated a New York statute criminalizing the

dissemination of material harmful to minors, ruling that the statute violated the

Commerce Clause because (1) it sought to regulate conduct occurring wholly

outside New York state, (2) its burden on interstate commerce far exceeded the

---

[22] SiriusXM also takes a second shot at comparing itself to a national sports league
by citing *Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378 (1983).
**(Br.:47)** However, like *Flood*, *Partee* specifically concerned the application of
state *antitrust* laws as applied to a professional sports league – and sport leagues
(unlike broadcasters) are recognized as deserving of different treatment. *Thales
Avionics, Inc. v. Matsushita Avionics Sys. Corp*, 2004 U.S. Dist. LEXIS 32433, *8
(C.D. Cal. Aug. 6, 2004).

benefits of the statute and (3) any regulation of the internet by the states exposed

users to inconsistent regulations. *Pataki*, 969 F. Supp. at 169. *Pataki*'s third

proposition was adapted by the court in *Johnson*, and SiriusXM relies on both

cases to argue that the Internet requires uniform regulation. But later decisions by

courts throughout the country upholding state statutes prohibiting spam and forms

of fraud perpetrated via e-mail clearly demonstrate that the Internet *is* susceptible

to state regulation. *See e.g. State v. Heckel*, 143 Wash. 2d 824, 839-40 (2001)

(distinguishing regulating all Internet communications as in *Pataki* and regulating

directed communication under Washington's anti-spam statute); *Beyond Sys. v.

Keynetics, Inc*., 422 F. Supp. 2d 523 (D. Md. 2006) (state statute protecting

Maryland residents from spam did not violate Commerce Clause); *Nat'l Fed'n of

the Blind*, 452 F. Supp. 2d 946 (holding California's version of the Americans with

Disabilities Act to defendant's web site did not violate Commerce Clause).

F&E is not, as SiriusXM contends, trying to regulate the Internet. It is

protecting pre-1972 recordings from being unlawfully exploited – in part, on the

Internet. This distinction is critical. *See People ex rel. Brown v. PuriTec*, 153 Cal.

App. 4th 1524, 1533 (2007). SiriusXM's piratical activity is not immunized by the

medium through which it elects to engage in piracy. *See Ford Motor Co. v. Texas

Dep't of Transp*., 106 F. Supp. 2d 905, 909 (W.D. Tex. 2000) ("[a]n activity which

is appropriately regulated when accomplished through any other medium [does not] become[] sacrosanct when accomplished through the internet.").

## CONCLUSION

For all the foregoing reasons, the denial of SiriusXM's motions for summary judgment and reconsideration should be affirmed.

Dated:  September 28, 2015      Respectfully submitted,

By:  /s/ Harvey W. Geller

GRADSTEIN & MARZANO, P.C.
Henry Gradstein
Maryann R. Marzano
Harvey Geller
6310 San Vicente Blvd., Suite 510
Los Angeles, California 90048
Telephone:  (323) 776-3100

Attorneys for Plaintiff-Appellant
FLO & EDDIE, INC.

## CERTIFICATE OF COMPLIANCE

The brief complies with the Fed. R. App. P. 32(a)(7)(B) because it contains 13,992 words (based on Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii).  The brief also complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated:  September 28, 2015          Respectfully submitted,

By:   /s/ Harvey W. Geller

GRADSTEIN & MARZANO, P.C.
Henry Gradstein
Maryann R. Marzano
Harvey Geller
6310 San Vicente Blvd., Suite 510
Los Angeles, California 90048
Telephone:  (323) 776-3100

Attorneys for Plaintiff-Appellant
FLO & EDDIE, INC.

59