# 15-1164-cv

# United States Court of Appeals

*for the*

# Second Circuit

FLO & EDDIE, INC., a California Corporation,
individually and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

– v. –

SIRIUS XM RADIO, INC., a Delaware Corporation,

*Defendant-Appellant,*

DOES, 1 THROUGH 10,

*Defendants.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF
## FOR DEFENDANT-APPELLANT SIRIUS XM RADIO INC.

JONATHAN D. HACKER
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

DANIEL M. PETROCELLI
CASSANDRA L. SETO
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
(310) 553-6700

*Attorneys for Defendant-Appellant Sirius XM Radio Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

I.    NEW YORK COMMON LAW DOES NOT GIVE PRE-1972 RECORDING OWNERS A PERFORMANCE RIGHT....................4

    A.    New York Law Governing Real And Personal Property Does Not Establish A Performance Right In Pre-1972 Recordings ...............................................5

    B.    New York Common Law Only Provides A *Copy* Right, Not A Performance Right .......................................8

    C.    New York Unfair Competition Law Does Not Establish A Performance Right ...............................13

    D.    A Performance Right Can Only Be Created Legislatively......14

II.    A NEW YORK PERFORMANCE RIGHT WOULD VIOLATE THE COMMERCE CLAUSE AS APPLIED TO SIRIUS XM..................................................17

    A.    The Commerce Clause Applies ...............................17

    B.    Applying A New York Performance Right To Sirius XM Would Violate The Commerce Clause Under The *Per Se* And *Pike* Tests .......................................20

III.    INTERNAL REPRODUCTIONS NECESSARY TO FACILITATE SIRIUS XM'S BROADCASTS ARE LAWFUL......24

    A.    The Fair Use Defense Applies And Protects Sirius XM's Library Copies.......................................24

    B.    Sirius XM's Buffer And Cache Copies Are Also Lawful .......28

CONCLUSION ................................................................29

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
  562 F.3d 630 (4th Cir. 2009) ...........................................................25

*Am. Booksellers Found. v. Dean,*
  342 F.3d 96 (2d Cir. 2003) .........................................................18, 21

*American Geophysical Union v. Texaco, Inc.,*
  60 F.3d 913 (2d Cir. 1994) ..............................................................27

*Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n,*
  461 U.S. 375 (1983)...........................................................................18

*Authors Guild, Inc. v. Google,*
  2015 WL 6079426 (2d Cir. Oct. 16, 2015) .....................................25

*Authors Guild, Inc. v. HathiTrust,*
  755 F.3d 87 (2d Cir. 2014) .........................................................25, 27

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
  448 F.3d 605 (2d Cir. 2006) .............................................................26

*BMW of N. Am. v. Gore,*
  517 U.S. 559 (1996)....................................................................17, 18

*Campaign for Fiscal Equity, Inc. v. State,*
  8 N.Y.3d 14 (2006) ...........................................................................15

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994)..............................................................24, 26, 28

*Capitol Records, Inc. v. Mercury Records Corp.,*
  221 F.2d 657 (2d Cir. 1955) .......................................................10, 11

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
  4 N.Y.3d 540 (2005) ................................................................ *passim*

*Caronia v. Phillip Morris USA, Inc.,*
  22 N.Y.3d 439 (2013) .......................................................................14

## TABLE OF AUTHORITIES
### (continued)

Page

*Cartoon Network LP, LLLP v. CDC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) ..............................................................28

*Casanova Entm't Grp., Inc. v. City of New Rochelle*,
375 F. Supp. 2d 321 (S.D.N.Y. 2005) ..................................................6

*Chamberlain v. Feldman*,
300 N.Y. 135 (1949) ........................................................................15

*Colavito v. New York Organ Donor Network, Inc.*,
8 N.Y.3d 43 (2006) ............................................................................5

*Dane v. M&H Co.*,
1963 WL 8060 (N.Y. Sup. Ct. Jan. 25, 1963) .....................................5

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) ...........................................................................13

*Dickman v. Comm'r*,
465 U.S. 330 (1984) ...........................................................................6

*Dowling v. U.S.*,
473 U.S. 207 (1985) ........................................................................6, 7

*EMI Records Ltd. v. Premise Media Corp. L.P.*,
2008 WL 5027245 (N.Y. Sup. Ct. Aug. 8, 2008).........................7, 24

*Estate of Hemingway v. Random House, Inc.*,
279 N.Y.S.2d 51 (Sup. Ct. 1967)......................................................24

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,
2015 WL 3852692 (S.D. Fla. June 22, 2015)........................... *passim*

*Flood v. Kuhn*,
443 F.2d 264 (2d Cir. 1971), *aff'd*, 407 U.S. 258 (1972)............21, 22

*Garland v. Herrin*,
724 F.2d 16 (2d Cir. 1983) ...............................................................14

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000)................................................................16

*GMC v. Tracy*,
  519 U.S. 278 (1997)................................................................19

*Golan v. Holder*,
  132 S. Ct. 873 (2012)..............................................................24

*Goldstein v. California*,
  412 U.S. 546 (1973)................................................................19

*Great Atl. & Pac. Tea Co. v. Cottrell*,
  424 U.S. 366 (1976)................................................................18

*Halstead v. Grinnan*,
  152 U.S. 412 (1894)................................................................11

*Head v. N.M. Bd. of Exam'rs in Optometry*,
  374 U.S. 424 (1963)................................................................19

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989)................................................................20

*Houston Realty Corp. v. Castro*,
  404 N.Y.S.2d 796 (Civ. Ct. 1978) .......................................15

*Huron Portland Cement Co. v. Detroit*,
  362 U.S. 440 (1960)................................................................19

*Ileto v. Glock Inc.*,
  349 F.3d 1191 (9th Cir. 2003) .............................................17

*In re XM Satellite Radio Holdings, Inc.*,
  23 FCC Rcd 12348 (2008).....................................................22

*James v. Terrace Tavern, LLC*,
  999 N.Y.S.2d 707 (Sup. Ct. 2014).........................................5

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Jensen v. Gen. Elec. Co.*,
  82 N.Y.2d 77 (1993) ................................................................5, 15

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ..........................................................25

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
  753 F.3d 395 (2d Cir. 2014) ............................................................16

*Metro. Opera Ass'n, Inc. v. Wagner-Nichols Recorder Corp.*,
  101 N.Y.S.2d 483 (Sup. Ct. 1950).....................................................12

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
  272 F.3d 104 (2d Cir. 2001) ............................................................23

*NCAA v. Miller*,
  10 F.3d 633 (9th Cir. 1993) .......................................................21, 22

*New England Power Co. v. New Hampshire*,
  455 U.S. 331 (1982).......................................................................20

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
  92 N.Y.2d 458 (1998) ...................................................................9, 14

*NXIVM Corp. v. Ross Inst.*,
  364 F.3d 471 (2d Cir. 2004) ............................................................27

*Palmer v. DeWitt*,
  47 N.Y. 532 (1872) .................................................................5, 9, 10

*People ex rel. Freeman v. Hulbert*,
  46 N.Y. 110 (1871) .........................................................................6

*People v. Dixson*,
  798 N.Y.S.2d 659 (Crim. Ct. 2005)....................................................6

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .........................................................28

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970)................................................................22, 23

*Ploof v. Putnam*,
81 Vt. 471 (1908)......................................................................5

*RCA Mfg. Co. v. Whiteman*,
114 F.2d 86 (2d Cir. 1940) ...............................................10, 11, 12

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)................................................................6, 7

*Sporhase v. Nebraska*,
458 U.S. 941 (1982)..................................................................20

*Tenn. Scrap Recyclers Ass'n v. Bredesen*,
556 F.3d 442 (6th Cir. 2009) ......................................................18

*Thales Avionics, Inc. v. Matsushita Avionics Sys. Corp.*,
2004 U.S. Dist. LEXIS 32433 (C.D. Cal. Aug. 6, 2004) .................................21

*UMG Recordings v. MP3.com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000) .........................................24, 25

*U.S. v. Ivezaj*,
568 F.3d 88 (2d Cir. 2009) ...........................................................6

*Victory v. Baker*,
67 N.Y. 366 (1876) .....................................................................5

*Westinghouse Credit Corp. v. D'Urso*,
371 F.3d 96 (2d Cir. 2004) ..........................................................16

*Williams v. Port Chester*,
76 N.Y.S. 631 (App. Div. 1902).......................................................5

*Wynehamer v. People*,
13 N.Y. 378 (1856) .....................................................................6

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Yantha v. Omni Childhood Ctr.*,
2013 WL 5327516 (E.D.N.Y. Sept. 20, 2013) ...................................................13

## STATUTES

17 U.S.C. § 112 .......................................................................................................27

17 U.S.C. § 301 ............................................................................................. *passim*

29 Stat. 481 (1897) ...................................................................................................9

35 Stat. 1075 (1909) .................................................................................................9

4 Stat. 436 (1831) .....................................................................................................9

N.C. GEN. STAT. § 66-28 (2015) ...........................................................................23

N.Y. PENAL LAW § 275 ..........................................................................................12

N.Y. PENAL LAW § 275.45 ......................................................................................12

S.C. CODE ANN. § 39-3-510 (2014) .......................................................................23

## OTHER AUTHORITIES

2 Melville Nimmer & David Nimmer, NIMMER ON COPYRIGHT (2015) ..............7, 9

Richard Posner, ECONOMIC ANALYSIS OF LAW (8th ed. 2011) ................................6

William Landes & Richard Posner, *Trademark Law: An Economic Perspective*, 30 J.L. & ECON. 265 (1987) ............................................7

William Patry, PATRY ON FAIR USE (2015) .............................................................7

## REGULATIONS

47 C.F.R. § 25.144(a)(3)(i) (2014) ........................................................................22

47 C.F.R. § 25.144(e)(4) (2014) ...........................................................................22

## INTRODUCTION

As Sirius XM's opening brief demonstrated, the district court's ruling shattered decades of legal, industry, and political consensus that no state's common law grants owners of pre-1972 recordings the unfettered, unconditional right to control performances of recordings that they sold to the public. The central premise of plaintiff's response brief is that no such consensus existed and that pre-1972 recording owners in fact *always* possessed such rights under New York common law.

That argument is at odds with precedent, to be sure, but it is also belied by simple reality. If such a right existed, recording owners would not have waited *75 years* to assert it. They would not have repeatedly insisted to Congress that no such right exists under state law. And they certainly would not have stood idly by while their rights were trampled by AM/FM radio stations, club DJs, restaurants, and thousands of others, on a daily and even hourly basis.

Make no mistake: the district court's ruling was "unprecedented," as even the court itself recognized in asking this Court to provide "authoritative guidance" on an interlocutory basis. SPA39, 55. Before now, no court has *ever* held that pre-1972 recording owners have a right to control or demand royalties for performances of their recordings. Courts have only recognized a right to prevent unauthorized *copying and distribution* of pre-1972 recordings—*i.e.*, record piracy.

Making bootleg copies of a record and selling those copies in direct competition with the owner is fundamentally different than buying a record from the owner and playing it—the exact purpose for which it was made and sold. While states have always granted protection against piracy, states have never allowed recording owners to prevent record-purchasers (including broadcasters) from performing lawfully obtained records. And New York law is clear that where, as here, creating a new right would dramatically expand existing law and affect many competing stakeholders, the decision whether and how to establish that right must be left to the legislature.

Plaintiff nonetheless argues that "ownership" in property is inherently absolute, relying on New York cases concerning real property, personal property, and record piracy. None of these cases recognizes the right to control performances that plaintiff now claims. To the contrary, if the cases are relevant at all, it is only because they confirm that property ownership is *not* absolute, but is always subject to limitations protecting other stakeholders. This is particularly true of copyright ownership, which has "never accorded the copyright owner complete control over all possible uses of his work." *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 2015 WL 3852692, at *5 (S.D. Fla. June 22, 2015).

Plaintiff also misunderstands the relevance of federal copyright law and the background of Congress's enactment of a limited performance right in post-1972

2

recordings.  Plaintiff says that Section 301(c) of the Copyright Act prohibits courts from even considering the Act and its background in determining the scope of rights in pre-1972 recordings, but that provision merely authorizes states to make (or not make) laws concerning pre-1972 recordings.  Nothing about Section 301(c) bars this Court from considering federal law to understand the scope of the common-law copyrights against which the federal law was enacted.  That is the key point here:  the terms and history of federal copyright law in this area confirm that no performance right existed under New York law, because *recording owners themselves* repeatedly said no such right existed, and for that reason implored Congress to create a *federal statutory* right.  Congress eventually did so, but it created only a carefully circumscribed right, and only for post-1972 recordings. That federal enactment exemplifies the nuanced policy balancing among various stakeholders that is required in this area, which shows why creating controversial new rights is a quintessential *legislative* act, not a task for courts construing the common law.

A common-law right *is*, however, a "regulation" of private conduct and thus no less subject to Commerce Clause scrutiny than a legislative enactment.  And the case law is clear that it would violate the Commerce Clause under both the *per se* and balancing tests to apply a New York performance right to Sirius XM, which is

required by FCC regulations *and* its FCC license to maintain nationwide, uniform broadcasts.

Finally, plaintiff contends that its reproduction claims survive Sirius XM's fair use defense because no such defense exists under New York common law. Plaintiff is wrong. The fair use defense is mandated by the First Amendment and applies in New York and every other state. Its function is to protect copies that, like Sirius XM's internal library copies of pre-1972 recordings, have no effect on the market for the original work. As for Sirius XM's seconds-long buffer and cache copies, there is no need to even reach the fair use defense, because those do not constitute actionable "copies" at all.

The judgment should be reversed.

## I. NEW YORK COMMON LAW DOES NOT GIVE PRE-1972 RECORDING OWNERS A PERFORMANCE RIGHT

Plaintiff argues that ownership of a pre-1972 recording is absolute, and necessarily includes a right to control all performances. Plaintiff relies on three sources for this supposed right: (1) general principles of real and personal property law; (2) New York cases concerning record piracy; and (3) New York unfair competition law. None of these sources establishes the performance right plaintiff claims. And the judicial invention of such a right would violate the settled principle that only a legislature can dramatically expand existing law in a way that affects many competing stakeholders.

4

A.    **New York Law Governing Real And Personal Property Does Not Establish A Performance Right In Pre-1972 Recordings**

Plaintiff's basic theory is that under New York common law, ownership of property encompasses all conceivable rights in that property, unless and until the legislature "withdraws certain rights from protection."  Respondent's Brief ("RB") 20.  Plaintiff cites no authority for this sweeping proposition, and there is none.[1]  Property rights, like all other rights, are subject to limitations.  *See Ploof v. Putnam*, 81 Vt. 471, 474-75 (1908).  Plaintiff's own cases acknowledge this unassailable truth.  *See Victory v. Baker*, 67 N.Y. 366, 368 (1876) (landowners' rights may be limited by competing stakeholder interests); *Palmer v. DeWitt*, 47 N.Y. 532, 532, 542 (1872) (common-law rights in literary works limited).  As Judge Posner has explained, "[t]ruly exclusive (absolute, unqualified) property

---

[1] Neither *Williams* nor *Jensen* remotely suggests that property rights are absolute until the legislature says otherwise.  *Williams v. Port Chester*, 76 N.Y.S. 631 (App. Div. 1902) (village charter requiring plaintiff to present negligence claim against village within 30 days violated plaintiff's due process right where injury prevented him from timely filing claim); *Jensen v. Gen. Elec. Co.*, 82 N.Y.2d 77 (1993) (statute cannot abrogate common law by implication).  It is perfectly routine for courts to recognize, enforce, and adjust limitations on common-law rights—including property rights—without legislative mandates.  *See, e.g.*, *Dane v. M&H Co.*, 1963 WL 8060, at *3-4 (N.Y. Sup. Ct. Jan. 25, 1963) (declining to extend common-law copyright to choreographic works); *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 52-53 (2006) (declining to recognize property rights in body parts); *James v. Terrace Tavern, LLC*, 999 N.Y.S.2d 707, 709 (Sup. Ct. 2014) (declining "to expand the limited common law duty of a business and its landlord").

rights would be a contradiction in terms."  Richard Posner, ECONOMIC ANALYSIS OF LAW § 3.6 (8th ed. 2011); *see* Appellant's Brief ("AB") 18-20.

Plaintiff relies principally on cases applying general principles of real and personal property law.  RB18-19.[2]  But even real and personal property rights are not unlimited.  A landowner, for example, does not have an inherent right to operate an exotic dance-club, drill for precious minerals, or build a towering skyscraper.  AB-18-20; *Casanova Entm't Grp., Inc. v. City of New Rochelle*, 375 F. Supp. 2d 321, 342 (S.D.N.Y. 2005).

Intangible property rights of the kind plaintiff claims are even more limited.  Copyright is "no ordinary chattel"—the "property rights of a copyright holder have a character distinct from the  possessory interest" of a real-property owner.  *Dowling v. U.S.*, 473 U.S. 207, 216-17 (1985).  Ownership of a copyright "has *never* accorded … complete control over all possible uses of [the] work."  *Id.* (emphasis added).  Copyright instead "comprises a series of carefully defined and carefully delimited interests to which the law affords correspondingly exact protections."  *Id.*; *accord Sony Corp. of Am. v. Universal City Studios, Inc.*, 464

---

[2] Plaintiff's cases involve personal property, *Wynehamer v. People*, 13 N.Y. 378, 382-83 (1856); *People v. Dixson*, 798 N.Y.S.2d 659, 663-64 (Crim. Ct. 2005), or real property, *People ex rel. Freeman v. Hulbert*, 46 N.Y. 110, 113 (1871), or are otherwise plainly inapposite, *Dickman v. Comm'r*, 465 U.S. 330, 336 (1984) (discussing definition of property under Internal Revenue Code in interpreting gift-tax provisions); *U.S. v. Ivezaj*, 568 F.3d 88, 91-92 (2d Cir. 2009) (discussing definition of property under New York's extortion statute).

6

U.S. 417, 431 (1984); *see* William Landes & Richard Posner, *Trademark Law: An Economic Perspective*, 30 J.L. & ECON. 265, 268 (1987) (intellectual property is "limited in ways that physical property is not").

Plaintiff argues that the Court cannot consider federal copyright cases like *Dowling* and *Sony*. That is wrong even on its own terms—courts frequently look to federal law for guidance in defining the scope of common-law copyright. *See EMI Records Ltd. v. Premise Media Corp. L.P.*, 2008 WL 5027245 (N.Y. Sup. Ct. Aug. 8, 2008) (applying federal fair use factors to common-law claim); William Patry, PATRY ON FAIR USE § 2:3 (2015) ("[i]t is appropriate that there be responsively expansive limitations and exceptions" on common-law copyright as under federal law). In any event, common law, like federal law, has never treated copyright ownership as absolute. *See* 2 Melville Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 8C.02 (2015) (surveying state cases and observing that common-law copyrights are limited). Even plaintiff's key case, *Naxos*, notes that common-law copyright may be limited by the fair use defense. 4 N.Y.3d 540, 564 (2005). And the Florida court held, under Florida common law, that pre-1972 recording owners do *not* have an "unqualified property right" allowing them to "control everything related to the performance of the sound recordings." 2015 WL 3852692, at *5.

As Sirius XM pointed out in its opening brief—but plaintiff notably fails to address—plaintiff's "ownership is absolute" theory would lead to absurd results. AB19-20.  If true, it would mean that a person who lawfully purchases a pre-1972 recording cannot play that recording—even in the privacy of their own home—unless the legislature enacts a statute expressly allowing such a use or the recording owner consents.  It would mean that every New Yorker who has played a Beatles or Rolling Stones album is a copyright infringer—along with thousands of AM/FM radio stations, club DJs, small-business owners, and others.  And it would mean that all other conceivable uses of a pre-1972 recording—such as re-selling it to a used record store, gifting it to a friend, or covering it at a karaoke bar—would be similarly barred.  This is not, and cannot be, the law.  *See id.*; ECF No. 73 at 13.

## B. New York Common Law Only Provides A *Copy* Right, Not A Performance Right

The performance right plaintiff claims has no more basis in New York law governing common-law copyright than it does in real and personal property law. Plaintiff cites no case so much as suggesting that copyright ownership encompasses all conceivable uses of a work, including an unfettered right to control performances of pre-1972 recordings.  No such case exists.  To the contrary, copyright ownership is inherently limited—it "has never accorded the copyright owner complete control over all possible uses of his work."  *Flo & Eddie*, 2015 WL 3852692, at *5.

8

Historically, common-law and statutory copyright were limited to just that—a "copy right." *See* NIMMER, *supra*, § 8.02; *Palmer*, 47 N.Y. at 542. Over time, the Copyright Act has expanded the scope of copyright protection—in certain specific contexts and with important limitations[3]—and the common law has often followed, consistent with the principle that the common law should evolve incrementally to avoid "encroach[ing] on the legislative branch." *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 467-68 (1998). Importantly, New York courts have only recognized common-law performance rights for certain creative works *after* Congress recognized corollary rights in the Copyright Act. AB31-32.

A "copy" right is thus the *only* right inherent to copyright ownership. Neither the common law nor the Copyright Act has ever conflated a copy right with a performance right. In *Palmer*, the New York Court of Appeals traced the evolution of copyright law in England and the U.S., noting the "copyright acts which secured to authors the exclusive right … to print and publish their works, *did not secure to them the exclusive right of the public representation* of their dramatic compositions." 47 N.Y. at 542 (emphasis added). The court explained

---

[3] For example, Congress protected musical *compositions* (as opposed to recordings) against unauthorized copying in 1831, but did not protect them against unauthorized performances until 1897—and it limited that right by requiring composers to grant compulsory licenses to those wishing to perform their music. 4 Stat. 436 (1831); 29 Stat. 481 (1897); 35 Stat. 1075 (1909).

that copy rights and performance rights "are *entirely distinct*, and the one may exist without the other." *Id.* (emphasis added).

Consistent with that distinction, the only rights recognized under New York law in pre-1972 recordings are limited rights to prevent unauthorized *copying* and sale—*i.e.*, record piracy. AB13-14. This Court applied exactly that distinction in *Whiteman*, which rejected the recording owner's claimed right to control radio performances, because the "only" common-law right in recordings is "the power to prevent others from reproducing" them, and the radio network "never invaded any such right" by performing plaintiff's recordings. 114 F.2d 86, 88 (2d Cir. 1940). Plaintiff's assertion that *Whiteman* actually "recognized a performance right," RB13, is contrary to that plain language and unambiguous holding.

*Whiteman*'s central holding that a recording owner possesses only the right to prevent *copying* of the recording, not performances, was not even questioned, much less overruled, by *Mercury Records*, 221 F.2d 657, 663 (2d Cir. 1955). That decision rejected only Judge Hand's *separate* "statement" that the sale of a record extinguishes the right against *copying*. *Id.*; *see* AB13-16. The analysis and holding in *Mercury Records* concerning a recording owner's *copy* rights had nothing to do with *Whiteman*'s holding that a recording owner possesses *only* those

10

copy rights.[4]  Many commentators have recognized—including after *Mercury Records* and *Naxos*—the continuing validity of *Whiteman*'s core holding that recording owners do not possess the right to control performances.  AB12-13 n.3, 15 n.5.

Indeed, if *Mercury Records* in fact overruled *Whiteman*'s performance-right ruling, then recording owners *since 1955* have had the right to demand royalties for performances of their recordings.  Yet for 60 years, no recording owner ever asserted such a right.  To the contrary, recording owners over those years—and even earlier—repeatedly insisted to Congress that no such common law performance right existed and that federal legislation was needed to create one. AB24-26.  As one amicus notes, the recording owners' "silence in asserting such a right, and their vehement public protests about the unfairness of not having such a right, ought to be conclusive."  ECF No. 56 at 10, 13; *see Halstead v. Grinnan*, 152 U.S. 412, 416 (1894) (where a party "asserts that he has been for many years the owner of certain rights … and yet has never attempted to enforce them, there is a strong persuasion that" those rights "never existed or had long since ceased").

---

[4] Judge Hand's dissent noted that the majority's ruling granted recording owners a "perpetual monopoly," in that they would maintain their anti-copying right in perpetuity, even after selling their recordings to the public (and even though federal law limits the duration of copyright protection). *Id.* at 667.  He never suggested that the majority's ruling granted recording owners a right to control performances—that right was not at issue in the case.

Consistent with *Whiteman*, New York caselaw has *only* recognized rights to prevent copying/piracy, and has never recognized a right to prevent performances of lawfully obtained recordings. All of the cases cited by plaintiff, other than two non-binding trial court decisions offering little or no analysis, AB16-18, address record piracy and have nothing to do with performance. As plaintiff itself concedes, "it can hardly be concluded that [a] court was defining the scope of New York law in connection with cases (and issues) that were not before it." RB29.[5]

Nor has the New York legislature ever equated the right to prevent record piracy with the right to control performance. The legislature outlawed piracy long ago, N.Y. PENAL LAW § 275, but it has never placed any restrictions on performances of lawfully obtained recordings. In fact, New York's record piracy statute expressly exempts radio broadcasters from liability for making copies to facilitate performance. *Id.* § 275.45.

---

[5] While plaintiff seizes on the word "performance" in *Metropolitan Opera*, a record piracy case, this is nothing more than wordplay—like plaintiff's repeated references to "performances embodied in pre-1972 recordings." RB2, 3, 9, 12, 18. In *Metropolitan Opera*, an opera company licensed a radio station the right to record and broadcast its live performances, and separately licensed a record company the right to sell recordings of its live performances. In a clear example of record piracy, defendant recorded the radio broadcasts and sold those recordings in direct competition with the record company. 101 N.Y.S.2d 483, 487 (Sup. Ct. 1950). While the case references the opera's live "performances," it had nothing to do with the right to perform lawfully obtained recordings.

12

### C.   New York Unfair Competition Law Does Not Establish A Performance Right

Plaintiff's suggestion that unfair competition law provides greater protection than common-law copyright is misplaced.  *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-36 (2003) (rejecting effort to construe non-copyright doctrine as providing greater protection than federal copyright law).  In order to prevail on an unfair competition claim, plaintiff must show some violation of or interference with an existing right.  *See Naxos*, 4 N.Y.3d at 563.  Plaintiff cannot meet this threshold requirement, because it has no protectable right or property interest in performances of its pre-1972 recordings.

Even if it did, plaintiff would have to show some "competitive injury," defined as "a direct financial loss, lost dealings, or … [lost] profits … or, at the very least, [diversion of] plaintiff's customers and business."  *Yantha v. Omni Childhood Ctr.*, 2013 WL 5327516, at *6 (E.D.N.Y. Sept. 20, 2013).  Plaintiff's principals were unable to identify a single lost license attributable to Sirius XM's broadcasts, and admitted there is no "evidence that SiriusXM has impaired Flo & Eddie's ability to license its pre-72 recordings."  A69 at 97:5-12; *see* A68 at 95:23-25; A86 at 107:15-22.  Not surprisingly, plaintiff testified:  "I don't know how we would be considered a competitor with a satellite provider."  A83 at 93:18-94:4.

### D.    A Performance Right Can Only Be Created Legislatively

As Sirius XM explained, AB29-30, the role of a federal court sitting in diversity is to interpret New York law, *not* to create controversial new rights.  *See Garland v. Herrin*, 724 F.2d 16, 20 (2d Cir. 1983) (federal court should not go "beyond the limits of the reported New York cases" or make "a policy-based extension of state law"); ECF No. 66 at 11-12.  New York law has never granted pre-1972 recording owners an unfettered, unconditional right to control performances.  By creating such a right at common law, the district court overstepped its authority *and* violated the settled principle that only a legislature can create new rights that dramatically expand existing law and affect many competing stakeholders.

This does not mean that courts can *never* recognize new rights.  *Cf.* RB22-23.  The common law of course can evolve with changing technology—for example, in the 1950s, courts across the country extended existing common-law principles to prevent record piracy.  *See Naxos*, 4 N.Y.3d at 554-55.  But by its very nature, the common law evolves only incrementally to avoid usurping the legislative function.  The New York Court of Appeals has made clear that a dramatic expansion of the common law would "clash with [the] customary incremental common-law developmental process" and "encroach[] on the legislative branch."  *Norcon*, 92 N.Y.2d at 467; *accord Caronia v. Phillip Morris*

*USA, Inc.*, 22 N.Y.3d 439, 451 (2013) (declining to recognize new tort claim, despite "significant policy reasons" for doing so, given "potential systemic effects of creating a new, full-blown" claim); *Houston Realty Corp. v. Castro*, 404 N.Y.S.2d 796, 798 (Civ. Ct. 1978) ("Significant changes in common-law doctrine are generally the product of legislation.").

This principle has particular force where, as here, expanding existing law would have major policy implications. *See Chamberlain v. Feldman*, 300 N.Y. 135, 140 (1949) (public-policy changes "must be the doing of the Legislature"); *Jensen*, 82 N.Y.2d at 84 (same). A court cannot "intrude upon the policy-making and discretionary decisions that are reserved to the legislat[ure]." *Campaign for Fiscal Equity, Inc. v. State*, 8 N.Y.3d 14, 28 (2006). Plaintiff has no response to these cases, other than to argue that New York common law already provides a performance right. RB23. It does not, as explained above.[6]

The reason for this rule is clear: the creation of a performance right by judicial will rather than legislative discretion creates policy and administrative

---

[6] *Chamberlain* is instructive. In that case, defendant obtained a 70-year-old unpublished manuscript by Mark Twain, and plaintiff tried to prevent defendant from publishing it. 300 N.Y. at 138-39. The common-law rule is that physical transfer of an unpublished manuscript does *not* automatically transfer the author's right of first publication. *Id.* Although the court noted a policy argument for abrogating this rule—*i.e.*, it contravenes "sound policy to keep meritorious literary achievement out of the public domain for so long"—it declined to change the existing law, as any "change of public policy *must be the doing of the Legislature*." *Id.* at 139-40 (emphasis added).

problems that courts are not equipped to address.  AB27-30.  A legislature can

avoid these problems by designing a scheme that balances all stakeholder interests.

That is what Congress did in the DPRA, which grants post-1972 recording owners

a digital performance right, but includes key limitations (including a carve-out for

AM/FM radio) and a compulsory licensing scheme to ensure that broadcasters can

obtain licenses at reasonable royalty rates.  *Id.*[7]  For these same reasons, the Florida

court declined to create a common-law performance right in pre-1972 recordings,

concluding that the "Florida legislature is in the best position to address" difficult

regulatory issues.  2015 WL 3852692, at *5.

 Plaintiff glosses over the many problems that would result from the creation

of a common-law performance right, asserting that parties could simply negotiate a

license, as in any other market transaction.  RB31-32.  It is hardly so simple.

Plaintiff is asking the Court to create an entirely new market, with no rules,

boundaries, or enforcement mechanisms.  A broadcaster whose performances of

_____

 [7] Some of Sirius XM's amici argue that a common-law performance right in
pre-1972 recordings would impermissibly conflict with the purposes and objectives
of the DPRA.  ECF No. 58 at 9-10.  Amici argue not that the DPRA "repealed"
Section 301(c), RB-17, but that Section 301(c) "does not foreclose a conflict
preemption analysis."  ECF Doc. 58 at 7-8; *see Geier v. Am. Honda Motor Co.*,
529 U.S. 861, 869 (2000) (savings clause "does *not* bar the ordinary working of
conflict pre-emption principles").

 Sirius XM did not itself raise this argument below, but the Court has broad
discretion to consider it.  *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 103
(2d Cir. 2004); *see Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413
(2d Cir. 2014) (accepting argument by amici "not raised or ruled upon below").

pre-1972 recordings are received in New York would have to identify any and all claimed owners of that recording, locate those owners, resolve any conflicting ownership claims, and attempt to negotiate a reasonable license—without the benefit of a registration system or compulsory licensing scheme. As various amici confirmed, such a process would impose "prohibitive transaction and compliance costs," ECF No. 66 at 25, "invite utter confusion and uncertainty," ECF No. 69 at 22, and create "financial distress for broadcasters," ECF No. 71 at 20.

## II. A NEW YORK PERFORMANCE RIGHT WOULD VIOLATE THE COMMERCE CLAUSE AS APPLIED TO SIRIUS XM

### A. The Commerce Clause Applies

Plaintiff makes three arguments why the Commerce Clause does not apply. None has merit. *First*, plaintiff argues that New York's protection of property against theft is an exercise of its "police power" and not a "regulation" to which the Commerce Clause applies. *All* exercises of state power are subject to Commerce Clause scrutiny. *See BMW of N. Am. v. Gore*, 517 U.S. 559, 572 n.17 (1996); *Ileto v. Glock Inc.*, 349 F.3d 1191, 1217 (9th Cir. 2003). There is no exemption in the Constitution or Commerce Clause jurisprudence for exercises of a state's police power (*i.e.*, laws concerning citizens' health and welfare). Nor could there be—if a state could avoid constitutional scrutiny simply by invoking its police power, application of the Commerce Clause would depend on careful draftsmanship rather than objective principles. For that reason, courts scrutinize

17

exercises of police power the same way as any other laws. *See Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 381 (1976) (scrutinizing "exercise of [Mississippi's] police power" to promulgate health standards).

Plaintiff's policy argument likewise fails. Application of the Commerce Clause would not "destroy New York's ability to confer intangible property rights." RB45-46. New York remains free to create property rights and enforce those rights within its borders, but property laws are subject to the same constitutional scrutiny as every other law. *See BMW*, 517 U.S. at 572 n.17.

*Second*, plaintiff contends that the outdated *Sherlock* test applies and immunizes any indirect regulation of interstate commerce. If this were true, states could burden interstate commerce with impunity by drafting laws in a facially non-discriminatory way. That is plainly not the law. *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103-04 (2d Cir. 2003) (violation of Commerce Clause to apply non-discriminatory state law prohibiting distribution of material "harmful to minors" to sex education website operating nationally). Courts long ago abandoned the direct/indirect test espoused in *Sherlock* because it proved unworkable to draw a "mechanical line … based on a supposedly precise division between 'direct' and 'indirect' effects on interstate commerce." *Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 390 (1983); *see Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 448-49 (6th Cir. 2009) ("[P]resumably

18

due to its questionable value as an analytical device, the 'direct/incidental' distinction has fallen out of use.").

Plaintiff cites no case to the contrary. *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 448 (1960), *Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 429 (1963), and *GMC v. Tracy*, 519 U.S. 278, 298 n.12 (1997), do not apply *Sherlock*'s direct-indirect test—rather, those cases confirm that state laws based on police power that only *indirectly* affect interstate commerce can nonetheless violate the Commerce Clause if their effect is to discriminate against interstate commerce or disrupt national uniformity.

*Third*, plaintiff asserts that Section 301(c) expressly authorizes states to burden interstate commerce. As Sirius XM explained, AB37-38 n.10, the district court rightly rejected this argument on the ground that Section 301(c) is a savings clause and "does not 'unambiguous[ly],' or 'unmistakably,' permit state interference with interstate commerce." SPA37 (citations omitted).

Plaintiff mischaracterizes *Goldstein v. California*, 412 U.S. 546, 566-67 (1973), which was *not* a Commerce Clause case—it merely clarified that Section 301(c) authorizes states to make laws concerning pre-1972 recordings and provides that such laws will not be preempted (as does the Patry treatise plaintiff cites). The question is whether Section 301(c) gives states free reign to make such laws in a way that burdens interstate commerce. It does not. Section 301(c) provides only

19

that state laws will "not be annulled or limited *by this title*"—*i.e.*, by the Copyright Act, not by the Commerce Clause or other laws.

Plaintiff attempts to distinguish a case cited by the district court, *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982), on the ground that the statute in that case was retrospective (*i.e.*, "lawful authority now exercised") whereas Section 301(c) applies prospectively. That makes no difference. A savings clause like Section 301(c) saves existing *and* future laws from preemption, but does not allow states to apply those laws in a way that burdens interstate commerce. *See id.* at 341; *Sporhase v. Nebraska*, 458 U.S. 941, 959-60 (1982) (statute providing "nothing *in this Act* shall be construed as affecting … the laws of any State" was savings clause) (emphasis added).

### B. Applying A New York Performance Right To Sirius XM Would Violate The Commerce Clause Under The *Per Se* And *Pike* Tests

Plaintiff argues that a New York performance right, which provides "wholly in-state protection," does not violate the Commerce Clause *per se*. RB50. But the relevant inquiry is whether the "practical effect" of the law, *as applied*, is to burden interstate commerce. *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989). Applying a New York performance right to Sirius XM's nationally uniform broadcasts would have the practical effect of burdening interstate commerce. AB41-45.

Plaintiff has no response to *American Booksellers*, which held that a state law has the practical effect of regulating interstate commerce where, as here, it is applied to an entity engaged in conduct that "does not recognize geographic boundaries." 342 F.3d at 103. Plaintiff's effort to distinguish *Flood* and *NCAA*—which held that it violates the Commerce Clause *per se* to apply a state law to an entity that, like Sirius XM, adheres to nationally uniform rules—is unavailing. Plaintiff argues that those cases involved sports leagues, which are entitled to special deference. RB51. There is no principled basis for affording greater deference to sports leagues than radio broadcasters. Nor did this Court draw such a distinction in *Flood*, which held broadly that, where an entity must "comply with the strictest standard of several states in order to continue an interstate business …, the extra-territorial effect which the application of a particular state law would exact" violates the Commerce Clause. 443 F.2d 264, 267 (2d Cir. 1971), *aff'd*, 407 U.S. 258 (1972); *accord Thales Avionics, Inc. v. Matsushita Avionics Sys. Corp.*, 2004 U.S. Dist. LEXIS 32433, at *9 (C.D. Cal. Aug. 6, 2004) (no Commerce Clause violation where, unlike here, defendant failed to show "the nature of its own business, like the professional sports leagues, depend[s] on the uniform application" of laws).

Plaintiff's suggestion that Sirius XM "voluntarily agreed" to maintain nationally uniform broadcasts, RB39, and is not actually required to do so, is

illogical and inaccurate.  FCC regulations, which were enacted to protect local

AM/FM radio stations from competition, require satellite radio broadcasters to

"service the 48 contiguous states" and prohibit them from distributing "any

information not also transmitted to all subscribers' receivers." 47 C.F.R.

§§ 25.144(a)(3)(i), 25.144(e)(4) (2014).  In addition, the license granted by the

FCC to Sirius XM prohibits it "from distributing local programming [or]

advertising" and from using terrestrial repeaters, which facilitate satellite

broadcasts, to "distribute localized content that is distinct from that provided to

subscribers nationwide."  23 FCC Rcd 12348 ¶¶ 145, 155 (2008).  The FCC

regulations and license are legally binding, and prohibit Sirius XM and other

satellite broadcasters from tailoring broadcasts by state.  National uniformity is

thus even more critical for Sirius XM than the sports leagues in *Flood* and *NCAA*,

which *chose* to adopt uniform rules and procedures.

Applying a New York performance right to Sirius XM would also violate

the balancing test set forth in *Pike*.  That test requires Sirius XM to show that "the

burden imposed on [interstate] commerce is *clearly excessive in relation to* the

putative local benefits."  397 U.S. 137, 142 (1970) (emphasis added).  Sirius XM

has made this showing.  *See* AB45-46.  New York has no unique interest,

particularly because the creation of a performance right would hand a windfall to

recording owners worldwide.  The burden on Sirius XM and other broadcasters,

22

however, would be staggering, and "could upend the … broadcasting industries." SPA39-40; *see* ECF No. 69, 22-25 (National Association of Broadcasters: affirmance would create "utter confusion and uncertainty" and "deter stations from playing pre-1972 tracks"); ECF No. 71, 22, 28-29 (New York State Broadcasters Association:  affirmance "could sound the death knell" for many radio stations). Plaintiff's effort to minimize the "significant economic consequences" the district court itself recognized, SPA39-40, is unconvincing.  *Supra* at 16-17.

Plaintiff argues that the *Pike* test has not been satisfied because Sirius XM has not shown that the burden on interstate broadcasters is greater than the burden on intrastate broadcasters.  RB53-54.  As plaintiff's own case makes clear, a state law "may disproportionately burden interstate commerce if it has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction."  *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001). That is precisely the situation here—because Sirius XM is required to have nationally uniform broadcasts, it would be forced to comply with New York's performance right, even though other states have expressly rejected any similar right.  *See Flo & Eddie*, 2015 WL 3852692, at *5; N.C. GEN. STAT. § 66-28 (2015); S.C. CODE ANN. § 39-3-510 (2014).  This imposes a disproportionate burden on Sirius XM and other interstate broadcasters, who are forced to modify their broadcasts nationwide to comply with New York law.

## III.  INTERNAL REPRODUCTIONS NECESSARY TO FACILITATE SIRIUS XM'S BROADCASTS ARE LAWFUL

### A.  The Fair Use Defense Applies And Protects Sirius XM's Library Copies

Plaintiff argues that courts are "prohibit[ed]" from applying the fair use defense to copyright infringement claims under New York common law.  RB33-34.  Not so.  As the Supreme Court has made clear, the fair use defense "serve[s] as built-in First Amendment accommodation[]"—meaning that it applies in state *and* federal courts.  *Golan v. Holder*, 132 S. Ct. 873, 876 (2012).  New York courts have thus long applied the fair use factors set forth in Section 107 of the Copyright Act to common law copyright claims.  *See EMI*, 2008 WL 5027245 (looking to Section 107 to define "the contours of common law fair use"); *Estate of Hemingway v. Random House, Inc.*, 279 N.Y.S.2d 51, 57 (Sup. Ct. 1967) (noting that federal and state law concerning fair use "are in accord").

The fair use defense plainly applies here.[8]  As for the first factor (nature of defendant's use), the relevant inquiry is whether Sirius XM's library copies "merely supersede[] the objects of the original creation" or are in some measure "transformative."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).  Plaintiff's case, *UMG Recordings v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y.

---

[8] The district court recognized that if Sirius XM's performances are deemed lawful, any incidental reproductions made to facilitate those performances would likely constitute fair use.  SPA55.  Sirius XM maintains that the fair use defense applies either way.

2000), is inapposite. In *MP3.com*, an interactive music service made complete copies of plaintiff's recordings and allowed users to download them in exchange for a subscription fee. *Id.* at 350-51. The court found that this use, which merely "repackag[ed]" plaintiff's records "through another medium," was not transformative. *Id.* at 351.

In contrast, Sirius XM's library copies are purely internal and can *never* be downloaded, streamed, or otherwise accessed by the public.[9] The sole purpose of these copies is to facilitate Sirius XM's performances—not to substitute for plaintiff's record sales. Courts have found similar instances of internal copying transformative. *See Authors Guild, Inc. v. Google*, 2015 WL 6079426, at *2 (2d Cir. Oct. 16, 2015) (creating digital copies of entire copyrighted books to provide search function); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) (same); *accord A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639-40 (4th Cir. 2009) (copying and archiving term papers to detect plagiarism); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-20 (9th Cir. 2003) (copying and displaying photographs for search purposes).

Because Sirius XM's library copies are transformative, the fact that Sirius XM is a for-profit entity, and that plaintiff's recordings are creative works (the

---

[9] Likewise, Omnifone—which operated Sirius XM's mobile applications—maintained server copies of certain recordings on Sirius XM's servers that were totally inaccessible to the public. A991 ¶ 29.

second fair use factor), are entitled to little (if any) weight. *See Campbell*, 510

U.S. at 579 ("[T]he more transformative the new work, the less will be the

significance of other factors, like commercialism."); *Bill Graham Archives v.

Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006) (second factor is "of

limited usefulness" where secondary use is transformative).

As for the third factor (amount used), the "extent of permissible copying

varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586-87.

In order to ensure uninterrupted broadcast, Sirius XM must maintain complete

copies of plaintiff's recordings on its servers—partial copies would be useless.[10]

This Court has made clear that where, as here, copying the entire work is

"necessary to make a fair use," the third factor does not weigh against fair use. *Bill

Graham*, 448 F.3d at 613.

*Naxos* is not to the contrary. That case merely notes—in the context of

finding defendant liable for record piracy—that as "a general rule" copying an

entire work does not constitute fair use. 4 N.Y.3d at 564. But as this Court has

recognized, "[t]here are no absolute rules as to how much of a copyrighted work

---

[10] Plaintiff quotes testimony by Sirius XM's CFO out of context to argue
that Sirius XM can broadcast from CDs rather than library copies. RB at 37. As
Sirius XM's Chief Engineering Officer clarified, even terrestrial radio stations
broadcasting on a single frequency need to make internal server copies to ensure an
uninterrupted broadcast, and the need is even greater for Sirius XM, which
broadcasts by satellite and internet radio across the country 24 hours a day. A987-
88 ¶¶ 17, 20.

may be copied and still be considered a fair use," and "it may be necessary to copy the entire copyrighted work." *HathiTrust*, 755 F.3d at 98.

The fourth and most important factor (market effect) focuses not on "whether the secondary use suppresses or even destroys the market for the original work," but whether it "usurps th[at] market." *NXIVM Corp. v. Ross Inst*., 364 F.3d 471, 482 (2d Cir. 2004). Plaintiff cannot show *any* market harm from its internal library copies, let alone a usurpation. AB35-36. None of plaintiff's three arguments has merit.

*First*, plaintiff claims that the DPRA created a market for internal server copies. The DRPA allows digital broadcasters to perform and make incidental reproductions of *post*-1972 recordings in exchange for a single compulsory licensing fee—it does *not* create a market for server copies of *pre*-1972 recordings. 17 U.S.C. § 112. Nor does *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913 (2d Cir. 1994), help plaintiff. In that case, the court found market harm where plaintiff publishers had created a "workable market for ... users to obtain licenses for" academic articles, and defendant had itself paid for such licenses. *Id.* at 930. No such market exists here—and the mere fact that defendant "did not pay a fee" for the challenged use does not create a cognizable market. *Id.* at 930-31.

*Second*, plaintiff's assertion that the widespread creation of server copies would have a usurping market effect ignores that for decades, tens of thousands of

terrestrial broadcasters *have* been making these copies. *See* AB987-88 ¶¶ 17, 20. Plaintiff has failed to identify any harm from this widespread copying. A1020-22 ¶¶ 79-82; A68 at 95:4-99:4; A86 at 107:15-22; A98 at 121:12-123:12.

*Third*, plaintiff relies on *Campbell* for the proposition that market harm may be presumed where "a commercial use amounts to mere duplication of the entirety of an original." RB39. The next sentence of *Campbell* makes clear that where, as here, a use is transformative, "market harm may not be so readily inferred" because the secondary use does not "act[] as a substitute." 510 U.S. at 591.

### B.  Sirius XM's Buffer And Cache Copies Are Also Lawful

The district court rightly concluded that temporary buffer and cache copies made by Sirius XM to ensure uninterrupted broadcast are too transitory to constitute "copies." SPA26. The Florida court reached the same conclusion. 2015 WL 3852692, at *6. Plaintiff's only response is that *Cartoon Network LP, LLLP v. CDC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), which the district court cited, was based on federal law. But courts interpreting common-law copyright frequently look to federal copyright law for guidance. *Supra* at 7. And in any event, these buffer and cache copies would certainly constitute fair use. *See Flo & Eddie*, 2015 WL 3852692, at *6 (buffer and cache copies made by Sirius XM in Florida are not actionable *and* are fair use); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007) (cache copies are "transformative").

28

## CONCLUSION

The judgment below should be reversed.

Dated:        October 27, 2015            O'MELVENY & MYERS LLP

By:  /s/ Daniel M. Petrocelli
    Daniel M. Petrocelli
    Cassandra L. Seto
    1999 Avenue of the Stars, 7th Floor
    Los Angeles, CA 90067-6035
    Telephone:  (310) 553-6700

    Jonathan D. Hacker
    1625 Eye Street, N.W.
    Washington, D.C. 20006
    Telephone:  (202) 383-5300

    *Attorneys for Defendant-Appellant Sirius XM
    Radio Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,875 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:     October 27, 2015         O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
  Daniel M. Petrocelli
  Cassandra L. Seto
  1999 Avenue of the Stars, 7th Floor
  Los Angeles, CA 90067-6035
  Telephone: (310) 553-6700

  Jonathan D. Hacker
  1625 Eye Street, N.W.
  Washington, D.C. 20006
  Telephone: (202) 383-5300

  *Attorneys for Defendant-Appellant Sirius XM Radio Inc.*