# 15-1164-cv

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

FLO & EDDIE, INC., a California Corporation,
individually and on behalf of all others similarly situated,

*Plaintiff-Appellee*,

v.

SIRIUS XM RADIO, INC., a Delaware Corporation,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF OF AMICUS CURIAE PUBLIC KNOWLEDGE
## IN SUPPORT OF APPELLANT

Sherwin Siy
John Bergmayer
Raza Panjwani
Public Knowledge
1818 N St. NW
Suite 410
Washington, DC 20036
Telephone: (202) 861-0020
ssiy@publicknowledge.org

August 5, 2015

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amicus Curiae* Public Knowledge states that it does not have a parent corporation and that no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF CONTENTS ............................................................ ii

TABLE OF AUTHORITIES........................................................ iii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................... 2

I.  A Common Law Right of Public Performance in Sound Recordings is Irreconcilable with the Structure and History of the Copyright Act ... 5

    A.  Statutory History of the DPRA Demonstrates the Creation of a New Right, not the Recognition of an Existing Common Law Right ................................................................ 7

    B.  The History of the Sound Recordings Act of 1971 Shows that Exclusive Rights Are Not Naturally Bundled Together.................................................................................. 9

    C.  Public Performance Rights Were Initially Granted Only to Certain Specific Types of Works............................................. 12

II.  New York Common Law Does Not Clearly Recognize a Public Performance Right in Sound Recordings .......................................... 15

III.  Without Engaging in Judicial Legislation, Courts Cannot Force Into Place a Common Law Regime That Is Consonant With Existing Law ..................................................................................................... 19

    A.  The Highly Specific, Regulatory Nature of the Digital Performance Rights Act Demonstrates Its Non-Common Law Status................................................................................ 19

    B.  Other, Later-Recognized Types of Intellectual Property Clearly Do Not Create or Indicate Parallel Common Law Rights ......................................................................................... 20

    C.  Later-Recognized Exclusive Rights, Such as the Display Right, Also Do Not Create Parallel Common Law Rights...... 22

IV.  The Presumption that Appropriate Limitations to a Common Law Right Could be Crafted to Match the Federal Right Requires Judicial Lawmaking ...................................................................................... 24

CONCLUSION......................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Capitol Records, Inc. v. Naxos of America, Inc.*, 830 N.E.2d 250 (N.Y. 2005) ...... 18

*EMI Records, Ltd. v. Premise Media Corp.*, 2008 WL 5027245, 89 U.S.P.Q.2d 1593 (N.Y. Sup. Ct. Aug. 08, 2008). ......... 26

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d 325 (S.D.N.Y. 2014). ............................................................................................ passim

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-5784, 2014 WL 7178134 (S.D.N.Y. Dec. 12, 2014) (on motion for reconsideration). ..................... 19

*Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968) ............... 21

*Metropolitan Opera Ass'n, Inc., v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786 (Sup. Ct. N.Y. 1950) ................................................................................... 17

*Palmer v. De Witt*, 47 N.Y. 532, 542 (1872). .................................................. 18

*RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940) ........................... 19, 20

*Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394 (1974) .... 21

*The Mikado Case*, 25 F. 183, 185 (C.C.S.D.N.Y. 1885) ................................ 17

## Statutes

17 U.S.C. § 106 ....................................................................... 6, 14, 15, 23

17 U.S.C. § 109(c). ....................................................................... 24

17 U.S.C. § 111 .............................................................................. 20

17 U.S.C. § 1301 ........................................................................... 22

Act of Aug. 18, 1856, ch. 171, 11 Stat. 138. ................................................ 14

Act of Aug. 24, 1912, Pub. L. No. 62-303, 37 Stat. 488. ............................. 15

Act of Jan. 6, 1897, ch. 4, 29 Stat. 481. ................................................ 14, 15

Act of July 17, 1952, Pub. L. No. 82-575, 66 Stat. 752. ......................... 14, 15

Copyright Act of 1790, ch. 15, 1 Stat. 124. ........................................... 13, 14

Copyright Act of 1831, ch. 16, 4 Stat. 436. ........................................... 13, 14

Copyright Act of 1909, Pub. L. No. 60-349, § 1(e), 35 Stat. 1075. ............. 15

Copyright Act of 1909, Pub. L. No. 60-349, § 5, 35 Stat. 1075. ................. 14

Digital Performance Right in Sound Recordings Act, Pub. L. No. 104-39, 109 Stat. 336 (1995). ................................................................ 7

Semiconductor Chip Protection Act of 1984 (SCPA), Pub. L. No. 98–620, sec. 302, 98 Stat. 3335 .............................................................................. 22

Sound Recordings Act of 1971, Pub L. No. 92-140, § 1, 85 Stat. 391 ... 11, 12

**Legislative History**

Conference Report on the Copyright Act of 1976, H.R. Rep. No. 94-1733, at 70 (1976) .................................................................................... 9

House Report on the Copyright Act of 1976, H.R. Rep. No. 94-1476 (1976). ...................................................................................................... 9, 10

House Report on the Digital Performance Right in Sound Recordings Act, H.R. Rep. No. 104-274 (1995) .................................................................. 8

House Report on the Semiconductor Chip Protection Act of 1984, H.R. Rep. No. 98-781 (1984) ......................................................................... 23

Senate Report on Sound Recordings Act of 1971, S. Rep. No. 92-72 (1971). .......................................................................................... 10, 11, 12, 13

**Other Authorities**

Ben Sisario, *Old Songs Generate New Cash for Artists*, N.Y. TIMES (Dec. 28, 2004) ........................................................................................................ 8

Les Watkins, Note, *The Digital Performance Right in Sound Recordings Act of 1995: Delicate Negotiations, Inadequate Protection*, 20 Colum.-VLA J.L. & ARTS 323 (1996) ..................................................................................................... 22

NIMMER ON COPYRIGHT ............................................................................. 25

PATRY ON COPYRIGHT ................................................................................ 25

## STATEMENT OF INTEREST[1]

*Amicus Curiae* Public Knowledge submits this brief pursuant to Fed. R. App. P. 29. Public Knowledge is a non-profit public interest organization that defends consumer rights in the emerging digital culture. Public Knowledge promotes balanced intellectual property policies that ensure that the public can access knowledge while protecting the legitimate interests of authors.

Public Knowledge has filed numerous amicus briefs on the topics of copyright law and policy before this Court, including *Authors Guild v. Google, Inc.*, 954 F. Supp. 2d 282 (S.D.N.Y. 2013), *appeal docketed*, No. 13-4829 (2d Cir. 2014); *John Wiley & Sons, Inc. v. Kirtsaeng*, 654 F.3d 210 (2d Cir. 2011); and *Cartoon Network, LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008). Public Knowledge has similarly filed amicus briefs before the Supreme Court in copyright issues of substantial policy import, such as *American Broadcasting Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014); *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2012); *Golan v. Holder*, 132 S. Ct. 873 (2012); and *Costco Wholesale Corp. v. Omega, S.A.*, 562 U.S. 40 (2010).

---

[1] No party's counsel authored this brief in whole or in part. Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than *amicus*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

Public Knowledge is concerned in this case with the appropriate boundaries of the exclusive rights granted by copyright, ensuring that the power of copyright law be restrained from potential overreach and abuse by better defining its reach. Within Congress, a number of complex copyright issues are being actively debated, including the scope of sound recording rights; the potential federalization of pre-1972 sound recording copyrights; statutory licenses for musical works and sound recordings; and antitrust scrutiny of several industries in the sound recording business. Radically altering the scope of rights, as the district court has below, could upend many of the existing discussions and potential for reform.

## INTRODUCTION AND SUMMARY OF ARGUMENT

If there were a New York common law public performance right in sound recordings, either of two things must be true: either it was always present (though unlitigated and unstated) within the law, or it was created in New York jurisprudence—either sometime in the past or in the district court's decision below. However, neither of these can be the case.

The opinion below presumes that the common law contains a preexisting, comprehensive set of exclusive rights that applies automatically to any form of creative expression. This is untrue: the various types of

exclusive rights granted to the owner of a copyright are not universally uniform; the common law does not recognize *ab initio* all conceivable exclusive rights that are constitutionally permissible. This interpretation of copyright's scope conflicts with the history and settled structures of copyright law, contradicts New York jurisprudence, and leads to untenable results that would, to be practicable, require legislation from the bench.

A common law public performance right in sound recordings is irreconcilable with the history of the development of copyright law. Insight into conceptions of the common law can be found in how statutes have added to its existing protections over the years, affirmatively creating new types of exclusive rights and new types of protected works not within the scope of common law protection. Common law rights, as opposed to statutorily created ones, bear a number of indicia. First, if rights were recognized at common law before they were covered by statute, Congress noted the rights as being codified or recognized, rather than created, upon enactment of the legislation. Second, common law rights, naturally developing as general principles within the law, would be more generally applicable, and subject to fewer detailed systems of statutory regulation. Extensive limitations that restricted the exercise of the right in most instances (as with section 109's limitation on the public display right), or detailed

3

statutory licenses affecting the granted right broadly (such as the statutory licenses for the digital public performance right in section 114), indicate narrowly targeted, statutorily generated protections. Common law rights, if subject to specific limitations and exceptions, are likely to have a far smaller proportion of their rights so constrained. Third, common law rights would be less likely to be granted only to particular types of creative works. Rights that apply to one type of creative work, but not others, frequently indicate an intent to create a specific policy outcome, rather than a general recognition of an exclusive right to be naturally exercised by any author of a creative work.

Nor can the public performance right in sound recordings have been created in previous decisions in New York common law; the cases cited by Respondents do not support the existence of a performance right (as opposed to a distribution or reproduction right) for sound recordings. In fact, one of the few cases directly on point demonstrates the lack of a public performance right in sound recordings.

Nor can the district court practicably create such a right below. Not only is the precedent for such a right lacking, but the creation of a public performance right would also necessarily conflict with the detailed regulatory structure of the federal rights for sound recordings. Contrary to the district

4

court's assertions, such conflicts cannot be dealt with judicially; doing so

would require legislation from the bench.

I.    A Common Law Right of Public Performance in Sound
      Recordings is Irreconcilable with the Structure and History of
      the Copyright Act

Despite a lack of precedent supporting a common law public

performance right for sound recordings, the district court assumes just such a

pre-existing right, characterizing its absence in federal law as a "carve-out"

or an "exception." *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 62 F. Supp. 3d

325, 341 (S.D.N.Y. 2014). This presumes a standard array of exclusive rights

in the common law, automatically applicable to any type of protectable

work. Such a standard array does not exist; it is not only inconsistent, but

incompatible with the conceptions of copyright law as embodied in the

history of the Copyright Act.[2] Had there been an expansive set of exclusive

rights that predated the statutory protections, the language used in their

---

[2] The history of copyright law in the United States is written primarily in statute; the first Copyright Act was passed in 1790, not long after the formation of the federal government itself. Copyright Act of 1790, ch. 15, 1 Stat. 124 (repealed 1831). While state common law protections have survived at the margins of federal preemption, the development of the Copyright Act, including the scope of exclusive rights and copyrightable works, provides valuable insight into the state of the common law and its scope as both it and the statutes evolved.

5

drafting, as well as their fundamental structures, would have been markedly different.

No Copyright Act has ever defined the scope of copyright rights as being a "traditional" bundle with carve-outs specific to particular types of works. On the contrary, the statute has provided, by positive law, certain privileges to some types of works but not others. The current Act grants, to all types of copyrighted works, the exclusionary rights "(1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106. Section106 then gives additional affirmative rights to particular types of works—for example, some types of works, but not others, have the performance right and a display right. 17 U.S.C. § 106(4)-(5). And only sound recordings have a special, limited right to "perform the copyrighted work publicly by means of a digital audio transmission." 17 U.S.C. § 106(6). The statutory history shows that different types of copyrighted works have been assigned different sets of exclusive rights since the inception of the first Copyright Act, and that this pattern continues today.

As Congress continued to add to the types of works eligible for copyright, it selected particular and limited exclusive rights for each. Many rights uncontemplated by the common law are thus created by statute—a near-infinite number could be created in the future—yet their later creation or potential creation does not mean that they sit, latent and unlitigated, within the confines of the common law.

A.    Statutory History of the DPRA Demonstrates the Creation of a New Right, not the Recognition of an Existing Common Law Right

If, as respondents claim, a public performance right for sound recordings existed prior to federal involvement, then when Congress created the digital public performance right in 1995, it would have been codifying that existing common law right, or at least some subset of it. But it did no such thing: the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA") is a highly technical, regulatory scheme that creates a new right where none had existed before, and creates a complex mechanism by which that right can be exercised. Pub. L. No. 104-39, 109 Stat. 336 (1995). As the legislative history demonstrates, prior to the 1995 action by Congress, no right existed, and Congress was well aware that it was creating a brand new right, not codifying or limiting an existing one. The Committee Reports abound with such phrases as "[the Act] *creates* a carefully crafted and narrow

performance right, applicable only to certain digital transmissions of sound recordings," "[t]he limited right *created* by this legislation reflects changed circumstances," and so on. H.R. Rep. No. 104-274, at 12, 14 (1995) (emphasis added).

The contemporaneous commentary of industry experts confirms the clear statements of legislative history. The New York Times, in an article noting that "The Digital Performance Right in Sound Recordings Act of 1995...established for the first time that the performers of a song and the copyright holder of the recording would be paid a special royalty separate from those paid to songwriters and publishers," quotes John Simson, then executive director of SoundExchange as saying "This is a brand-new right... A lot of artists are unaware of it, and we're working against 80 years of a music industry without a performance right." Ben Sisario, *Old Songs Generate New Cash for Artists*, N.Y. TIMES (Dec. 28, 2004), http://www.nytimes.com/2004/12/28/arts/music/28roya.html.

By contrast, where Congress codified a common law right, it was well aware that it was doing so: the codification of fair use was "express statutory *recognition* of the judicial doctrine that the fair use of a copyrighted work is not an infringement of copyright." H.R. Rep. No. 94-1733, at 70 (1976) (Conf. Rep.) (emphasis added). "The judicial doctrine of fair use, one of the most

important and well established limitations on the exclusive right of copyright owners, would be given express statutory *recognition* for the first time in section 107. The claim that a defendant's acts constituted a fair use rather than an infringement has been raised as a defense in innumerable copyright actions over the years, and there is ample case law recognizing the existence of the doctrine and applying it." H.R. Rep. No. 94-1476, at 65 (1976) (emphasis added).

Similarly, when Congress codified the first sale doctrine, it expressly acknowledged its common law origin: the statute "restates and confirms the principle that, where the copyright owner has transferred ownership of a particular copy or phonorecord of a work, the person to whom the copy or phonorecord is transferred is entitled to dispose of it by sale, rental, or any other means... [T]his principle... has been established by the court decisions...." H.R. Rep. No. 94-1476, at 79.

> B.    The History of the Sound Recordings Act of 1971 Shows that Exclusive Rights Are Not Naturally Bundled Together

The evolution of rights in the Copyright Act shows that public performance rights are not extended to a particular type of work until Congress decides to make it so. This is further demonstrated by the progress of federal copyright protection extended to sound recordings generally.

Sound recordings not only lacked a public performance right before the DPRA in 1995; they lacked federal copyright protection of any kind until Congress created a limited protection in the Sound Recordings Act of 1971, which set out "a limited copyright in sound recordings for the purpose of protecting against unauthorized duplication and piracy of sound recordings." S. Rep. No. 92-72, at 1 (1971). Record producers in the music industry wanted to prevent others from making and selling unauthorized physical copies of sound recordings. The Sound Recordings Act of 1971 accomplished this narrow goal by giving the copyright holder the right to prevent others from creating recorded media of the performer's recording. Sound Recordings Act of 1971 § 1 (granting the right "[t]o reproduce and distribute to the public by sale or other transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording").

Furthermore, Congress rejected the creation of a public performance right in the Sound Recordings Act. An early, rejected version of the bill would have "extended that protection to encompass a performance right so that record companies and performing artists would be compensated when their records were performed for commercial purposes." S. Rep. No. 92-72, at 3. However, granting the performance right would not have stopped the

unauthorized reproduction of sound recordings, so this right was not included in the 1971 Act.

In addition, far-reaching and detailed limitations and exceptions to the rights granted in the Sound Recordings Act indicate the lack of a uniformly assumed bundle of rights. The exclusive rights of reproduction and distribution created by the Sound Recording Act were further limited in two ways. First, the sound recording's copyright owner cannot prevent "sound-alike" recordings. Sound Recordings Act of 1971 § 1(a) ("[T]his right does not extend to the making or duplication of another sound recording that is an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording . . . ."). Anyone can take a band into the recording studio and record a sound-alike version of the Turtles' 1965 cover of *Like a Rolling Stone* by Bob Dylan. As long as royalties are paid to Dylan, the Turtles cannot prevent anyone from selling the sound-alike record. This indicates a far more restrictive scope than would seem to accrue from a natural right; whether a copyist reproduces a musical work via technological means or with a handwritten transcription, the result is still an infringing reproduction.

Second, the statute protected "reproductions made by transmitting organizations exclusively for their own use." Sound Recordings Act of 1971

11

§ 1(a). This limitation ensured that the rights of transmitting organizations, such as public television and radio stations, would remain unchanged by the Act. S. Rep. 92-72 at 8. The limitation gave wide latitude for nonprofit broadcasters to make physical copies of sound recordings, because the exception for transmitting organizations "extends to programs produced, duplicated, distributed and transmitted by or through more than one public broadcasting agency or entity so long as exclusively for educational use." S. Rep. 92-72 at 8. These specific limitations to the scope of the sound recording right indicate an intent to achieve a particular policy end, rather than a desire to recognize an existing common-law or natural right.

As demonstrated by the legislative history of the Sound Recordings Act of 1971, there was no "carve out" for public performances. The law was narrowly tailored to solve the economic harms caused by the unauthorized reproduction and sale of sound recordings. Giving the public performance right to sound recordings would not have solved this problem, so it was not granted. Congress does not "carve out" a right every time it declines to create one by statute.

C.    Public Performance Rights Were Initially Granted Only to Certain Specific Types of Works

The history of public performance rights generally further reveals that public performance is not to be assumed as a common law right. No public performance right for any type of work was recognized statutorily until 1852. *See* Copyright Act of 1790, ch. 15, 1 Stat. 124 (repealed 1831); Copyright Act of 1831, ch. 16, 4 Stat. 436 (repealed 1870). The original Copyright Act of 1790 conferred upon authors only the exclusionary rights to "print, reprint, publish, or vend" works; protected works were limited to books, maps, and charts. Copyright Act of 1790, ch. 15. Composers were first granted copyright protection for musical works in 1831, but only for printing, reprinting, publishing, and vending. Copyright Act of 1831, ch. 16.

Public performance rights were not introduced until 1852, when dramatic works were granted copyright protection for both a reproduction right and a public performance right. Act of Aug. 18, 1856, ch. 171, 11 Stat. 138 (repealed 1870) (granting, "along with the sole right to print and publish," a right "to act, perform, or represent the same, or cause it to be acted, performed, or represented, on any stage or public place…."). Notably, however, Congress declined to create a similar protection for musical works, though they were clearly recognized and given exclusive rights equivalent to reproduction and distribution. *See* Act of Aug. 18, 1856, ch. 171. It took more than forty years before musical compositions received a public

13

performance right. Act of Jan. 6, 1897, ch. 4, 29 Stat. 481 (repealed 1909).

Lectures were first given copyright protection in 1909, Copyright Act of

1909, Pub. L. No. 60-349, § 5, 35 Stat. 1075, 1076 (repealed 1947), but were

not granted a public performance right until 1952. Act of July 17, 1952, Pub.

L. No. 82-575, 66 Stat. 752 (amended 1976). Motion pictures first received

the public performance right in 1976, Copyright Act of 1976, Pub. L. No.

94-553, § 106(4), 90 Stat. 2541, 2546, even though motion pictures were

initially copyright-eligible under the federal statute as "photographs" and

later explicitly given copyright protection against unauthorized

reproduction. Act of Aug. 24, 1912, Pub. L. No. 62-303, 37 Stat. 488

(repealed 1947) (providing copyright protection to "Motion-picture

photoplays"). Literary works were first granted copyright protection in 1790,

but were not granted a public performance right as a whole until over a

century later in 1952. Act of July 17, 1952, Pub. L. No. 82-575.

   Furthermore, even when Congress created a public performance

right, it has occasionally curtailed that scope's right by limiting infringement

to for-profit performances. The Copyright Act of 1909, for instance, granted

musical works a public performance right, but only if the performance was

for profit. Copyright Act of 1909 § 1(e),. This represented a refinement of the

performance right granted to musical works just a few years before. Act of

Jan. 6, 1897, ch. 4, 29 Stat. 481 (repealed 1909). The for-profit limitation was not removed until the 1976 Act. *See* Copyright Act of 1976, Pub. L. No. 94-553, § 106(4), 90 Stat. 2541, 2546.

As demonstrated by the evolution of public performance rights among different types of protected works, the recognition of a public performance right is an expansion beyond the already existing reproduction right. If anything can be called a "traditional" right inherent in copyright law, it is the reproduction right. *See The Mikado Case*, 25 F. 183, 185 (C.C.S.D.N.Y. 1885) ("Strictly, the only invasion of a copyright consists in the multiplication of copies of the author's production without his consent. Any other use of it, such as for the purpose of public reading or recitation, is not piracy."). The evolution of copyright protection in sound recordings also supports this assertion, as does the statutory creation of the limited digital public performance right in sound recordings.

## II. New York Common Law Does Not Clearly Recognize a Public Performance Right in Sound Recordings

Not only is the creation of a public performance right in sound recordings contrary to the development of rights at the federal level, the evidence for such a right developing in the common law of New York is scant at best. Prior to the district court's November 14, 2014 decision in this

case, no New York court had recognized the existence of a common law

public performance right in sound recordings. In fact, to the extent that

courts have opined on the issue, the only question has been whether those

opinions have affirmatively denied the existence of such a right.

Two of the most prominent New York state law cases on rights in

sound recordings (and decisions upon which the district court relies) provide

no hint that the common law might encompass a right resembling the

modern public performance right. *Metropolitan Opera Ass'n, Inc., v. Wagner-*

*Nichols Recorder Corp.*, 199 Misc. 786 (Sup. Ct. N.Y. 1950), held that the

plaintiffs had an unfair competition claim against defendants, who made

unauthorized *recordings and distributions* of its opera productions by taping

television broadcasts. *Capitol Records, Inc. v. Naxos of America, Inc.*, 830 N.E.2d

250 (N.Y. 2005), was likewise about a claim of unauthorized *copying and*

*distribution* of a sound recording. Contrary to how it is characterized by the

court below, *Naxos* was not decided after "a century of judicial silence." *Flo*

*& Eddie, Inc.*, 62 F. Supp. 3d at 340. Common law copyrights *with respect to*

*reproduction* were well established when *Naxos* was decided.[3] *Naxos*'s

---

[3] While New York common law has thus previously recognized a right of
*reproduction* in sound recordings, that fact does not in itself create a *public*
*performance* right. New York case law draws a clear distinction between the
two types of exclusive rights even for works that were explicitly granted both:
"The right publicly to represent a dramatic composition for profit, and the

incremental step of deciding that state common law rights are not affected by changes to common law jurisdictions is a far cry from the judicial creation of a whole new performance right, and neither *Naxos* nor *Metropolitan Opera* provide support for such a leap.

Faced with a dearth of case authority to find a similar public performance right for sound recordings, the district court improperly assumed parallels with federal statutory law in defining the boundaries of New York's common law. See *Flo & Eddie, Inc.*, 62 F. Supp. 3d at 343 (stating that common law copyrights should be harmonized with federal statutory copyrights). Yet the court has not elucidated which "general principles of common law" create the authority to recognize performance rights in sound recordings where none existed before.

While New York's state courts have not entertained a case focused on the public performance of sound recordings, this Circuit has in fact done so. In *RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), this Court considered a case where the offending conduct consisted of broadcasting a sound recording over terrestrial radio, and found such conduct noninfringing. The district court, on motion for reconsideration, dismissed

---

right to print and publish the same composition to the exclusion of others, are entirely distinct, and the one may exist without the other." *Palmer v. De Witt*, 47 N.Y. 532, 542 (1872).

the importance of *Whiteman*, on the basis that the decision at least in part rested on a finding that any common-law copyrights were extinguished by the sale of a copy of the record, a doctrine that was subsequently overturned. *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-5784, 2014 WL 7178134, at *3 (S.D.N.Y. Dec. 12, 2014). However, the *Whiteman* court also restricted the scope of the rights to reproduction: "Copyright in any form, whether statutory or at common-law, is a monopoly; it consists only in the power to prevent others from *reproducing* the copyrighted work." *Whiteman*, 114 F.2d at 88 (emphasis added).

The Court further noted that "even if Whiteman's 'common-law property' in his performances survived the sale of the records on which they were inscribed, it would be very difficult to see how he, or a fortiori the maker of the records, could impose valid restrictions upon their resale." *Whiteman*, 114 F.2d at 89. That is to say, even if the plaintiffs' common law rights lasted beyond the sale of a record, those rights did not include a right to prevent the complained-of activity: public performance. Notably, no court decision has contradicted *Whiteman* on this point.

The case law makes clear that there is no basis in New York common law for a finding of a public performance rights in sound recordings.

III.    Without Engaging in Judicial Legislation, Courts Cannot Force Into Place a Common Law Regime That Is Consonant With Existing Law

    A.    The Highly Specific, Regulatory Nature of the Digital Performance Rights Act Demonstrates Its Non-Common Law Status

To impose a public performance right would require courts to engage in substantial, detailed rulemaking. With the DPRA, Congress created a new right while simultaneously subjecting that right to a statutory licensing system with royalty rates established by the Copyright Board. Such a complex system would be at odds with any purported broad right in common law, yet neither the statute nor its legislative history indicate the awareness or intent that this was the case. Far more likely is the fact that Congress was creating a new, limited right, following the precedent it set when it framed the public performance rights of television programming in the 1976 Act.

The 1976 Act brought secondary transmissions by cable systems of television broadcasts within the scope of copyright law while simultaneously creating a statutory license for the newly-created right, administered by the Register of Copyrights. *See* 17 U.S.C. § 111. Faced with Supreme Court decisions clearly explaining why broadcasters lacked the right to control secondary transmissions (*Fortnightly Corp. v. United Artists Television, Inc.*, 392

U.S. 390 (1968); *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394 (1974)), Congress responded in the 1976 Act by creating a narrow new right, which existed from that time forward.

Similarly, in the DPRA, faced with a body of law that clearly did not grant owners of sound recordings with public performance rights, Congress responded by creating a narrow new right applicable only to digital transmissions. Congress was responding to a perceived gap in copyright protection—and was criticized by some in the music community as not going far enough in creating new rights. *See, e.g.*, Les Watkins, Note, *The Digital Performance Right in Sound Recordings Act of 1995: Delicate Negotiations, Inadequate Protection*, 20 COLUM.-VLA J.L. & ARTS 323 (1996). But under Respondent's theories, when Congress enacted the DPRA, it was in fact severely limiting the rights of post-1972 sound recording copyright holders— but it, the music community, analog and digital broadcasters, academics and copyright experts of all kinds somehow missed this. This is not only implausible, it overlooks the purpose of Congress's action: to grant sound recording copyright holders a right they had never had before.

      B.     Other, Later-Recognized Types of Intellectual Property Clearly Do Not Create or Indicate Parallel Common Law Rights

The existence of a statutory right does not imply or create the existence of a common law right that precedes that statute. To find otherwise would force courts to arbitrarily select which classes of works upon which to build new intellectual property rights. Similarly to how courts cannot assume that common law rights for the digital public performance of sound recordings exists for pre-1972 works simply because Congress, in 1995, created that right for post-1972 works, courts cannot assume that the "design of a vessel hull, deck, or combination of a hull and deck, including a plug or mold" is subject to common law protection prior to October 28, 1998, merely because Congress passed the Vessel Hull Design Protection Act (VHDPA) in 1998. *See* 17 U.S.C. § 1301; Vessel Hull Design Protection Act, 105 Pub. L. No. 304, § 1301, 112 Stat. 2860, 2905 (1998) (effective Oct. 28, 1998); *id.* § 1332 ("Protection under this chapter shall not be available for any design that has been made public under section 1310(b) before the effective date of this chapter.").

Similarly, when Congress enacted the Semiconductor Chip Protection Act of 1984 (SCPA), Pub. L. No. 98–620, sec. 302, 98 Stat. 3335, 3347, it was not codifying or federalizing an existing common law right, but creating

21

a new one.[4] H.R. Rep. No. 98-781, at 4 (1984) ("Current law needs to be changed to help innovating firms combat unfair chip copying."). Yet under the theory advanced by respondents, *sui generis* statutory rights, like the 1995 digital public performance right, could be taken as evidence for the preexistence of broader common law rights. This absurd result would be bad law and worse policy. The common law does not include every imaginable right by default, with legislation serving only to limit those rights.

C.    Later-Recognized Exclusive Rights, Such as the Display Right, Also Do Not Create Parallel Common Law Rights

Even within the scope of the Copyright Act, the history of the display right demonstrates the lack of a standard, presumed set of rights. The right to prohibit the public display of copyrighted works was newly created by the 1976 Act. *See* Copyright Act of 1976, Pub. L. No. 94-553, § 106(5), 90 Stat. 2541, 2546; 5 PATRY ON COPYRIGHT § 15:2. This right exists only in statutory law. *See* 1-2 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 2.02 n.9 (Matthew Bender, Rev. Ed.) ("Common law copyright does not appear to include a 'display' right."). Its presence in the 1976 Act, and its absence from common law precedent, gainsays the district

---

[4] The VHDPA and the SCPA both contain a common law savings clause— but a savings clause does not create, but merely preserves, any common law rights that may exist. It is not evidence that any such rights do in fact exist.

court's assumption that New York courts would provide common-law copyright owners with every possible type of protection available. *Flo & Eddie, Inc.*, 62 F. Supp. 3d at 341 ("No New York case recognizing a common law copyright in sound recordings has so much as suggested that right was in some way circumscribed, or that the bundle of rights appurtenant to that copyright was less than the bundle of rights accorded to plays and musical compositions."). The court apparently places the burden of proof on the defendant to prove that New York would not grant the public performance right to sound recordings. Under this logic, the New York common law should also recognize a display right—a right not contemplated as such until the 1976 Act was created, and therefore lacking case law to prove its nonexistence.

The specifically conscribed nature of the display right in the 1976 Act further shows that rights cannot be assumed to apply in bulk in the common law. The display right, as written within section 106, would clearly prohibit a multitude of activities that would clearly be noninfringing under the common law; the display of paintings in public museums, posters in shop windows, or books in a library or a bookstore, all would have been prohibited if we assumed that a display right naturally accompanied a set of common law rights that were coterminous with the federal statutory rights.

Instead, these everyday activities are only allowed through the specific operation of section 109(c), which creates limitations on the display right that were unarticulated in common law first sale doctrines. 17 U.S.C. § 109(c). Section 109(c), which removes the applicability of the display right in the vast majority of occasions upon which a work is publicly displayed, is so essential to the operation of the law that it strains credulity that an exclusive right of display would have been present in the common law at any time, unless a clearly articulated limitation like that in 109(c) had existed.

IV.     The Presumption that Appropriate Limitations to a Common Law Right Could be Crafted to Match the Federal Right Requires Judicial Lawmaking

The district court notes, and dismisses, the fact that a state common law right in the public performance of sound recordings would be broader than the federal right. *Flo & Eddie, Inc.*, 62 F. Supp. 3d at 343-44Despite the fact that this would upset the carefully crafted federal statutory regime, the court asserts that courts like it and those of the State of New York could create a parallel system of exceptions, limitations, and statutory licenses to match the federal one.

While courts are certainly free to adopt and develop limitations and exceptions to exclusive rights,[5] it is far less likely that they can craft the equivalent of statutory licenses such as those in the DPRA. This constitutionally suspect viewpoint would have the courts usurp the role of the legislature by transforming the common law from a system of precedent and deliberate, incremental change to one of wholesale judicial lawmaking. Preemption of the legislature is hardly a straightforward application of judicial power. The district court's reference to the ASCAP/BMI consent decree is inapt; that consent decree is the result of a law enforcement action by the Department of Justice, applying antitrust law to a market prone to anticompetitive behavior. *Flo & Eddie, Inc.*, 62 F. Supp. 3d at 344It is not the result of the United States District Court for the Southern District of New York *sua sponte* imposing its policy views with respect to intellectual property on the music industry. Yet when the court below suggests that it is "capable of fashioning appropriate relief - and even of recognizing only such public performance rights in pre-1972 sound recordings as conform to rights statutorily conferred on holders of statutory copyright in post-1972 recordings," *Id.*, it is ascribing to itself the ability to legislate from the bench.

---

[5] *See, e.g., EMI Records, Ltd. v. Premise Media Corp.*, 2008 WL 5027245, 89 U.S.P.Q.2d 1593 (N.Y. Sup. Ct. Aug. 08, 2008) (applying and finding fair use in the context of a pre-1972 sound recording).

The absence of common law evidence on whether a public performance right exists for sound recordings in New York is, in this particular case, evidence of its absence. To hold otherwise requires this Court to believe that the broadcast industry has operating unlawfully since its inception and that the music industry simply chose not to pursue an obvious source of revenue, despite its repeated statements that it would like to do so. Because the decision of the court below requires this Court to abandon both common law and common sense, it must be rejected.

## CONCLUSION

It is tempting to think that copyrights are, and have always been, uniform in both the types of works that they protect and in the particular rights that they grant to authors. However appealing this simplicity may be, it is belied by the history of copyright law in the United States. Traditional conceptions of copyright lacked many of the exclusive rights now recognized in federal statutes; nor did the creation of such rights by statute automatically create them within the common law. The absence of a public performance right in sound recordings at New York common law cannot be created or inferred by its limited presence in federal statute, nor does the common law of New York support its creation now. For these reasons, we believe that the

decision of the district court with respect to the public performance right should be reversed.

Dated: August 5, 2015                                    By: /s/ Sherwin Siy

                                                         Sherwin Siy
                                                         John Bergmayer
                                                         Raza Panjwani
                                                         PUBLIC KNOWLEDGE
                                                         1818 N St. NW
                                                         Suite 410
                                                         Washington, DC 20036

                                                         *Attorneys for Amicus Curiae*
                                                         *Public Knowledge*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1. This Brief of *Amicus Curiae* Public Knowledge In Support of Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,872 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011, the word processing system used to prepare the brief, in 14 point Baskerville font.

Dated: August 5, 2015                                    By: /s/ Sherwin Siy

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N St. NW
Suite 410
Washington, DC 20036

*Attorney for Amicus Curiae*
*Public Knowledge*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of August, 2015, a true and correct copy of the foregoing Brief of *Amicus Curiae* Public Knowledge in Support of Appellant was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated: August 5, 2015                         By: /s/ Sherwin Siy

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N St. NW
Suite 410
Washington, DC 20036

*Attorney for Amicus Curiae*
*Public Knowledge*