# 15-1164-cv

## United States Court of Appeals

*for the*

## Second Circuit

FLO & EDDIE, INC., a California Corporation,
individually and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

— v. —

SIRIUS XM RADIO, INC., a Delaware Corporation,

*Defendant-Appellant,*

DOES, 1 THROUGH 10,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF LAW PROFESSORS GARY PULSINELLI, JULIE ROSS, AND PETER JASZI AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT SIRIUS XM RADIO, INC.**

BRANDON BUTLER
American University Washington College of Law
4801 Massachusetts Avenue, N.W.
Washington, DC 20016
(202) 274-4165
bbutler@wcl.american.edu

*Counsel of Record for Amici Curiae Professors Gary Pulsinelli, University of Tennessee College of Law; Julie Ross, Georgetown Law Center; and Peter Jaszi, American University Washington College of Law*

# TABLE OF CONTENTS

Table of Contents.........................................................................i

Table of Authorities ..................................................................ii

Interest of *Amici Curiae* ..........................................................1

Summary Of Argument ..............................................................2

Argument ...................................................................................4

    I.  Conflict Preemption Analysis of State Law Performance Rights in Pre-1972 Sound Recordings Is Required Under the Supremacy Clause of the U.S. Constitution Despite the Saving Clause for Pre-1972 Sound Recordings in 17 U.S.C. § 301(c)...................................4

    II. State-Law Digital Performance Rights Conflict with Congress's Goal of National Uniformity in the Copyright System.................10

        A.  The History of Copyright Law Demonstrates Congress's Strong Desire for National Uniformity. ....................................10

        B.  A State-Law Digital Performance Right Conflicts with Congress's Strong Desire for National Uniformity. ................13

        C.  Because a State-Law Digital Performance Right Conflicts with Congress's Strong Desire for National Uniformity, It Should Be Preempted under the Supremacy Clause. ...........................14

    III. State-Law Digital Performance Rights Conflict with Congress's Carefully Balanced Restrictions on and Regulation of the Federal Digital Performance Right................................................................22

        A.  The Section 114 Compulsory License Reflects Congress's Comprehensive Balancing of Competing Interests in Enacting a Digital Public Performance Right.............................................22

        B.  Because a State-Law Digital Performance Right Conflicts with the Federal Compulsory License for Digital Audio Transmissions, It Should Be Preempted Under the Supremacy Clause. .......................................................................................31

Conclusion ................................................................................36

# TABLE OF AUTHORITIES

## CASES

*Arizona v. United States*,
132 S. Ct. 2492 (2012) ..................................................................... 34, 35

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989) ................................................................................ 12

*Bonneville International Corp. v. Peters*,
347 F.3d 485 (3d Cir. 2003) .................................................................... 28

*Capital Cities Cable, Inc. v. Crisp*,
467 U.S. 691 (1984) ................................................................ 17, 18, 32, 33

*Capitol Records, Inc. v. Mercury Records Corp.*,
221 F.2d 657, 667 (2d Cir. 1955) (Hand, J., dissenting) ...................... 12

*De Canas v. Bica*,
424 U.S. 351, 356 (1976) ......................................................................... 35

*Geier v. American Honda Motor Co.*,
529 U.S. 861 (2000) ....................................................................... passim

*Goldstein v. California*,
412 U.S. 546 (1973) ....................................................................... passim

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ............................................................................ 6, 18

*United States v. Locke*,
529 U.S. 89 (2000) ...................................................................................7

## STATUTES

15 U.S.C. § 1397(k) (1988) ...............................................................................7

17 U.S.C. § 106 (2012) ....................................................................................10

17 U.S.C. § 114 (2012) ............................................................................ passim

17 U.S.C. § 301 (2012) ............................................................................ passim

17 U.S.C. § 801(b)(1) (2012) ...........................................................................27

Digital Performance Rights in Sound Recordings Act, Pub. L. No. 104-
39, 109 Stat. 336 (1995) .................................................................... 10, 22

N.C. GEN. STAT. § 66-28 (2010) ....................................................................13

S.C. CODE ANN. § 39-3-510 (2011) ...............................................................13

U.S. CONST. art. I, § 8, cl. 8 .................................................................. 10, 15

U.S. CONST. art. VI, cl. 2 ............................................................................4

## LEGISLATIVE MATERIALS

H.R. REP. NO. 104-274 at 14 (1995) .................................................25, 27, 30

H.R. REP. NO. 105-796 (1998) ...................................................................28

H.R. REP. NO. 94-1476 (1976) ....................................................................11

S. REP. NO. 104-128 (1995) ...............................................................passim

S. REP. NO. 92-72 (1971) ..........................................................................17

## OTHER AUTHORITIES

1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT
§ 1.01[B][3][a].................................................................................15

Brief and Special Appendix for Defendant-Appellant Sirius XM Radio,
Inc., July 29, 2015 ...................................................................... 4, 13

ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND
POLICIES §§ 5.1–5.2 (4th ed. 2011) ......................................... 4, 5, 6

Gary Pulsinelli, *Happy Together? The Uneasy Coexistence of Federal and State
Law Protection for Sound Recordings*, 82 TENN. LAW REV. 167 (2015) ......4

Harry G. Henn, THE COMPULSORY LICENSE PROVISIONS OF THE U.S.
COPYRIGHT LAW (General Revision of the Copyright Law, Study No.
5, Senate Subcomm. on the Judiciary) (Comm. Print 1956) ...............23

Irah Donner, *The Copyright Clause of the U.S. Constitution: Why Did the
Framers Include It with Unanimous Approval?*, 36 AM. J. LEGAL HIST. 361,
373 (1992) ...............................................................................10

Julie L. Ross, *[Un]Happy Together: Why the Supremacy Clause Preempts State
Law Digital Performance Rights in Radio-Like Streaming of Pre-1972 Sound
Recordings*, — J. COPYRIGHT SOC. U.S.A. — (forthcoming Summer
2015) .......................................................................................4

REGISTER OF COPYRIGHTS, FEDERAL PROTECTION FOR PRE-1972
SOUND RECORDINGS (2011) ...................................................16

ROBERT P. MERGES ET AL., INTELLECTUAL PROPERTY IN THE NEW
TECHNOLOGICAL AGE 432 (6th ed. 2012) ..........................................10

THE FEDERALIST NO. 43 (James Madison) (B. Wright ed. 1961)............12

## RULES

Fed. R. App. P. 28(i)...................................................................................4

Fed. R. App. P. 29(c)(5)............................................................................1

Local Rule 29.1.........................................................................................1

# INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* seek leave of the Court to file this brief pursuant to Federal Rule of Appellate Procedure 29(a).

*Amici curiae* are law professors who teach and write about intellectual property law, including copyright law. We have no personal stake in the outcome of this case. Our interest is in seeing that the Court consider the important federal question of whether state laws providing public performance rights to owners of pre-1972 sound recordings necessarily conflict with federal copyright law and are preempted under the Supremacy Clause, Article VI, cl. 2, of the United States Constitution. In particular, we seek to demonstrate for the Court how the District Court's interpretation of New York's common copyright law creates an obstacle to the accomplishment and execution of the full purposes and objectives of Congress expressed in the federal copyright law and its legislative history. The Supremacy Clause requires that these conflicts be

---

[1] Pursuant to Fed. R. App. P. 29(c)(5) and Local Rule 29.1, counsel for the parties have not authored any part of this brief; no party or a party's counsel contributed money for the brief; and no one other than *amici* and its members and counsel have contributed money for this brief.

1

resolved in favor of the federal law, and thus the District Court's holding should not stand.

## SUMMARY OF ARGUMENT

In 1995, federal copyright law recognized a limited digital performance right that allows owners of sound recordings to receive royalties when their works are transmitted via satellite radio or the Internet. However, this federal protection does not extend to pre-1972 sound recordings, which are excluded from the federal copyright system and instead left to the protections of state law. Although no state law explicitly provides any type of transmission right for such recordings, the District Court in this case held that the Plaintiff-Appellee had such a right under New York's common law of copyright.

However, such an interpretation of New York law should have been preempted under the conflict preemption principles of the Supremacy Clause of the U.S. Constitution. Although a savings clause in § 301 of the Copyright Act leaves pre-1972 sound recordings outside the Copyright Act's explicit preemption provision, state laws purporting to grant digital public performance rights to owners of those recordings

2

may nevertheless be preempted under ordinary conflict preemption principles for two related reasons. First, such protection would interfere with the fundamental principle of national uniformity that underlies the Copyright Act. Second, such protection is inconsistent with the carefully delineated system of exclusions and statutory licenses that Congress put in place when it created the federal digital performance right.

# ARGUMENT[2]

**I. CONFLICT PREEMPTION ANALYSIS OF STATE LAW PERFORMANCE RIGHTS IN PRE-1972 SOUND RECORDINGS IS REQUIRED UNDER THE SUPREMACY CLAUSE OF THE U.S. CONSTITUTION DESPITE THE SAVING CLAUSE FOR PRE-1972 SOUND RECORDINGS IN 17 U.S.C. § 301(C).[3]**

In our federal system of government, the Constitution's Supremacy Clause[4] dictates that the laws of the federal government take precedence over the laws of the states.[5] Pursuant to the Supremacy Clause, state laws that conflict with federal laws are invalid.[6]

---

[2] Pursuant to Fed. R. App. P. 28(i), *amici* hereby incorporate the Statement of the Facts in its entirety from the Brief and Special Appendix for Defendant-Appellant Sirius XM Radio, Inc., July 29, 2015.

[3] The arguments in this Brief derive substantially from two articles by certain of the *amici*: Gary Pulsinelli, *Happy Together? The Uneasy Coexistence of Federal and State Law Protection for Sound Recordings*, 82 TENN. LAW REV. 167 (2015)*, available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2593182; and Julie L. Ross, *[Un]Happy Together: Why the Supremacy Clause Preempts State Law Digital Performance Rights in Radio-Like Streaming of Pre-1972 Sound Recordings*, — J. COPYRIGHT SOC. U.S.A. — (forthcoming Summer 2015)*, available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2595794. The articles explore the presented preemption arguments in more depth.

[4] U.S. CONST. art. VI, cl. 2.

[5] *See generally* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES §§ 5.1–5.2 (4th ed. 2011).

[6] *See* CHEMERINSKY, *supra* note 5, § 5.1.

4

Current Supreme Court doctrine analyzes federal preemption of state laws using two broad categories: express preemption and implied preemption.[7] First, the Court looks to see if the federal statutory scheme contains a provision that expressly states that the federal enactment is meant to preempt state law in the area.[8] If so, then the Court analyzes whether the state law falls within the scope of the preemption provision.[9]

Section 301(a) of the Copyright Act is such a provision, preempting essentially all state copyright laws.[10] However, § 301(c) specifically exempts pre-1972 sound recordings from the strictures of § 301(a).[11] The recordings at issue in this case all fall within the § 301(c) exception to preemption. Thus, a digital performance right under New York common copyright law would not be expressly preempted. However, this conclusion is only the first step in determining whether the state

---

[7]   *See id.* § 5.2.1.
[8]   *See id.* § 5.2.2.
[9]   *See id.*
[10]  17 U.S.C. § 301(a) (2012).
[11]  *Id.* § 301(c).

5

laws at issue would be preempted by federal copyright law, not the end of it.

If the federal law does not contain an express preemption provision, or the challenged state provision does not fall within it, the state law may nevertheless be impliedly preempted.[12] One type of implied preemption is conflict preemption.[13] A particular state law may so conflict with some part of the federal law that the two cannot coexist.[14] In that case, the state law is invalidated under the Supremacy Clause. The relevant standard the Supreme Court applies is whether the state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[15]

Although it was dealing with a very different federal statutory scheme and state law, the Supreme Court's analysis in *Geier v. American Honda Motor Co.*[16] is particularly relevant to the preemption analysis in the

---

[12]  *See* CHEMERINSKY, *supra* note 5, § 5.2.1.

[13]  *See id.* §§ 5.2.4–5.2.5.

[14]  *See id.*

[15]  *Goldstein v. California*, 412 U.S. 546, 561 (1973) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[16]  529 U.S. 861 (2000).

6

present case. In *Geier*, the Court analyzed a statutory scheme for automobile safety requirements that contained both an express preemption provision and a saving clause.[17] The Court concluded that the saving clause foreclosed any express preemption,[18] but "the saving clause (like the express pre-emption provision) does *not* bar the ordinary working of conflict pre-emption principles."[19]

The Court then went further, stating "[n]either do we believe that the pre-emption provision, the saving provision, or both together, create some kind of 'special burden' beyond that inherent in ordinary pre-emption principles—which 'special burden' would specially disfavor pre-emption here."[20] It also recognized that "this Court has repeatedly 'decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'"[21] Just as the saving clause in *Geier* did not preclude the application of ordinary conflict preemption principles, § 301(c)  does not foreclose a conflict

---

[17]  *Id.* at 867–68 (quoting 15 U.S.C. § 1397(k) (1988)).

[18]  *Id.*

[19]  *Id.* at 869 (emphasis in original).

[20]  *Id.* at 870; *see also id.* at 870–74 (further exploring the problems that would be created if a special burden applied in this situation).

[21]  *Id.* at 870 (quoting *United States v. Locke*, 529 U.S. 89, 106–07 (2000)).

7

preemption analysis, or even create a "special burden."[22] In fact, the Court tells us we should read such a saving clause narrowly.[23]

In *Goldstein v. California*, the Court addressed preemption in the context of pre-1972 sound recordings, considering the validity of a California criminal law that implicated only the rights of copying and distribution.[24] The case came to the Court in 1973, after sound recordings had been brought into the Copyright Act on a prospective basis, but before the 1976 Copyright Act added the express preemption provisions.[25] The Court upheld the California law as a valid exercise of the state's power.[26]

The Court expressly analyzed the issue of conflict preemption, framing it as "whether, in actual operation, the exercise of the power to grant copyrights by some States will prejudice the interests of other

---

[22] *Geier*, 529 U.S. at 870–71.

[23] *See id.* at 870 (stating "this Court has repeatedly 'decline[d] to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'" (quoting *United States v. Locke,* 529 U.S. at 106–07)).

[24] 412 U.S. at 548–49.

[25] This timing makes modern interpretation of the case somewhat problematic, as the law has changed significantly in the interim.

[26] *Goldstein*, 412 U.S. at 571.

8

States."[27] Because the law placed no burden on the non-protecting states, it did not create "a need for uniformity such as that which may apply to the regulation of interstate shipments" or "prejudicial conflicts."[28] Absent such issues, the Court held, the California statute was not preempted.[29]

In the case at bar, a state-law digital performance right "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Specifically, the "full purposes and objectives" of federal copyright law include a fundamental commitment to national uniformity with only very narrow exceptions, as revealed in both the history of copyright law and the specific structure of the present law. In addition, enforcement of state law digital public performance rights in pre-1972 sound recordings will necessarily conflict with Congress's careful balancing of interests in establishing the federal statutory license

---

[27]  *Id.*
[28]  *Id.* at 559.
[29]  *Id.* at 560.

for digital audio transmissions in the 1995 Digital Performance Rights in Sound Recordings Act ("DPRA").[30]

## II. STATE-LAW DIGITAL PERFORMANCE RIGHTS CONFLICT WITH CONGRESS'S GOAL OF NATIONAL UNIFORMITY IN THE COPYRIGHT SYSTEM.

### A. The History of Copyright Law Demonstrates Congress's Strong Desire for National Uniformity.

Federal copyright law in the United States has long strived for uniformity. Prior to 1790, most states had their own copyright laws.[31] However, the different laws in each state created logistical difficulties for authors,[32] and the laws sometimes conflicted with each other.[33] To address these problems,[34] the Framers drafted copyright protection into the Constitution.[35] Congress enacted the first Copyright Act in 1790,[36]

---

[30] Pub. L. No. 104-39, 109 Stat. 336 (1995) (codified as amended at 17 U.S.C. §§ 106, 114 (2012).

[31] *See* Irah Donner, *The Copyright Clause of the U.S. Constitution: Why Did the Framers Include It with Unanimous Approval?*, 36 AM. J. LEGAL HIST. 361, 373 (1992).

[32] *See id.* at 374.

[33] *See id.* at 374, 376–77; ROBERT P. MERGES ET AL., INTELLECTUAL PROPERTY IN THE NEW TECHNOLOGICAL AGE 432 (6th ed. 2012).

[34] *See* MERGES ET AL., *supra* note 33, at 432.

[35] U.S. CONST. art. I, § 8, cl. 8.

[36] *See* MERGES ET AL., *supra* note 33, at 432.

then made major revisions in 1909 and 1976, each time moving further in the direction of national uniformity.

This desire for national uniformity provided the impetus for the express preemption provision found in § 301(a) of the 1976 Copyright Act, as the House Report accompanying the 1976 Act makes abundantly clear:

> One of the fundamental purposes behind the copyright clause of the Constitution, as shown in Madison's comments in *The Federalist*, was to promote national uniformity and to avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in the separate courts of the various States. Today, when the methods for dissemination of an author's work are incomparably broader and faster than they were in 1789, national uniformity in copyright protection is even more essential than it was then to carry out the constitutional intent.[37]

Courts have also repeatedly recognized national uniformity as a crucial part of a federal copyright law. Judge Learned Hand of this Court made this point emphatically in dissent, quoting a passage from James Madison in *The Federalist*:

> Uniformity was one of the principal interests to be gained by devolving upon the Nation the regulation of [copyright law]. . . . [I]n the 43rd number of the Federalist, Madison made this short comment on the Clause, 'The States cannot separately make

---

[37]  H.R. REP. NO. 94-1476, at 129 (1976).

effectual provision for either of these cases' [patents or copyrights], 'and most of them have anticipated the decision of this point, by laws passed at the instance of Congress.' He assumed that it was obvious that the states could not make any such 'effectual provision,' and so it was; for, although a state may prohibit the importation of pirated 'works' published elsewhere, and even confiscate them, that has again and again proved an ineffective protection . . . .[38]

The Supreme Court subsequently made this same point very explicitly in *Goldstein v. California*,[39] stating "[t]he objective of the Copyright Clause was clearly to facilitate the granting of rights national in scope"[40] and quoting the same passage from Madison.[41] Later, in *Bonito Boats v. Thunder Craft Boats*, the Court stated: "One of the fundamental purposes behind the Patent and Copyright Clauses of the Constitution was to promote national uniformity in the realm of intellectual property."[42]

---

[38] *Capitol Records v. Mercury Records Corp.*, 221 F.2d 657, 667 (2d Cir. 1955) (Hand, J., dissenting) (footnote omitted) (quoting THE FEDERALIST NO. 43, at 309 (James Madison) (B. Wright ed. 1961)).

[39] 412 U.S. 546 (1973).

[40] *Id.* at 555.

[41] *Id.* at 555–56 (quoting THE FEDERALIST NO. 43, at 309).

[42] 489 U.S. 141, 162 (1989).

## B. A State-Law Digital Performance Right Conflicts with Congress's Strong Desire for National Uniformity.

A state-law digital performance right presents a conflict with the Copyright Act's fundamental purpose of national uniformity that far exceeds the minimal conflict presented by state law duplication and distribution rights addressed in *Goldstein*. The District Court's interpretation of New York common copyright law applies only in New York. Any digital broadcasts of pre-1972 sound recordings that are received in New York, regardless of their point of origin—including broadcasts that are legal where made[43]—will be infringing in New York. However, the main sources of digital performances—satellite radio and the Internet—are inherently unlimited by state boundaries.

Defendant-Appellant discusses the need for uniformity in copyright protections affecting interstate transactions in detail.[44] To summarize, the benefits of a uniform, nation-wide, efficient copyright system would be nullified if digital broadcasters were forced to distinguish between

---

[43] Notably, both North and South Carolina have statutes that explicitly *deny* broadcast rights for pre-1972 sound recordings. *See* N.C. GEN. STAT. § 66-28 (2010); S.C. CODE ANN. § 39-3-510 (2011).

[44] Brief and Special Appendix for Defendant-Appellant Sirius XM Radio, Inc., July 29, 2015, at 43–45, 46–48.

13

individual sound recordings that are streamed over their services to (1) ascertain the date of recording, (2) identify the owner of that recording; (3) identify all performers on the recording who might assert performance rights in it; (4) evaluate whether the laws of any of the fifty-plus states or U.S. territories provide performance rights to the owner and/or performers on the recording; (5) figure out which performances to which listeners were covered under that law; and (6) negotiate a license to stream the particular work for a fee that is acceptable to both the streaming service and the owners/performers.[45]

### C. Because a State-Law Digital Performance Right Conflicts with Congress's Strong Desire for National Uniformity, It Should Be Preempted under the Supremacy Clause.

Because a state-law digital performance right destroys national copyright uniformity and thus "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"[46] as expressed in the Copyright Act, this Court should hold that conflict preemption bars the establishment of any such right.

---

[45] *Cf. Geier*, 529 U.S. at 881 (discussing importance of predictability and uniformity in a nation-wide standard of care).

[46] *Goldstein*, 412 U.S. at 561.

14

The structure of the Supreme Court's analysis in *Geier* applies nicely to assessing the availability of a digital performance right under state law. First, the § 301(a) express preemption provision strongly expresses an intent for national uniformity.[47] The Court in *Geier* observed that "the pre-emption provision itself reflects a desire to subject the industry to a single, uniform set of federal safety standards."[48] Having found that this provision did not bar conflict preemption, the Court considered the scope and purpose of the federal laws at issue and concluded that the suit was preempted because it would conflict with that purpose, including the goal of national uniformity.[49] In fact, the case for Copyright Act preemption is more persuasive than that in *Geier*, because the need for national uniformity is rooted in the Constitution itself, in the Intellectual Property Clause.[50]

Second, just as the existence of a saving clause in the federal statute at issue in *Geier* did not negate the need for uniform implementation of

---

[47] *See* 17 U.S.C. § 301(a) (2012).

[48] *Geier*, 529 U.S. at 871.

[49] *Id.* at 874–86; *see also* 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 1.01[B][3][a] (suggesting that the *Geier* analysis would apply to copyright law).

[50] U.S. CONST. art. I, § 8, cl. 8.

15

federal safety standards or prevent the application of ordinary preemption principles,[51] the exception in § 301(c) for state law as applied to pre-1972 sound recordings does not negate the strong interest in uniformity underlying the 1976 Act or prevent the application of ordinary preemption principles. At the time the exception was drafted, the only relevant state laws in existence were limited to sound recording piracy,[52] involving the copying and distribution rights. Furthermore, the federal Copyright Act itself at the time explicitly *denied* all public performance rights in sound recordings.[53] The narrow reading of the § 301(c) exception demanded by *Geier*[54] thus suggests limiting its scope

---

[51]  529 U.S. at 868–74.

[52]  *See* REGISTER OF COPYRIGHTS, FEDERAL PROTECTION FOR PRE-1972 SOUND RECORDINGS 20–21 (2011), *available at* http://www.copyright.gov/docs/sound/pre-72-report.pdf (describing the state laws prior to *Goldstein* as "laws making it a criminal offense to duplicate and distribute sound recordings, without authorization, for commercial purposes"); *id.* at 44 (noting that "[i]n general, state law does not appear to recognize a performance right in sound recordings.").

[53]  17 U.S.C. § 114(a) (1976).

[54]  *See Geier*, 529 U.S. at 870.

16

to the type of anti-piracy rights Congress knew existed in many states at the time.[55]

Furthermore, the degree of conflict between the goal of uniformity underlying the Copyright Act and a state-law digital performance right is much greater than that for the traditional state rights of copying and distribution. Copying and distribution are relatively localized activities. In contrast, digital broadcasting and webcasting are, by their very natures, immediately national in scope. They are therefore particularly suitable for federal regulation and, conversely, particularly unsuitable for state regulation.

Also on point is *Capital Cities Cable, Inc. v. Crisp*.[56] In *Capital Cities*, the Supreme Court considered federal preemption of Oklahoma's prohibition against alcohol advertising.[57] The specific issue was whether federal law preempted the Oklahoma law as it applied to alcohol

---

[55] *E.g.*, S. REP. NO. 92-72, at 3–4 (1971) (discussing "widespread unauthorized reproduction" of sound recordings and noting statutes enacted in New York and California to suppress record piracy).

[56] 467 U.S. 691 (1984).

[57] *Id.* at 694 & n.1.

advertising carried on cable television.[58] The Court first found that the FCC's comprehensive regulations pertaining to cable television preempted state regulations,[59] noting that Oklahoma's ban "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of the federal regulatory scheme."[60] The Court then went on to apply the same standard to preemption under the Copyright Act.[61] It noted that Congress, in the 1976 Act, had implemented special rules for cable television, "to facilitate the cable industry's ability to distribute broadcast programming on a national basis,"[62] Oklahoma's advertising ban interfered with this purpose and was therefore preempted.[63]

Moreover, although it recognizes the state's power to regulate pre-1972 sound recordings, *Goldstein* only enforces the conclusion that any state-law performance right should be preempted. While protecting works of "local importance" may be accomplished when the only

---

[58]  *Id.* at 696.

[59]  *Id.* at 698–709.

[60]  *Id.* at 706 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[61]  *Id.* at 709–11.

[62]  *Id.* at 709.

[63]  *Id.* at 716.

18

activities prohibited are copying and distribution,[64] the same is not true when the activities prohibited involve transmissions that are unavoidably national in scope. Limiting the state-law digital performance right protections to works of "local importance" to New Yorkers is simply impossible when the targeted technologies are satellite radio and webcasts. Similarly, a Sirius XM broadcast or webcast of a pre-1972 sound recording may be non-infringing where made and also in most places where it is received, but it will be infringing in New York. New York's state-law digital performance right would thus "prejudice the interests of other States," in a way that the California provisions in *Goldstein* did not.[65] Indeed, transmissions of pre-1972 sound recordings are more comparable to the "interstate shipments" that the Court suggested needed uniform regulation than they are to copies of sound recordings of "local interest."[66] In these situations, the federal interest is much stronger than it was in *Goldstein*, and thus state-law digital performance rights should be preempted for conflicting with the national uniformity of the copyright system.

---

[64] *Goldstein*, 412 U.S. at 557–60; *accord id.* at 576 (Marshall, J., dissenting).
[65] *Id.* at 558.
[66] *See id.*

19

These points also highlight the significance of another statement the Court made in *Goldstein*:

> To interpret accurately Congress' intended purpose in passing the 1909 Act and the meaning of the House Report petitioners cite, we must remember that our modern technology differs greatly from that which existed in 1909. The Act and the report should not be read as if they were written today, for to do so would inevitably distort their intended meaning; rather, we must read them against the background of 1909, in which they were written.[67]

Technology has changed even more dramatically between the time of the 1976 Act and today than it did between the 1909 Act and *Goldstein* in 1973. In 1976, Congress was willing to preserve state law protection for pre-1972 sound recordings via § 301(c),[68] which at the time meant provisions like California's that prevented localized copying and distribution. Given the absence of any state law performance rights in 1976 and the broadcast industry practice of freely performing sound recordings without permission from or payment to their owners, Congress could not have foreseen or necessarily intended to permit state laws limiting the types of digital performance uses reached by the

---

[67] *Id.* at 564.
[68] 17 U.S.C. § 301(c) (2012).

District Court's ruling. Thus, the § 301(c) saving clause does not stand in the way of finding that the conflicting provisions are preempted.

Furthermore, nothing in the decision limits it to digital performances; the District Court seems to have recognized a general public performance right for pre-1972 sound recordings. No state has ever before recognized such a right, which subjects an enormous number of parties to unexpected liability, including any radio station whose signal can be received in New York—a right that is specifically denied post-1972 sound recordings under federal law.[69] Such an enormous expansion of liability, in contradiction of federal law, only enhances the case for preemption under the Copyright Act. Thus, the Plaintiff-Appellee's requested state-law public performance right should have been preempted, and Sirius XM should not have been liable for transmitting its sound recordings to New York.

---

[69] *See id.* §§ 114(a), (d)(i).

21

III. **STATE-LAW DIGITAL PERFORMANCE RIGHTS CONFLICT WITH CONGRESS'S CAREFULLY BALANCED RESTRICTIONS ON AND REGULATION OF THE FEDERAL DIGITAL PERFORMANCE RIGHT.**

Even if the Court were to conclude that the conflict between state-law recognition of a public performance right in pre-1972 recordings and the general goal of uniformity underlying the federal Copyright Act is insufficient alone to justify preemption, the Court must still consider whether the Supremacy Clause preempts such state laws to the extent that they conflict with the compulsory statutory licensing provisions of § 114 of the Copyright Act.[70]

## A. The Section 114 Compulsory License Reflects Congress's Comprehensive Balancing of Competing Interests in Enacting a Digital Public Performance Right.

When Congress created the digital public performance right in the DPRA in 1995,[71] it at the same time created a complex, carefully balanced system for compensating copyright owners for uses implicating this right while protecting the public interest. The statutory scheme

---

[70] *Id.* § 114(d)(2).
[71] Pub. L. No. 104-39, 109 Stat. 336 (1995).

included a compulsory statutory licensing system for qualifying digital audio transmissions of sound recordings.[72]

As a general matter, compulsory statutory licenses have been created by Congress with regard to specific uses of specific types of works to allow for a more efficient mechanism in both guaranteeing public access to works and compensating copyright owners.[73] Such licenses impose a limitation on both the owner's ability to control access to the category of works and on the owner's ability to set a price for use of those works by others. As a result, statutory licenses inevitably reflect both a considered balancing by Congress of the rights of copyright owners and the rights of those who wish to use the works. Statutory licenses also require a carefully crafted system to define who qualifies for the license and how royalties will be determined and paid.

---

[72] 17 U.S.C. § 114(d)(2).

[73] *See, e.g.,* Harry G. Henn, THE COMPULSORY LICENSE PROVISIONS OF THE U.S. COPYRIGHT LAW 2, n.13 (General Revision of the Copyright Law, Study No. 5, Senate Subcomm. on the Judiciary) (Comm. Print 1956), *available at* http://www.copyright.gov/history/studies/study5.pdf (discussing § 1(e) of the 1909 Act). Today, Title 17 of the U.S. Code establishes several different types of statutory licenses, many of which apply to musical compositions or sound recordings and their uses in various media.

In the DPRA, Congress created an addition to the existing bundle of federal property rights in sound recordings for the benefit of copyright owners and performing artists, but ensured unimpeded access to these works by licensees in narrowly defined circumstances through a compulsory statutory license. This careful balancing in the drafting of statutory license provisions adopted under the DPRA is reflected both in the structure of § 114 of the Copyright Act and in the legislative history of the statute.

The statutory license established by § 114 is precisely tailored to accomplish its intended purpose: to authorize qualifying, radio-like digital services that perform a variety of sound recordings selected by the service (rather than by users) to digitally perform those sound recordings without a license from the copyright owners, provided that a statutory royalty is paid to the designated collective.[74] Section 114(d) specifically sets forth the limitations on the digital performance right in sound recordings established by the DPRA in § 106(6), including the creation of a statutory license for specified categories of digital audio services that

---

[74] *See* S. REP. NO. 104-128 at 16, 24 (1995).

transmit non-interactive public performances of sound recordings meeting a carefully delineated, detailed set of eligibility requirements.[75] Its structure reflects the congressional intent to address the potential impact of new digital music services on the recording industry, with a particular concern about the potential for interactive digital transmissions to serve as a substitute for record sales. Section 114 also reflects Congress's intent to avoid stifling technology or imposing unnecessary burdens on certain existing distribution services.[76]

Sections 114(e) through (j) address at length a variety of considerations and procedures relating to the implementation of this new statutory license, including:

- the authority for direct negotiations of licenses;[77]

- a limited antitrust exemption for collective negotiations of rates and terms under the statutory license;[78]

---

[75] 17 U.S.C. § 114(d)(2).

[76] S. REP. NO. 104-128 at 15–16; H.R. REP. NO. 104-274 at 14 (1995).

[77] 17 U.S.C. § 114(e).

[78] *Id.*

25

- detailed procedures for setting rates and terms for digital audio services eligible for statutory licensing;[79]

- specific instructions for how licensing proceeds are to be divided among both copyright owners and performers on sound recordings;[80] and

- placing limitations on licensing to affiliated entities.[81]

Overlaying the strict requirements for qualifying for the statutory license are a host of specific procedures and the creation of an administrative apparatus established in § 114(f) for determining rates for different types of licensees under the statutory license. The statute lays out standards to be applied when setting statutory rates and a detailed rate-setting process.[82] Although different standards are identified for different types of licensees, some of the factors to be used in setting digital streaming royalties for preexisting services (such as Sirius XM) under the statutory license are maximizing the availability of works to

---

[79] *Id.* § 114(f).
[80] *Id.* § 114(g).
[81] *Id.* § 114(h).
[82] *See* 17 U.S.C. § 114(f)(1)(A) & (B), (f)(2)(A) & (B).

26

the public, affording a fair return to copyright owners and a fair income to copyright users, and minimizing any disruptive impact on the relevant industries.[83]

Nowhere in the § 114 statutory license provisions or in the grant of a limited digital performance right in sound recordings in § 106(6) is there a reference to pre-1972 recordings. The provisions of § 114 and supporting analysis in the Senate and House reports were focused on establishing a streamlined compulsory license system that would both benefit owners and performers of sound recordings and simplify the licensing process for digital streaming services; Congress simply did not consider the possibility that state laws might place additional burdens on services complying with the federal statutory license for digital performances.

Both the Senate Report and House Report repeatedly noted the careful balance that the DPRA was striking between multiple competing interests.[84] It sought to create a narrowly defined revenue stream for owners of (and performers in) sound recordings whose livelihoods were

---

[83] *See id.* § 801(b)(1).

[84] S. REP. NO. 104-128 at 15–16; H.R. REP. NO. 104-274 at 14.

threatened by the advent of online access to and uncompensated downloads of musical recordings. Congress also sought to protect entities that were engaged in developing what has become one of the preferred sources of music listening for today's consumers—streaming services offering music to consumers in a manner similar to that of terrestrial radio. The statutory license was thus a necessary corollary to the new digital performance right, streamlining the licensing process for digital performances that were "radio-like" and thus were less likely to substitute for sales of recordings. The Senate Report stated,

> [T]he Committee has sought to address the concerns of record producers and performers regarding the effects that new digital technology and distribution systems might have on their core business without upsetting the longstanding business and contractual relationships among record producers and performers, music composers and publishers and broadcasters that have served all of these industries well for decades. Accordingly, the Committee has chosen to create *a carefully crafted and narrow performance right,* applicable only to *certain* digital transmissions of sound recordings.[85]

---

[85] S. REP. NO. 104-128 at 13, *quoted in and emphasis added by Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 497 (3d Cir. 2003); *see also* H.R. REP. NO. 105-796 at 79–80 (1998) (Conf. Rep.) (stating that later amendments to §§ 112 & 114 of the Copyright Act were "intended to achieve two purposes: first, to further a stated objective of Congress when it passed the [DPRA] to ensure that recording artists and record

28

The intent of Congress to reconcile competing interests in light of changed circumstances in the music industry is a repeated theme in the legislative history:

> The limited right created by this legislation reflects changed circumstances: the commercial exploitation of new technologies in ways that may change the way prerecorded music is distributed to the consuming public. It is the Committee's intent to provide copyright holders of sound recordings with the ability to control the distribution of their product by digital transmissions, without hampering the arrival of new technologies, and without imposing new and unreasonable burdens on radio and television broadcasters, which often promote, and appear to pose no threat to, the distribution of sound recordings.[86]

The Senate Report discussed "the need to strike a balance among all of the interests affected" by the new performance right, with that balance "reflected in various limitations on the new performance right" set forth in the DPRA.[87] It further expressed the need for the legislation to address concerns about the performance right making it

---

companies will be protected as new technologies affect the ways in which their creative works are used; and second, *to create fair and efficient licensing mechanisms that address the complex issues facing copyright owners and copyright users* as a result of the rapid growth of digital audio services") (emphasis added).

[86] S. REP. NO. 104-128 at 15.

[87] *Id.* at 15–16.

"economically infeasible for some transmitters to continue certain current uses of sound recordings."[88]

Both the House and the Senate Report reflect the belief of Congress that a performance right in sound recordings was necessary to protect recording artists and record companies, but that the right needed to be limited to allow the public to benefit from new digital transmission technologies and to "strike a balance among all of the interests" affected by the new right.[89] Because of the anticipated continued advancement of digital transmission technology, both reports stated the intent that "both the rights and exemptions and limitations created by the bill be interpreted in order to achieve their intended purposes."[90]

Throughout the legislative history of the DPRA, the baseline presumption was that except for those uses that fell within the digital performance right under federal law, other performances of sound recordings remained in the public domain and were freely permitted without any payment obligation to the owner. Reports of the Copyright

---

[88] *Id.* at 16.
[89] *Id.* at 14; *see also* H.R. REP. NO. 104-274 at 13 (1995).
[90] S. REP. NO. 104-128 at 14; H.R. REP. NO. 104-274 at 13.

Office demonstrate a similar understanding of pre-DPRA law as permitting radio stations to perform sound recordings freely without any payment obligation. Based on the compulsory statutory licensing system established by Congress in 1995, satellite and digital radio services grew and flourished, with business models relying on the absence of the need for individual licensing negotiations with sound recording owners.

### B. Because a State-Law Digital Performance Right Conflicts with the Federal Compulsory License for Digital Audio Transmissions, It Should Be Preempted Under the Supremacy Clause.

Allowing owners of pre-1972 works to assert state law digital performance rights directly conflicts with the purposes and objectives of the federal compulsory license in § 114(d)(2), because it requires digital streaming services that qualify for the federal compulsory license to negotiate separate licenses with individual owners of pre-1972 sound recordings based on a patchwork of differing state laws, for performances that are not specific to any one state but that are available everywhere that a satellite radio or Internet connection exists. In other words, even when a streaming service meets the rigorous requirements for a statutory license under § 114, it would still be required to check

31

millions of sound recordings with tens of millions of owners and performers against fifty-plus state regimes to determine whether any further licenses were needed beyond the federal statutory license.

The Court's reasoning in *Capital Cities Cable, Inc. v. Crisp*[91] so precisely fits the current situation that it bears quoting at length:

> In revising the Copyright Act . . . , Congress concluded that cable operators should be required to pay royalties to the owners of copyrighted programs retransmitted by their systems on pain of liability for copyright infringement. At the same time, Congress recognized that "it would be impractical and unduly burdensome to require every cable system to negotiate [appropriate royalty payments] with every copyright owner" in order to secure consent for such retransmissions. [from the footnote: "In developing this approach, Congress was aware that cable operators would face virtually insurmountable technical and logistical problems if they were required to block out all programs as to which they had not directly obtained copyright permission from the owner."] Section 111 of the 1976 Act codifies the solution devised by Congress. It establishes a program of compulsory copyright licensing that permits cable systems to retransmit distant broadcast signals without securing permission from the copyright owner and, in turn, requires each system to pay royalty fees to a central royalty fund based on a percentage of its gross revenues. . . .
>
> In devising this system, Congress has clearly sought to further the important public purposes framed in the Copyright Clause, U.S. Const., Art. I, § 8, cl. 8, of rewarding the creators of copyrighted works and of "promoting broad public availability of literature, music, and the other arts." Compulsory licensing not only

---

[91]  467 U.S. 691 (1984).

protects the commercial value of copyrighted works but also enhances the ability of cable systems to retransmit such programs carried on distant broadcast signals, thereby allowing the public to benefit by the wider dissemination of works carried on television broadcast signals. By requiring cable operators to delete commercial advertisements for wine, however, the Oklahoma ban forces these operators to lose the protections of compulsory licensing. Of course, it is possible for cable systems to comply with the Oklahoma ban by simply abandoning their importation of the distant broadcast signals covered by the Copyright Act. But such a loss of viewing options would plainly thwart the policy identified by both Congress and the FCC of facilitating and encouraging the importation of distant broadcast signals.[92]

As it did with cable, Congress foresaw the problems creating a new digital performance right in sound recordings would present in licensing rights for national digital transmissions and so enacted a comprehensive statutory licensing scheme.[93] The *Capital Cities* Court's reasoning regarding preemption of state laws interfering with the compulsory license for cable retransmissions applies equally to state laws interfering with the compulsory license for digital public performances of sound recordings. Compulsory licenses by their nature are designed to make individual licensing unnecessary; state laws that would add individual

---

[92] *Id.* at 709–11 (citations and footnotes omitted).
[93] *See* 17 U.S.C. § 114(d)–(j).

33

licensing burdens to entities eligible for the federal compulsory license stand as obstacles to that design.

The application of conflict preemption principles in this situation—where Congress has stepped in with a comprehensive federal program after courts had previously ruled that state laws were not preempted—is also implicated by the Supreme Court's analysis in *Arizona v. United States*.[94] There, the Court considered whether certain provisions of an Arizona statute aimed at addressing the problem of illegal immigration were preempted under the Supremacy Clause.[95] Of particular relevance here is the Court's discussion of section 5(C) of the Arizona law, which made it a misdemeanor for unauthorized aliens to "apply for work, solicit work in a public place, or perform work as an employee or independent contractor" in Arizona.[96] Before there had been any "comprehensive federal program regulating the employment of unauthorized aliens,"[97] the Court had upheld a California statute regulating employment of aliens against a preemption challenge, finding

---

[94] 132 S. Ct. 2492 (2012).
[95] *Id.* at 2497.
[96] *Id.* at 2503.
[97] *Id.*

34

that "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State."[98] However, at the time, "the Federal Government had expressed no more than 'a peripheral concern with [the] employment of illegal entrants.'"[99] In *Arizona*, the Court found that because federal law had changed and a comprehensive framework relating to employment of illegal aliens had been put into place, with a deliberate choice by Congress to not impose criminal penalties on aliens who seek to work in the U.S., the Arizona law "would interfere with the careful balance struck by Congress."[100]

As *Goldstein* recognized and as § 301(c) confirms, the states possess some authority to protect pre-1972 sound recordings. However, just as the states' interest in regulating employment in *Arizona* did not outweigh a subsequently enacted federal regime when specific state laws interfered with the ability of the federal law to accomplish its objectives, neither

---

[98] *Id.* (citing *De Canas v. Bica*, 424 U.S. 351, 356 (1976)).

[99] *Id.* (quoting *De Canas*, 424 U.S. at 360).

[100] *Id.* at 2504–05. The Court also found that the existence of an express preemption provision in the relevant federal statute had no affect on the Supremacy Clause preemption analysis. *Id.*

35

should states' continuing interests in and power to protect pre-1972 recordings be permitted to interfere with the goals and objectives of the national compulsory licensing regime enacted by Congress for digital performances of sound recordings.

## CONCLUSION

This case presents important issues under the Supremacy Clause of the U.S. Constitution that this Court should consider. Although § 301(c) of the Copyright Act saves state-law protections for pre-1972 sound recordings from express statutory preemption, it does not prevent the application of ordinary conflict preemption principles. The state-law digital performance right that the District Court recognized conflicts with Congress's goal of national uniformity for copyright law. It also interferes with Congress's carefully delineated parameters and restrictions on the federal digital performance right and related statutory license that resulted from balancing the many and varied interests implicated by the right. Enforcement of these conflicting state laws should therefore be preempted under the Supremacy Clause.

*Amici* are quite sympathetic to the desire of Plaintiff-Appellee to receive compensation for the digital performance of their pre-1972 sound recordings commensurate with that received by owners of post-1972 sound recordings. The music industry is in a period of substantial transition, with digital streaming revenues recently surpassing sales of physical compact discs and approaching revenues from digital downloads. Although owners and performers of pre-1972 sound recordings have justifiable complaints about exclusion from some parts of this growing revenue stream, only Congress is in a position to evaluate how the interests of owners of pre-1972 recordings can best be balanced with all other interested parties. Individual state laws addressing digital performance rights post too great a risk to the delicate balance struck by Congress in the DPRA.

Dated: August 4, 2015

Respectfully Submitted

By:  /s/ Brandon Butler

Brandon Butler
American University Washington College of Law
4801 Massachusetts Avenue, N.W.
Washington, DC 20016
(202) 274-4165
bbutler@wcl.american.edu
*Counsel of Record for Amici Curiae*

37

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)

I certify that the foregoing Brief complies with the type-volume limitations of the Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6955 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

I certify that the foregoing Brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2011 in 14-point font of Garamond type style.

Dated: August 4, 2015          By: /s/ Brandon Butler

Brandon Butler
American University Washington College of Law
4801 Massachusetts Avenue, N.W.
Washington, DC 20016
(202) 274-4165
bbutler@wcl.american.edu
*Counsel of Record for Amici Curiae*